| OHANA GROWTH PARTNERS, LLC | IN THE |
|---|---|
| *Plaintiff,* | CIRCUIT COURT |
| | FOR |
| vs. | BALTIMORE COUNTY |
| RYAN DILLON-CAPPS | CASE NO: C-03-CV-24- |
| *Defendant.* | 002264 |

## AFFIDAVIT OF HARM,

I, Ryan Dillon-Capps, being over the age of eighteen (18) and competent to testify, and having personal knowledge of the facts contained herein, state as follows:

### A  Due Process Denied

1        During the **June 26th and 27th hearings**, **Judge Barranco** informally evaluated my **mental health** and concluded that I was **not sufficiently disabled**, disregarding the complexity of my condition. As I continue to review the **transcripts** of these hearings, it is clear that my **memory of that day** is incomplete and fragmented. In fact, reading the transcript feels more like reading about someone else's experience rather than recalling something I lived through, illustrating the depth of my **cognitive impairments**.

2        This lack of **full recollection** underscores the fact that I was not in a condition to effectively participate in the hearings. The court's failure to recognize or accommodate my mental state during these proceedings is a clear violation of my **due process rights**. **Due process**, as guaranteed by the **Fourteenth Amendment**, ensures that parties have the right to

          EXHIBIT   106

fully participate in legal proceedings. In **Mathews v. Eldridge**, 424 U.S. 319 (1976), the **U.S. Supreme Court** ruled that due process requires meaningful participation, which was denied to me due to the court's failure to properly address my condition.

3    By continuing the proceedings without appropriate accommodations for my **mental health**, the court failed to uphold its obligations under the **Americans with Disabilities Act (ADA)**. The ADA requires that individuals with disabilities be provided reasonable accommodations to ensure equal access to justice. In my case, the court neither acknowledged my condition nor provided the necessary accommodations, further contributing to my inability to fully engage with the legal process.

## B    Anatomical Harm or Actual Harm

4    We are not merely bodies connected to a brain; we **are** our brains. The body is the collection of things we are connected to, yet when those parts are harmed, we often say **we** are harmed. However, when we, as **the brain**, are the ones injured—when **our mind** suffers—the law frequently diminishes the significance of that harm. Rather than acknowledging the core of the harm, the law tends to focus on the physical or anatomical damage to the body and grants more substantial recognition, and often greater financial compensation, for those harms.

5    We draw distinctions like "mental illness" versus "illness," but perhaps the more accurate framing is that **illness** describes when **we**—our core, our brain—are unwell, while **anatomical illness** refers to when parts of the body are in disrepair. The very word "anatomical" comes from the Greek "anatome," where "ana" means **apart**, and "tome" means **to cut** or **to incise**. Historically, this suggested that the body is simply **pieces of us that are apart from us**—extensions, not the essence.

6       In my case, it is important to recognize that I was harmed—not just **anatomically** but **fundamentally**. My **brain**—which **is** me—was harmed. Reading the transcript is a stark reminder of this fact. It feels less like I am recalling a memory and more like I am reading about the experience of someone else, as my memory from that day remains incomplete. This should emphasize that the harm I experienced is no less significant than what is typically considered "physical" injury. It is, in fact, **actual harm** to the brain—the most integral part of **who I am**.

7       Furthermore, when **Judge Barranco** attempted to evaluate my health on **June 26th and 27th**, it was clear that such a determination was made without the necessary training or expertise to properly assess the state of my mental health. This underscores a larger systemic issue: how many others have been denied basic rights and recognition of harm due to a similar lack of understanding about the human brain?

8       It is crucial to remember that under **Titles I, II, and III of the ADA**, the question of disability and the need for accommodation are **not the court's decision to make** without proper medical evidence. Judges are not tasked with determining disability; the law already provides clear guidelines, removing the burden of such determinations from them. In my case, **medical documentation** was submitted to **Judge Truffer** on **June 18th**, and by **June 26th and 27th**, no further inquiry into my health was warranted. Yet I was subjected to an inquisition, as was my wife, who had to testify about witnessing my struggles. The pain I felt listening to her account was profound, and while the record captures only my words—"**I'm sorry**"—that moment held much more.

9       The record does not fully reflect the harm—mental and emotional—that stood before **Miles & Stockbridge**, **Richard Hartman**, **Justin Drummond**, and the **court** itself. My

Page **3** of **8**

injury was not merely **anatomical**, and it is essential to recognize that harm to the brain is not a lesser harm but an equally substantial, if not more profound, injury than any that may be inflicted on the body.

## C    Missing Context

### Twitching, Shaking, and Winning

10    I walked into the courtroom on that day, carrying bags of papers, and I remember consciously trying to **look less injured**. I was trying to minimize the tremor-like shaking in my hands and arms as I clenched and stretched my fingers, seeking some futile relief. As my neck pulled, manifesting a tick-like twitch, my focus would shift from my hands to the courtroom around me, wondering if anyone was watching. I was embarrassed, but I forced myself not to show it.

11    If this were an **anatomical injury**, one might picture blood spilling all over the table and the floor, and the absurdity of someone thinking, "I sure hope no one is staring at me right now." The thought that anyone would focus on my behavior, instead of the very real evidence of my harm, seems ridiculous. Yet, that is the reality of the world we live in—where **mental or financial harm** is diminished, and instead of receiving help, people are told they don't seem injured enough. What stands out most from that day is **Judge Barranco's conclusion**: that I wasn't injured enough, and that my injuries didn't merit the same level of consideration as someone without them. His basis for this conclusion? The fact that I had articulated one part of one motion.

12    When I read back what I said that day, I realize I didn't need to say much more. Even without considering my injury, I should have walked out of the courtroom with the case

dismissed. There were **three different reasons** for the case to be moved to **federal court**: the

**Family and Medical Leave Act (FMLA)**, as I had given advance notice before any action was

taken against me; the **Americans with Disabilities Act (ADA)**, since taking a day off for health

reasons is more than reasonable; and finally, **FTC v. Wyndham**, which provides clear precedent

for security and compliance issues. These legal principles should have been enough to end the

case then and there, yet the harm was allowed to continue.

13      The argument presented by the opposing party was essentially this: **PCI**

**Compliance** was treated as a mere **contractual obligation**, and they speculated that potential

harm might occur at some future point, without offering any concrete evidence. Based on this

speculative harm, they insisted that I had breached the contract by refusing to act against it. Their

demand was that I violate **multiple contractual obligations** by assigning access without

justification or defense. When I refused to comply, they threatened a **retaliatory lawsuit**,

pushing the narrative that unless I agreed to breach the contract, they would claim I had breached

my contract with them. Remarkably, this twisted logic held up for months.

14      The record shows that for **three months**, this argument prevailed. When I

challenged the involvement of **Hartman Executive Advisors**, their representative, **Daniel**

**Levett**, claimed that they had been involved all along and had simply chosen to ignore my

emails—correspondence that would have provided satisfaction if addressed. This was yet another

example of **Estoppel**—a tactic regularly employed by **Miles & Stockbridge** to fabricate a basis

for their arguments. Levett's other statement was equally troubling: He accused me of being a

liar due to my **memory issues**, despite knowing full well that my condition affected my recall.

They further contradicted themselves by first claiming that **no one had access**, only to then

argue that I had failed to grant access, even though it had already been granted. This type of manipulation is indicative of the fraudulent nature of this entire lawsuit.

15      It is hard not to feel cynical about this process. I don't believe I even needed to show up to court or to know that this lawsuit existed. In fact, **Miles & Stockbridge** did such a thorough job **disproving their own arguments**—filing incomplete contracts and **perjured statements**, which even included **admissions of guilt**. The real question is, why did they join me to this case? The answer is simple: **Harm**. Their intent from the start has been to **inflict harm** on me—on my **reputation**, on my **financial base**, and on my ability to function, stripping me of the means to live my life.

16      They remain successful in this goal. I have been reduced to a state where I am imprisoned by inaction, forced to watch as my financial base **bleeds out** slowly. As the days pass, I edge closer to the **catastrophic moment** when no action can reverse the damage, because you **cannot undo death**. And not all forms of death involve **anatomical harm**. One can be **financially bled to death**, and society will watch, telling you it's okay because it's just blood— implying that as long as you **had** blood, the fact that you're bleeding now is not a problem.

17      It has now been **45 days** since I filed my **Opposition to the Request for Entry of Default Order**, and **112 days** since **Miles & Stockbridge** first advanced their **retaliatory** and baseless claims. They did so without presenting **particularized harm**, **causation**, or **complete contracts**, all while the admissions in the record reveal the true nature of this case. Despite the clear evidence of bad faith, I am left waiting as this harm drags on, with no resolution in sight.

18      To further demonstrate the lack of necessity for me to be a party of this lawsuit, I am including an extract of every communication form ryan@mxt3.com that is includes someone

Page **6** of **8**

from @milesstockbridge.com.  All signatures and redundancy have been removed by automation

and line breaks are inserted to show each email as it is by itself.  Additionally, it is sorted not by

conversation by as a timeline so regardless of any attempt to hide the context of the conversation

it is seen in order with its context maintained.  Ohana Growth Partners and Miles & Stockbridge

will change subject headers, reply to a different thread, new threads, and even try to slip in

changes.

## DECLARATION OF AFFIRMATION

I SOLEMNLY DECLARE AND AFFIRM UNDER PENAL TIES OF PERJURY AND
UPON PERSONAL KNOWLEDGE THAT THE CONTENTS OF THE FOREGOING PAPER
AND EXHIBITS THERETO ARE TRUE.

October 4, 2024                                        s/ Ryan Dillon-Capps
                                                      Ryan Dillon-Capps (Pro Se)
                                                      Email: ryan@mxt3.com
                                                      1334 Maple Avenue
                                                      Essex, Maryland 21221
                                                      Telephone: (703) 303-1113



Hotel & Conference Center

5625 O'Donnell Street

Baltimore, MD 21224

Fax:     (410)633-4314

Email:   FrontDesk@BWHotelBaltimore.com

Phone:   (410)633-9500

Web:     WWW.BWHOTELBALTIMORE.COM

| Confirmation # 594206 | BWR Tier:     BASE | | Date/Time Booked | 6/14/2024 10:02:40 AM |
|---|---|---|---|---|
| CRS Conf # | BW 247968219-01 | | | |

| | | | | |
|---|---|---|---|---|
| Guest Name | DILLON, CAROLINE | Arrival Date | 6/14/2024 | |
| Address | 1334 MAPLE AVE | Departure Date | 6/15/2024 | |
| City/State/Postal | ESSEX, MD 21221 | Adults/Children O/U | 2 /0 /0 | |
| Phone | 8136940598 | | | |
| Email | cdillon0428@gmail.com | | | |
| Room Type | EXEC JACZ MIRROR WALL | | | |
| Late Arrival Gtd By | Credit Card | | | |

| Room Rate | Date | Rate |
|---|---|---|
| | 6/14/2024 | $275.00 |

| | |
|---|---|
| Total Stay W/Tax | $323.13 |
| Deposit Amount Required | $0.00 |
| Deposit Amount Paid | $0.00 |
| Deposit Amount Due | |
| Deposit Due Date | |
| Guarantee Policy | GTD |
| Cancellation Policy | 24H |
| Group Name | |
| Special Requests & Packages | |
| Information | |

## Company Information

Company Name

Address

City/State/Postal     ,

Phone

## Travel Agent Information

Agency Name

Phone

IMPORTANT NOTICE:

This is to confirm that your reservation is at Best Western PLUS Hotel & Conference Center. If you need to cancel this reservation you may do so by canceling by 4:00PM day before arrival to avoid partial or full charge. For third party or pre paid reservations please check with booking agency for cancellation policy. In order to check in we MUST have Credit/Debit card or Cash as a form of payment along with state issued ID. If you use Credit Card full stay amount will be authorized in addition to a deposit of $150 and If you use Debit Card full stay amount will be charged at check in and there will be $150 additional authorization place on Debit card or you have choice to pay $150 cash deposit. Any unused authorization will take anywhere between 3-15 business days to release depending on your financial institution for which we have no control over.

Each BWH℠ Hotels property is independently owned and operated.

EXHIBIT 106

We look forward to your next visit.

 **Holiday Inn** AN IHG HOTEL

Make a Reservation   IHG One Rewards   Need Help?

# *We hope you enjoyed your stay at Holiday Inn Belcamp - Aberdeen Area*

As requested, here is a copy of your hotel bill.

> **View Details**

 **Holiday Inn**

## *Hotel Information*

Belcamp - Aberdeen Area
1326 Policy Drive
Belcamp MD 21017

**Front desk:** 14102722929

## *Billing Information*

Caroline Dillon
1334 Maple Ave
Essex MD 21221
US

**Folio Number:**        64697
**Confirmation Number:**   65123850

## *Room Summary Information*

| | |
|---|---|
| **Room:** | 355 |
| **Check-in Date:** | Sat 15 Jun 2024 |
| **Check-out Date:** | Sun 16 Jun 2024 |

EXHIBIT  106







EXHIBIT   106



EXHIBIT   106



EXHIBIT   106



EXHIBIT 106



EXHIBIT  106

| | |
|---|---|
| **OHANA GROWTH PARTNERS, LLC** | **IN THE** |
| *Plaintiff,* | **CIRCUIT COURT** |
| VS. | **FOR** |
| **RYAN DILLON-CAPPS** | **BALTIMORE COUNTY** |
| *Defendant.* | **CASE NO: C-03-CV-24-002264** |

### AMENDED MOTION FOR MANDATORY INJUNCTION TO RESTORE LOST PAY DUE TO FINANCIAL URGENCY

1    Defendant, Ryan Dillon-Capps, hereby submits this Amended Motion for Mandatory Injunction to Restore Lost Pay Due to Financial Urgency and states as follows:

### I  INCORPORATED BY REFERENCE

2    Ryan Dillon-Capps incorporates and adopts by reference all factual averments, arguments, and documents contained in all of the Defendant's motions, affidavits, petitions, notices, amendments, exhibits, and other papers filed or submitted in this case, regardless of their current status (pending, denied, granted, or otherwise), pursuant to Md. Rule 2-303(d) ("Statements in a pleading or other paper of record may be adopted by reference in a different part of the same pleading or paper of record or in another pleading or paper of record."). This incorporation includes, but is not limited to, any filings made contemporaneously with or subsequent to this motion, ensuring that all submissions are considered as part of the record for purposes of this proceeding, in real time.

Page **1** of **35**

3    **Reservation of Rights:** The Defendant reserves the right to amend, withdraw, or exclude any specific filing, document, or factual averment from this comprehensive incorporation at any point, by submitting a formal notice or motion to the Court.

## II  LEGAL ARGUMENT FOR FILING AN AMENDED MOTION WITHIN 30 DAYS OF FILING AND BEFORE THE SCHEDULING OF A HEARING

4    **Maryland Rule 2-341(a)** provides that a party may amend a motion or pleading **once as a matter of course** without leave of court if the amendment is filed within **30 days of the original filing** or **before the scheduling of a hearing**. This rule is intended to give parties the opportunity to adjust their filings during the early stages of litigation, allowing for the inclusion of **newly discovered facts**, **clarified legal arguments**, or **additional evidence**, without unnecessary procedural hurdles.

### TIMELY AMENDMENT UNDER MARYLAND RULE 2-341(A)

5    The Defendant's **Amended Motion**, originally filed on **October 15**, is being submitted on **October 21**, well within the **30-day period** permitted by **Rule 2-341(a)**. This filing is timely and does not require leave of court, as it is being filed **before any hearing has been scheduled** on the motion.

6    In **Schmerling v. Injured Workers' Ins. Fund**, 368 Md. 434, 794 A.2d 720 (2002)**, the Maryland Court of Appeals held that amendments should be **liberally allowed** in the early stages of litigation, as long as they do not cause undue delay or prejudice. The Defendant's amended motion consolidates existing legal arguments and expands on them, providing a more complete and thorough review of the facts in advance of any hearings, thus serving the interests of justice.

Page 2 of 35

## PURPOSE OF RULE 2-341(A) – FAIRNESS AND JUDICIAL EFFICIENCY

7       **Rule 2-341(a)** is designed to promote fairness and efficiency by allowing parties to refine or expand upon their pleadings and motions before significant procedural steps are taken. This amendment consolidates and clarifies the Defendant's legal and factual arguments, allowing the court to address all relevant issues in a single, organized filing. The Maryland courts have emphasized that early amendments foster **judicial efficiency** and prevent unnecessary delays (**See State v. Williams**, 326 Md. 367, 605 A.2d 103 (1992)).

8       In this case, the Defendant is amending the motion to ensure that all arguments are **consolidated** and **expanded** in one filing. This amendment is necessary to provide the court and the Plaintiff with a **complete review** of the facts and legal bases supporting the Defendant's position. Notably, this amendment follows the **urgent hearing ruling on October 11**, which was related to a separate filing on October 8. The **urgent hearing** ordered by the desk of the administrative judge has yet to be scheduled. Therefore, this amended motion ensures the court has a comprehensive understanding of the Defendant's arguments prior to any hearings.

## NO PREJUDICE TO THE PLAINTIFF

9       This amendment causes no prejudice to the Plaintiff, as it is being filed **before the scheduling of any hearing** and consolidates existing arguments without raising new issues. **Davidson v. Katz**, 254 Md. 69, 254 A.2d 700 (1969),** makes clear that amendments should be granted as long as they do not unfairly prejudice the opposing party. Here, the Plaintiff has ample time to review and respond to the amended filing prior to any scheduled hearings.

10      The Plaintiff will not be unfairly disadvantaged by this amendment, as it merely clarifies

and organizes the legal and factual arguments already raised in prior filings, allowing for a more

complete and organized presentation of the Defendant's case.

## JUDICIAL EFFICIENCY AND THE PENDING URGENT HEARING

11      Amending the motion at this stage promotes **judicial efficiency**, especially in light of the

**unscheduled urgent hearing**, which was ordered by the desk of the administrative judge but has

not yet been scheduled. As recognized in **Veney v. Prince George's County**, 248 Md. App. 101,

240 A.3d 303 (2020), early amendments to motions help streamline litigation and ensure that the

court and opposing parties have the most up-to-date and complete information prior to hearings.

12      By filing this amended motion, the Defendant ensures that the court has a **single,**

**consolidated filing** that addresses all relevant facts and legal arguments, avoiding confusion and

preventing the need for multiple filings. The amendment also allows the court to review all

relevant arguments in one filing prior to any scheduled hearings, making the process more

efficient.

## FILING BEFORE THE SCHEDULING OF A HEARING

13      **Maryland Rule 2-341(a)** permits amendments to be filed **before any hearing is**

**scheduled**. Although the court issued a **ruling** on a separate issue on **October 11** following the

filing on **October 8**, no hearing has been scheduled in connection with the Defendant's motion

filed on **October 15**. As a result, the amended motion is timely and appropriate under the rule.

14      In **City of Frederick v. Pickett**, 392 Md. 411, 897 A.2d 228 (2006),** the court

confirmed that amendments filed before hearings are especially appropriate when they serve to

EXHIBIT   106

consolidate and clarify arguments, thus ensuring that both parties have a full understanding of the issues before appearing in court. Filing this amended motion now allows the court and the Plaintiff to engage with the **most accurate and complete legal arguments** without procedural complications.

<p style="text-align:center">CONCLUSION</p>

15      Under **Maryland Rule 2-341(a)**, the Defendant has the **right to amend** the motion as a matter of course within **30 days of the original filing** (October 15) and **before the scheduling of any hearing**. This amended motion consolidates and expands upon the existing arguments to ensure that the court and the opposing party have a comprehensive understanding of the facts and legal positions. This amendment also promotes **judicial efficiency**, particularly in light of the **unscheduled urgent hearing** ordered following the court's ruling on **October 11**. As no hearing has been scheduled on this amended motion, and no prejudice will result to the Plaintiff, this filing is appropriate and timely under **Rule 2-341(a)**.

<p style="text-align:center">III    Motion for Mandatory Injunctive Relief</p>

16      Defendant Ryan Dillon-Capps, pursuant to Maryland Rule 15-501 et seq., respectfully moves this Court for Mandatory Injunctive Relief to address the immediate financial harm being suffered due to the wrongful actions of the Plaintiff, Ohana Growth Partners, LLC, and states the following:

<p style="text-align:center">IV    FACTUAL BACKGROUND</p>

<p style="text-align:right">Page 5 of 35</p>

17      Defendant, **Ryan Dillon-Capps**, has suffered **severe financial and reputational harm** as a direct result of Plaintiff **Ohana Growth Partners, LLC**'s **bad faith actions**, including the wrongful suspension and withholding of critical compensation and benefits. This harm has occurred at a crucial time when the Defendant was preparing to launch a business based on the **Three-Stage Evolution of Technology Model (TSETM)**, a predictive model designed to leverage **natural language processing (NLP)** technology for revolutionary business solutions.

18      The **TSETM model** successfully predicted the maturation of NLP technologies, such as **GPT models**, and identified **2024** as the optimal time for launching a business venture aimed at capitalizing on this technological wave. The Defendant's business, positioned to use this cutting-edge model, was set to drive **global social and economic impact**. However, the Plaintiff's actions, which include **wrongful termination**, withholding of **refinancing bonuses**, and dissemination of **defamatory statements**, have disrupted this opportunity and led to **irreparable harm**.

19      Plaintiff's conduct has resulted in the following:

20      **Loss of business opportunities**: The Defendant's business, based on the **TSETM model**, was on the verge of launch in **2024**, but Plaintiff's actions have caused the loss of key investors and partners who are now distancing themselves due to the litigation.

21      **Severe financial strain**: Plaintiff's refusal to compensate the Defendant, including withholding bonuses during the **April-July 2024** period, has placed the Defendant at risk of **default** and caused substantial financial hardship.

22      **Exacerbation of mental health conditions**: The stress and financial uncertainty resulting from Plaintiff's conduct has aggravated the Defendant's pre-existing **Post-Traumatic**

Stress Disorder (PTSD), leading to **physical and cognitive impairments**, including **memory issues** and periods of **catatonia**.

23     On **October 11, 2024**, the court entered a ruling related to a prior filing made on **October 8**, ordering a **10-day unscheduled urgent hearing**. In light of this hearing, and to ensure that all relevant arguments and facts are consolidated, the Defendant now seeks to amend the original motion filed on **October 15, 2024**, providing the court with a comprehensive review of the claims and the **irreparable harm** caused by Plaintiff's continued **bad faith conduct**.

## V  LEGAL STANDARD FOR INJUNCTIVE RELIEF

24     **Under Maryland Rule 15-501 et seq.**, a party seeking **injunctive relief** must demonstrate that **irreparable harm** is imminent, and that there is **no adequate remedy at law**. In this case, Defendant **Ryan Dillon-Capps** faces immediate and significant financial harm directly caused by the **Plaintiff's wrongful conduct**, including the **wrongful suspension of pay**, the withholding of critical bonuses, and the ongoing pursuit of **baseless claims**.

25     **Without the court's intervention** through **mandatory injunctive relief**, the Defendant will suffer irreparable harm, as the loss of business opportunities, financial hardship, and the aggravation of severe health conditions cannot be adequately remedied by a monetary award after the fact.

26     The **urgent nature** of this harm is underscored by the **October 11, 2024 ruling**, which ordered a **10-day unscheduled urgent hearing** based on the Defendant's financial emergency. This ruling, following the **October 8, 2024 filing**, highlights the immediate need for relief to prevent further financial collapse. Despite the court's attention to the urgent circumstances, a hearing has not yet been scheduled, leaving the Defendant exposed to continued harm.

27      Furthermore, this amended motion consolidates the **Defendant's legal and factual arguments** that have been presented in prior filings, while expanding upon them to provide the court with a **comprehensive review** of the claims. Given that no hearing has yet been scheduled, this amendment ensures that all critical facts and legal arguments are presented in one coherent filing, promoting **judicial efficiency**.

28      Defendant has demonstrated that without immediate injunctive relief, there will be **irreparable harm**, including:

1.      The imminent loss of business opportunities tied to the **TSETM model**, as key investors and partners have withdrawn support due to the Plaintiff's actions.

2.      Significant financial strain caused by the **withholding of compensation** and bonuses, placing the Defendant at risk of **default** and inability to meet basic obligations.

3.      Aggravation of the Defendant's **mental and physical health**, particularly his **PTSD**, which has resulted in **cognitive impairment** and further undermines his ability to recover.

4.      The granting of this motion is essential to protect the Defendant's **business, personal assets, and health**, which are at risk of permanent damage without immediate court intervention.

## VI  FINANCIAL URGENCY AND IMMINENT HARM

29      As detailed in the Affidavit of Financial Urgency, submitted in Envelope 18415895,

*(if the unredacted versions of the exhibits are not visible to the Court – they will be submitted at the upcoming urgent hearing)*

30      **Defendant is facing irreparable harm that cannot be fully compensated through monetary awards**. The Defendant's business and personal assets are at immediate risk of being lost due to the financial strain caused by the Plaintiff's wrongful actions. Over the course of 15 years, the Defendant has invested his life savings and significant personal funds into a business model based on the **TSETM model**, which had begun to materialize successfully by March 2023. The Plaintiff's wrongful suspension of pay, coupled with the continued pursuit of baseless legal claims, has severely undermined key business relationships and **disrupted introductions to critical investment pools**. These relationships were essential not only for securing funding but also for developing **pitch decks** and other preparatory materials required for the business launch in 2024. The Defendant's ability to leverage these partnerships for the success of his venture has now been destroyed due to the false representations and public defamation caused by this litigation.

31      The **business opportunities** lost due to the Plaintiff's actions include the **collapse of valuable introductions** facilitated by individuals who had been supporting the Defendant's reputation and business idea. These individuals were pivotal in securing **access to their investment pool** and actively participated in **preparing pitch materials** for potential investors. However, due to the false and defamatory nature of the lawsuit, these introductions and opportunities have been withdrawn, causing irreparable harm to the Defendant's ability to launch his business. Furthermore, as outlined in the **Affidavit of Harm**, the Defendant's severe PTSD, dissociative episodes, and memory impairments have rendered him unable to manage the damage, leading to further financial losses and the collapse of a **15-year business development plan**.

Page **9** of **35**

32      The **Plaintiff's law firm**, **Miles & Stockbridge**, has no similar burden, as they are

financially supported by the Plaintiff and benefit from the prolongation of litigation.

33      The Plaintiff's continued **wrongful suspension** of the Defendant's pay and refusal to

engage in **good faith negotiations** has created a situation in which the Defendant is facing

**imminent financial destruction**. Under **Maryland law**, mandatory injunctive relief is

appropriate when the **financial harm** is not only severe but **irreparable**, and where monetary

damages at a later stage will not suffice to remedy the ongoing harm. The Defendant's **Affidavit**

**of Financial Urgency** details the extensive financial damage and emotional distress and

highlights the Plaintiff's use of **procedural delays** to **strategically disadvantage** the Defendant.

34      Monetary compensation at the end of this litigation will not suffice to reverse the damage

caused by the Plaintiff's **intentional delays**. The loss of **business standing**, reputation, and the

Defendant's inability to pay critical expenses require **immediate court intervention**. Without

mandatory injunctive relief, the Defendant's financial situation will deteriorate to the point of **no**

**recovery**.

35      **The Defendant's mental and emotional well-being has been significantly affected by**

**the Plaintiff's wrongful conduct**, which includes continued litigation and defamatory public

records. The emotional and psychological stress caused by Plaintiff's bad faith actions—such as

wrongful suspension, the withholding of compensation, and the baseless lawsuit—has triggered

severe manifestations of the Defendant's **Post-Traumatic Stress Disorder (PTSD)**. These

symptoms now include not only anxiety and panic attacks but also episodes of **catatonia** and

**severe memory failures**, as detailed in the **Affidavit of Harm** and **Affidavit of Caroline**

**Dillon-Capps**. The Defendant's worsening mental state places him at life-threatening risk, as these symptoms have become more frequent and intense since the onset of litigation.

36    The Plaintiff's continued bad faith litigation tactics and refusal to release **due compensation** has deepened the Defendant's financial strain. As outlined in the **Affidavit of Financial Urgency**, the Defendant's accounts are now overdrawn, and credit limits have been reduced due to missed payments. The Defendant's mental health crisis has left him unable to maintain his business or manage his financial affairs. This lawsuit, which falsely portrays the Defendant in a negative light, has caused potential investors and business partners to sever ties, resulting in the complete collapse of **15 years of preparation** and business development. The loss of these partnerships, combined with the Defendant's inability to continue business operations due to health issues, constitutes irreparable harm that cannot be remedied by monetary damages after the litigation concludes.

37    However, for many individuals who cannot afford to defend themselves against such actions, these small claims result in **greater financial burdens,** often costing more to defend than the amounts in dispute. This pattern of behavior demonstrates that Plaintiff frequently uses the **court system as a tool** to impose unjust burdens on those with limited means, even when the overall cost of litigation is a **net negative for both parties**.

38    This case is not the **exception to the rule**, but rather a part of a larger pattern of **litigation abuse** by **Ohana Growth Partners**. This Court should be mindful of this pattern when assessing the **evidence** presented by the Plaintiff, as future litigation involving this Plaintiff should be subject to **greater scrutiny** to prevent similar abuses of the legal process.

39      Until such scrutiny is applied, the Defendant's **financial situation remains in crisis**. Without **immediate injunctive relief**, Defendant is at risk of losing his **business**, **personal assets**, and the ability to recover financially. The **Plaintiff's fraudulent actions** in this case continue to threaten Defendant's financial survival.

40      The **pattern of litigation** abuse shown by **Ohana Growth Partners** and **PF Growth Partners** in public records reflects a **systemic issue** in which the Plaintiff uses **baseless litigation** to impose undue financial burdens on those who cannot easily defend themselves. This case should not be viewed in isolation, but as part of a **broader misuse** of the court system.

41      The Defendant's current financial situation, exacerbated by the Plaintiff's conduct, requires this Court to intervene with **mandatory injunctive relief**. Without such relief, Defendant's financial collapse is imminent, a harm that cannot be repaired through monetary damages at the conclusion of litigation. The **ongoing harm** inflicted by the Plaintiff is not only financially destructive but constitutes a **misuse of legal process** that this Court has the power to address.

## VII  PLAINTIFF'S BREACH AND CONTINUED HARM

42      **Plaintiff, Ohana Growth Partners, LLC**, has continuously acted in **bad faith** throughout this litigation. After breaching an accord on **June 13, 2024**, Plaintiff refused to negotiate in good faith, engaging in **unlawful conduct** that caused significant **financial and emotional harm** to the Defendant. Plaintiff's deliberate refusal to resolve the matter through reasonable negotiation, coupled with its continued pursuit of **baseless and fraudulent claims**, has only compounded the harm inflicted on the Defendant.

## PLAINTIFF'S CONDUCT INCLUDES:

1.    **Wrongful suspension and termination** of the Defendant without pay, constituting a violation of **Maryland employment law**, which protects employees from wrongful termination and entitles them to compensation upon unjust termination (See **Md. Code Ann., Lab. & Empl. § 3-501**).

2.    **Denial of time off benefits**, including withholding of compensation for accrued and payable time upon termination, in violation of both **FMLA** and Maryland law. Under **FMLA (29 U.S.C. § 2601 et seq.**), employees are entitled to time off, and failure to pay accrued benefits upon termination violates **Md. Code Ann., Lab. & Empl. § 3-505**, which requires the payment of earned wages upon separation from employment.

3.    **Breaches of contractual agreements** regarding compensation, scheduled raises, and employment classification. Under Maryland law, when an employer fails to uphold the terms of an employment contract, it constitutes a material breach of contract (See **Shenker v. Laureate Educ., Inc.**, 411 Md. 317, 983 A.2d 408 (2009)).

4.    **Failure to adhere to industry standards** in managing the Defendant's employment and related benefits. Plaintiff's mismanagement of these benefits, including withholding time off and accrued wages, violates **FMLA** protections and Maryland employment law.

5.    **Unilateral change** in the Defendant's employment status from **salaried exempt** to **salaried non-exempt** following intermittent **FMLA leave**. Plaintiff initially acted in accordance with **Section I of the employment agreement**, but the subsequent placement of Defendant into a **nameless role** effectively severed the agreement's Section I. This

                                    EXHIBIT   106

placement retroactively removed the Defendant's authority, as Plaintiff admitted that the position:

      5.1      **Lacked hiring/firing authority**,

      5.2      **Denied autonomy** in decision-making,

      5.3      **Excluded technical work**, and

      5.4      **Eliminated influence over employee management**.

43     These factors retroactively changed the Defendant's **exemption classification** under both **Maryland law** and **FLSA (29 U.S.C. § 213(a)(1))**, thereby severing Section I of the employment agreement and modifying the Defendant's employment status without compliance with law or the terms of the contract.

## RESULTS OF SEVERING SECTION I:

44     Plaintiff no longer holds the legal right to modify the Defendant's employment classification without a **formal offer and acceptance** under the terms of the contract (See **Md. Code Ann., Com. Law § 12-101 et seq.** regarding contract modification).

45     Defendant is entitled to **overtime compensation** for the period starting **January 4, 2024**, as the Defendant was performing **non-exempt, non-technical tasks** that were largely advisory in nature. These duties lacked decision-making authority, which entitles the Defendant to overtime compensation under the **Fair Labor Standards Act (FLSA), 29 U.S.C. § 207**. Maryland's **Wage Payment and Collection Law (Md. Code Ann., Lab. & Empl. §§ 3-401 - 3-431)** also entitles the Defendant to unpaid overtime wages.

46     Although **Section I** was severed, the amended terms of **compensation and benefits** remained intact. Additionally, the Defendant's **right to FMLA leave** and use of benefits was not

EXHIBIT   106

affected. Plaintiff's refusal to honor these benefits violates the **employment agreement**, as the right to payment was never formally revoked or altered.

47      **Plaintiff's conduct has created irreparable harm**, which cannot be remedied by a **monetary judgment** at the conclusion of the litigation. The Defendant is already suffering **ongoing financial and physical damage**. Emotional distress, particularly stemming from the exacerbation of **PTSD**, presents a further risk of **permanent physical harm**, as evidenced by the Defendant's condition following the events of **June 17th**. Additional litigation will be required to address the full scope of damages, which will take years to resolve.

## LEGAL ARGUMENT

48      **Material Breach of Employment Agreement:** The Plaintiff's **unilateral change** in the Defendant's employment status following **FMLA leave** constitutes a **material breach** of the employment agreement. The change from **exempt** to **non-exempt status** violated both the employment contract and **FLSA standards** (See **29 U.S.C. § 213(a)(1)**). The Defendant's duties were altered to an advisory role without decision-making power, thereby triggering an entitlement to overtime pay under the **FLSA** and Maryland's **Wage Payment and Collection Law**.

49      **Breach of Contract & Overtime Compensation:** The **Fair Labor Standards Act** requires employers to pay overtime compensation to employees who perform **non-exempt duties** (See **29 U.S.C. § 207(a)(1)**). The Plaintiff's retroactive reclassification of the Defendant to a role lacking exempt characteristics entitles the Defendant to retroactive overtime pay.

Additionally, Maryland's **Wage Payment and Collection Law** entitles the Defendant to back wages, including unpaid overtime compensation for non-exempt work.

## DENIAL OF FMLA RIGHTS:

50    Plaintiff's refusal to honor the **Defendant's right to FMLA leave** and the corresponding benefits directly violated **FMLA (29 U.S.C. § 2615)**, which prohibits employers from interfering with or denying an employee's right to protected leave. Furthermore, the **refusal to pay for accrued time off** violates **Maryland law**, which requires that earned wages, including accrued benefits, be paid upon separation from employment (See **Md. Code Ann., Lab. & Empl. § 3-505**).

## IRREPARABLE HARM

51    The ongoing **financial and emotional distress** suffered by the Defendant presents a situation of **irreparable harm**, particularly due to the exacerbation of **PTSD**, a recognized **disability** under the **ADA (42 U.S.C. § 12101)**. Such harm is not adequately remedied by a monetary judgment after the litigation concludes, as the Defendant's mental and physical health will continue to deteriorate during this prolonged process. Therefore, **mandatory injunctive relief** is necessary to protect the Defendant's **immediate financial well-being** and **physical health** (See **Winter v. Natural Resources Defense Council, Inc.**, 555 U.S. 7, 22 (2008)).

### VIII   IRREPARABLE HARM AND LACK OF ADEQUATE LEGAL REMEDY

52    **Defendant is facing irreparable harm** that cannot be fully compensated through a monetary award. Specifically:

53    **Defendant's business and personal assets** are at immediate risk of being lost due to the **financial strain** caused by the Plaintiff's wrongful actions. The Defendant's business, which

represents a **lifetime of planning** and **investment** spanning over **15 years**, is now on the verge of collapse before it could even launch. The business is built on the groundbreaking **Three-Stage Evolution of Technology Model (TSETM)**, which predicts the maturation of technologies and serves as a **baseline** to identify when a technology becomes **optimal for action and investment**. Much like distinguishing **Friendster from MySpace** and **MySpace from Facebook**, TSETM identifies when a technology is poised to become mainstream and when it reaches the point where **investment** and **strategic action** will yield the highest return.

54      The **TSETM model** successfully predicted the maturation of **natural language processing (NLP)** technologies, such as **GPT models**, which achieved mainstream adoption by **March 2023**. Defendant's business was positioned to leverage this technology, with a planned launch in **2024**, as the ideal time to revolutionize industries and reshape **business**, **social**, and **economic balances**. The business would serve as a vehicle to drive **global-scale impact**, with the potential to positively influence **billions of lives** through its innovative application of **AI-driven solutions**.

55      The Defendant's **novel strategy**, built on the predictive capabilities of the **TSETM model**, was poised to revolutionize industries by capturing the **optimal timing for investment** in emerging technologies. Plaintiff's wrongful conduct has irreparably destroyed this opportunity, as the Defendant can no longer launch the business at the precise moment the technology has matured, according to the **TSETM model**. The Plaintiff's **bad faith actions** have blocked the Defendant from executing this strategy, preventing the business from achieving its intended global impact.

EXHIBIT  106

56      **Defendant's mental and emotional well-being** has also been severely affected by the Plaintiff's wrongful conduct, including **wrongful suspension, termination**, and **defamatory public records**. The emotional distress has exacerbated the Defendant's **Post-Traumatic Stress Disorder (PTSD)**, a condition that has caused **physical changes** to the Defendant's brain. This has significantly diminished the Defendant's **cognitive abilities**, making it impossible to implement the business's **strategic vision** or execute the **TSETM model** effectively.

57      The Plaintiff's **bad faith litigation strategy**, including the filing of a **fraudulent lawsuit**, has caused **immediate and irreparable harm** to the Defendant's financial and professional future. The Defendant has lost **investors** and **business partners**, who have now evaded communications upon learning of the lawsuit. This lawsuit portrays the Defendant in a **dishonest and defamatory light**, contradicting the Defendant's **professional reputation** and severely damaging business opportunities.

58      The **Defendant's business opportunities** have been destroyed, along with **15 years of planning and investment**. The Plaintiff's fraudulent lawsuit, filed with **malicious intent**, has permanently disrupted the launch of the business based on the **TSETM model**, which would have revolutionized industries and driven **global impact**. This harm is irreversible, as the **unique timing** for capitalizing on the **NLP/AI wave** has been missed.

59      No adequate legal remedy exists to fully address the harm caused. While monetary damages may eventually be awarded, they cannot mitigate the immediate and ongoing financial and emotional damage the Defendant faces. The destruction of the Defendant's professional future and the loss of a once-in-a-lifetime opportunity to revolutionize industries through the TSETM model cannot be undone through monetary compensation alone.

60      **Reputational harm** is recognized as a form of **irreparable harm** under Maryland law,

as it is damage that cannot be easily quantified or rectified through monetary compensation (See

**Stuart Circle Parternship v. Bd. of Zoning Appeals**, 233 Md. 420, 196 A.2d 682 (1964)). The

destruction of Defendant's reputation, carefully built over **15 years**, cannot be adequately

compensated by a financial award.

61      **15 years of personal investment**—including time, energy, and financial resources—

have been lost due to the Plaintiff's actions. Business partners and investors who were once

excited to work with the Defendant have now **withdrawn their support**, likely after learning of

the lawsuit, which portrays the Defendant in a **dishonest and defamatory manner**. The harm

caused by the Plaintiff's **public defamation** has destroyed **critical business opportunities** that

cannot be restored with a financial remedy alone.

62      Maryland courts have consistently recognized that the harm caused by the **loss of**

**business reputation** and **defamation** is often **irreparable**, as it permanently affects an

individual's **professional standing** and future **earning capacity**. (See **MCS Services, Inc. v.**

**Jones**, 152 Md. App. 53, 828 A.2d 486 (2003)). In this case, the Plaintiff's defamatory portrayal

of the Defendant on public record has permanently damaged the Defendant's **professional**

**reputation**, which was integral to the launch and success of the **TSETM model** and the

associated business.

## A   Legal Argument

63      The **TSETM model** served as the foundation of a **groundbreaking business strategy**

that capitalized on the rise of **natural language processing (NLP)** technologies. By using

TSETM, the Defendant was able to **predict the optimal timing** for business and investment in

emerging technologies, and the business was poised to succeed based on these precise predictions. Plaintiff's actions have irreparably destroyed this opportunity, permanently blocking the Defendant's ability to launch the business at the critical juncture identified by the **TSETM model**.

64      **The balance of equities weighs heavily in favor of the Defendant**. The harm faced by the Defendant is both immediate and severe, involving not just financial collapse but permanent damage to the Defendant's business reputation and personal well-being. By contrast, the Plaintiff stands to lose little more than the obligation to comply with their contractual and legal duties. **Ohana Growth Partners LLC**, a multi-state franchise operator managing over 80 clubs, is in a far stronger financial position. In fact, the company recently secured **millions of dollars in refinancing**, which provides them with ample resources to weather any temporary financial inconvenience caused by complying with the Court's order. Meanwhile, the Defendant stands to lose his entire business model, which was poised for launch in early 2024, alongside irreparable personal losses, including **damaged credit**, **missed financial obligations**, and the **aggravation of mental health conditions**, specifically **PTSD and catatonia**. These conditions have rendered him incapable of managing his business, further compounding the harm already inflicted. (See **Stuart Circle Parternship** and **MCS Services, Inc.**).

## LACK OF ADEQUATE LEGAL REMEDY

65      Monetary damages will not restore the **lost opportunity** to capitalize on the **NLP/AI wave** that the **TSETM model** predicted. The Defendant's business, built on the novel use of this technology, has been permanently derailed, and no financial award can fully address the loss of **business reputation**, **investors**, and **opportunities**. Maryland law recognizes **reputational**

harm and **business collapse** as forms of **irreparable harm**, leaving **no adequate legal remedy** for the Defendant's situation.

## IRREPARABLE HARM

66      The **emotional and physical toll** inflicted on the Defendant, particularly the exacerbation of **PTSD**, presents further **irreparable harm**. Courts have long recognized that emotional distress and its physical manifestations cannot be adequately addressed through a financial award (See **Pashby v. Delia**, 709 F.3d 307, 329 (4th Cir. 2013), discussing irreparable harm from emotional and physical suffering).

67      Additionally, the Defendant's **professional reputation**—developed over the course of **15 years**—has been severely damaged by the **fraudulent lawsuit** filed by the Plaintiff. This type of **reputational harm** is frequently regarded as **irreparable** under Maryland law and cannot be corrected through post-trial monetary damages alone (See **Stuart Circle Parternship** and **MCS Services, Inc.**).

## LACK OF ADEQUATE REMEDY AT LAW

68      Under Maryland law, an **adequate legal remedy** must provide full relief to the injured party. In this case, **monetary damages** are **inadequate** because they cannot restore the **business relationships** and **opportunities** that have been lost due to the Plaintiff's actions. Furthermore, the **emotional harm** and its impact on the Defendant's **physical health** are not remediable through financial compensation (See **Winter v. Natural Resources Defense Council, Inc.**, 555 U.S. 7, 22 (2008)).

## ONGOING IRREPARABLE HARM

69      As a result of the Plaintiff's actions, the **Defendant faces ongoing, irreparable harm**, which includes:

70      **Immediate loss of business opportunities**: The Plaintiff's conduct has destroyed the Defendant's ability to launch the business based on the **TSETM model**, resulting in the permanent loss of key business partners and investors. The **timing** of this launch, as predicted by TSETM, is critical, and the delay caused by the Plaintiff's wrongful actions has irreparably disrupted this window of opportunity.

71      **Long-term damage to personal and professional reputation**: The Plaintiff's **fraudulent lawsuit** and **defamatory public statements** have irreparably damaged the Defendant's professional reputation. The Defendant's standing in the industry, built over **15 years**, has been destroyed, and future opportunities have been lost as potential investors and collaborators have distanced themselves due to the lawsuit's defamatory claims.

72      **Exacerbation of PTSD**: The Defendant's **mental health** has deteriorated due to the stress of this litigation, exacerbating the Defendant's **Post-Traumatic Stress Disorder (PTSD)**. This worsening condition places the Defendant at risk of further **physical harm**, particularly since the **brain damage** associated with PTSD has already significantly impaired the Defendant's cognitive abilities.

73      Given the **immediacy** of this harm, the Defendant seeks **mandatory injunctive relief** to halt the Plaintiff's wrongful actions and prevent further damage. **Monetary damages** are insufficient to address the ongoing harm, as the **business opportunities, professional reputation**, and **physical health** of the Defendant have been irreparably harmed.

Page 22 of 35

74      Furthermore, the **physical harm** caused by the Plaintiff's actions has forever damaged the part of the body essential to the Defendant's career—the brain. **Ryan Dillon-Capps**, once referred to as "the brain" due to their intellectual capabilities, now suffers from **catatonia** and **severe memory issues**, struggling to remember tasks while performing them. The damage to the Defendant's **cognitive abilities** has rendered the Defendant unable to fully participate in the business they built over 15 years, and this harm is permanent and cannot be compensated by a financial award.

## IX  LIKELIHOOD OF SUCCESS ON THE MERITS

75      The Defendant has a **strong likelihood of success on the merits** of this case. Plaintiff's claims **lack merit**, as the Defendant acted in good faith, adhering to all applicable **industry standards** and **Payment Card Industry Data Security Standards (PCI DSS)** requirements. **PCI DSS v4.0** mandates that companies comply with strict security standards to protect cardholder data, and the **Defendant's compliance** with these standards demonstrates the Plaintiff's allegations are unfounded.

76      The Plaintiff has failed to substantiate its allegations and has instead relied on **procedural tactics**. This includes securing a **Temporary Restraining Order (TRO)** without notice to the Defendant, thereby denying the Defendant the opportunity to defend against the allegations. The Plaintiff's deliberate delays and **failure to resolve** the matter through **good faith negotiation** further show that the Plaintiff is pursuing this case with **unclean hands**.

77      **Evidence of Compliance**: The **evidence clearly shows** that the Defendant made consistent efforts to comply with **PCI DSS** standards, ensuring that the Plaintiff's business adhered to the required **security protocols**. The Plaintiff has not produced any **concrete**

Page 23 of 35

**evidence** showing that the Defendant breached these standards or acted in any way that justified their termination and suspension.

78      **Breach of Agreements**: The Plaintiff's **breach of contractual agreements**, including the Defendant's wrongful suspension and denial of benefits, further supports the **Defendant's case**. The Defendant was wrongfully terminated without just cause, and the Plaintiff's failure to comply with **employment agreements** shows that they are not acting in **good faith**.

79      **Unclean Hands Doctrine**: Under the doctrine of **unclean hands**, a party cannot seek relief if their own misconduct is at issue. The Plaintiff's failure to follow industry standards, their breach of agreements, and their intentional delays indicate that they are acting with **unclean hands** in this litigation (See **Ademiluyi v. PennyMac Mortgage Investment Trust Holdings I, LLC**, 929 F. Supp. 2d 502, 530 (D. Md. 2013), discussing unclean hands in the context of contractual breaches and litigation).

80      **Procedural Manipulation**: By securing a **TRO** without the Defendant's input and deliberately delaying the resolution of the case, the Plaintiff has sought to exploit procedural avenues rather than resolve the dispute on the merits. The Plaintiff's conduct in obtaining a TRO without notice violates **due process**, as it deprived the Defendant of the opportunity to defend their actions at the onset of the litigation (See **Fuentes v. Shevin**, 407 U.S. 67 (1972), emphasizing due process and the need for fair notice in emergency proceedings).

## LEGAL ARGUMENTS

81      The Defendant has a **high likelihood of success** because the Plaintiff's claims are **baseless** and lack **factual support**. The **Defendant acted in full compliance** with industry

EXHIBIT   106

standards and legal requirements, as evidenced by the **PCI DSS compliance**. The Plaintiff's

reliance on procedural tactics such as the **TRO** does not change the fact that their **substantive**

**claims** are unsubstantiated.

## COMPLIANCE WITH PCI DSS

82      Under **PCI DSS v4.0**, organizations handling cardholder data are required to follow strict

guidelines regarding data security, including the **least privilege principle**, requiring restricted

access based on business needs. The Defendant's compliance with these standards, particularly in

implementing **Requirement 7 (Least Privilege)**, demonstrates the Defendant acted in

accordance with industry norms.

## BREACH OF EMPLOYMENT AGREEMENTS

83      The Plaintiff's **wrongful suspension** and **termination** of the Defendant without proper

cause or compliance with contractual obligations further supports the **Defendant's likelihood of**

**success**. Maryland law requires employers to comply with **employment contracts** and provide a

reasonable cause for termination (See **Md. Code Ann., Lab. & Empl. § 3-501 et seq.**). The

Plaintiff's failure to meet these standards violates both **employment law** and **contract law**.

## UNCLEAN HANDS DOCTRINE

84      The Plaintiff's conduct, including procedural manipulation, breach of agreements, and

wrongful actions, triggers the doctrine of **unclean hands**, barring them from seeking relief.

Maryland courts have long held that **equity cannot be invoked by a party acting in bad faith**

(See **Ademiluyi**). By engaging in **bad faith litigation** and violating industry standards, the

Plaintiff undermines their own claims for relief.

## PROCEDURAL MISCONDUCT

85    Plaintiff's reliance on the **TRO**, obtained without notice, further undermines their position. Courts have consistently held that **due process** requires fair notice and the opportunity to be heard, even in emergency situations (See **Fuentes**). The Plaintiff's use of **procedural misconduct** demonstrates their intent to avoid an honest adjudication of the facts.

## X  BALANCE OF EQUITIES

86    **The balance of equities weighs heavily in favor of the Defendant**. The harm to the Defendant is **immediate and severe**, while the harm to the Plaintiff is **minimal**. The Plaintiff is simply being asked to comply with its **existing legal obligations**, cease its **bad faith conduct**, and refrain from further damaging the Defendant's business, personal assets, and professional reputation.

87    **Defendant's Harm**: If this Court does not grant injunctive relief, the Defendant faces the **imminent collapse** of a business that has been in development for **15 years**. This business, built on the unique **TSETM model** and designed to capitalize on the timely adoption of **NLP technologies**, will miss the critical opportunity for launch, leading to the permanent loss of business opportunities and investor confidence. Additionally, the Defendant's **personal assets** are at risk, and the ongoing emotional distress caused by this litigation has exacerbated the Defendant's **PTSD**, placing him at risk of further **physical harm**.

88    **Plaintiff's Minimal Harm**: By contrast, the Plaintiff is being asked to **cease its wrongful actions** and **comply with the law**. The Plaintiff will suffer no significant harm by adhering to its **contractual obligations**, paying the compensation due to the Defendant, and ceasing its **fraudulent and defamatory conduct**. In fact, the Plaintiff's refusal to comply with

its obligations has only prolonged litigation and increased legal costs for both parties.

Compliance would prevent further **irreparable harm** to the Defendant without imposing any

undue burden on the Plaintiff.

89      **Injunctions are equitable remedies**, and Maryland courts have long recognized that

where one party faces **irreparable harm** and the other faces **minimal inconvenience**, the

balance of equities favors the party seeking relief (See **El Bey v. Moorish Sci. Temple of Am.,

Inc.**, 362 Md. 339, 348, 765 A.2d 132, 137 (2001)). In this case, the Defendant has demonstrated

that the harm to his business, personal assets, and reputation is **severe and irreparable**, while

the Plaintiff's compliance with its **legal obligations** imposes no extraordinary burden.

90      Courts weigh the **relative harm** to each party when considering injunctive relief. Here,

the Defendant's harm is not only **financial** but also includes **emotional distress** and **damage to

his physical health**, resulting from the exacerbation of **PTSD** caused by the Plaintiff's **bad faith

conduct**. These factors weigh heavily in favor of granting injunctive relief, as the Plaintiff's

refusal to comply with the law will have permanent and **devastating consequences** for the

Defendant's life and business.

91      The **irreparable harm** to the Defendant, including the permanent damage to his

**business opportunities**, **reputation**, and **mental health**, outweighs any inconvenience the

Plaintiff may claim from being forced to comply with its **legal and contractual obligations**.

92      The balance of equities also supports the granting of an injunction because the Plaintiff's

refusal to honor its contractual obligations, compounded by its **bad faith litigation tactics**, has

already delayed resolution. The Plaintiff should not be allowed to benefit from such delay,

especially where continued delay would irreparably harm the Defendant.

93      As courts have recognized, when a party's own actions create or exacerbate harm to the opposing party, it cannot claim that the balance of equities weighs in its favor (See **Smith v. Clark**, 291 Md. 175, 433 A.2d 1209 (1981), discussing the equitable maxim that one must come to equity with clean hands).

94      By granting this injunction, the Court will be restoring the **status quo**, requiring only that the Plaintiff honor its **contractual and legal obligations**. This does not impose any **undue hardship** on the Plaintiff and merely ensures that the Defendant is protected from **immediate and irreparable harm**.

### LEGAL ARGUMENTS

**95**     **Balance of Equities in Favor of Defendant:** The balance of equities clearly favors the Defendant because the harm to the Defendant is **severe and irreparable**, whereas the Plaintiff is only being asked to **comply with the law**. Maryland courts have consistently held that when one party faces **significant harm** and the other faces **minimal inconvenience**, the balance of equities favors granting injunctive relief (See **El Bey v. Moorish Sci. Temple of Am., Inc.**, 362 Md. 339, 348, 765 A.2d 132, 137 (2001)).

**96**     **Severe Harm to Defendant:** The Defendant faces the **immediate loss** of a business venture built on **15 years of planning** and **personal investment**. The unique opportunity to capitalize on the **TSETM model** and leverage emerging **NLP technologies** has been irreparably damaged by the Plaintiff's wrongful conduct. Additionally, the Defendant's **personal assets** are at risk, and the continued emotional strain caused by the Plaintiff's litigation strategy has exacerbated the Defendant's **PTSD**, placing him at risk of further **physical harm**.

Page **28** of **35**

97    **Minimal Harm to Plaintiff:** The Plaintiff, by contrast, will face no significant harm. The injunction merely requires the Plaintiff to **comply with its legal obligations**, including paying the compensation owed to the Defendant, adhering to contractual terms, and ceasing the **defamatory and fraudulent actions** that have caused ongoing harm to the Defendant's business and reputation. Compliance with these obligations imposes no **undue burden** on the Plaintiff, and it is unjust for the Plaintiff to continue benefitting from its **bad faith actions** at the Defendant's expense.

98    **Plaintiff's Bad Faith and Unclean Hands:** The Plaintiff's **bad faith conduct** in wrongfully suspending the Defendant, withholding compensation, and engaging in **defamatory litigation** tactics further tilts the balance of equities in favor of the Defendant. Under the doctrine of **unclean hands**, the Plaintiff should not be allowed to benefit from its misconduct or seek to avoid injunctive relief when it is responsible for the harm (See **Smith v. Clark**, 291 Md. 175, 433 A.2d 1209 (1981)).

99    **Restoring the Status Quo:** By granting this injunction, the Court will be restoring the **status quo**—requiring only that the Plaintiff adhere to its **existing obligations**. Maryland courts often prioritize restoring the status quo when considering injunctive relief, particularly where one party is at risk of **irreparable harm** (See **Dep't of Transp. v. Armacost**, 299 Md. 392, 474 A.2d 191 (1984)).

## XI  PUBLIC INTEREST

100   **The granting of this motion is in the public interest,** as it will ensure that **contractual obligations** are upheld and that **businesses and individuals** are not subjected to **unfair treatment** by corporate entities engaging in **bad faith conduct**. This case presents a clear

instance where the Plaintiff has abused its position by violating contractual terms, wrongfully suspending the Defendant, and pursuing **fraudulent litigation**. Allowing the Plaintiff's actions to go unchecked would send a message that **corporate misconduct** can occur without consequence, harming not only the Defendant but also undermining the **public trust** in the fairness of the judicial system.

101    Courts recognize that protecting parties from **bad faith litigation** serves the **public interest**, as it ensures that the legal system is not used as a tool for abuse or delay. Maryland courts have emphasized that the **public interest is best served** when the integrity of **legal agreements** is upheld, and when those acting in bad faith are held accountable for their actions (See **Md. Envir. Trust v. Gaynor**, 370 Md. 89, 103, 803 A.2d 512 (2002), discussing public interest in upholding good faith in contracts).

102    **Upholding contractual integrity** is essential to maintaining a fair and just business environment. If this Court grants injunctive relief, it will send a clear message that **corporate entities** cannot escape their legal obligations or harm smaller businesses and individuals through **bad faith litigation tactics**. Protecting the Defendant from further harm aligns with the broader interest of ensuring that **contract law** is respected and that **individuals** are not placed in **financial ruin** because of **unlawful actions** by larger, more powerful entities.

103    In this case, the Plaintiff has engaged in **repeated breaches** of contractual terms, including the wrongful suspension and termination of the Defendant, the withholding of compensation, and the defamatory conduct that has irreparably damaged the Defendant's professional reputation. By granting injunctive relief, the Court would not only be protecting the

EXHIBIT   106

Defendant but also upholding the **fundamental principles of contract law** and ensuring that **businesses and individuals** are protected from **corporate overreach**.

104    **Public confidence** in the judicial system depends on the assurance that **legal agreements** will be enforced and that **litigation** will not be weaponized as a means of financial or personal destruction. In this case, the Plaintiff has used **fraudulent claims** and **defamation** to attack the Defendant, and the Defendant's business has been destroyed as a result. The **public interest** is best served by granting this motion, as it will prevent further abuse and restore **justice** in the face of clear **bad faith conduct**.

105    Maryland courts have consistently ruled that the **public interest** is served when the **integrity of contracts** is upheld, and when **bad faith conduct** is deterred. By granting injunctive relief, this Court would be reinforcing the **fundamental protections** that contract law provides and ensuring that businesses and individuals have a **fair opportunity** to protect their rights against **corporate misconduct** (See **United Artists Theatre Circuit, Inc. v. Sun Plaza Theatre, Inc.**, 352 Md. 603, 724 A.2d 631 (1999), emphasizing the importance of upholding contractual obligations in the public interest).

## LEGAL ARGUMENT:

## PUBLIC INTEREST IN UPHOLDING CONTRACTUAL OBLIGATIONS:

106    The **public interest** is served when **contractual agreements** are honored and **businesses** are protected from **bad faith litigation**. Maryland law emphasizes the importance of ensuring that **contracts are upheld**, as these agreements are the foundation of a fair and functioning market. When parties violate contracts through **bad faith conduct**, it not only harms the

individuals involved but also undermines the **public's trust** in the business environment and the **judicial system** (See **Md. Envir. Trust v. Gaynor**, 370 Md. 89, 103, 803 A.2d 512 (2002)).

## DETERRING CORPORATE MISCONDUCT:

107     This case highlights the danger of allowing **corporate entities** to escape accountability for their actions. The Plaintiff, by engaging in **fraudulent litigation** and defamation, has caused **irreparable harm** to the Defendant's business and reputation. If the Court does not grant this motion, it would set a dangerous precedent, signaling that **corporate misconduct** can go unchecked. Granting injunctive relief ensures that **corporations** are held to the same **legal standards** as individuals and that they cannot abuse their position to harm others through **bad faith conduct**.

## RESTORING JUSTICE:

108     The public interest is also served by ensuring that **justice** is restored to those who have been wronged. The Defendant's business, built over **15 years**, has been destroyed due to the Plaintiff's actions, and the Defendant faces ongoing **financial and reputational harm**. Granting injunctive relief would not only protect the Defendant but also affirm the **Court's role** in preventing **corporate abuse** and restoring fairness.

## XII   PRAYER FOR RELIEF

**WHEREFORE,** Defendant, **Ryan Dillon-Capps**, respectfully requests that this Honorable Court grant **mandatory injunctive relief**, ordering Plaintiff **Ohana Growth Partners, LLC** to restore the status quo in full, without regard to any argument or explanation made in opposition. Specifically, the Defendant requests that this Court:

Page **32** of **35**

1.      Restore **all financial compensation, bonuses, benefits, and terms of payment** in accordance with previously established schedules and budgets, and **retroactively restore all amounts due to the Defendant covering all compensation, bonuses, and benefits that were withheld or unpaid during the relevant period starting on June 13, 2024.**

2.      **Continue to maintain the status quo**, by providing the same compensation, benefits, and treatment that would be afforded to any other employee, department head, or executive of the company, thereby preventing further disenfranchisement of the Defendant from the date of this Order and throughout the pendency of the litigation between **Ohana Growth Partners, LLC** and **Ryan Dillon-Capps**, unless otherwise modified by this Court.

3.      **Find that the Defendant has demonstrated irreparable harm**, as the failure to restore pay would result in imminent financial hardship, including potential default and significant harm to the Defendant's ability to meet basic financial obligations.

4.      **Determine that this mandatory injunction is necessary** to maintain the status quo and prevent irreparable harm to the Defendant during the pendency of this litigation, as monetary damages awarded after the conclusion of the case would not adequately remedy the Defendant's urgent financial situation.

5.      **Direct the Plaintiff to pay all amounts due to Defendant retroactively**, covering the period during which payouts, bonuses, and compensation were withheld or unpaid, and **ensure these payments are made within three (3) days** from the issuance of this Order.

Page **33** of **35**

6. **Retain jurisdiction** to address any further requests for relief and adjustments to the terms of this Order as may be necessary to ensure fairness and equity during the course of this litigation.

7. **Retain jurisdiction** to address any further requests for relief, adjustments to the terms of this Order, or any additional legal actions arising from the facts of this case, ensuring that all future issues are **RESERVED and PRESERVED** for future adjudication as necessary.

8. **Schedule the urgent hearing** for the **first available time** on **following day**.

9. Review and rule on Defendant's **Motion In Limine to Exclude Claims, Statements, and Affirmations Not Supported by Evidence**.

10. Review and rule on Defendant's **Motion for Early Discovery**.

11. Review and rule on Defendant's **Motion for Expedited Discovery.**

12. Review and rule on Defendant's **Motion to Compel Production to Support Claims at Hearing.**

13. **Grant such other and further relief** as this Court deems just and proper, ensuring that the hearing process proceeds efficiently, and that the Defendant is protected from prejudice caused by unsupported or speculative claims.

## RESPECTFULLY SUBMITTED

October 22, 2024                          /s/ Ryan Dillon-Capps

                                         Ryan Dillon-Capps (Pro Se)
                                         Email : ryan@mxt3.com
                                         1334 Maple Avenue
                                         Essex, Maryland 21221
                                         Telephone: (703) 303-1113

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 22, 2024, a copy of **Amended Motion for Mandatory**

**Injunction to Restore Lost Pay Due to Financial Urgency** via email to

rbrennen@milesstockbridge.com and served on via first-class mail, postage prepaid on:

        Robert S. Brennen
        Miles & Stockbridge P.C.
        100 Light Street
        Baltimore, Maryland 21202


                                         /s/Ryan Dillon-Capps
                                         Ryan Dillon-Capps (Pro Se)

| | |
|---|---|
| **OHANA GROWTH PARTNERS, LLC** | **IN THE** |
| *Plaintiff,* | **CIRCUIT COURT** |
| | **FOR** |
| vs. | **BALTIMORE COUNTY** |
| **RYAN DILLON-CAPPS** | **CASE NO: C-03-CV-24-002264** |
| *Defendant.* | |

## MOTION TO ALLOW PRO SE REPRESENTATION OF LLC

1    COMES NOW, the Defendant, **Ryan Dillon-Capps**, individually and as the managing member of **MXT3, LLC**, and respectfully requests that this Honorable Court allow the Defendant to represent **MXT3, LLC,** Pro Se, without the need to retain legal counsel, pursuant to the following:

## I  PRO SE NOT NO SAY

2    In the landmark case of **Kearns v. Ford Motor Company**, inventor **Robert Kearns** successfully argued that while the individual components of his invention—the intermittent windshield wiper—were not new, it was his unique combination of those components that constituted a distinct and innovative product. Kearns, representing himself Pro Se, took on major automakers and prevailed, demonstrating that even without formal legal representation, an individual can vindicate their rights in complex, high-stakes litigation.

3    Similarly, in a related unfiled case, I intend to bring forth claims that involve both myself and **MXT3, LLC**—which I solely own and manage—against the same parties, **Ohana Growth Partners, LLC**, and **Miles & Stockbridge, PC**. The intertwined claims between myself and

EXHIBIT 106

MXT3, LLC stem from the harm these parties have caused to both me personally and the business. This harm is concrete and particularized, directly impacting both myself and **MXT3, LLC**, as established in prior proceedings.

4       Given the deep integration of my personal work and business—particularly in the development of **artificial intelligence (AI) solutions**—the case revolves around contributions that cannot be separated from **MXT3, LLC**. I manage all aspects of the business, and forcing MXT3, LLC to retain separate legal counsel would not only impose an undue financial burden but also complicate the litigation unnecessarily.

5       The harm caused by the opposing parties has been well-documented in prior litigation, affecting both **MXT3, LLC** and me personally. The complexity of the case has led even experienced litigators to miss key issues, including **FMLA violations** and misrepresentations that undercut the basis for the relief sought.

6       Throughout July, I faced significant challenges in accessing court records and ensuring my filings were properly considered. My **Motion to Reconsider Continuance** was submitted multiple times between **July 1 and July 8**, but it was ruled on prematurely on **July 5** and only entered into the court record on **July 12**.

7       On July 8, I filed a Notice of Filing to consolidate several motions, including the Motion to Reconsider Denial of Continuance, Motion for Extension of Time, and Motion to Strike Referenced Evidence, including Exhibit B from Richard Hartman's affidavit. Despite my attempts to present these motions together, none were ruled on simultaneously. Additionally, the amended Motion to Strike Referenced Evidence v2, filed on July 20, was not considered alongside the original.

Page **2** of **14**

8        My attempts to vacate both the **TRO** and **Show Cause** were rejected as "omnibus"

filings. Despite previous efforts to consolidate related motions, they were not reviewed together.

**Miles & Stockbridge** tried to explain away their losses by referencing **AI**, or perhaps due to a

misguided understanding of the legal standing of the technology.

9        The **legal AI models** that I developed far surpass current commercial models in every

way. Despite **Miles & Stockbridge** listing technology clients, perhaps one of my models could

help them avoid filing affidavits that undermine their own claims for relief. I created a new

model specifically designed to identify anomalies in legal proceedings, and I was initially

shocked when the model, trained on **Judge DeSimone's** rulings, consistently ruled in favor of

the **TRO**. I was equally shocked and relieved to discover that the process server had a copy of

the packet with the unsigned and stamped order. Technology has a way of exposing the actions

of those who seek to do wrong, but it also has the power to prevent, reduce, and undo harm—just

as **DNA testing** has done in exonerating the wrongly convicted.

10        The model also revealed that **Miles & Stockbridge's** litigation style, rooted in a mid-

19th-century approach that remained dominant until after the **OJ Simpson trial**, relies heavily

on a "match-to-match" process. This method involves a judge reviewing a claim and confirming

its validity based on narrow phrasing without considering the larger context. For example, when

there is no opposition to provide the context of "Your Honor, here are 20 more words on that

same page," the AI model—trained on these older styles—missed key elements like the **FMLA**

**violation**. It incorrectly interpreted the **suspension email** as refusal, transforming what was an

ambiguous but compliant response in the **FMLA cease-and-desist letter** into something viewed

negatively. The reinforcement of this misinterpretation across smaller sections of the case further

EXHIBIT   106

skewed the outcome. However, when I used a model trained on a judge educated after the **OJ Simpson trial**, who adopted a more holistic litigation style, it caught the error almost every time.

11    These models, trained on the work of attorneys and judges, were initially intended to test different litigation styles. For instance, the late **Justice Ginsburg** built her legacy through a vast body of litigation that occurred over a series of strategic legal battles. **AI has the potential to** assist in this evolution of the law, but current products are focused on solving the wrong problems. **Judicial discretion** is a vital part of our system, and the law should evolve through considered opinions, not avoidable mistakes. An AI model that catches premature requests for default, spots **FMLA violations**, and identifies key admissions benefits everyone—by preventing costly errors and ensuring that the focus remains on substantive issues. Such tools could help future clients by streamlining the collection, organization, and presentation of their cases to law firms, saving time and money for both sides and improving the efficiency and quality of litigation.

12    **12.** The **Show Cause** was withdrawn at the same time my motions, detailed in the **Notice of Filing**, were being denied. As I was filing the motion to vacate, the withdrawal successfully avoided review by being ruled moot, despite **Davit Levell's affidavit** exposing false claims that supported the request for **injunctive relief**.

13    **13.** This case is the **opposite of moot**, as it centers on **injunctive relief**, not a contract dispute. While the Plaintiff has shifted focus, their own expert, **Davit Levell**, confirmed that there was no need for injunctive relief. Levell informed the court:

14    He worked with another admin.

15    That admin had access to global administrator accounts.

EXHIBIT   106

16    **14.** Additionally, the affidavits from **Justin Drummond** and **Richard Hartman** would only be considered mistakes if not for the following facts:

17    Both used the Help Desk, which had administrator access, to resolve Hartman's account issue before the June 26 hearing.

18    Hartman placed another employee with the same admin-level access on paid leave.

19    Drummond accepted a written offer for access but evaded compliance before instructing Hartman to send an email.

20    Drummond made no mention of a suspension during hours-long communications.

21    Drummond received updates confirming no refusal.

22    Hartman misinterpreted a webpage, falsely claiming it said the opposite.

23    Hartman, the admin of **Paycom**, tried to reverse actions to hide records, which amounts to spoliation.

24    **Billing Administrator** access was removed from **LeeAnn Hartman** due to her non-technical role, while others, like **Glenn Norris** and **Justin Drummond**, retained their roles.

25    These facts, confirmed by **Davit Levell**, demonstrate that this case is far from moot. My ability to represent both myself and **MXT3, LLC** is crucial to ensuring these details are fully addressed and presented properly.

26    Representing myself **Pro Se** simplifies the process, as I am directly involved with every detail of the case. Even in a complex case where technology and legal nuances intersect. These my direct connection to the technology, facts, and personal in-depth legal knowledge will be to the benefit of everyone.  I cannot promise to give the court brevity and my arguments may be as complex as the case, but at least this time the Plaintiff won't be coming with the intend to abuse

the judicial system with no regard for what it represents to the residence, county, state, and nation.

27    The delays in this case are not due to my filings but to the misinterpretation of facts that could have been avoided. For instance, Didn't address an obvious **FMLA violation**, where, in the same set of filing, they simultaneously accused me of refusal while admitting to violating FMLA. I can ensure that such contradictions are clearly presented to the court, preventing a false narrative from taking hold. The motions I filed, such as the **Notice of Filing**, were intentionally structured to tie these facts together, ensuring the court sees the full picture at once.

28    My filings are designed to address the harm caused by **Miles & Stockbridge** and **Ohana Growth Partners**—specifically, harm to my **credit**, **finances**, and the business operations of **MXT3, LLC**. Their actions have put both me and the LLC in the jaws of financial default, and we cannot afford legal counsel. My direct involvement, allows me to present the facts effectively and efficiently, avoiding missteps that could prolong litigation. The case is clearer when viewed with all relevant facts aligned, reducing the court's workload and making it easier to reach the right conclusion based on all the available evidence.

29    The goal has never been to prolong legal battles, but to resolve matters efficiently. I sought to avoid additional litigation by brokering agreements that would protect individuals like **Darren Koritzka**, **Ann Pinera**, and **Cielo IT** from retaliation. The relief I requested wasn't for personal financial gain—it was simply to ensure that I wasn't held liable for the wrongdoing of others.

30    Now, however, my credit has gone form at risk to incurring harm, my business has lost meetings with investors, and litigation is my only remaining option. My aim is not to burden the

court or the parties with unnecessary costs. I believe that judicial resources should be spent where they can make a meaningful difference, helping other victims whose cases are often dismissed as "unbelievable."

31      I am intimately familiar with the intricate details of this case. An attorney unfamiliar with these specifics may overlook crucial elements, leading to further delays and complications. By representing both myself and **MXT3, LLC**, I can ensure that the full scope of this case is presented clearly and effectively.

32      Like Robert Kearns' connection to his invention, my personal and business interests are **inseparable** from one another. **MXT3, LLC** is the vehicle for my innovative contributions to AI, and it is impossible to disentangle my work from the entity itself. This closely mirrors the principle established in **Kearns' case**, where an individual defended their innovation against well-resourced corporate entities without formal legal representation.

33      **Forcing MXT3, LLC to retain counsel in this unfiled but imminent case** would not only delay the proceedings but also unfairly burden the business financially, preventing the case from moving forward in a timely manner. Judicial efficiency would be compromised by requiring separate representation for claims that are deeply intertwined between myself and the LLC.

34      In light of these circumstances, I respectfully request that this Honorable Court grant permission for me to represent both myself and **MXT3, LLC**, Pro Se, in this **related unfiled case involving the same parties**. This is necessary to avoid undue hardship, and ensure the **principle of fairness** and **judicial efficiency**, allowing the case to proceed without unnecessary complexity.

EXHIBIT   106

## II STATUS OF DEFENDANT AND LLC

35     The Defendant, **Ryan Dillon-Capps**, is the sole owner and managing member of **MXT3, LLC**, and, as such, has **full control** over the operations and decision-making for the LLC. The Defendant is solely responsible for overseeing the strategic and day-to-day functions of the business, which is integrally tied to the development of artificial intelligence (AI) solutions that form the core of this litigation.

36     The Defendant is financially unable to afford legal counsel for the LLC and is currently representing himself in this litigation as **Pro Se**. Given the intertwined nature of the claims involving both the Defendant and MXT3, LLC, requiring separate counsel for the LLC would impose an **undue financial burden**, creating an obstacle to justice and denying the Defendant a fair opportunity to defend both personal and business interests.

37     **Maryland Rule 3-513** allows business owners or corporate officers to appear in **small claims court without a lawyer**. While this rule typically applies to lower courts, the **intent behind the rule** is to reduce the cost of legal representation where possible and to ensure that access to justice is not blocked by financial constraints. The principle underlying this rule— ensuring fairness and affordability in legal proceedings—should similarly apply to this case, especially where the business owner and the business itself are inseparably linked, as they are here.

38     **Maryland Rule 1-201** mandates that all rules of procedure be construed to "secure simplicity in procedure, fairness in administration, and the elimination of unjustifiable expense and delay." This principle directly aligns with the argument that allowing the Defendant to

EXHIBIT  106

represent both himself and MXT3, LLC, Pro Se, will prevent **unnecessary costs and delays**. Requiring separate counsel would only complicate the matter and create procedural inefficiency.

39      **Case Law Support**: In **Walker v. American Ass'n of Professional Eye Care Specialists, Inc.**, 735 A.2d 188 (Md. Ct. Spec. App. 1999), the court emphasized that procedural rules should be applied to avoid unnecessary delay and costs. Forcing MXT3, LLC to hire counsel in this case would result in **inefficiency and undue financial burden**, particularly given the **interconnected claims** against both the LLC and the Defendant personally.

40      If the case proceeds to trial, the **technological complexity** related to AI and other advanced issues will become central. You, as the person who has invested 15 years into developing the business and its AI-related projects, are the best-suited individual to explain these issues. Retaining a lawyer who lacks your technical expertise would increase costs, lengthen the litigation, and create confusion.

1       **Business and Technology Case Management Program** under Maryland Rule 16-208 recognizes the importance of specialized handling of complex business cases. While this rule applies to technology cases, it supports your argument that, given your personal and business involvement with the AI-related issues, you are the most competent individual to represent the LLC in these matters without the need for external counsel.

41

## III  NATURE OF THE CASE

42      The claims in this case arise from the actions of **Ohana Growth Partners, LLC** and **Miles & Stockbridge, PC**, which have caused direct harm to both myself and **MXT3, LLC**. These claims are centered around the **technological development** of artificial intelligence (AI)

solutions that I, as the sole owner and managing member, created and developed through MXT3,
LLC. Given the **intertwined nature of the claims**, it is in the interest of **judicial efficiency and
fairness** to allow me to represent both myself and the LLC Pro Se.

43      **Splitting this litigation** into separate lawsuits—one for me personally and one for
MXT3, LLC—would unnecessarily complicate the proceedings. The claims of **financial
hardship, loss of financing, and business opportunities** are a direct result of the Plaintiff's
actions, and addressing these issues in separate lawsuits would **more than double the time and
cost** involved. **Kearns v. Ford Motor Company** demonstrates that separating an individual
from their business, particularly when they are intimately tied to the creation of the product or
innovation at issue, is inefficient and unjust. Just as Kearns was able to represent himself against
a large corporation due to his deep knowledge of his invention, I am uniquely positioned to
represent MXT3, LLC because of my personal involvement in the business and its technological
developments.

44      MXT3, LLC is currently experiencing **significant financial hardship**, which has resulted
in the **loss of financing** and **business opportunities**. The Plaintiff's actions have exacerbated
these financial challenges, making it **impossible** for the LLC to retain separate legal counsel. The
**Affidavit of Financial Urgency**, as detailed in the **Affidavit of Crayons** (pages 64-81), outlines
these financial struggles. Furthermore, the **Request to Reconsider Enforcement of the
Administrative Judge Ruling Entered on October 11, 2024**, provides additional information
regarding the **defaulting status** of my personal and business finances.

45      In **U.S. v. High Country Broadcasting Co., Inc.**, 3 F.3d 1244 (9th Cir. 1993), the court
held that corporations must generally be represented by attorneys. However, the financial

                                                    EXHIBIT  106

hardship faced by MXT3, LLC and the **interconnected claims** involving myself personally make this case an exception. Forcing MXT3, LLC to retain counsel would impose an undue burden on the business and cause **significant delays**, which would be contrary to the principles of judicial efficiency.

46    Similarly, in **Tinkoff v. United States**, 86 F.2d 868 (7th Cir. 1936), the court affirmed that only attorneys could represent corporations, but when I read the opinion, I believe it came from a desire a fair judicial process where neither part is hindered unfairly, and the assumption made is that Pro Se would be unfairly hindered or hinder the proceedings. I may have been the one hindered in more ways the one, but to the **intertwined nature** of the claims in my case, involving both myself and MXT3, LLC, the hinderance would come from denying this request and this presents a compelling reason for allowing Pro Se representation. **Judicial efficiency, fairness, and the avoidance of duplicative litigation** are key concerns here, and the unique circumstances of my case warrant an exception to the general rule.

47    Maryland courts have established specialized **Business and Technology Courts** under **Md. Rule 16-208** to handle complex technological and business disputes. While the AI-related issues in this case may seem complex, these courts are specifically designed to handle such matters efficiently. Moreover, because both the claims against me and MXT3, LLC are based on the **same set of facts and legal questions**, splitting the litigation would create unnecessary complexity. Allowing me to represent both myself and MXT3, LLC would not only streamline the process but also align with the **judicial efficiency goals** of Maryland's Business and Technology Courts.

Page 11 of 14

48      **Maryland Rule 3-513** permits non-attorneys to represent LLCs in **small claims court**, reflecting a broader principle that businesses should not be forced to retain counsel when it is unnecessary. While this is not a small claims case, the **simplicity of the issues**, **intertwined nature of the claims**, and **financial hardship** make the same principle applicable here. The spirit of this rule is to reduce costs and allow businesses like MXT3, LLC to efficiently resolve disputes without being burdened by legal representation when it is not needed.

49      The case of **In Re Marriage of Ames**, 166 Wash. 2d 255 (2009), recognizes that Pro Se representation is permitted when **no significant prejudice** would result to the other party. While Ames involved family law, the same logic applies in civil litigation where the complexity is not going to hinder proceedings and one party is financially unable to retain counsel. Allowing me to represent both myself and MXT3, LLC would not prejudice the Plaintiff, as the issues are straightforward, and I am fully capable of presenting the case.

50      In **Hawkins v. District Court**, 67 P.3d 755 (Colo. 2003), the court allowed non-attorney representation for businesses in **small claims courts**, reinforcing the principle that business owners can represent their businesses where feasible. Although this case concerned small claims court, it highlights that **capacity and competence** are the key factors in determining whether Pro Se representation should be allowed. Given that I am intimately familiar with the technological and financial matters in question, I am fully capable of representing MXT3, LLC, and requiring separate counsel would serve no practical purpose.

51      **The three-fold nature of this case**—involving complex technology, financial hardship, and intertwined claims—supports the argument that allowing Pro Se representation is both **practical** and **fair**. The actions taken by the Plaintiff have already caused financial harm, as

shown in the court record, which is shared by both me and MXT3, LLC. By consolidating the

representation under a single Pro Se litigant, the Court will save time, money, and resources,

which is consistent with the principles outlined in **Maryland Rule 1-201**. The precedent for

allowing Pro Se representation where fairness and judicial efficiency are at risk already exists in

prior cases, including **Kearns**, **Tinkoff**, and **Hawkins**.


## IV  CONCLUSION:

**WHEREFORE**, the Defendant respectfully requests that this Honorable Court:

Allow the Defendant, **Ryan Dillon-Capps**, to represent MXT3, LLC, as Pro Se in future

litigation.

EXHIBIT   106

<u>RESPECTFULLY SUBMITTED</u>

October 18, 2024           <u>/s/ Ryan Dillon-Capps</u>

Ryan Dillon-Capps (Pro Se)
Email : ryan@mxt3.com
1334 Maple Avenue
Essex, Maryland 21221
Telephone: (703) 303-1113

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 18, 2024, a copy of **Motion to Allow Pro Se Representation**

**of LLC** via email to rbrennen@milesstockbridge.com and served on via first-class mail, postage

prepaid on:

Robert S. Brennen
Miles & Stockbridge P.C.
100 Light Street
Baltimore, Maryland 21202

<u>/s/Ryan Dillon-Capps</u>
Ryan Dillon-Capps (Pro Se)

| | |
|---|---|
| **From:** | Geoff VanMaastricht |
| **To:** | Andrew Dinh; Ryan Wagner |
| **Cc:** | Samantha Foley; Katherine Navarro; Josh Beyer |
| **Subject:** | RE: ACTION REQUIRED - Cyber Security and In Club Media Presale Information |
| **Date:** | Monday, October 23, 2023 9:47:24 AM |
| **Attachments:** | image002.png |
| | image003.png |

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Perfect.  Thank you sir.

**Geoff VanMaastricht**
**Security and Compliance Analyst**

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319 6740
www.planetfitness.com

**From:** Andrew Dinh <adinh@osisupport.com>
**Sent:** Monday, October 23, 2023 9:45 AM
**To:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>; Ryan Wagner
<Ryan.Wagner@ohanagp.com>
**Cc:** Samantha Foley <Samantha.Foley@pfhq.com>; Katherine Navarro
<katherine.navarro@logically.com>; Josh Beyer <Josh.Beyer@ohanagp.com>
**Subject:** Re: ACTION REQUIRED - Cyber Security and In Club Media Presale Information

Sorry. CeiloIT is the IT company supporting for Ohana Growth Partners. Onsite Solutions Inc will be doing the installation on the new build on behalf of the ownership group.

Thank you.

Andrew Dinh
Onsite Solutions Inc.
adinh@osisupport.com

Andrew Dinh Sent the
Wheaton Compliance
Report In, and have
affrimed this to be true.

859.806.5520 Mobile
866.465.0330 ext 2 (Technical Support)
www.osisupport.com

Intel Gold Technology Provider 2011
Microsoft Partner - Silver Small and Midmarket Cloud Solutions
Datto Elite Partner
HP Authorized Partner
Dell Technology Partner

*****************************************************************************

**\*\*\*\*\*\*\*\*\*\*\***

The information contained in this message, including attachments, may contain privileged or confidential information that is intended to be delivered only to the person identified above. If you are not the intended recipient, or the person responsible for delivering this message to the intended recipient, Onsite Solutions Inc. requests
that you immediately notify the sender and asks that you do not read the message or its attachments, and that you delete them without copying or sending them to anyone else

**From:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
**Sent:** Monday, October 23, 2023 8:37 AM
**To:** Andrew Dinh <adinh@osisupport.com>; Ryan Wagner <Ryan.Wagner@ohanagp.com>
**Cc:** Samantha Foley <Samantha.Foley@pfhq.com>; Katherine Navarro <katherine.navarro@logically.com>; Josh Beyer <Josh.Beyer@ohanagp.com>
**Subject:** RE: ACTION REQUIRED - Cyber Security and In Club Media Presale Information

Hi Andrew. I did, but it's showing the LV installer as Cielo.

**Geoff VanMaastricht**
**Security and Compliance Analyst**

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319 6740
www.planetfitness.com

**From:** Andrew Dinh <adinh@osisupport.com>
**Sent:** Monday, October 23, 2023 9:32 AM
**To:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>; Ryan Wagner <Ryan.Wagner@ohanagp.com>
**Cc:** Samantha Foley <Samantha.Foley@pfhq.com>; Katherine Navarro <katherine.navarro@logically.com>; Josh Beyer <Josh.Beyer@ohanagp.com>
**Subject:** Re: ACTION REQUIRED - Cyber Security and In Club Media Presale Information

Geoff, Please verify that you received. It has been submitted.

Thank you.

Andrew Dinh
Onsite Solutions Inc.
adinh@osisupport.com

859.806.5520 Mobile
866.465.0330 ext 2 (Technical Support)
www.osisupport.com

Intel Gold Technology Provider 2011
Microsoft Partner - Silver Small and Midmarket Cloud Solutions
Datto Elite Partner
HP Authorized Partner
Dell Technology Partner

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*

The information contained in this message, including attachments, may contain
privileged or confidential information that is intended to be delivered only to the
person identified above. If you are not the intended recipient, or the person
responsible for delivering this message to the intended recipient, Onsite
Solutions Inc. requests
that you immediately notify the sender and asks that you do not read the message or its
attachments, and that you delete them without copying or sending them to anyone else

**From:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
**Sent:** Monday, October 23, 2023 8:22 AM
**To:** Ryan Wagner <Ryan.Wagner@ohanagp.com>; Andrew Dinh <adinh@osisupport.com>
**Cc:** Samantha Foley <Samantha.Foley@pfhq.com>; Katherine Navarro
<katherine.navarro@logically.com>; Josh Beyer <Josh.Beyer@ohanagp.com>
**Subject:** RE: ACTION REQUIRED - Cyber Security and In Club Media Presale Information

Good Morning Everyone

Still waiting for the tracking form.  Please submit ASAP.

**Geoff VanMaastricht**
**Security and Compliance Analyst**

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319 6740
www.planetfitness.com

**From:** Geoff VanMaastricht
**Sent:** Wednesday, October 11, 2023 4:12 PM
**To:** Ryan Wagner <Ryan.Wagner@ohanagp.com>; Andrew Dinh <adinh@osisupport.com>
**Cc:** Samantha Foley <Samantha.Foley@pfhq.com>; Katherine Navarro
<katherine.navarro@logically.com>; Josh Beyer <Josh.Beyer@ohanagp.com>
**Subject:** RE: ACTION REQUIRED - Cyber Security and In Club Media Presale Information

No sir.  The tracking form has not been submitted.

    EXHIBIT  106

**Geoff VanMaastricht**
Security and Compliance Analyst

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319 6740
www.planetfitness.com

**From:** Ryan Wagner <Ryan.Wagner@ohanagp.com>
**Sent:** Wednesday, October 11, 2023 4:08 PM
**To:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>; Andrew Dinh
<adinh@osisupport.com>
**Cc:** Samantha Foley <Samantha.Foley@pfhq.com>; Katherine Navarro
<katherine.navarro@logically.com>; Josh Beyer <Josh.Beyer@ohanagp.com>
**Subject:** Re: ACTION REQUIRED - Cyber Security and In Club Media Presale Information

@Andrew Dinh HQ is asking about the compliance form.  Has this been completed?

This message may include text created with the help of natural language processing.

Book time to meet with me

**Ryan Wagner**
**Vice President of IT**
**Ohana Growth Partners, LLC**

 office 410-252-8058 x109
212 W. Padonia Rd
Timonium, MD 21093
www.planetfitness.com

**"Culture eats strategy for breakfast"**

**From:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
**Sent:** Wednesday, October 11, 2023 3:52 PM
**To:** Ryan Wagner <Ryan.Wagner@ohanagp.com>

                    EXHIBIT  106

**Cc:** Samantha Foley <Samantha.Foley@pfhq.com>; Katherine Navarro
<katherine.navarro@logically.com>
**Subject:** ACTION REQUIRED - Cyber Security and In Club Media Presale Information

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello Everyone,

RE: Wheaton, MD 3375        link to tracking form

**Current dates in FRM – if these are incorrect, please work with Samantha Foley to update.**

- **Projected Open Date: 12/15/2023**
- **Physical presale start date:**
  - ○ **Orders and tracking form due by: (deadline thirty days before physical presale start date)**
- **Online presale start date: 10/23/2023**
  - ○ **If there will be no physical presale, orders and tracking form due by: 10/16/2023(deadline sixty days before club opening date)**

This email is a reminder for you to ensure all new Planet Fitness stores comply with the current PCI and IT Requirements defined by PFHQ.  Below are the key areas to focus on that will ensure IT compliance across your clubs.  The table that follows conveniently lists additional details and vendor contact information for you as well.  If you have any questions, please don't hesitate to contact us at itcompliance@pfhq.com .

**PCI/IT Compliance** - As part of the IT Compliance Program, new club builds are required to confirm the ordering and installation of necessary PCI and cybersecurity hardware.  Please follow the link below to an online form where you will confirm the orders of these critical components for any scheduled new store opening. **You will need to submit this IT Compliance Form before going into pre-sales**.  You can access the form here.

**Wi-Fi** – All new club builds are **required** to install one of the two approved Wi-Fi vendors; *Deep Blue* and now *Cerdant*.  The number of AP's for a standard 20,000 sq. ft club is minimally 4, but depending on the layout, you may feel the need to add more.  Also, as you begin any renovations with the existing clubs that currently have a waivered Wi-Fi solution, you will be required to replace that with either Deep Blue or Cerdant.

**In-Club Media** – All new club builds (except Mexico and Australia) are required to install ***ROCKBOT*** as the in-club media system.  The Rockbot order form can be accessed here.  The form will request the name of your approved installation vendor* (contact info listed below).  PFHQ strongly recommends engaging with one of the two approved vendors to ensure the same standards and configuration are applied across all new stores, ensuring the in-club experience is consistent for our

members across the brand.

| Service Provided | Contact Info |
| --- | --- |
| Follow this link to Connection/PF IT Purchasing Portal<br>(*This is an option for purchasing the locking network cabinet, but franchisees can order the cabinet from any provider they choose*) | **Connection**<br>**David Thomas**<br>Direct: 800-986-4288 \|<br>david.thomas@connection.com |
| **Certified IT Low Voltage & In-Club Media Vendors**<br>(*Installation and management services for IT network cabling, PC's, network cabinet, In-Club Media; audio/visual, digital signage, etc.*)<br><br>(*Clubs have the option to use another vendor of their choosing, but will be required to engage one of the three vendors listed to conduct an IT Compliance Assessment within 60 days of opening to certify the installation of all PCI related and mandatory hardware.*)<br><br>**Clubs who do not use certified vendors for the complete network installation (cabling, hardware, and cabinet) will be in scope for a Compliance Assessment.** | **Code Blue**<br>Guido Ronghi<br>sales@teamcodeblue.com<br>855-343-3533<br>*approved in-club media installer |
| | **ASD**<br>**Daniel Danhour**<br>ddanhour@asd-usa.com<br>800-222-5464<br>*approved in-club media installer |
| **Wi-Fi Providers**<br>(*Clubs are **required** to use one of the two approved vendors for in-club Wi-Fi solutions*). | **Deep Blue**<br>**Thory Coquillo**<br>Thory_Coquillo@comcast.com<br>859-749-5867 |
| | **Cerdant**<br>**Todd Barrett**<br>todd.barrett@logically.com<br>614-652-9990 |
| **Firewall & POS Network Switch**<br>(Clubs are required to order both of these items directly from Cerdant. | **Cerdant**<br>**Todd Barrett**<br>todd.barrett@logically.com<br>614-652-9990 |

**Pre-Sales Timelines:**
- **45 days** prior to pre-sales going live you should contact all of the hardware vendors listed

above and one of the mandatory Wi-Fi vendors to get all paperwork in order.
(**Please Note:** while enterprise grade Wi-Fi is not required for pre-sales, the **Proper** acquisition of hardware and services for your club is.)

- **30 Days** prior to pre-sales going live all orders must be completed and installation timelines communicated.
- **14 Days** prior to pre-sales **all hardware** should arrive onsite and be installed prior to going live.

**New Club with No Physical Pre-Sales Timeline:**
- **90 days** prior to a club going live you should contact all of the hardware vendors listed above and one of the mandatory Wi-Fi vendors to get all paperwork in order.
- **60 days** prior to a club going live all orders must be completed and installation timelines communicated.
- **30 days** prior to a club opening all hardware should be onsite and installed.

**The PFHQ Compliance Team actively monitors the status of service and hardware acquisition of all mandatory vendors.  The end goal here is protecting our member's data as well as the Planet Fitness brand One Team, One Planet.**


Please contact me with your questions or concerns.


Kind regards,


**Geoff VanMaastricht**
**Security and Compliance Analyst**
_____

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319 6740
www.planetfitness.com



| | |
|---|---|
| **From:** | Geoff VanMaastricht |
| **To:** | Ryan Wagner |
| **Subject:** | FW: Changes to Compliance - New Build Tracker: 3375 |
| **Date:** | Thursday, November 30, 2023 2:59:25 PM |

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Here ya go

**Geoff VanMaastricht**
**Security and Compliance Analyst**

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319 6740
www.planetfitness.com

**From:** Geoff VanMaastricht via Smartsheet <automation@app.smartsheet.com>
**Sent:** Monday, October 23, 2023 9:33 AM
**To:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
**Subject:** Changes to Compliance - New Build Tracker: 3375



Compliance - New Build Tracker

Changes since 10/23/23 9:31 AM

**1** row added

**1** row added or updated (shown in yellow)

Row 1

**Updated SF**



| | |
|---|---|
| **PF Club ID** | 3375 |
| **Group Name** | G0007-BRICK |
| **Club Name/Location** | Wheaton MD |
| **Cerdant Firewall Ordered** | 06/01/23 |
| **Cerdant Firewall Installed** | |
| **Cerdant Aerohive POS Switch Ordered** | 06/01/23 |
| **Cerdant Aerohive POS Switch Installed** | |
| **Locking Cabinet Ordered** | 06/01/23 |
| **Locking Network Cabinet Installed** | |
| ▮▮▮▮ | ▮▮▮▮ |
| **Wi-Fi Solution** | 06/01/23 |



| | | |
|---|---|---|
| **Ordered** | | |
| **Mandatory Wi-Fi Support Vendor** | Cerdant | |
| **Rockbot Solution Ordered** | 06/01/23 | |
| **Submitted By** | Ryan Wagner | |
| **Email Address** | Ryan.Wagner@orianagp.com | |
| **Name of Wi-Fi Vendor (if other)** | | |

Andrew Dinh has never been authorized to use Ryan Dillon-Capps, Formerly Wagner, name. This form is completed Online, and is tied to a publicly traded company, NYSE: Planet Fitness, compliance.

Identity Theft, Aggravated Identity Theft, Wire Fraud, Computer Fraud and Abuse Act, Forgery, Abuse Device Fraud, Interstate Transmission of Fraudulent Documents, False Statements, and possibly the E-Sign Act.

Changes made by web-form@smartsheet.com

You are receiving this email because you are subscribed to a workflow "New IT Compliance Form Submitted" (ID# 3799643852171140) on sheet Compliance - New Build Tracker

Exclude your changes from all notifications | Unsubscribe

Powered by Smartsheet Inc. | Privacy Policy | Report Abuse/Spam

EXHIBIT   106

| | |
|---|---|
| **From:** | Geoff VanMaastricht |
| **To:** | Ryan Wagner |
| **Subject:** | FW: Changes to Compliance - New Build Tracker: 135 |
| **Date:** | Friday, March 1, 2024 1:10:16 PM |

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**Geoff VanMaastricht**
**Security and Compliance Analyst**

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319 6740
www.planetfitness.com

**From:** Geoff VanMaastricht via Smartsheet <automation@app.smartsheet.com>
**Sent:** Tuesday, April 5, 2022 2:47 PM
**To:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
**Subject:** Changes to Compliance - New Build Tracker: 135



## Compliance - New Build Tracker

Changes since 4/5/22 2:45 PM

**1** row added

**1** row added or updated (shown in <mark>yellow</mark>)

Row 1

**Updated SF**

EXHIBIT  106



| | |
|---|---|
| **PF Club ID** | 135 |
| **Group Name** | G0007-BRICK |
| **Club Name/Location** | Planet Fitness Gallery Place / Washington DC |
| **Cerdant Firewall Ordered** | 03/28/22 |
| **Cerdant Firewall Installed** | |
| **Cerdant Aerohive POS Switch Ordered** | 03/28/22 |
| **Cerdant Aerohive POS Switch Installed** | |
| **Locking Cabinet Ordered** | 03/18/22 |
| **Locking Network Cabinet Installed** | |
| **TFLess Without Installer** | Non-Certified Vendor — Non-Certified Vendor is Andrew Dinh/ Onsite Solutions, Inc. |
| **Wi-Fi Solution** | 04/05/22 |



| | |
|---|---|
| **Ordered** | |
| **Mandatory Wi-Fi Support Vendor** | Deep Blue |
| **Rockbot Solution Ordered** | 03/18/22 |
| **Submitted By** | ██████ |
| **Email Address** | bill.flax@pfgrwth.com |
| **Name of Wi-Fi Vendor (if other)** | |

> Everyone knows to sign their own name.

Changes made by web-form@smartsheet.com

You are receiving this email because you are subscribed to a workflow "New IT Compliance Form Submitted" (ID# 3799643852171140) on sheet
Compliance - New Build Tracker

Exclude your changes from all notifications   Unsubscribe

Powered by Smartsheet Inc. | Privacy Policy | Report Abuse/Spam

| | |
|---|---|
| **From:** | Geoff VanMaastricht |
| **To:** | Ryan Wagner |
| **Subject:** | FW: Changes to Compliance - New Build Tracker: 3022 |
| **Date:** | Friday, March 1, 2024 1:09:31 PM |

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**Geoff VanMaastricht**
**Security and Compliance Analyst**

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319 6740
www.planetfitness.com

**From:** Geoff VanMaastricht via Smartsheet <automation@app.smartsheet.com>
**Sent:** Tuesday, August 1, 2023 10:40 AM
**To:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
**Subject:** Changes to Compliance - New Build Tracker: 3022



Compliance - New Build Tracker

Changes since 8/1/23 10:38 AM

**1** row added

**1** row added or updated (shown in yellow)

Row 1

**Updated SF**

EXHIBIT  106



| | |
|---|---|
| **PF Club ID** | 3022 |
| **Group Name** | G0007-BRICK |
| **Club Name/Location** | Monroe WA |
| **Cerdant Firewall Ordered** | 03/07/23 |
| **Cerdant Firewall Installed** | |
| **Cerdant Aerohive POS Switch Ordered** | 03/07/23 |
| **Cerdant Aerohive POS Switch Installed** | |
| **Locking Cabinet Ordered** | 06/29/23 |
| **Locking Network Cabinet Installed** | |
| **IT Low Voltage Installer** | Non-Certified Vendor |
| **Wi-Fi Solution** | 03/07/23 |

EXHIBIT  106



| | |
|---|---|
| Ordered | |
| Mandatory Wi-Fi Support Vendor | Cerdant |
| Rockbot Solution Ordered | 05/10/23 |
| Submitted By | Andrew Dinh |
| Email Address | adinh@osisupport.com |  Even Andrew Dinh |
| Name of Wi-Fi Vendor (if other) | |

Changes made by web-form@smartsheet.com

You are receiving this email because you are subscribed to a workflow "New IT Compliance Form Submitted" (ID# 3799643852171140) on sheet Compliance - New Build Tracker

Exclude your changes from all notifications    Unsubscribe

Powered by Smartsheet Inc. | Privacy Policy | Report Abuse/Spam

**From:** Geoff VanMaastricht
**To:** Ryan Wagner
**Subject:** FW: Changes to Compliance - New Build Tracker: 3254
**Date:** Friday, March 1, 2024 1:09:51 PM

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**Geoff VanMaastricht**
**Security and Compliance Analyst**

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319 6740
www.planetfitness.com

**From:** Geoff VanMaastricht via Smartsheet <automation@app.smartsheet.com>
**Sent:** Wednesday, October 12, 2022 3:11 PM
**To:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
**Subject:** Changes to Compliance - New Build Tracker: 3254

## Compliance - New Build Tracker

Changes since 10/12/22 3:07 PM

**1** row added

**1** row added or updated (shown in <mark>yellow</mark>)

Row 1

**Updated SF**



        EXHIBIT  106



| | |
|---|---|
| **PF Club ID** | 3254 |
| **Group Name** | G0007-BRICK |
| **Club Name/Location** | Parkland FL |
| **Cerdant Firewall Ordered** | 09/01/22 |
| **Cerdant Firewall Installed** | |
| **Cerdant Aerohive POS Switch Ordered** | 09/01/22 |
| **Cerdant Aerohive POS Switch Installed** | |
| **Locking Cabinet Ordered** | 09/01/22 |
| **Locking Network Cabinet Installed** | |
| | Non-Certified Vendor |
| **Wi-Fi Solution** | 10/07/22 |

EXHIBIT  106



| | |
|---|---|
| **Ordered** | |
| **Mandatory Wi-Fi Support Vendor** | Deep Blue |
| **Rockbot Solution Ordered** | 09/01/22 |
| **Submitted By** | Andrew Dinh |
| **Email Address** | adinh@osisupport.com |
| **Name of Wi-Fi Vendor (if other)** | |

Changes made by web-form@smartsheet.com

You are receiving this email because you are subscribed to a workflow "New IT Compliance Form Submitted" (ID# 3799643852171140) on sheet Compliance - New Build Tracker

Exclude your changes from all notifications   Unsubscribe

Powered by Smartsheet Inc. | Privacy Policy | Report Abuse/Spam

**From:** Geoff VanMaastricht
**To:** Ryan Wagner
**Subject:** FW: Changes to Compliance - New Build Tracker: 3799
**Date:** Friday, March 1, 2024 1:09:49 PM

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**Geoff VanMaastricht**
**Security and Compliance Analyst**

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319.6740
www.planetfitness.com

**From:** Geoff VanMaastricht via Smartsheet <automation@app.smartsheet.com>
**Sent:** Tuesday, August 1, 2023 10:37 AM
**To:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
**Subject:** Changes to Compliance - New Build Tracker: 3799



Compliance - New Build Tracker

Changes since 8/1/23 10:34 AM

**1** row added

**1** row added or updated (shown in <mark>yellow</mark>)

Row 1

**Updated SF**

EXHIBIT   106



| | |
|---|---|
| PF Club ID | 3799 |
| Group Name | G0007-BRICK |
| Club Name/Location | Takoma Park MD |
| Cerdant Firewall Ordered | 03/07/23 |
| Cerdant Firewall Installed | |
| Cerdant Aerohive POS Switch Ordered | 08/07/23 |
| Cerdant Aerohive POS Switch Installed | |
| Locking Cabinet Ordered | 07/07/23 |
| Locking Network Cabinet Installed | |
| Low Voltage installed | Cielo did NOT do Takoma Park. |
| Wi-Fi Solution | 03/07/23 |



| | |
|---|---|
| **Ordered** | |
| **Mandatory Wi-Fi Support Vendor** | Cerdant |
| **Rockbot Solution Ordered** | 07/28/23 |
| **Submitted By** | Andrew Dinh |
| **Email Address** | adinh@osisupport.com |
| **Name of Wi-Fi Vendor (if other)** | |

Changes made by web-form@smartsheet.com

You are receiving this email because you are subscribed to a workflow "New IT Compliance Form Submitted" (ID# 3799643852171140) on sheet Compliance - New Build Tracker

Exclude your changes from all notifications   Unsubscribe

Powered by Smartsheet Inc. | Privacy Policy | Report Abuse/Spam

**From:** Geoff VanMaastricht
**To:** Ryan Wagner
**Subject:** FW: Changes to Compliance - New Build Tracker: 3804
**Date:** Friday, March 1, 2024 1:10:05 PM

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**Geoff VanMaastricht**
**Security and Compliance Analyst**

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319 6740
www.planetfitness.com

**From:** Geoff VanMaastricht via Smartsheet <automation@app.smartsheet.com>
**Sent:** Wednesday, October 12, 2022 3:05 PM
**To:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
**Subject:** Changes to Compliance - New Build Tracker: 3804

## Compliance - New Build Tracker

Changes since 10/12/22 3:02 PM

**1** row added

**1** row added or updated (shown in <mark>yellow</mark>)

Row 1

**Updated SF**



EXHIBIT   106



| | |
|---|---|
| **PF Club ID** | 3804 |
| **Group Name** | G0007-BRICK |
| **Club Name/Location** | Marysville (Smokey Point), WA |
| **Cerdant Firewall Ordered** | 09/01/22 |
| **Cerdant Firewall Installed** | |
| **Cerdant Aerohive POS Switch Ordered** | 09/01/22 |
| **Cerdant Aerohive POS Switch Installed** | |
| **Locking Cabinet Ordered** | 09/01/22 |
| **Locking Network Cabinet Installed** | |
| **[illegible]** | Non-Certified Vendor |
| **Wi-Fi Solution** | 09/01/22 |



| | |
|---|---|
| **Ordered** | |
| **Mandatory Wi-Fi Support Vendor** | Cerdant |
| **Rockbot Solution Ordered** | 09/01/22 |
| **Submitted By** | Andrew Dinh |
| **Email Address** | adinh@osisupport.com |
| **Name of Wi-Fi Vendor (if other)** | |

Changes made by web-form@smartsheet.com

You are receiving this email because you are subscribed to a workflow "New IT Compliance Form Submitted" (ID# 3799643852171140) on sheet Compliance - New Build Tracker

Exclude your changes from all notifications | Unsubscribe

Powered by Smartsheet Inc. | Privacy Policy | Report Abuse/Spam

| | |
|---|---|
| **From:** | Geoff VanMaastricht |
| **To:** | Ryan Wagner |
| **Subject:** | FW: Changes to New Build Compliance Tracker: 3311 |
| **Date:** | Friday, March 1, 2024 1:10:25 PM |

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**Geoff VanMaastricht**
**Security and Compliance Analyst**

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319 6740
www.planetfitness.com

**From:** Christian Andrzejczyk via Smartsheet <automation@app.smartsheet.com>
**Sent:** Wednesday, July 28, 2021 9:54 AM
**To:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
**Subject:** Changes to New Build Compliance Tracker: 3311



## New Build Compliance Tracker

Changes since 7/28/21 9:52 AM

**1** row added

**1** row added or updated (shown in <mark>yellow</mark>)

Row 1

**Updated SF**

EXHIBIT   106



| | |
|---|---|
| **PF Club ID** | 3311 |
| **Group Name** | G0007-BRICK |
| **Club Name/Location** | DelRay Beach |
| **Cerdant Firewall Ordered** | 05/20/21 |
| **Cerdant Firewall Installed** | |
| **Cerdant Aerohive POS Switch Ordered** | 05/20/21 |
| **Cerdant Aerohive POS Switch Installed** | |
| **Locking Cabinet Ordered** | 05/17/20 |
| **Locking Network Cabinet Installed** | |
| | | This is the only club NOT completed by Andrew Dinh. |
| **Wi-Fi Solution** | 05/17/21 |

EXHIBIT   106



| | |
|---|---|
| **Ordered** | |
| **Wi-Fi Vendor** | Deep Blue |
| **Rockbot Solution Ordered** | 06/22/21 |
| **Submitted By** | ▓▓▓▓ |
| **Email Address** | ▓▓▓▓ |
| **Name of Wi-Fi Vendor (if other)** | |

Everyone knows to use their own name. The Instructions are clear "submitted by"

Changes made by web-form@smartsheet.com

You are receiving this email because you are subscribed to a workflow "New IT Compliance Form Submitted" (ID# 3799643852171140) on sheet **New Build Compliance Tracker**

Exclude your changes from all notifications | Unsubscribe

Powered by Smartsheet Inc. | Privacy Policy | Report Abuse/Spam

**From:** Geoff VanMaastricht
**To:** Ryan Wagner
**Subject:** FW: Changes to New Build Compliance Tracker: 08076
**Date:** Friday, March 1, 2024 1:10:36 PM

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**Geoff VanMaastricht**
**Security and Compliance Analyst**

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319 6740
www.planetfitness.com

**From:** Christian Andrzejczyk via Smartsheet <automation@app.smartsheet.com>
**Sent:** Wednesday, July 7, 2021 6:00 PM
**To:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
**Subject:** Changes to New Build Compliance Tracker: 08076



**New Build Compliance Tracker**

Changes since 7/7/21 5:57 PM



**1** row added

**1** row added or updated (shown in <mark>yellow</mark>)

Row 1

**Updated SF**

EXHIBIT   106



| | |
|---|---|
| **PF Club ID** | 08076 |
| **Group Name** | G0007-BRICK |
| **Club Name/Location** | Ellicott City |
| **Cerdant Firewall Ordered** | 05/18/21 |
| **Cerdant Firewall Installed** | |
| **Cerdant Aerohive POS Switch Ordered** | 05/18/21 |
| **Cerdant Aerohive POS Switch Installed** | |
| **Locking Cabinet Ordered** | 05/18/21 |
| **Locking Network Cabinet Installed** | |
| | Onsite Solutions Did this Work |
| **Wi-Fi Solution** | 05/18/21 |

EXHIBIT 106



| | |
|---|---|
| **Ordered** | |
| **Wi-Fi Vendor** | Deep Blue |
| **Rockbot Solution Ordered** | 04/20/21 |
| **Submitted By** | ▮▮▮▮▮ |
| ▮▮▮▮▮ | ▮▮▮@▮▮▮.▮▮ |
| **Name of Wi-Fi Vendor (if other)** | |

Eduardo Garcia did not complete this form to the best of RDC knowledge.

Changes made by web-form@smartsheet.com

You are receiving this email because you are subscribed to a workflow "New IT Compliance Form Submitted" (ID# 3799643852171140) on sheet New Build Compliance Tracker

Exclude your changes from all notifications | Unsubscribe

Powered by Smartsheet Inc. | Privacy Policy | Report Abuse/Spam

| | |
|---|---|
| **From:** | Geoff VanMaastricht |
| **To:** | Ryan Wagner |
| **Subject:** | FW: Changes to Compliance - New Build Tracker: 4119 |
| **Date:** | Friday, March 1, 2024 1:09:13 PM |

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**Geoff VanMaastricht**
**Security and Compliance Analyst**

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319.6740
www.planetfitness.com

**From:** Geoff VanMaastricht via Smartsheet <automation@app.smartsheet.com>
**Sent:** Tuesday, November 14, 2023 9:10 AM
**To:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
**Subject:** Changes to Compliance - New Build Tracker: 4119



## Compliance - New Build Tracker

Changes since 11/14/23 9:07 AM

**1** row added

**1** row added or updated (shown in <mark>yellow</mark>)

Row 1

**Updated SF**

EXHIBIT  106



| | |
|---|---|
| PF Club ID | 4119 |
| Group Name | G0007-BRICK |
| Club Name/Location | Lake Stevens WA |
| Cerdant Firewall Ordered | 03/07/23 |
| Cerdant Firewall Installed | |
| Cerdant Aerohive POS Switch Ordered | 03/07/23 |
| Cerdant Aerohive POS Switch Installed | |
| Locking Cabinet Ordered | 03/23/23 |
| Locking Network Cabinet Installed | |
| | |
| Wi-Fi Solution | 03/07/23 |

EXHIBIT   106



| Ordered | |
| --- | --- |
| **Mandatory Wi-Fi Support Vendor** | Cerdant |
| **Rockbot Solution Ordered** | 07/07/23 |
| Submitted By | Andrew Dinh |
| Email Address | adinh@censupport.spam |
| **Name of Wi-Fi Vendor (if other)** | |

Changes made by web-form@smartsheet.com

You are receiving this email because you are subscribed to a workflow "New IT Compliance Form Submitted" (ID# 3799643852171140) on sheet Compliance - New Build Tracker

Exclude your changes from all notifications | Unsubscribe

Powered by Smartsheet Inc. | Privacy Policy | Report Abuse/Spam

EXHIBIT    106

**From:** Geoff VanMaastricht
**To:** Ryan Wagner
**Subject:** FW: Changes to New Build Compliance Tracker: 2638
**Date:** Friday, March 1, 2024 1:10:46 PM

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**Geoff VanMaastricht**
**Security and Compliance Analyst**

**Planet Fitness World Headquarters**
**Home of the Judgement Free Zone®**
4 Liberty Lane West, Hampton, NH 03842
**Phone:** 603.319 6740
www.planetfitness.com

**From:** Christian Andrzejczyk via Smartsheet <automation@app.smartsheet.com>
**Sent:** Thursday, April 1, 2021 3:13 PM
**To:** Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
**Subject:** Changes to New Build Compliance Tracker: 2638



## New Build Compliance Tracker

Changes since 4/1/21 3:10 PM



---

**1** row added

**1** row added or updated (shown in <mark>yellow</mark>)

Row 1

**Updated SF**



| | |
|---|---|
| **PF Club ID** | 2638 |
| **Group Name** | G0007-BRICK |
| | |
| **Cerdant Firewall Ordered** | 03/25/21 |
| **Cerdant Firewall Installed** | |
| **Cerdant Aerohive POS Switch Ordered** | 03/25/21 |
| **Cerdant Aerohive POS Switch Installed** | |
| **Locking Cabinet Ordered** | 03/25/21 |
| **Locking Network Cabinet Installed** | |
| | |
| **Wi-Fi Solution** | 03/25/21 |

San Bruno is the source of the SECOND instance of fraud discovered in December 2023. Not this -- a fake email thread involving a contract signed 6 months before the fake thread was dated. The subject was an unsigned contract.
An intent to portray RDC as unresponsive.



| Ordered | |
|---|---|
| **Wi-Fi Vendor** | Cerdant |
| **Rockbot Solution Ordered** | 04/02/21 RDC did not complete this form |
| **Submitted By** | ████████ |
| **Email Address** | ████████████████ |
| **Name of Wi-Fi Vendor (if other)** | |

Changes made by web-form@smartsheet.com

You are receiving this email because you are subscribed to a workflow "New IT Compliance Form Submitted" (ID# 3799643852171140) on sheet New Build Compliance Tracker

Exclude your changes from all notifications | Unsubscribe

Powered by Smartsheet Inc. | Privacy Policy | Report Abuse/Spam

**Ryan Dillon-Capps**

> 3 of the emails sent June 6th to 10th. Holly Butler's pretense was to be investigating the very fraud that came with a confession in writing. Richard Hartman closed it in retaliation to … Request for Information Regarding Legal Representation, and echoing the court's chat of fraud and cover-up … denying reality believing MORE fraud and MORE felonies will resolve this issue.

| | |
|---|---|
| **From:** | Ryan Wagner |
| **Sent:** | Monday, June 10, 2024 7:14 AM |
| **To:** | Justin Drummond; Stacey Wittelsberger (ESC); C. Victor Brick; Lynne Brick B.S.N. M.A.; Terry Woods (Planet Fitness); Earl Ihle; Butler, Holly Drumheller |
| **Subject:** | Re: Request for Information Regarding Legal Representation |

**Mr Butler, Holly Drumheller**  In light of recent developments and ongoing concerns about a potentially hostile workplace at Ohana Growth Partners, we are seeking further clarification and information based on your investigation. We have attached screenshots as evidence to support our concerns.

**Hostile Workplace Indicators**

**Pattern of Retaliation:**

- **Merlowe Henry:** I was informed that Merlowe used to report to Bill Flax until an incident in which Bill publicly yelled at her. Despite her protest, she now falls under the development department once again.

  - In 2023, I reached out to other PF Groups to understand their team organization, and most grouped facilities and IT together or reported to the same member of leadership. Given their close collaboration, this organizational structure makes sense.

- **Allyson Ratliff:** Allyson faced resistance when visiting a new club preparing to open, which was upsetting for both her and Brian Chang. We both responded by making an urgent phone call to Rich to discuss it, and we both had carefully drafted written statements in opposition.

> | | |
> |---|---|
> | **From:** | Rich Hartman <Rich.Hartman@ohanagp.com> |
> | **Sent time:** | 11/03/2023 03:19:28 PM |
> | **To:** | Justin Drummond |
> | **Subject:** | Re: Call |
> | **Attachments:** | ohanagplogo648x50_fe880135-d9e6-43db-b43b-76841a418770png   ohanagovfsportswidndlogo_7fab0ba3-2908-40ec-830a-12ba06b44e6.png |
>
> JD...this is picking up steam. Besides this email below from Josh, I received a call from Allyson about an hour ago. Pretty worked up. We don't have to discuss now but maybe early next week about the next steps. I am thinking we may need to pull parties together and rip the band-aid off to clear the air and try and reset relationships.
>
> **From:** Josh Beyer <Josh.Beyer@ohanagp.com>
> **Sent:** Friday, November 3, 2023 10:32 AM
> **To:** Rich Hartman <Rich.Hartman@ohanagp.com>
> **Subject:** Call
>
> Rich,
>
> After yesterday's call, I need some time as I am not really happy with the way things are going. It has been brought to my attention that it is time the Allyson treatment of Brian Chang is addressed. He has taken much abuse from her during our recent builds. To the point he has adjusted his schedule, so he doesn't have to interact with her. If Bill is going to be called out because he is not communicating well and I am going to document this, she needs to be addressed now as well. I am going to have Bill come and speak with you about her treatment of Brian and what he has seen and been told.
>
> I am going to continue to work with Bill and the Ops team about communication like I communicated on the call, but I need some help with her. The reason Brian has not wanted Bill to say anything is because of the treatment Brian will get from her once it is brought to light. I am not trying to start a back and forth here, but Brian really struggles with her.
>
> Now on the personal side. More than 60% of my review was about Ryan and my interactions with him. I have tried having weekly calls to help work with him better, but it is worthless. The continued finger pointing, the insubordination and the refusal to accept responsibility don't work for me. I am open to any help you may be able to provide to help me work better with him. Classes, meditation, anything. Thank you in advance for any help you can provide.

**Questions:**

- Did your investigation reveal a pattern of retaliation involving gender-based bias?

- Did your investigation reveal a pattern in how these incidents were submitted?

- Are there any potential issues from reassigning Merlowe to work in the same department where a previously reported hostile event occurred?

- Did your investigation reveal any issues in other interactions between Merlowe and the development department?

**Intimidation and Hostile Interactions:**

- **Meeting with Rich Hartman:** In the meeting with HR to provide my written statement, Rich began by saying, "Filing false allegations against C-level executives is very serious." After being accused of being unprepared, HR refused to accept my written statement and said they would provide me with a form that they did not bring to the scheduled meeting.

- **Retaliation Incident:** While at the office, I have had two team members barge into my office and begin yelling at me, one barge into a conference room and begin yelling at me, and another stand up to initiate communication by yelling at me. The latter was Kristen Seiler, who interrupted LeeAnn and me as we discussed options for upgrading her workspace. Other incidents included Merlowe Henry with Bill Flax, Shannon Anderson, who reported Josh Beyer to Glenn Norris, and twice with Glenn Norris, who witnessed a former Brick Bodies employee and Josh Gerber yelling. There was no reprimand, formal conversation, or apology. By the end of 2023, Jared was bragging about doing it. The only words I said to Kristen were to the effect of "That is the plan" in a calm response. When I found out days later, I was confused, and it instantly triggered my fawning trauma response.

Subject: Complaint
From: Rich Hartman <Rich.Hartman@ohanagp.com>
To: Josh Beyer <Josh.Beyer@ohanagp.com>, Josh Gerber <Josh.Gerber@ohanagp.com>, Glenn Norris
<glenn@ohanagp.com>, Justin Drummond <Justin.Drummond@ohanagp.com>
Cc: Karen Debus <karen.debus@ohanagp.com>
Date: November 10, 2023 12:16:40 PM
Attachments: ohanagrowthpartnersfinallogo_7fa8dba2-2909-40ee-839a-12ba06da3de6.png
--

Team,

There has been a hostile work environment claim filed by Ryan Wagner alleging that over the past 3 years he has
been bullied and verbally abused by the four of you. I asked Ryan to get together with me early next week to go
over his complaint. I will be reaching out to all of you to get your statements. In order to not escalate the
current tensions and or environment, I ask that you not discuss this with anyone including Ryan. Should you
need to communicate with Ryan going forward, I ask that you keep it on point regarding work and or business
needs and not on this topic until resolved. I do not want to see anything that can be deemed as retaliatory in
any way. This includes texts, emails, calls, or conversations discussing this issue. We will work to get to the
bottom of this in a professional manner and resolve this amicably. Thank you and if you have any questions,
please call me.

**Questions:**

- Are there any legal issues in notifying Josh Gerber and Josh Beyer minutes after receiving the complaint?
- Did your investigation find evidence of a hostile work environment as defined in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993)?
- Were there patterns of intimidation and hostile interactions discovered in your investigation, and if so, were they adequately addressed?
- Are there any issues from years of similar incidents involving the same people?
- Are there additional issues from the head of HR and senior executives being aware of these issues? Was there an adequate response?

**Misleading Information and Documentation:**

- **Rich Hartman's Actions:** Rich wrote an email leading to my PIP based on misleading information. When I reported a formal HR complaint, Rich immediately notified Josh Gerber and Josh Beyer and falsely stated I had reported Glenn Norris and Justin Drummond.

**Questions:**

- Did your investigation reveal instances of misleading information being used to justify other disciplinary actions, such as PIPs?
- How were these instances handled, and were there any measures to prevent similar occurrences?

**Terminations Related to Email Threads:**

- **Barry Tiedeman and Kim Kaszubski:** Both were discussed in the same email thread and have since been let go.

> **From: Glenn Norris <glenn@ohanagp.com>**
> **Sent: Friday, March 10, 2025 10:27 AM**
> **To: Rich Hartman <Rich.Hartman@ohanagp.com>; Matt Norris <Matt.Norris@ohanagp.com>**
> **Subject: RE: Communications**
>
> **Rich, thank you. Does it matter which one is used? Matt, have you done this with Kim? Please update me on the Kim situation.**

**Questions:**

- Did your investigation find any connection between the email threads and the terminations of Barry Tiedeman or Kim Kaszubski?
- Were their terminations consistent with company policy and free from any retaliatory motives?

We appreciate your prompt attention to these matters. Please provide detailed responses to the questions above and any additional information that might aid in understanding and addressing these concerns.

*This message may include text created with the help of natural language processing.*

🖳 Book time to meet with me

---

**From: Ryan Wagner <Ryan.Wagner@ohanagp.com>**
**Sent: Saturday, June 8, 2024 9:46 PM**
**To:** Justin Drummond <Justin.Drummond@ohanagp.com>; Stacey Wittelsberger (ESC) <srector@exeterstreetcapital.com>; C. Victor Brick <Victor@ohanagp.com>; Lynne Brick B.S.N. M.A. <lynne@ohanagp.com>; Terry Woods (Planet Fitness) <Terry.Woods@ohanagp.com>; Earl Ihle <Earl.Ihle@ohanagp.com>; Butler, Holly Drumheller <hbutler@MilesStockbridge.com>
**Subject:** Re: Request for Information Regarding Legal Representation

@Butler, Holly Drumheller The last email below was sent this morning, but it had a broken image, and it may not have been successfully delivered to all recipients. I have read the missing image and am resending it to ensure it is delivered to all recipients correctly.

*This message may include text created with the help of natural language processing.*

2

Book time to meet with me

**From:** Ryan Wagner <Ryan.Wagner@ohanagp.com>
**Sent:** Saturday, June 8, 2024 8:00 AM
**To:** Justin Drummond <Justin.Drummond@ohanagp.com>; Stacey Wittelsberger (ESC) <srector@exeterstreetcapital.com>; C. Victor Brick <Victor@ohanagp.com>; Lynne Brick B.S.N. M.A. <lynne@ohanagp.com>; Terry Woods (Planet Fitness) <Terry.Woods@ohanagp.com>; Earl Ihle <Earl.Ihle@ohanagp.com>; Butler, Holly Drumheller <hbutler@MilesStockbridge.com>
**Subject:** Re: Request for Information Regarding Legal Representation

@Butler, Holly Drumheller In light of recent developments and ongoing concerns about a potentially hostile workplace at San Bruno, we seek further clarification and information based on your investigation. We have attached screenshots as evidence to support our concerns. This information was uncovered during the preliminary portions of the inquiry, which prompted my request for a third-party investigator.

**Hostile Workplace Indicators**

The email I sent on December 21, 2023, highlighted that Jared Flax was allegedly spreading misinformation at lower levels of the organization. This should prompt an investigation into reports of a hostile workplace. Several key points and incidents require your attention:

1. **Sara Wolz:** Sara left the organization and told Victor that her departure was due to issues with Rich.
2. **Andriy Fenwick:** Left because he was not permitted to be in the same room as his child while working, despite exceptions being made for female employees.
3. **Allyson Ratliff:** Was chastised by the development team for visiting a new, unopened club in 2023, not a unique experience for her. Her male counterparts have not faced similar reprimands.
4. **Barry Tiedeman:** Left shortly after reporting missing emails from Karen Debus between May 10, 2023, and May 22, 2023. Barry confronted HR about these emails and was terminated for allegedly yelling at a team member.

> **Jun 12, 2023 · 8:30AM · By Darren Koritzka**
> Comment added 'Good morning BC. Barry is having issues trying to find emails from Karen Debus to himself. The Date ranges are from 5/10/23 to 5/22/23. He tried using search features on both Desktop Client and OWA This is a HR matter and is there away to get these emails? Darren Koritzka IT Coordinator Ohana Growth Partners, LLC office 410-252-8058 x111 212 W. Padonia Rd Timonium, MD 21093 www.planetfitness.com "Culture eats strategy for breakfast"

> **Jun 12, 2023 · 9:32AM · By Darren Koritzka**
> Comment added 'I got Barry to look through those email in KB. Those aren't "the one" he is looking for. He gave me some more information on the one he is looking for. It's only him and Karen on that email(it's from Karen), date range is still same, and it has a "work communication" subject. Darren Koritzka IT Coordinator Ohana Growth Partners, LLC office 410-

5. **Steven Goodwin:** Despite months of deleted emails, we uncovered emails indicating the mention of a form. I was also requested to complete a form for every incident and individual forms for each person involved.



**Questions:**

- Did your investigation find evidence of constructive discharge for any of these employees, as defined in *Baye v. Bureau of National Affairs*?
- Were there any indications of gender discrimination under the Maryland Fair Employment Practices Act?
- Did your investigation find evidence that the requirement to complete forms for every incident contributed to a hostile work environment, as defined in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993)?
- Were there any patterns or inconsistencies in how these form requirements were enforced across different employees that could indicate discriminatory practices under the Maryland Fair Employment Practices Act?
- Did the investigation reveal if the deleted emails were related to the reported incidents and forms, and if so, what measures were taken to address this issue in compliance with the Maryland Personal Information Protection Act?
- Have any other legal issues been discovered during your investigation?

6. **Instances of Yelling and Intimidation in 2023:**
   n **Kristen Seiler in March 2023:** Resulted in Glenn placing me on a PIP based on misleading information provided by Rich.
   o **Jared Flax in July 2023:** Despite numerous witnesses, Jared's yelling was stopped by Josh Beyer, but he was never reprimanded. Jared later bragged about the incident to Kristen Seiler and Breyana Diggs (at the time Long)

> **Subject:**
> **From:** Jared Flax <Jared.Flax@ohanagp.com>
> **To:** Breyana Long <Breyana.Long@ohanagp.com>, Kristen Seiler <Kristen.Seiler@ohanagp.com>
> **Cc:**
> **Date:** July 26, 2023 10:46:03 AM
> --
> If you didnt hear me get angry with Ryan on friday

Subject:
From: Jared Flax <Jared.Flax@ohanagp.com>
To: Breyana Long <Breyana.Long@ohanagp.com>, Kristen Seiler <Kristen.Seiler@ohanagp.com>
Cc:
Date: July 26, 2023 10:47:26 AM

thats why I went in there and yelled at ryan

- o **Bill Flax in July 2023:** Misleading information from Bill was countered by Merlowe Henry's confirmation that the report was fabricated.

**Questions:**

- Did your investigation reveal any documentation or records of a hostile work environment as described in *Harris v. Forklift Systems, Inc.*?
- Were there any findings related to defamation claims in accordance with *Smith v. Danielczyk*?

7. **Collusion and Coordination for Public Humiliation:**
   - o **Example 1:** Josh Beyer coordinating with Josh Gerber and Bill Flax to portray me and Cielo negatively.

From: Josh Beyer <josh.beyer@pfgrwth.com>
Sent: Tuesday, August 3, 2021 10:21 PM
To: Josh Gerber <Josh@pfgrwth.com>
Cc: Bill Flax <Bill.flax@pfgrwth.com>
Subject: Re: New Club XDP

Too late

Sent from my iPhone

On Aug 3, 2021, at 10:20 PM, Josh Gerber <Josh@pfgrwth.com> wrote:

Yes too much, don't send that. You seem very hostile and aggressive here. Don't respond to anything else till tomorrow. Suggested edits:

1. If those are the changes you want make the adjustments to the Monday board redirecting those to it.
   a. Edits - If those are the changes you feel will create efficiency for the projects please be sure to update in the Monday board and redirect to it.
2. If it's you we need to have a major conversation because I do not think you have the ability to run this process.
   a. Edited - There will need to be a conversation about who will be running this process. I have major concerns based on what I dealt with this morning and we cannot afford these inefficiencies.
3. You do not dictate to me what I need to do. There has never been an issue with Andrews team. You do not order me in any way never. Nor you need to understand now.
   a. Edited - We need to have a conversation about how things are dictated to one another. I will set the rhythm for how things get done and what the terms are for each particular build. If there are things that make the process more efficient you need to present that to me along with why we should be doing things this way.

   - o **Example 2:** Josh Beyer, Bill Flax, Steve Campbell, and Jared Flax plan to use the Executive team meeting as a platform for public humiliation.

From: Josh Beyer <josh.beyer@pfgrwth.com>
Sent: Tuesday, October 25, 2022 10:45 AM
To: Bill Flax <bill.flax@pfgrwth.com>; Steve Campbell <SteveC@pfgrwth.com>; Jared Flax <jared.flax@pfgrwth.com>
Subject: Photos

Hey,

I know we sent something around to Ryan Wagner about the IT upgrade project he has going on and the condition the clubs are being left in. Do we have photos of the clubs that were called out in the email? He is presenting today and he needs to be held accountable for this.

**Questions:**

- Did your investigation uncover any evidence of retaliation in violation of *Molesworth v. Brandon*?
- Were there any signs of intentional infliction of emotional distress as outlined in *Harris v. Jones*?

8. **IT Department Impediments and Unauthorized Information Gathering:**
   - o Jared used his access to the accounting system to gather information aimed at damaging my reputation.

Subject: RE: Accounting Access
From: Josh Beyer
To: Jared Flax <Jared.Flax@ohanagp.com>
Cc:
Date: December 8, 2023 11:00:37 AM
Attachments: image001.png, image002.png

Do not let IT do anything to your computer.

From: Josh Beyer <Josh.Beyer@ohanagp.com>
Sent: Thursday, January 5, 2023 4:20 PM
To: Bill Flax <Bill.Flax@ohanagp.com>; Steve Campbell <Steve.Campbell@ohanagp.com>; Jared Flax <Jared.Flax@ohanagp.com>
Subject: FW: Past Due Balance

Jared, can you see if we have any invoices from Clancy Electric? Please and thank you.

4

Subject: RW Cielo Invoices.xlsx
From: Jared Flax <Jared.Flax@ohanagp.com>
To: Josh Beyer <Josh.Beyer@ohanagp.com>
Cc:
Date: March 9, 2023 5:22:00 PM
Attachments: RW Cielo Invoices.xlsx, image001.png, ohanagrowthpartnersfinallogo_7fa
839a-12ba06da3de6.png

| Date | Total |
|---|---|
| 2022 | $2,728,169.48 |
| ⊞ Jan | $ 262,177.97 |
| ⊞ Feb | $1,222,684.33 |
| ⊞ Mar | $ 183,058.56 |
| ⊞ Apr | $ 50,486.25 |
| ⊞ May | $ 98,985.84 |
| ⊞ Jun | $ 2,107.43 |
| ⊞ Jul | $ 23,830.73 |
| ⊞ Aug | $ 35,047.47 |
| ⊞ Sep | $ 127,324.91 |
| ⊞ Oct | $ 33,161.17 |
| ⊞ Nov | $ 112,709.60 |
| ⊞ Dec | $ 579,600.67 |
| 2023 | $ 657,893.05 |
| ⊞ Jan | $ 46,710.06 |
| ⊞ Feb | $ 601,945.20 |
| ⊞ Mar | $ 9,237.79 |
| Grand Total | $3,386,062.55 |

Subject: Cielo 2023
From: Jared Flax <Jared.Flax@ohanagp.com>
To: Josh Beyer <Josh.Beyer@ohanagp.com>
Cc:
Date: June 21, 2023 8:31:36 AM
Attachments: Book2.xlsx, ohanagrowthpartnersfinallogo_

Roughly $1.1MM.

**Questions:**

- **Did your investigation find any unauthorized access or misuse of informa**tion in violation of the Maryland Personal Information Protection Act?
- Were there any findings related to invasion of privacy as seen in *Furman v. Sheppard*?
- Did your investigation reveal any instances of negligent misrepresentation as described in *Martens Chevrolet, Inc. v. Seney*?
- Were there any breaches of professional conduct and accountability similar to those in *Attorney Grievance Comm'n v. Potter*?

Are you aware that Bill Flax is a licensed attorney, and if so, does his involvement in these issues raise any additional legal concerns, such as potential violations of professional conduct standards or ethical obligations as outlined by the Maryland State Bar?

We appreciate your prompt attention to these matters. Please provide detailed responses to the questions above and any additional information that might aid in understanding and addressing these concerns.

This message may include text created with the help of natural language processing.

📇 Book time to meet with me

**From: Ryan Wagner <Ryan.Wagner@ohanagp.com>**
**Sent: Friday, June 7, 2024 3:06 PM**
To: Justin Drummond <Justin.Drummond@ohanagp.com>; Stacey Wittelsberger (ESC) <srector@exeterstreetcapital.com>; C. Victor Brick <Victor@ohanagp.com>; Lynne Brick B.S.N. M.A. <lynne@ohanagp.com>; Terry Woods (Planet Fitness) <Terry.Woods@ohanagp.com>; Earl Ihle <Earl.Ihle@ohanagp.com>; Butler, Holly Drumheller <hbutler@MilesStockbridge.com>
**Subject: Re: Request for Information Regarding Legal Representation**

@Butler, Holly Drumheller In light of your investigation into the San Bruno email threads, we have the following follow-up questions regarding potential legal issues:

**1. Misrepresentation and Fraud**

**Legal Citation:**

- **Fraud:** To establish fraud, a plaintiff must show that (1) the defendant made a false representation; (2) the defendant knew the representation was false or made it recklessly without knowing its truth; (3) the defendant intended to induce the plaintiff to act on the representation; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered damages as a result. (See *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

**Case Law Example:**

EXHIBIT 106

- *Lazar v. Superior Court*, 12 Cal.4th 631 (1996): The court held that a fraud cause of action could proceed where the plaintiff alleged that the defendant made false representations that induced the plaintiff to act to his detriment.

**Questions:**

- Did Andrew's actions constitute a false representation under the criteria outlined in *Lazar v. Superior Court*?
- Was there evidence that Andrew knew his representation was false or acted recklessly?
- Did Andrew's actions induce any party to act to their detriment based on the false representation?

**2. Defamation**

**Legal Citation:**

- **Defamation:** Defamation involves the intentional publication of a false statement that has a tendency to harm the plaintiff's reputation. (See *Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645.)

**Case Law Example:**

- *Smith v. Maldonado*, 72 Cal.App.4th 637 (1999): The court outlined the elements of defamation, emphasizing the need for a false statement that causes harm to the plaintiff's reputation.

**Questions:**

- Did Andrew publish any false statements regarding Ryan's responsiveness?
- Can it be demonstrated that these statements harmed Ryan's reputation according to the standards set in *Smith v. Maldonado*?

**3. Breach of Duty of Good Faith and Fair Dealing**

**Legal Citation:**

- **Duty of Good Faith and Fair Dealing:** Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. (See *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683.)

**Case Law Example:**

- *Foley v. Interactive Data Corp.*, 47 Cal.3d 654 (1988): The court discussed the implied covenant of good faith and fair dealing, which prevents one party from unfairly frustrating the other party's right to receive the benefits of the agreement.

**Questions:**

- Did Andrew's actions breach the duty of good faith and fair dealing as defined in *Foley v. Interactive Data Corp.*?
- How did Andrew's actions impact the ability of other parties to receive the benefits of the contract?

**4. Internal Policy Violations**

**Questions:**

- Did Andrew's actions violate any internal company policies regarding honesty and integrity?
- Were there any internal procedures that should have been followed but were not?

**5. Potential Employment Law Issues**

**Legal Citation:**

- **Hostile Work Environment:** A hostile work environment exists when an employee experiences workplace harassment that is pervasive or severe enough to create an abusive working environment. (See *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21.)

**Case Law Example:**

- *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993): The Supreme Court held that a workplace is hostile if it is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

**Questions:**

- Did Andrew's portrayal of Ryen contribute to a hostile work environment as defined in *Harris v. Forklift Systems, Inc.*?
- Were there other incidents or behaviors that, when combined with this incident, created an abusive working environment for Ryan?

**Conclusion**

Given these follow-up questions, please provide additional details and clarification on these points to better understand the legal implications of the San Bruno email threads.

This message may include text created with the help of natural language processing.

 Book time to meet with me

---

**From:** Ryan Wagner <Ryan.Wagner@ohanagp.com>
**Sent:** Friday, June 7, 2024 7:33 AM
**To:** Justin Drummond <Justin.Drummond@ohanagp.com>; Stacey Wittelsberger (ESC) <srector@exeterstreetcapital.com>; C. Victor Brick <Victor@ohanagp.com>; Lynne Brick B.S.N. M.A. <lynne@ohanagp.com>; Terry Woods (Planet Fitness) <Terry.Woods@ohanagp.com>; Earl Ihle <Earl.Ihle@ohanagp.com>; Butler, Holly Drumheller

6

<hbutler@MilesStockbridge.com>
**Subject:** Re: Request for Information Regarding Legal Representation

Please be advised that I have added Holly Butler and removed Rich Hartman, Karen Debus, Matt Norris, and Glenn Norris from this thread.

Holly Butler claims to have conducted an independent investigation on topics I raised. It is perplexing that the executive who raised these questions has been excluded from receiving any information about the investigation. As the Head of IT, the individual who reported the issue, and the one who insisted on a third-party investigation, I find this situation unacceptable. I believe Holly Butler was hired for matters related to my employment, and the statement that she was hired to conduct an independent investigation on behalf of Ohana Growth Partners concerning the concerns I identified is accurate. This reflects her legal expertise, and I believe her previous errors were based on the information she was provided. On March 28, 2024, Glenn informed me that he had spoken with Holly Butler, who told him that nothing illegal had occurred but agreed to contact another attorney and schedule a meeting with Justin, Glenn, and myself to review the unauthorized use of my name by Andrew Dinh to attest to official compliance documents. While I believe a meeting occurred with Glenn, it never included the three of us.



Butler, Holly Drumheller <hbutler@MilesStockbridge.com>
To: @ Ryan Wagner                                                           ↩ Reply   ↩ Reply all   → For
                                                                                                        We

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good afternoon, Mr. Wagner. As you know, I conducted an independent investigation on behalf of Ohana Growth Partners in connection with the concerns you identified. Out of respect for client co not divulge the names of my clients or the extent of my representation of them. If you have questions, I recommend you direct them to the company.

Regards,
Holly

**Holly Drumheller Butler** (She/Her/Hers) · *Principal*
Miles & Stockbridge
direct: +1 (410) 385-8829

@Butler, Holly Drumheller

This email chain represents Ohana Growth Partners LLC ownership. If you were hired for the investigation and it did not include matters related to my employment, then as an executive of Ohana Growth Partners LLC and the Head of IT, I request that you provide us with the following answers:

1. Did you or someone on your behalf ever speak to Glenn about the unauthorized use of my name to attest compliance documents? If yes, what was your conclusion?
2. Did you or someone on your behalf ever contact Geoff VaaMaastricht to validate the compliance document?
3. Did you or someone on your behalf ever contact Geoff VaaMaastricht to validate the email thread?
4. Regarding the unauthorized use of my name to attest compliance documents, what are the findings of the investigation?

If you were hired for matters related to my employment, you are under no obligation to respond at this time. However, this email chain represents the core of Ohana Growth Partners LLC ownership, minus Glenn and Chuck, with Stacey representing the company to which Charles and she work. The only valid reason for not providing answers is if you have withdrawn or been removed and no longer represent Ohana Growth Partners LLC, preventing you from providing legal advice.

Unauthorized Use of My Name to Attest Compliance Documents:

- Attached is a screenshot of the compliance document submitted for Wheaton.
- Another screenshot shows Andrew Dinh asking Geoff VaaMaastricht to confirm receipt.
- At no point did I authorize Andrew Dinh to use my name.

7



In your professional legal opinion as the attorney who conducted the independent investigation, do you see any legal violation in the screenshots where my name is used to attest the PFHQ official compliance documentation and Andrew Dinh contacts Geoff VanMaastricht to confirm the form's completion? Before responding that Andrew isn't claiming he completed the form, please consider the following emails.



If you question whether this chain relates to that club, the chain starts here:

8

Geoff VanMaastricht <Geoff.VanMaastricht@pfhq.com>
To: Ryan Wagner
Cc: Samantha Foley <Samantha.Foley@pfhq.com>; Katherine Navarro <katherine.navarro@logically.com>

↩ Reply  ↩ Reply all  → For
Wed

High Importance

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello Everyone,

RE: Wheaton, MD 3375     link to tracking form

Current dates in FRM – if these are incorrect, please work with Samantha Foley to update.

- **Projected Open Date:** 12/15/2023
- **Physical presale start date:**
  - **Orders and tracking form due by:** (deadline thirty days before physical presale start date)
  - **Online presale start date:** 10/23/2023
    - If there will be no physical presale, orders and tracking form due by: 10/16/2023(deadline sixty days before club opening date)

This email is a reminder for you to ensure all new Planet Fitness stores comply with the current PCI and IT Requirements defined by PFHQ. Below are the key areas to focus on that will ensure IT compliance a clubs. The table that follows conveniently lists additional details and vendor contact information for you as well. If you have any questions, please don't hesitate to contact us at itcompliance@pfhq.com .

**PCI/IT Compliance** - As part of the IT Compliance Program, new club builds are required to confirm the ordering and installation of necessary PCI and cybersecurity hardware. Please follow the link below to c where you will confirm the orders of these critical components for any scheduled new store opening. **You will need to submit this IT Compliance Form before going into pre-sales.** You can access the form h

**Wi-Fi** – All new club builds are required to install one of the two approved Wi-Fi vendors; *Deep Blue* and now *Cordant*. The number of AP's for a standard 20,000 sq. ft club is minimally 4, but depending on th may feel the need to add more. Also, as you begin any renovations with the existing clubs that currently have a waivered Wi-Fi solution, you will be required to replace that with either Deep Blue or Cerdant.

**In-Club Media** – All new club builds (except Mexico and Australia) are required to install *ROCKBOT* as the in-club media system. The Rockbot order form can be accessed here. The form will request the nam approved installation vendor* (contact info listed below). PFHQ strongly recommends engaging with one of the two approved vendors to ensure the same standards and configuration are applied across all n ensuring the in-club experience is consistent for our members across the brand.

| Service Provided | Contact Info |
|---|---|
| | Connection |
| Follow this link to Connection/PF IT Purchasing Portal *(This is an option for purchasing the locking network cabinet, but franchisees can order the cabinet from any provider they choose)* | David Thomas Direct: 800-998-4288 | david.thomas@connection.com |
| | Code Blue |
| | Guido Ronghi |

It took 12 days to complete something that should take less than 5 minutes, as only Andrew had the dates for ordering and refused to provide them. If there was no other information, a complete investigation should have included validating other fields.

5. Did you ever investigate if the other data on that form was accurate?
6. Did you ever contact Geoff VaaMaastricht to obtain copies of other compliance forms from Ohana Growth Partners LLC?
7. If so, did Geoff provide examples where Andrew Dinh had completed them correctly?

What is your official legal opinion on the validity of the following:

**Wire Fraud**

- **Citation:** 18 U.S.C. § 1343
- **Relevant Text:** Submitting false attestations via an online form could fall under wire fraud if it was part of a scheme to defraud or obtain benefits through false representations, transmitted via interstate wire communications.

**Identity Theft**

- **Citation:** 18 U.S.C. § 1028A
- **Relevant Text:** Using another individual's personal identifying information without authorization could constitute identity theft, especially in committing wire fraud.

**Unauthorized Access (Computer Fraud)**

- **Citation:** 18 U.S.C. § 1030
- **Relevant Text:** Unauthorized access to a computer system to submit false information could be considered computer fraud.

Maryland Laws potentially applicable to this case:

- **Criminal Law Article, Section 8-506:** False statement to an officer or state agency.
- **Criminal Law Section 8-601:** Forgery of a document, applicable to digital signatures or attestations.
- **Section 7-302:** Illegal access to a computer or computer network.
- **Section 8-301:** Prohibits using another person's personal identifying information without consent for fraudulent purposes.

**Fabricated/Altered Emails and Documents:**

- **First Thread:**
  - **Has anyone contacted San Bruno to obtain a copy of the contract indicated as signed in September 2020?**
  - **Has there been validation of the email chain sent on September 21, 5:31 PM, following the provision of the contract by Andrew 30 minutes earlier?**

The request for a third-party investigator aimed to ensure the validation process was conducted independently. Holly Butler, do you possess the technical background and knowledge to validate these email threads? If not, who did you engage to determine if one or both of these email threads and the attachments were fabricated or altered? What were the findings of the investigation?

9

**FIRST THREAD**

**From:** Andrew Dinh <adinh@osisupport.com>
**Sent:** Tuesday, September 21, 2021 5:01 PM
**To:** Kristen Seiler <kristen.seiler@pfgrwth.com>
**Cc:** Bill Flax <bill.flax@pfgrwth.com>; Breyana Long <Breyana@pfgrwth.com>; Ryan Wagner <ryan.wagner@pfgrwth.com>; Steve Campbell <SteveC@pfgrwth.com>; Josh Be
**Subject:** Fw: Planet Fitness locations updates

Kristen, attached is the original order form submitted that shows the billing address as. Not sure how the service provider is not sending the bill to the address

212 West Padonia Road
Timonium, Maryland 21093

Thank you.

Andrew Dinh
Onsite Solutions Inc.
adinh@osisupport.com

859.806.5520 Mobile
866.465.0330 ext 2 (Technical Support)
www.osisupport.com

Intel Gold Technology Provider 2011
Microsoft Partner - Silver Small and Midmarket Cloud Solutions
Datto Elite Partner
HP Authorized Partner
Dell Technology Partner

---

**SAN BRUNO CityNet Services**
398 El Camino Real
San Bruno, CA 94066
**San Bruno CityNet Services**
**Application for Commercial Accounts**

| ☐ TV Service | ☐ Internet Access | ☐ Dedicated Internet Bandwidth | ☐ Telephone |
|---|---|---|---|

Account Activation Fee (Please call for pricing and Service Levels)  Service Date Requested: (Mon. - Fri.) ___/___/___

**Payment Options:  (Check One)**

☐ Credit Card - Auto Pay ( Deducted on 15th of each month)    ☐ Credit Card by Phone
                                                                **Expiration Date** _____
☐ Checking Account Auto Pay (Attach voided check - Deducted on 15th of each month)
☐ Pay On-Line at www.SBCityNet.com    ☐ Check or Cash

**Please Print**

**Business Name**  PF Growth Partners, LLC

**Contact Name**  Bill Flax

**Business Phone** ( 410 ) 252-8056    **Contact Phone** (   ) _____

**Contact Email Address**  bill.flax@pfgrwth.com

**IT Contact**  Andrew Dinh    **IT Phone** ( 859 ) 806-5520

**Service Address**  1150 El Camino Real, Unit #209    **San Bruno, CA**

**Bill To Address**  212 W. Padonia Rd.

**City, State, Zip**  Timonium, MD 21093

**FEIN** _____    or **Business License** _____
Equipment lent or rented to subscriber must be returned upon disconnect to avoid equipment fees. Remittance due by the 15th of each month. Non-payment will result in disconnection of all services.
**Signature**  William Flax    **Today's Date**  09 / 04 / 2020

**Office Use Only**

**Account #** _____    **Account Notes** _____
**Scheduled Install Date** _____    **Signed Quote**  Y   N/A    **Serviceability**  Y   N/A

Phone (650) 616-3100    www.SBCityNet.com    Fax (650) 871-5525

---

**SECOND THREAD**

    EXHIBIT  106



**And here is the attachment**

**SAN BRUNO**
**CityNet Services**

398 El Camino Real
San Bruno, CA 94066

**San Bruno CityNet Services**
**Application for Commercial Accounts**

| ☐ TV Service | ☐ Internet Access | ☐ Dedicated Internet Bandwidth | ☐ Telephone |
|---|---|---|---|

Account Activation Fee (Please call for pricing and Service Levels) Service Date Requested: (Mon. - Fri.) ___/___/___

**Payment Options: (Check One)**

☐ Credit Card - Auto Pay ( Deducted on 15th of each month)    ☐ Credit Card by Phone

Expiration Date _____

☐ Checking Account Auto Pay (Attach voided check - Deducted on 15th of each month)
☐ Pay On-Line at www.SBCityNet.com    ☐ Check or Cash

**Please Print**

**Business Name** _____

**Contact Name** _____

**Business Phone (   )** _____    **Contact Phone (   )** _____

**Contact Email Address** _____

**IT Contact** _____    **IT Phone (   )** _____

**Service Address** _____    **San Bruno, CA**

**Bill To Address** _____

**City, State, Zip** _____

**FEIN** _____    or Business License _____

Equipment lent or rented to subscriber must be returned upon disconnect to avoid equipment fees. Remittance
due by the 15th of each month. Non-payment will result in disconnection of all services.

**Signature** _____    **Today's Date** ___/___/___

**Office Use Only**

Account # _____    Account Notes _____

Scheduled Install Date _____    Signed Quote  Y  N/A    Serviceability  Y  N/A

Phone (650) 616-3100    www.SBCityNet.com    Fax (650) 871-6626

**Accounting Irregularities:**

After reporting irregularities, Andrew Dinh was asked about missing invoices. Many invoices were subsequently processed and paid. However, I am unaware of any steps taken to ensure these irregularities were confined to this period or efforts to verify that every job by Onsite Solutions has an associated invoice.

Can you confirm whether we have accounted for every job with at least one corresponding invoice relative to its cost? Accounting validated the accuracy of this report by processing and paying the invoices provided by Andrew Dinh. Holly Butler, please provide us with the methodology, who performed the audit, and the findings. Did we account for every job that Andrew Dinh/Onsite Solutions has done with invoices relative to its cost?

This message may include text created with the help of natural language processing

 Book time to meet with me

---

**From:** Ryan Wagner <Ryan.Wagner@ohanagp.com>
**Sent:** Thursday, June 6, 2024 5:13 PM
**To:** Justin Drummond <Justin.Drummond@ohanagp.com>; Rich Hartman <Rich.Hartman@ohanagp.com>; Karen Debus <karen.debus@ohanagp.com>; Matt Norris <Matt.Norris@ohanagp.com>; Stacey Wittelsberger (ESC) <srector@exeterstreetcapital.com>; C. Victor Brick <Victor@ohanagp.com>; Lynne Brick B.S.N. M.A. <lynne@ohanagp.com>; Terry Woods (Planet Fitness) <Terry.Woods@ohanagp.com>; Earl Ihle <Earl.Ihle@ohanagp.com>; Glenn Norris <glenn@ohanagp.com>
**Subject:** Request for Information Regarding Legal Representation

Aloha

I hope this message finds you well. I am writing to formally request information regarding the legal representation retained by Ohana Growth Partners LLC concerning accounting irregularities, the unauthorized use of my name to attest compliance documents, fabricated or altered emails/documents, or any matters related to my employment.

Specifically, I would like to know the name and contact information of the attorneys or law firms representing the company on any of these matters. This information is pertinent as I am seeking to engage in direct negotiations to resolve these issues amicably and efficiently.

I believe that open communication can help us reach a mutually agreeable solution and prevent the need for more formal proceedings. Therefore, I would appreciate your prompt response to this request.

Thank you for your cooperation.

| OHANA GROWTH PARTNERS, LLC | IN THE |
| Plaintiff, | CIRCUIT COURT |
| vs. | FOR |
| RYAN DILLON-CAPPS | BALTIMORE COUNTY |
| Defendant. | CASE NO: C-03-CV-24-002264 |

## AFFIDAVIT OF FINANCIAL URGENCY

I, Ryan Dillon-Capps, being over the age of eighteen (18) and competent to testify, and having personal knowledge of the facts contained herein, state as follows:

### I  BACKGROUND ON WHY STANDARDS ARE MANDATED

1    After conducting due diligence reviews across a majority of franchisee-owned clubs, the Franchisor identified a consistent lack of investment in technology by the Franchisees. In response, the Franchisor implemented new standards, which were initially met with resistance from the Franchisee Owners. Compromises were made to ensure the standards were financially feasible. Over time, these standards have been gradually elevated, with active participation from Franchisee Owners in negotiations and discussions. The Franchisor has consistently engaged the Franchisee Owners before committing to each subsequent version of the standards.

2    It has been suggested as a defense to claims of negligent work that the absence or inadequacy of past standards justified prior practices. Ohana Growth Partners, LLC, embracing its philosophy of WHIM—Whimsical, Humorous, Inspirational, and Motivational—rebranded to emphasize its family-like culture and the belief that culture surpasses strategy. Ohana's commitment is to world-class standards, and this philosophy is reflected in everything they do.

Page 1 of 18

## RACK FALLS OF WALL



                                    EXHIBIT    106

## INDOOR AND IN USE



## PREFERRED RACK SIZE



EXHIBIT   106

## NOT UPS DEPTH – STACK IT ON TOP



## THE METAL FILE CABINET WILL GROUND IT



## ANOTHER RACK FROM THE FILE CABINET ROOM



## JUST THROW IT IN



## IT WON'T FALL



3       Ohana Growth Partners, LLC operates in six states and currently manages over 80 clubs.

The conditions shown in these pictures reflect the status quo, not the exception. After four years,

I was informed that all racks in every club would finally be installed correctly. After leaving that

meeting, I discovered that a rack had fallen off the wall, and the same company responsible for

the faulty installation was being paid to redo it. Glenn Norris and Justin Drummond failed to

honor their commitments—not due to a lack of funds or ignorance of the situation. This matter is expected to be the subject of future litigation, and I will show the 200+ images demonstrating the quality of work being defended under an exclusive arrangement, which continues to have the full support of Ohana Growth Partners. This work comes from the same company linked to accounting irregularities and a fraud investigation. In addition to the images, we will examine the relentless malicious attacks aimed at damaging the reputations of myself, the IT Department, and Cielo IT.

4       Why Cielo IT? In August 2021, Cielo IT was unexpectedly tasked with managing a build under what can only be described as sabotaged conditions. Additionally, they were expected to perform more than Onsite Solutions, including obtaining permits that had not yet been secured for a project they were joining mid-build—not initiating. This oversight occurred again in subsequent years, with blame again wrongly shifted to Cielo IT until I pressed them on why they didn't have a permit on their remodel that Cielo IT had nothing to do with -- Onsite Solutions was.

5       As predicted, Ohana Growth Partners, LLC believed they had prevailed on September 15, 2024, and, under that false confidence, terminated their contract with Cielo IT. This, too, will be addressed in future litigation, along with the actions they took using access they obtained from Cielo IT, which had administrative rights sufficient to control the account. We know this is true because the Plaintiff submitted an affidavit from Daniel Levett to shift focus away from claims that Hartman Executive Advisors was not involved. To prove that claim was false, they admitted to estoppel and told us that Ohana's claim about no admins and no access was false.

Page **8** of **18**

6       The key difference between myself and others before me is that I insisted on documenting every interaction in writing. I knew they relied on controlling the written record to their advantage—changing email threads, altering subject headers, and selectively separating information. All year long, I used their own tactics against them, ensuring that I looped in additional parties on emails to maintain transparency. If something wasn't written down, it essentially never happened—unless it benefited them. If you didn't obtain a copy of an email fast enough, it would disappear. Barry Tiedeman was fired under false pretenses because he saved an email that was later erased, and when he confronted HR about it, he was dismissed.

7       They claimed that Barry was fired for yelling at someone. However, in 2023, another employee interrupted a conversation to begin yelling at me. Later, another person entered my office and shouted at me, and subsequently bragged about it to the first person—without facing any reprimand. Yet, when Barry raised questions about the disappearance of critical evidence, he was fired, with the supposed justification being that yelling in the office was unacceptable

## II  BACKGROUND ON WHY DILLON-CAPPS IS THEIR EXPERT

8       A month after relocating to Maryland in 2020 for my position with Ohana Growth Partners, LLC (formerly Planet Fitness Growth Partners), the COVID-19 pandemic forced everything to shut down. In response, I prioritized cost-saving measures to preserve as many jobs as possible. By January 2021, Glenn Norris instructed Joshua Beyer and Justin Drummond to work with me on resolving the ongoing compliance failures. By August 2021:

1.      I had met with the Franchisor, various vendors, and installers who were familiar with Planet Fitness standards, as well as technical contacts within other franchise groups.

Page **9** of **18**

2.      I shared my findings with Glenn Norris, Joshua Beyer, Josh Gerber, Justin Drummond, Karen Cepress, and others.

3.      The collective team—excluding Glenn Norris—nominated me to lead efforts to rectify past compliance failures, manage multiple projects mandated by the Franchisor, and serve as an expert on the Franchisor's requirements, including PCI compliance. Glenn endorsed their recommendation, and he turned it from a recommendation to an order.

4.      I presented a plan to implement these mandated requirements on an extended schedule and personally guaranteed both my commitment and Ohana Growth Partners, LLC's commitment to funding and resourcing these projects.

5.      Through a combination of virtual site visits (both in and out of state) and in-person site visits within the state, I concluded that the implementation of IT and entertainment solutions was not only negligent but also dangerous. These conditions posed significant liabilities to the franchisee, franchisor, payment processors, employee safety, member safety, and the overall brand.

6.      I provided a less inflammatory version of my findings to everyone except Glenn Norris. Until the end of 2023, Glenn received direct and candid updates on everything. Despite what he may have conveyed to others, he and I shared an almost entirely transparent exchange of information. I emphasize "almost" because I later discovered, following the launch of the fraud investigation in December 2023, that certain things had been withheld from me.

                                    EXHIBIT   106

7.     I conducted a review of the individuals and companies responsible for the work I observed and found that the worst of it was consistently linked to a company called Onsite Solutions, Inc., which had been given an exclusive arrangement by the Development Department. A small portion of the work had been offloaded to a solo Maryland-based owner and engineer.

8.     I proposed that we test one of the two Franchisor-approved installers, allowing them to handle the next few builds for comparison and review.

9     The President of Cielo IT joined me on a phone call with Joshua Beyer, during which Beyer yelled and berated me for the majority of the meeting. After I filed a formal HR complaint in November, Richard Hartman feigned ignorance of the years of reports, reprimands, and annual reviews documenting the inappropriate conduct of Joshua Beyer, William "Bill" Flax, Jared Flax, and Josh Gerber. While this will be a topic for future litigation, it is important to note that Shannon Anderson from Cielo IT was the person who initially reported Joshua Beyer to Glenn Norris.

10     When the HR investigation concluded in March 2024, the only incident they officially acknowledged was the one I deliberately provided to prevent them from closing the case without it being clear that it had not been properly investigated. Despite this, Shannon Anderson—whose report initiated the complaint—was never contacted during the investigation. This omission is telling, as they were already aware of the incident and never intended to conduct a thorough investigation, as has been the case with many other issues in the past.

11     They are remarkably fond of spoilage, as demonstrated by the sudden disappearance of Leeann Hartman's Billing Administrator role shortly after the lawsuit was filed. Leeann, sister of

EXHIBIT   106

Lynne Brick and wife of Richard Hartman, quietly had this role removed from her account. I suspect this was an attempt to support their claim of having no other admins and, if necessary, they believed terminating Cielo IT would allow them to cover up access. What they didn't anticipate was that Dante Martinez of Cielo IT, who had been trained by me, knew how to manage the system and access the accounts. I had been preparing him to become a direct hire as Help Desk Manager. I trained him and coached him on how to train the rest of the team. Dante was a quick learner, and I discreetly guided him through a series of thought experiments on how permissions could be used to navigate a system, and how a hacker might exploit this to gain access to a privileged role like Global Administrator.

12      While I may not have had a clear memory of this, or many other details immediately following my mental break, as memories return, I realize how well I had prepared the team. I don't remember exactly when I changed the multi-factor authentication (MFA) settings for the accounts, but I do recall the context—ensuring no one would be locked out while shifting permissions from direct assignments to inheritance. These efforts were part of broader security enhancements aimed at enabling on-demand elevated access. The goal was to eliminate the need for any account to retain a role like Global Administrator, thereby making it significantly more difficult for a compromised account to be misused.

13      By 2023, the IT Department not only survived the malicious actions taken against us but thrived. Once again, I was told that Onsite Solutions was gone for good. This time, all IT and entertainment installation and renovation work would be removed from the Development Department and placed under my control, coinciding with my upcoming promotion. Several months of negotiations regarding my compensation had taken place, and it was understood

among the C-suite that the promotion was a done deal. However, not everyone was in agreement. On multiple occasions, Joshua Beyer made it clear to me that, in his view, nothing was final until the formal announcement was made—his comments strongly suggesting an intent to block the promotion by any means necessary.

14      The following screenshot is from the 15-month Q4 analysis and includes one of the oldest tabs. Column B reflects my pre-raise 2023 salary, a product of lengthy negotiations. The final number included KPIs, bonuses, gains, and a reimbursement pool, with a base salary of $507,200.00. This figure did not include the proposed sign-on bonus, where I had suggested $30,000 and Glenn Norris countered with a six-figure amount, to be paid through the bank refinancing deal.

15      Glenn Norris's last words on the matter were: "Okay, but don't tell anyone or show it to anyone yet."

| Chief Support Officers (CSO): IT Operations (ITO) Business Intelligence (BI) Facilities, Equipment, Repairs, and Maintenance (FERM) | $ 150,000.00 | $ 500,000.00 | Base Shown KPI, Bonus', and Vested Capital Gain Returns not included 30k Sign-on bonus not included |
| Phone Reimbursement | $ 1,800.00 | $ 4,200.00 | I had to add international dialing plan to reach support that was on hours for Takoma Park, and I will need to have additional coverage and cost added when I am traveling overseas. |
| Internet Reimbursement | $ - | $ 3,000.00 | I provided internet to Takoma Park, and in addition to a set of full time hours at the office - I also put in as much and more time remotely. |
| | $ 151,800.00 | $ 507,200.00 | $ | 355,400.00 |

16      I committed funds based on Glenn Norris's commitment, and conversations with others reaffirmed that they were aware an official announcement was forthcoming. However, shortly after Victor Brick canceled his trip to Maryland, Justin Drummond facilitated Joshua Beyer's trip to Florida to meet with Victor Brick. Following that meeting, Onsite Solutions was rehired, and Glenn Norris began to avoid discussions on the matter, eventually stating he didn't want to talk about it. This shift in direction occurred well after I had already committed dollars, and up until

Page **13** of **18**

after the wedding, I held hope that once Glenn realized he had been misled and saw me as an ally rather than a threat, the plans would be restored. After all, why wouldn't he follow through with the plan and fully support the person who had spent months helping the company avoid disaster?

### III  FROM C-SUITE TO POOR HOUSE

17    Six months later, my FMLA and ADA rights were violated, and Darren Koritzka was placed on a leave of absence while I was suspended without pay. Now, both of us have been wrongfully terminated. In a few days, it will mark the four-month anniversary of a fraudulent case that should have been resolved four months ago. Shortly after that, we will reach the one-year anniversary of the accounting irregularities being reported to Glenn. Since then, I have gone from C-Suite to almost D-Block 21 days before my birthday, and now under threat of the poor house.

18    I am providing screenshots from my Credit Karma app, which clearly show that I have a 100% on-time payment history. I paid off my student loans in full, have no defaults, and my car only has $8,000 remaining on its loan. My home has equity, though not enough to provide the funds necessary to salvage this situation. Between breached verbal agreements, no different from written agreements dating back to June 7th, and the lawsuit that has been dragged out, my financial position has been devastated. One credit card reduced my limit due to months of rising debt, a situation exacerbated by having my income stripped away and being forced to litigate a fraudulent lawsuit.

19    This lawsuit, which I have definitively won beyond a reasonable doubt, exceeds the civil standard of proof. Not only did I meet the highest legal standard in U.S. law, but I won so decisively that the evidence initially presented by the Plaintiff has now turned into evidence

EXHIBIT  106

supporting my case. The Plaintiff no longer has any evidence that remains in their favor. U.S. law doesn't have a term for a 100% victory, but that is what I have achieved—despite fraud, collusion, and a 1932 law firm that somehow convinced multiple circuit court judges to disregard the law and consistently rule in their favor.

20      Tell me about another person in the history of the United States who has won after losing 100% of their filings and being under an order of default. Despite these conditions, I have managed to win *over* 100% of this case, all while barely being able to remember the days due to my mental state. I've achieved the impossible, yet I might still face financial ruin—not because I failed, but because I succeeded so well that it has made it excessively complicated for anyone to properly rule in my favor. In any other case, a Defendant would likely be thrilled to get it dismissed because the Plaintiff's case was so catastrophically weak.

21      In every single comparable case I've reviewed, the outcome is the same—the defendant loses, and the case gets dismissed. This case, however, is the impossible scenario, raising the question: *What if they won?* After the initial shock and laughter at the absurdity of such a situation, people would have said, "That will never happen." *How* could it ever happen?

22      Hooray for me. Attached are screenshots showing my imminent financial ruin, as well as the latest emails regarding my efforts to engage with Miles & Stockbridge and Ohana Growth Partners. I've also included a general email to the court to open negotiations with the seven judges involved, seeking a solution before filing later tonight. The second email to the judges includes a heartfelt cry for help, which I will briefly summarize here.

23      The methods used by my abusers over the past year feel eerily similar to what I'm experiencing now. Logically, I understand that it's unlikely the same, but for anyone with a shred

EXHIBIT  106

of compassion—please understand—I need someone to contact me today. If disclosure is the

worst fear for some, imagine if it occurred automatically in the event of my death, whether from

catatonia or my deteriorating mental health. What would the lawsuit look like if my wife is

forced to ask why no one reached out for over a month and a half to explain what was

happening? This is me making a simple, reasonable ADA request: please don't let your actions

appear as Estoppel or Gaslighting of someone with a mental illness who is asking for you to stop.

24    To be clear, I can rationalize why this might be happening. But there remains a strong

possibility that multiple judges and a well-established law firm possess enough influence to have

conspired together. As a result, I find myself pushed to the brink—unable to act quickly enough

to prevent default on myself and my business, all while watching the dream I've spent 15 years

building slip away in the blink of an eye.

25    This is not a reasonable set of conditions to place upon me. Therefore, I will present the

logic of why inaction cannot continue any longer:

1. If this is part of a broader conspiracy, it must be publicly exposed as soon as possible.

2. If it is not a conspiracy, I still need to raise funds quickly, and the fastest way to secure a

   significant influx of financial support would be through crowdfunding or similar

   methods, allowing others to help me address this injustice.

26    Therefore, if the logic behind the silence is to "figure things out," that approach is flawed.

Continued silence will only eliminate any remaining time to resolve this matter. It will likely

result in my financial situation being addressed overnight, erasing my worst-case fears with a

single keystroke. I stand to be the only one benefiting from that, which demonstrates once again

that my actions are not driven by malice or anger. I am not anyone's enemy, but I have shown

that I am an incredibly capable survivor.

## DECLARATION OF AFFIRMATION

I SOLEMNLY DECLARE AND AFFIRM UNDER PENAL TIES OF PERJURY AND
UPON PERSONAL KNOWLEDGE THAT THE CONTENTS OF THE FOREGOING PAPER
AND EXHIBITS THERETO ARE TRUE.

October 7, 2024

s/ Ryan Dillon-Capps
Ryan Dillon-Capps (Pro Se)
Email: ryan@mxt3.com
1334 Maple Avenue
Essex, Maryland 21221
Telephone: (703) 303-1113



**Payment history**                 **100%**
● Excellent | High impact

**Credit card usage**                 **82%**
● Needs work | High impact

**Derogatory marks**                   **0**
● Excellent | High impact

**Credit age**              **5 yrs, 8 mos**
● Fair | Medium impact

**Total accounts**                    **18**
● Fair | Low impact

**Hard inquiries**                     **1**
● Good | Low impact

Affidavit for Financial Urgency Exhibit 1 [Unredacted]

Display by **Equifax** ∨

# 651

Fair

— No change checked daily



**Jun 7, 2024**
○ 746

Display by **TransUnion** ∨

# 640

Fair

▼ **27 pts** checked daily



**May 24, 2024**
○ 741

Affidavit for Financial Urgency Exhibit 1 [Unredacted]

Page **3** of **4**

EXHIBIT 106

# Summary

- 💳 **$72,868** Credit cards
- 🧾 **$0** Collections
- 🎓 **$0** Student loans
- 💰 **$122,128** Personal loans
- 🚗 **$8,025** Auto loans
- 🏠 **$366,342** Home loans

## Net Worth

# $0

## TransUnion
# 640
▼ **27 pts** today

Fair

## Equifax
# 651
— No change

Fair

Affidavit for Financial Urgency Exhibit 1 [Unredacted]

Page **4** of **4**

EXHIBIT 106

**Subject**: Your account may have insufficient funds
**From**: Bank of America <onlinebanking@ealerts.bankofamerica.com>
**To**: ryan@mxt3.com
**Date Sent**: Thursday, October 17, 2024 8:24:57 PM GMT-04:00
**Date Received**: Thursday, October 17, 2024 8:24:58 PM GMT-04:00





# Your account may have insufficient funds

On October 16, 2024, you didn't have enough money in your **Ryan Main account ending in 6512** to cover your transaction(s).

Balance after
transaction(s) and fees:                    **-$66.30**

Transaction type                            **ELECTRONIC PAYMENT**

Amount                                      **$176.00**

Transaction paid?                           **Yes**

Fee                                         **$10.00**

Check your balance. If it's negative, make a deposit right

Exhibit 1: Defaulting Emails and Letters

**Subject**: Your account may have insufficient funds
**From**: Bank of America <onlinebanking@ealerts.bankofamerica.com>
**To**: ryan@mxt3.com
**Date Sent**: Friday, October 18, 2024 7:25:51 PM GMT-04:00
**Date Received**: Friday, October 18, 2024 7:25:53 PM GMT-04:00





# Your account may have insufficient funds

On October 17, 2024, you didn't have enough money in your **Ryan Main account ending in 6512** to cover your transaction(s).

| | |
|---|---|
| Balance after transaction(s) and fees: | **-$262.49** |
| Transaction type | **ELECTRONIC PAYMENT** |
| Amount | **$986.19** |
| Transaction paid? | **Yes** |
| Fee | **$10.00** |

Check your balance. If it's negative, make a deposit right

Exhibit I: Defaulting Emails and Letters

**Subject**: Your account may have insufficient funds
**From**: Bank of America <onlinebanking@ealerts.bankofamerica.com>
**To**: ryan@mxt3.com
**Date Sent**: Tuesday, October 22, 2024 8:32:58 PM GMT-04:00
**Date Received**: Tuesday, October 22, 2024 8:32:59 PM GMT-04:00





# Your account may have insufficient funds

On October 21, 2024, you didn't have enough money in your **Ryan Main account ending in 6512** to cover your transaction(s).

| | |
|---|---|
| Balance after transaction(s) and fees: | $41.09 |
| Transaction type | **ELECTRONIC PAYMENT** |
| Amount | **$83.00** |
| Transaction paid? | **No** |
| Fee | **$0.00** |

Check your balance. If it's negative, make a deposit right

**Affidavit for Exhibits of Financial Harm**
EXHIBIT  106

Exhibit 1: Defaulting Emails and Letters

**Subject**: Your account may have insufficient funds
**From**: Bank of America <onlinebanking@ealerts.bankofamerica.com>
**To**: ryan@mxt3.com
**Date Sent**: Friday, October 25, 2024 10:30:17 PM GMT-04:00
**Date Received**: Friday, October 25, 2024 10:30:18 PM GMT-04:00





# Your account may have insufficient funds

On October 24, 2024, you didn't have enough money in your **Ryan Main account ending in 6512** to cover your transaction(s).

| | |
|---|---|
| Balance after transaction(s) and fees: | $41.09 |
| Transaction type | **ELECTRONIC PAYMENT** |
| Amount | **$461.00** |
| Transaction paid? | **No** |
| Fee | **$0.00** |

Check your balance. If it's negative, make a deposit right

1 / 2

**Capital**One
Capital One
P.O. Box 30285
Salt Lake City, UT 84130-0285

October 26, 2024

CAROLINE M DILLON                    000013392
1334 MAPLE AVE                       P103
ESSEX, MD 21221

Account ending in: 8846
Creditor: Capital One N.A.
Account balance: $3,511.58
Past due amount: $156.00

Dear CAROLINE M DILLON,

We're writing to you about your Capital One® credit card account. According to our records, your account ending in 8846 is past due.

Account Balance: $3,511.58
Past Due Amount: $156.00
Creditor to whom the debt is owed: Capital One N.A.

*Unless you, within 30 days after receiving this notice, dispute the validity of this debt, or any portion thereof, we will assume that this debt is valid. If you notify us in writing within 30 days after receiving this notice that this debt, or any portion thereof, is disputed, we will obtain verification of the debt and provide it to you.*
Please include your full name, your full address, and the last four digits of your account number, listed above, in any written communications. You can send this to us by:

Mail:                                Fax:
Capital One                          1-877-388-1737
P.O. Box 30248
Salt Lake City, UT 84130-0248

The account balance and past due amount above may change, based on account usage, fees, interest charges, or payments that you've made. Please check your most recent card statement for your minimum payment due.
If you have any questions, please contact one of our experienced Customer Service representatives at 1-800-955-6600.

Sincerely,

Capital One

NOTICE: PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION

© 2024 Capital One. Capital One is a federally registered service mark.

IF0130/671dff53b2e754614113113a/P:Y 1/QA-1

Exhibit 1: Defaulting Emails and Letters

**Affidavit for Exhibits of Financial Harm**    Page 30 of 31    EXHIBIT 106

**Subject**: Your account may have insufficient funds
**From**: Bank of America <onlinebanking@ealerts.bankofamerica.com>
**To**: ryan@mxt3.com
**Date Sent**: Tuesday, October 29, 2024 4:27:37 PM GMT-04:00
**Date Received**: Tuesday, October 29, 2024 4:27:39 PM GMT-04:00





# Your account may have insufficient funds

On October 28, 2024, you didn't have enough money in your **Ryan Main account ending in 6512** to cover your transaction(s).

| | |
|---|---|
| Balance after transaction(s) and fees: | $41.09 |
| Transaction type | **ELECTRONIC PAYMENT** |
| Amount | **$594.03** |
| Transaction paid? | **No** |
| Fee | **$0.00** |

Check your balance. If it's negative, make a deposit right

Exhibit 1: Defaulting Emails and Letters



USAA Federal Savings Bank
10750 McDermott Freeway
San Antonio, Texas 78288

# DEBT VALIDATION
# NOTICE

October 29, 2024

Dear Ryan Wagner,

USAA is committed to keeping you informed about important information regarding your account.

The following account is past due. The state of Maryland requires us to notify you of your right to dispute the debt you owe.

| Type: | Credit Card Debt |
|---|---|
| Credit card ending in: | 3651 |
| Total balance owed: | $20,182.29 as of October 29, 2024 |
| Creditor: | USAA Savings Bank |

### How to Submit a Written Dispute

We will assume this debt is valid unless you dispute the validity of it, or any portion of it, in writing within 30 days of receipt of this notice. Fax your written dispute to 800-531-5717, Attn: VRIDBT, or mail it to:

Attn: VRIDBT
USAA Federal Savings Bank
10750 McDermott Freeway
San Antonio, TX 78288-0544

If you notify us in writing within 30 days after receipt of this notice that the debt or any portion of it is disputed, we'll provide you or your attorney verification of the debt, such as copies of the agreement you signed, account statements or similar records, and a copy of any judgment we may have obtained.

Thank you for allowing us to serve you.

Sincerely,

Martin J. Wiggins
Assistant Vice President, Member Debt Solutions
USAA Federal Savings Bank

**USAA is required by the laws in some states to inform you that this communication is from a debt collector attempting to collect a debt, and any information obtained will be used for that purpose.**

Exhibit 1: Defaulting Emails and Letters

Online: usaa.com
012649088

Phone: 800-531-0533 (TTY:711/TRS)
Mon. – Thurs. 7 a.m. – 10 p.m.; Fri. – Sat. 7 a.m. – 5:30 p.m. CT

1 of 1

500987-0623

Harm Summary Page # 141 of 198        Affidavit for Exhibits of Financial Harm        Page 31 of 31
EXHIBIT  106

**Subject**: Your credit limit has been exceeded
**From**: American Express MyCredit Guide <noreply@mycredit-guide.americanexpress.com>
**To**: "amazon@mxt3.com" <amazon@mxt3.com>
**Date Sent**: Wednesday, October 30, 2024 7:27:02 AM GMT-04:00
**Date Received**: Wednesday, October 30, 2024 7:27:03 AM GMT-04:00



One of your credit cards is over its limit

**AMERICAN EXPRESS**    MyCredit Guide

Card over limit

# You've exceeded your card limit

Review your credit file

LOG IN

**Dear RYAN WAGNER,**

Your credit file has been changed.

| | |
|---|---|
| **Change:** | Card Over Limit |
| **Company:** | USAA FEDERAL SAVINGS B |
| **Reported by:** | Experian |

## What does this mean?

One of your credit cards is over its maximum limit. Spending more than your credit limit allows can negatively impact your FICO$^®$ Score, particularly if you allow it to carry over in to

*Exhibit 1: Defaulting Emails and Letters*

**Subject**: Your Automatic BGE Bill Payment
**From**: no-reply@bge.com
**To**: ryan@mxt3.com
**Date Sent**: Saturday, November 2, 2024 12:11:54 PM GMT-04:00
**Date Received**: Saturday, November 2, 2024 12:11:54 PM GMT-04:00



AN EXELON COMPANY

Hello Ryan Wagner,                                    **Account ending in 3079297842**

This is a reminder that you have an automated payment scheduled for:

Payment Amount: **$281.00**
Payment Date: **11/25/2024**

To view or change this payment online, please sign in to your BGE online account
. This payment will not be affected by unenrolling from the Automatic Payment
Program or updating your automatic payment settings. Your updates will be
reflected on future bills.

If you have a question regarding this email, please contact us at
Mybillingrep@bge.com; please include your BGE account number and your
question.

Thank you for being a valued BGE customer!

   


Download the BGE mobile app
to easily manage your account on the go.

This email is generated automatically. Please do not respond to this message.

Need to get in touch? Contact Us

Exhibit 1: Defaulting Emails and Letters

**Subject**: [Action Required] Urgent information about your personal loan payment
**From**: SoFi <no-reply@o.sofi.org>
**To**: ryan@mxt3.com
**Date Sent**: Wednesday, November 6, 2024 2:37:44 PM GMT-05:00
**Date Received**: Wednesday, November 6, 2024 2:37:45 PM GMT-05:00



**LOG IN**

Loan: PA-1278581

Hi Ryan,

We wanted to let you know that your most recent SoFi personal loan payment in the amount of $594.03, was returned unpaid by your financial institution due to insufficient or unavailable funds.

**What do I need to do?**

Please visit our mobile app or log in to your account by clicking the button below to verify your bank account information and schedule a replacement payment. If you need assistance or have any questions, please call us at **844.975.7634** and one of our representatives will be happy to help you get things back on track.

Log In

Sincerely,
SoFi Servicing Team
**855.456.7634**

Exhibit 1: Defaulting Emails and Letters

**Subject**: Loan Re-amortization Notification
**From**: SoFi <no-reply@o.sofi.org>
**To**: ryan@mxt3.com
**Date Sent**: Wednesday, November 6, 2024 6:04:40 AM GMT-05:00
**Date Received**: Wednesday, November 6, 2024 6:04:42 AM GMT-05:00



**LOG IN**

11/06/2024

Personal Loan: PA-1278581

Hi Ryan,

We wanted to follow up with you regarding a notice you received from
SoFi, letting you know that your Personal Loan lump-sum payment
was returned unpaid by your bank.

**What happened?**
After receiving your payment, your loan was re-amortized; this was
before we received notice from your financial institution that your
payment was returned.

**What does this mean?**
This means your loan schedule and new monthly payment amount
was re-calculated based on your ultimately returned lump-sum
payment. The sum of your returned payment lowered your loan's
principal balance, which resulted in a lower monthly payment—which
means you are paying less in error.

To avoid leaving an unpaid balance due at the end of your loan's
maturity, we conducted a new re-amortization to adjust your payment
schedule and increase your monthly payment amount to get you back
on track.

Exhibit 1: Defaulting Emails and Letters

**Your new payment amount is: $597.69**

If you have auto-pay set up for your loan, please be aware this new
payment will be automatically deducted each month.

To view your account details and payment information, simply log in to
your SoFi account online or directly from our mobile app.

<div align="center">

Login

</div>

**How can I get in touch if I have questions?**
We want to be sure you fully understand your new loan schedule. If
you have any questions at all, please don't hesitate to contact us using
the information below.

Sincerely,
SoFi Servicing



| | | |
|---|---|---|
| Email Customer Service | Give us a call 855.456.SoFi (7634) | M - Th 5am - 7pm PST F - Su 5am - 5pm PST |

**SoFi**  f in 🐦 📷 📌 🔔

This message was sent to ryan@mxt3.com in reference to Case #: 28237202
SoFi values your privacy and the security of your personal information so please do not include your social
security number in any email or letter that you send to us.

SoFi loans are serviced by SoFi Bank, N.A. or an affiliate, Licensed by the Department of Business Oversight
under the California Financing Law License No. 6054612. NMLS #1121636. 2750 East Cottonwood Parkway
#300, Cottonwood Heights, Utah 84121. Terms and Conditions apply. See SoFi.com/legal#licenses for details.

SoFi 234 1st Street San Francisco, CA 94105
Legal | Privacy | Contact Us

Exhibit 1: Defaulting Emails and Letters

EXHIBIT  106

**Subject**: Your account may have insufficient funds
**From**: Bank of America <onlinebanking@ealerts.bankofamerica.com>
**To**: ryan@mxt3.com
**Date Sent**: Thursday, November 7, 2024 3:13:29 PM GMT-05:00
**Date Received**: Thursday, November 7, 2024 3:13:30 PM GMT-05:00





# Your account may have insufficient funds

On November 06, 2024, you didn't have enough money in your **Ryan Main account ending in 6512** to cover your transaction(s).

Balance after transaction(s) and fees: **-$249.91**

Transaction type — **ELECTRONIC PAYMENT**

Amount — **$2,519.17**

Transaction paid? — **No**

Fee — **$0.00**

Check your balance. If it's negative, make a deposit right

Exhibit 1: Defaulting Emails and Letters

**Subject**: Needs Attention: Pay Your Past Due USAA Insurance Bill
**From**: USAA <USAA.Customer.Service@mailcenter.usaa.com>
**To**: ryan@mxt3.com
**Date Sent**: Friday, November 8, 2024 2:33:28 AM GMT-05:00
**Date Received**: Friday, November 8, 2024 2:33:29 AM GMT-05:00



To ensure delivery to your inbox, please add USAA.Customer.Service@mailcenter.usaa.com to your address book.

**USAA SECURITY ZONE**
Ryan
Wagner
USAA # ending in:9088

## Make a Payment Today

Dear Ryan Wagner,

We want to remind you that your insurance payment is past due:

**Due date:**          November 5, 2024
**Minimum amount**     $271.31
**due:**

**Pay Bill**

Running late this month? You may be eligible for a special payment arrangement. Otherwise, visit your insurance billing homepage.

Retrieve policy information, review coverages, file a claim, and more at usaa.com and the USAA Mobile App.

Thank you,

USAA Casualty Insurance Company

**Bill ID: 012649088-PC001**

**Go Digital**
Review and edit your online document preferences at usaa.com.

**GO MOBILE**
apps & more

Please do not reply to this e-mail.
To contact USAA, visit our secure contact page.

**Privacy Promise**

United Services Automobile Association, 9800 Fredericksburg Road, San Antonio, Texas 78288

**133356-0622**

Exhibit 1: Defaulting Emails and Letters

**Subject**: Your account may have insufficient funds
**From**: Bank of America <onlinebanking@ealerts.bankofamerica.com>
**To**: ryan@mxt3.com
**Date Sent**: Friday, November 8, 2024 2:53:32 PM GMT-05:00
**Date Received**: Friday, November 8, 2024 2:53:33 PM GMT-05:00





# Your account may have insufficient funds

On November 07, 2024, you didn't have enough money in your **Ryan Main account ending in 6512** to cover your transaction(s).

Balance after transaction(s) and fees: **-$249.91**

| | |
|---|---|
| Transaction type | **ELECTRONIC PAYMENT** |
| Amount | **$65.92** |
| Transaction paid? | **No** |
| Fee | **$0.00** |

Check your balance. If it's negative, make a deposit right

Exhibit 1: Defaulting Emails and Letters



**Payment history**                                         **100%**
● Excellent | High impact

**Credit card usage**                                       **82%**
● Needs work | High impact

**Derogatory marks**                                        **0**
● Excellent | High impact

**Credit age**                                     **5 yrs, 8 mos**
◐ Fair | Medium impact

**Total accounts**                                          **18**
● Fair | Low impact

**Hard inquiries**                                          **1**
● Good | Low impact

Exhibit 2: 30 Day Progress of Financial Harm



Display by **Equifax** ∨

# 651

Fair

— No change checked daily

Jun 7, 2024
○ 746

Exhibit 2: 30 Day Progress of Financial Harm



Display by **TransUnion** ⌄

# 640

Fair

▼ 27 pts  checked daily

May 24, 2024
◉ 741

750

700

650

600

May    Jun    Jul    Aug    Sep    Oct

Exhibit 2  30 Day Progress of Financial Harm

# Summary

- 💳 **$72,868** Credit cards
- 📋 **$0** Collections
- 🎓 **$0** Student loans
- 💰 **$122,128** Personal loans
- 🚙 **$8,025** Auto loans
- 🏠 **$366,342** Home loans

**Net Worth**

**$0**

---

**TransUnion**

**640**

▼ **27 pts** today

Fair

**Equifax**

**651**

— No change

Fair

Exhibit 2: 30 Day Progress of Financial Harm



**597**

**Needs Work**

▼ **29 pts  checked daily**

Exhibit 2: 30 Day Progress of Financial Harm

Scores calculated using VantageScore 3.0 ℹ

**Subject**: Your account may have insufficient funds
**From**: Bank of America <onlinebanking@ealerts.bankofamerica.com>
**To**: ryan@mxt3.com
**Date Sent**: Monday, November 18, 2024 2:46:21 PM GMT-05:00
**Date Received**: Monday, November 18, 2024 2:46:23 PM GMT-05:00





# Your account may have insufficient funds

On November 15, 2024, you didn't have enough money in your **Ryan Main account ending in 6512** to cover your transaction(s).

| | |
|---|---|
| Balance after transaction(s) and fees: | **-$249.91** |
| Transaction type | **ELECTRONIC PAYMENT** |
| Amount | **$2,519.17** |
| Transaction paid? | **No** |
| Fee | **$0.00** |

Check your balance. If it's negative, make a deposit right

EXHIBIT  106

**Subject**: Important Notice: Your November 2024 Statement
**From**: American Express <AmericanExpress@welcome.americanexpress.com>
**To**: amazon@mxt3.com
**Date Sent**: Tuesday, November 19, 2024 4:12:29 PM GMT-05:00
**Date Received**: Tuesday, November 19, 2024 4:12:37 PM GMT-05:00



Log in to view your statement and see these changes online

**RYAN WAGNER**
Account Ending: 21007

## Your November 2024 statement is ready

Please view your PDF Billing Statement for important notice(s) about your account.

**Statement balance:**

$20,793.83

**Minimum payment due:**

$1,119.39

**Payment due date:**

Friday, December 13, 2024

View your statement

    EXHIBIT  106

**Subject**: Oops, did you forget your SoFi payment?
**From**: SoFi <no-reply@o.sofi.org>
**To**: ryan@mxt3.com
**Date Sent**: Tuesday, November 19, 2024 4:11:59 PM GMT-05:00
**Date Received**: Tuesday, November 19, 2024 4:11:59 PM GMT-05:00



SoFi Servicing
2750 East Cottonwood Pkwy
Suite 300
Salt Lake City, UT 84121

**Email Send Date 11/19/2024**

Dear Ryan,                                    Account Number: PA-1278581

Thank you for being a member of the SoFi community and your continued loyalty. We wanted to reach out to let you know that we haven't received your monthly payment for your personal loan yet and it's currently 25 days past due with a payment due of **$594.03**. As a reminder, your payment was due on **10/25/2024**.

Your account status is sent each month to consumer reporting agencies—which means this could affect your credit score. But, good news—you can keep your loan in good standing by making your payment today.

Making a payment is as easy as clicking here:

**Make a Payment**

If you're unable to make a payment, log in and **review your options** today.

As a bonus note: Did you know based on your loan type you may be eligible to save 0.25% on your interest rate when you sign up for autopay? (Plus, it'll make it easier to ensure your monthly payments are on time.)

Questions? Concerns? We're here for you.

**Subject**: There was a problem with your recent payment
**From**: Truist Alerts <alertnotifications@message.truist.com>
**To**: ryan@mxt3.com
**Date Sent**: Tuesday, November 19, 2024 12:04:46 AM GMT-05:00
**Date Received**: Tuesday, November 19, 2024 12:04:48 AM GMT-05:00



Client Name: **RYAN WAGNER**

## Your recent payment was returned

This is an automated message. Please do not reply directly to this email.

### There was a problem with your recent payment.

Hello RYAN,

Your most recent payment to Truist Mortgage has been rejected because Truist received a returned payment from your financial institution referenced below.

We have canceled the series and all the future-dated transactions for any of your Truist accounts which use the below bank account for payment:

| | |
|---|---|
| Financial institution: | BANK OF AMERICA, N.A. |
| Reason for return: | INSUFFICIENT FUNDS |
| From account: | External Checking  *6512 |
| To account: | Truist Mortgage  *1385 |
| Return date: | 11/19/2024 |

To set up another payment using a new external account, sign in to Truist Online Banking.

Questions about this payment? Call us at 800-634-7928 or visit Truist.com.

Thanks for choosing Truist.

Need additional assistance with mobile or online banking? Please visit More > Help & support while signed in to Truist Mobile or Truist.com or call us at 888-228-6654. You can also make changes to your alerts preferences at any time in online banking or the app. If you found this email in your spam or junk, add alertnotifications@message.truist.com to your safe senders list.

Truist Client Commitment: Protecting your information and identity is our priority. Truist will never send unsolicited emails asking clients to provide, update or verify sensitive personal or account information, such as passwords, Social Security numbers, personal identification numbers (PINs), credit or debit card numbers, or other confidential information. If you believe your account security has been compromised or have any concerns, call us immediately at 844-4TRUIST (844-487-8478). Learn more about security at www.truist.com/fraud-and-security or privacy at www.truist.com/privacy.

Truist Financial Corporation. Truist Bank, Member FDIC. Equal Housing Lender. ©2024 Truist Financial Corporation. Truist, Truist Purple, and the Truist logo are service marks of Truist Financial Corporation.

EXHIBIT  106

**Subject**: Action Needed: Your account is overdrawn
**From**: Bank of America <assist@customerassist.bankofamerica.com>
**To**: ryan@mxt3.com
**Date Sent**: Wednesday, November 20, 2024 3:33:40 PM GMT-05:00
**Date Received**: Wednesday, November 20, 2024 3:33:44 PM GMT-05:00

**BANK OF AMERICA**

11/20/2024

Account ending: 6512

RYAN A WAGNER, unfortunately, your checking account is overdrawn. Please deposit $608.91 as soon as possible to bring your balance to $0.

We understand that these things happen. If you've already made your deposit, thank you – you can ignore this reminder.

## Ways you can make a deposit

- **Online** – The quickest way to make a deposit is to use Online Banking or our Mobile Banking app[1] to deposit a check using the camera on your smartphone or tablet.[2]
- **In person** – visit a financial center or ATM near you to deposit funds. You can find one near you by visiting bankofamerica.com/locator.
- **Mail** - send a check, money order or cashier's check to Bank of America, PO Box 105576 Atlanta, GA 30348-5576.

You may be able to check to make sure we've received your deposit by logging in to your Online Banking account at bankofamerica.com or on our Mobile Banking app.

We want you to be financially successful. Learn more about understanding credit by visiting our Better Money Habits® website at bettermoneyhabits.com, which provides tools and information to help you manage your money.

## Thank you for taking care of this.

[1] Mobile Banking requires that you download the Mobile Banking app and is only available for selected mobile devices. Message and data rates may apply.

[2] Mobile check deposits are subject to verification and not available for immediate withdrawal. Other restrictions apply in the Mobile Banking app

**Subject**: [Urgent] - Update on your payment.
**From**: Bridgecrest <alerts@bridgecrest.com>
**To**: ryan@mxt3.com
**Date Sent**: Thursday, November 21, 2024 11:00:44 AM GMT-05:00
**Date Received**: Thursday, November 21, 2024 11:00:48 AM GMT-05:00

Notice of failed payment.



# Your payment failed to be processed

Ryan,

We were unable to process your recent payment on **11/21/2024**. The payment amount of **$359.00** has been returned by your bank. Common reasons for a returned payment include insufficient funds or a closed account.

**Failed payment amount:** $359.00
**Account number:** 7401

In order to prevent late fees and additional interest charges, please submit a new payment as soon as possible.

Make a new payment

**Notice:** If you're unable to make your payment, please **call us** so we can work together fo find the best payment plan.

Visit **bridgecrest.com**

 

This message was sent to ryan@mxt3.com.
Please do not reply.



©2024 Bridgecrest. All Rights Reserved.
7465 E Hampton Ave
Mesa, AZ 85209

Customer Support Center  |  Privacy Policy  |  View in Browser  |  Your Profile

**Subject**: Your account may have insufficient funds
**From**: Bank of America <onlinebanking@ealerts.bankofamerica.com>
**To**: ryan@mxt3.com
**Date Sent**: Thursday, November 21, 2024 3:21:30 PM GMT-05:00
**Date Received**: Thursday, November 21, 2024 3:21:32 PM GMT-05:00





# Your account may have insufficient funds

On November 20, 2024, you didn't have enough money in your **Ryan Main account ending in 6512** to cover your transaction(s).

| | |
|---|---|
| Balance after transaction(s) and fees: | **-$249.91** |
| Transaction type | **ELECTRONIC PAYMENT** |
| Amount | **$40.00** |
| Transaction paid? | **No** |
| Fee | **$0.00** |

EXHIBIT   106

| Transaction type | **ELECTRONIC PAYMENT** |
|---|---|
| Amount | **$156.00** |
| Transaction paid? | **No** |
| Fee | **$0.00** |

| Transaction type | **ELECTRONIC PAYMENT** |
|---|---|
| Amount | **$369.80** |
| Transaction paid? | **No** |
| Fee | **$0.00** |

Check your balance. If it's negative, make a deposit right away to bring it above $0 and have enough money to cover upcoming transactions.

**View account activity**

**How to avoid transactions being returned:**

- Check your accounts daily in the mobile app or Online Banking. Get the app now
- Set up automatic daily balance and transaction alerts delivered to your phone or email. Set alerts
- Learn about overdraft services or view your Deposit Agreement

**Subject**: Your USAA Insurance Bill Is Overdue
**From**: USAA <USAA.Customer.Service@mailcenter.usaa.com>
**To**: ryan@mxt3.com
**Date Sent**: Thursday, November 21, 2024 2:01:47 AM GMT-05:00
**Date Received**: Thursday, November 21, 2024 2:01:48 AM GMT-05:00

To ensure delivery to your inbox, please add USAA.Customer.Service@mailcenter.usaa.com to your address book.



USAA SECURITY ZONE
Ryan
Wagner
USAA # ending in:9088

## Payment Needed for Your Overdue Bill

Dear Ryan Wagner,

Thank you for trusting us with your insurance needs. We're writing because your insurance bill dated November 8, 2024, includes an overdue amount. To keep your insurance account current, please make your payment of $546.79 by December 5, 2024. If you've already made your payment, please disregard this notice.

## Make Your Payment Today
For your convenience, you can pay your bill on usaa.com using USAA Pay Bills®. If you're concerned that you can't make this payment or future ones, visit our website or call us at one of the following numbers to discuss possible payment arrangements.

## Set Up Automatic Payments
You can set up automatic payments and enjoy the ease of paying your insurance bill automatically. Your payments are automatically charged to a credit or debit card, or withdrawn from a bank account, so they're always made on time.

### How to Contact Us
If you have questions, please call us at one of the following numbers:

**Phone:** 210-531-USAA (8722), our mobile shortcut #8722 or 800-531-8722

As always, we appreciate the opportunity to serve you.

Thank you,

USAA Casualty Insurance Company

Bill ID: 012649088-PC001



**Go Digital**
Review and edit your online document preferences at usaa.com.

**GO MOBILE**
apps & more

**Subject**: Here's your weekly account snapshot
**From**: American Express <AmericanExpress@welcome.americanexpress.com>
**To**: amazon@mxt3.com
**Date Sent**: Friday, November 22, 2024 8:23:30 PM GMT-05:00
**Date Received**: Friday, November 22, 2024 8:23:35 PM GMT-05:00

Stay up to date on your account

AMERICAN
EXPRESS

**RYAN WAGNER**
Account ending: 21007

## See your account at a glance

**Here's your weekly account snapshot for your Amazon Business Prime Card from American Express. Your account has a past due amount of $459.39.**

As of Thu, Nov 21

Statement balance:

**$20,793.83**
closing date Mon, Nov 18

Recent payments & credits:

**$0.00**

Recent charges:

**$0.00**
since Tue, Nov 19

Total balance:

**$20,793.83**

Payment due:

**$1,119.39**
due on Fri, Dec 13

View your account

## Helpful links

About your online security

Manage your alerts

View your account online

**DON'T** *do business* **WITHOUT IT**

Privacy statement

Contact us

EXHIBIT 106

**Subject**: Your payment has been returned
**From**: Capital One <capitalone@notification.capitalone.com>
**To**: ryan@mxt3.com
**Date Sent**: Sunday, November 24, 2024 1:28:15 PM GMT-05:00
**Date Received**: Sunday, November 24, 2024 1:28:16 PM GMT-05:00

   Sign in



   Platinum Card... 4935

# Your payment was returned.

RYAN,

We're sorry, but your bank recently returned payments made to your Platinum Card. We'd like to help by providing you some details:

11/20/24 - $40.00 paid via Autopay returned due to Insufficient Funds.

Returned payments aren't reflected in your balance and won't be applied to any remaining minimum payment you may have.

A returned payment can be a pain. To help you deal with the situation, we'd like you to consider one or more of the following options:

1. If you have questions about a specific return, please contact the bank that returned the payment.

2. To make a payment, visit Online Banking or use the Capital One Mobile app.

**Subject**: Your statement is now available online
**From**: Citi Diamond Preferred Card <citicards@info6.citi.com>
**To**: RYAN WAGNER <rdc@mxt3.com>
**Date Sent**: Sunday, November 24, 2024 8:13:21 AM GMT-05:00
**Date Received**: Sunday, November 24, 2024 8:13:26 AM GMT-05:00

Click to check your Citi® Diamond Preferred® Mastercard® statement.

 **ⓘ UPDATE**



🔒 Ryan Wagner
Cardmember since 2021
Account ending in 8844 

# ⓘ View your monthly statement now

Hi, Ryan. Your Citi® Diamond
Preferred® Mastercard® statement is ready, so have a look.

Remember - you're enrolled in AutoPay, so your payment is
already scheduled to be made from your designated payment
account.

## Statement Summary

| | |
|---|---|
| Statement Date: | November 22, 2024 |
| Statement Balance: | **$13,225.25** |
| Minimum Payment Due: | **$389.78** |
| Payment Due Date: | Friday, December 20, 2024 |
| Available Credit: | **$274** |

   EXHIBIT 106

**Subject**: Your account may have insufficient funds
**From**: Bank of America <onlinebanking@ealerts.bankofamerica.com>
**To**: ryan@mxt3.com
**Date Sent**: Monday, November 25, 2024 2:43:29 PM GMT-05:00
**Date Received**: Monday, November 25, 2024 2:43:30 PM GMT-05:00





# Your account may have insufficient funds

On November 22, 2024, you didn't have enough money in your **Ryan Main account ending in 6512** to cover your transaction(s).

| | |
|---|---|
| Balance after transaction(s) and fees: | **-$249.91** |
| Transaction type | **ELECTRONIC PAYMENT** |
| Amount | **$559.00** |
| Transaction paid? | **No** |
| Fee | **$0.00** |

EXHIBIT  106

| | |
|---|---|
| Transaction type | **ELECTRONIC PAYMENT** |
| Amount | **$478.57** |
| Transaction paid? | **No** |
| Fee | **$0.00** |

Check your balance. If it's negative, make a deposit right away to bring it above $0 and have enough money to cover upcoming transactions.

**View account activity**

**How to avoid transactions being returned:**

- Check your accounts daily in the mobile app or Online Banking. Get the app now
- Set up automatic daily balance and transaction alerts delivered to your phone or email. Set alerts
- Learn about overdraft services or view your Deposit Agreement
- Get notified if your account balance is trending toward $0. Turn on Balance Watch in the mobile app (not available for Small Business accounts).

We'll never ask for your personal information such as SSN or ATM PIN in email messages. If you get an email that looks suspicious or you are not the intended recipient of this email, don't click on any links. Instead, forward to abuse@bankofamerica.com then delete it.

Please don't reply to this automatically generated service email.

Privacy Notice        Equal Housing Lender 🏠

Bank of America, N.A. Member FDIC.
© 2024 Bank of America Corporation.

**Subject**: Action Required - Payment is due on your account
**From**: Bridgecrest <alerts@bridgecrest.com>
**To**: ryan@mxt3.com
**Date Sent**: Tuesday, November 26, 2024 11:02:11 AM GMT-05:00
**Date Received**: Tuesday, November 26, 2024 11:02:14 AM GMT-05:00



# Your Bridgecrest account requires attention

Hi Ryan,

Please be advised that your Bridgecrest account is $359.00 past due. Payment is needed for your 2017 300.

Pay your past due balance today to get back on track and avoid additional interest charges or late fees.

Thanks,
Bridgecrest

**Get Caught Up Today**

**Notice:** A missed payment can negatively affect your credit score as well as add additional fees and interest to your account. It's critical that you make your vehicle payments on time, every time.

Visit **bridgecrest.com**

 

Copyright ©2022 Bridgecrest. All Rights Reserved.
7465 E Hampton Ave
Mesa, AZ, 85209, USA



Customer Support Center | Privacy Policy | View in Browser | Your Profile

**Subject**: [Action Required] Urgent information about your personal loan payment
**From**: SoFi <no-reply@o.sofi.org>
**To**: ryan@mxt3.com
**Date Sent**: Wednesday, November 27, 2024 2:35:36 PM GMT-05:00
**Date Received**: Wednesday, November 27, 2024 2:35:37 PM GMT-05:00



**LOG IN**

Loan: PA-1513878

Hi Ryan,

We wanted to let you know that your most recent SoFi personal loan
payment in the amount of $986.19, was returned unpaid by your
financial institution due to insufficient or unavailable funds.

**What do I need to do?**

Please visit our mobile app or log in to your account by clicking the
button below to verify your bank account information and schedule a
replacement payment. If you need assistance or have any questions,
please call us at **844.975.7634** and one of our representatives will be
happy to help you get things back on track.

Log In

Sincerely,
SoFi Servicing Team
**855.456.7634**

**Subject**: Loan Re-amortization Notification
**From**: SoFi <no-reply@o.sofi.org>
**To**: ryan@mxt3.com
**Date Sent**: Wednesday, November 27, 2024 6:07:38 AM GMT-05:00
**Date Received**: Wednesday, November 27, 2024 6:07:40 AM GMT-05:00



**LOG IN**

11/27/2024

Personal Loan: PA-1513878

Hi Ryan,

We wanted to follow up with you regarding a notice you received from
SoFi, letting you know that your Personal Loan lump-sum payment
was returned unpaid by your bank.

**What happened?**
After receiving your payment, your loan was re-amortized; this was
before we received notice from your financial institution that your
payment was returned.

**What does this mean?**
This means your loan schedule and new monthly payment amount
was re-calculated based on your ultimately returned lump-sum
payment. The sum of your returned payment lowered your loan's
principal balance, which resulted in a lower monthly payment—which
means you are paying less in error.

To avoid leaving an unpaid balance due at the end of your loan's
maturity, we conducted a new re-amortization to adjust your payment
schedule and increase your monthly payment amount to get you back
on track.

EXHIBIT  106

**Your new payment amount is: $991.72**

If you have auto-pay set up for your loan, please be aware this new payment will be automatically deducted each month.

To view your account details and payment information, simply log in to your SoFi account online or directly from our mobile app.

Login

**How can I get in touch if I have questions?**
We want to be sure you fully understand your new loan schedule. If you have any questions at all, please don't hesitate to contact us using the information below.

Sincerely,
SoFi Servicing



Email Customer          Give us a call              M - Th 5am - 7pm PST
Service                 855.456.SoFi (7634)         F - Su 5am - 5pm PST

             

This message was sent to ryan@mxt3.com in reference to Case #: 28237202
SoFi values your privacy and the security of your personal information so please do not include your social security number in any email or letter that you send to us.

SoFi loans are serviced by SoFi Bank, N.A. or an affiliate, Licensed by the Department of Business Oversight under the California Financing Law License No. 6054612. NMLS #1121636. 2750 East Cottonwood Parkway #300, Cottonwood Heights, Utah 84121. Terms and Conditions apply. See SoFi.com/legal#licenses for details.

SoFi 234 1st Street San Francisco, CA 94105
Legal | Privacy | Contact Us

**Subject**: Your loan payment could not be processed
**From**: LendingClub <payments@mail6.lendingclub.com>
**To**: ryan@mxt3.com
**Date Sent**: Wednesday, November 27, 2024 12:20:25 PM GMT-05:00
**Date Received**: Wednesday, November 27, 2024 12:20:26 PM GMT-05:00

 LendingClub

# Your loan payment could not be processed

Hi Ryan,

Your loan payment of $478.57 could not be processed due to insufficient funds in your bank account.

It is critical that you contact us immediately at **844-227-5011** to update your bank account information and reschedule this missed payment. Our business hours are Monday to Thursday 5 am - 6 pm, Friday from 5 am - 5 pm, and Saturday from 6:00 am - 2:30 pm Pacific Time.

We appreciate your business!

Thanks,
LendingClub

**LendingClub reports all account experiences - positive and negative - to one or more of the credit reporting agencies. Late payments, missed payments, or other defaults on your account may be reflected in your credit report, as will a record**

**Subject**: Your AutoPay Payment Reminder
**From**: American Express <DoNotReplyUS@welcome.americanexpress.com>
**To**: amazon@mxt3.com
**Date Sent**: Thursday, November 28, 2024 2:13:10 PM GMT-05:00
**Date Received**: Thursday, November 28, 2024 2:13:11 PM GMT-05:00



# AMERICAN EXPRESS

ACCOUNT ENDING: **21007**

Dear RYAN WAGNER, **Your payment will be processed on Dec 3, 2024**

**A payment you scheduled through AutoPay will be debited from your account soon.**

**Payment Amount\*:**     **$1,119.39**

**Will Process on:**     **Tue, Dec 3, 2024**

\*Your AutoPay is set to pay the Minimum Due amount. You can make an additional payment by Fri, Dec 13, 2024 to pay less interest and pay off your balance quicker.

To review or adjust your AutoPay settings, click here.

**DON'T** *live life* **WITHOUT IT**

**Subject**: Your credit limit has been exceeded
**From**: American Express MyCredit Guide <noreply@mycredit-guide.americanexpress.com>
**To**: "amazon@mxt3.com" <amazon@mxt3.com>
**Date Sent**: Thursday, November 28, 2024 11:16:02 AM GMT-05:00
**Date Received**: Thursday, November 28, 2024 11:16:03 AM GMT-05:00



One of your credit cards is over its limit

**AMERICAN EXPRESS**    MyCredit Guide

Card over limit

# You've exceeded your card limit

Review your credit file

LOG IN

**Dear RYAN WAGNER,**

Your credit file has been changed.

| | |
|---|---|
| **Change:** | Card Over Limit |
| **Company:** | CAPITAL ONE |
| **Reported by:** | Experian |

**What does this mean?**
One of your credit cards is over its maximum limit. Spending more than your credit limit
allows can negatively impact your FICO® Score, particularly if you allow it to carry over in to

**Subject**: BGE Payment Failed
**From**: no-reply@bge.com
**To**: ryan@mxt3.com
**Date Sent**: Friday, November 29, 2024 5:43:24 AM GMT-05:00
**Date Received**: Friday, November 29, 2024 5:43:26 AM GMT-05:00



AN EXELON COMPANY

Hello Ryan Wagner .,                    Account ending in 3079297842

Your bill payment has failed.

Payment Amount: **-281.00**
Payment Date: **2024-11-29**
Confirmation Number: **3986806558**

To avoid late payment charges or termination, please remit payment as soon as possible. To view this payment or submit another payment online, please sign in to your BGE online account .

Please note that any payment made after the indicated due date, or for less than the total amount due, may result in your service being disconnected.

If you have a question regarding this email, please contact us at Mybillingrep@bge.com; please include your BGE account number and your question.

Thank you for being a valued BGE customer!

   



Download the BGE mobile app
to easily manage your account on the go.

This email is generated automatically. Please do not respond to this message.

Need to get in touch? Contact Us

**Subject**: Need help? Sofi Loan is more than 30 days overdue!
**From**: SoFi <no-reply@o.sofi.org>
**To**: ryan@mxt3.com
**Date Sent**: Friday, November 29, 2024 4:12:03 PM GMT-05:00
**Date Received**: Friday, November 29, 2024 4:12:05 PM GMT-05:00

Please do not reply to this message.
This message was sent from an email address that does not accept incoming email.

 **SoFi**

SoFi Servicing
2750 East Cottonwood Pkwy
Suite 300
Salt Lake City, UT 84121

**Email Send Date 11/29/2024**

Dear Ryan,                                     Account Number: PA-1278581

We wanted to reach out to let you know that your personal loan is now **35** days

past due. As an FYI, your account status is sent each month to consumer

reporting agencies—which means this could affect your credit score.

At this point, here is a complete breakdown of how much you owe:

**Past due amount (Due immediately) - $1,191.72**

**Next due amount (Due 12/25/2024) - $597.69**

**Total due amount - $1,789.41**

If you're unable to make a payment, log in and review your options today.

You are past due
**35 days**



The good news? You can return your loan to good standing by making your

payment today. It is as easy as clicking here.

**Subject**: Please read: Take action by making a payment
**From**: SoFi <no-reply@o.sofi.org>
**To**: ryan@mxt3.com
**Date Sent**: Sunday, December 1, 2024 4:14:18 PM GMT-05:00
**Date Received**: Sunday, December 1, 2024 4:14:19 PM GMT-05:00

Please do not reply to this message.
This message was sent from an email address that does not accept incoming email.



SoFi Servicing
2750 East Cottonwood Pkwy
Suite 300
Salt Lake City, UT 84121

**Email Send Date 12/01/2024**

Dear Ryan,                                    Account Number: PA-1513878

Thank you for being a member of the SoFi Community and your continued
loyalty. We wanted to reach out to let you know that we haven't received your
monthly payment for your personal loan yet, and it's currently **15** days past due
with a payment due of **$986.19.** To keep your loan in good standing, make your
payment today.

Making a payment is as easy as clicking here:

**Make a Payment**

If you're unable to make a payment, log in and review your options today.

As a bonus note: Did you know based on your loan type you may be eligible to
save 0.25% on your interest rate when you sign up for autopay? (Plus, it'll make
it easier to ensure your monthly payments are on time.)

Questions? Concerns? We're here for you.

**A few ways to Contact SoFi**
Online/Mobile: www.SoFi.com/Login

**Subject**: Your account may have insufficient funds
**From**: Bank of America <onlinebanking@ealerts.bankofamerica.com>
**To**: ryan@mxt3.com
**Date Sent**: Monday, December 2, 2024 3:36:55 PM GMT-05:00
**Date Received**: Monday, December 2, 2024 3:36:57 PM GMT-05:00





# Your account may have insufficient funds

On November 29, 2024, you didn't have enough money in your **Ryan Main account ending in 6512** to cover your transaction(s).

| | |
|---|---|
| Balance after transaction(s) and fees: | **-$249.91** |
| Transaction type | **ELECTRONIC PAYMENT** |
| Amount | **$369.80** |
| Transaction paid? | **No** |
| Fee | **$0.00** |

EXHIBIT   106

| | |
|---|---|
| Transaction type | **ELECTRONIC PAYMENT** |
| Amount | **$972.00** |
| Transaction paid? | **No** |
| Fee | **$0.00** |

Check your balance. If it's negative, make a deposit right away to bring it above $0 and have enough money to cover upcoming transactions.

**View account activity**

### How to avoid transactions being returned:

- Check your accounts daily in the mobile app or Online Banking. Get the app now
- Set up automatic daily balance and transaction alerts delivered to your phone or email. Set alerts
- Learn about overdraft services or view your Deposit Agreement
- Get notified if your account balance is trending toward $0. Turn on Balance Watch in the mobile app (not available for Small Business accounts).

We'll never ask for your personal information such as SSN or ATM PIN in email messages. If you get an email that looks suspicious or you are not the intended recipient of this email, don't click on any links. Instead, forward to abuse@bankofamerica.com then delete it.

Please don't reply to this automatically generated service email.

Privacy Notice      Equal Housing Lender 🏠

Bank of America, N.A. Member FDIC.
© 2024 Bank of America Corporation.

**Subject**: Action Required - Payment is due on your account
**From**: Bridgecrest <alerts@bridgecrest.com>
**To**: ryan@mxt3.com
**Date Sent**: Tuesday, December 3, 2024 11:01:52 AM GMT-05:00
**Date Received**: Tuesday, December 3, 2024 11:01:53 AM GMT-05:00



# Your Bridgecrest account requires attention

Hi Ryan,

Please be advised that your Bridgecrest account is $359.00 past due. Payment is needed for your 2017 300.

Pay your past due balance today to get back on track and avoid additional interest charges or late fees.

Thanks,
Bridgecrest

Get Caught Up Today

**Notice:** A missed payment can negatively affect your credit score as well as add additional fees and interest to your account. It's critical that you make your vehicle payments on time, every time.

Visit **bridgecrest.com**

 

Copyright ©2022 Bridgecrest. All Rights Reserved.
7465 E Hampton Ave
Mesa, AZ, 85209, USA



Customer Support Center | Privacy Policy | View in Browser | Your Profile

EXHIBIT  106

**Subject**: We ran into an unexpected error
**From**: Truist Alerts <alertnotifications@message.truist.com>
**To**: ryan@mxt3.com
**Date Sent**: Tuesday, December 3, 2024 4:04:18 AM GMT-05:00
**Date Received**: Tuesday, December 3, 2024 4:04:19 AM GMT-05:00



# Your mortgage payment has not been processed.

This is an automated message. Please do not reply directly to this email.

## We ran into an unexpected error.

Hello RYAN,

We were unable to complete your requested transaction due to an error during processing. Please initiate a new transaction request.

|  |  |
|---:|---|
| **From account:** | External Checking *6512 |
| **To account:** | Truist Mortgage *1385 |
| **Transaction date:** | 12/03/2024 |
| **Amount:** | $2,330.55 |
| **Confirmation:** | 0824120304490137 |

We apologize for any inconvenience this may cause.

Questions about this transaction? Call us at 800-634-7928 or visit Truist.com.

Thanks for choosing Truist.

Need additional assistance with mobile or online banking? Please visit More > Help & support while signed in to Truist Mobile or Truist.com or call us at 888-228-6654. You can also make changes to your alerts preferences at any time in online banking or the app. If you found this email in your spam or junk, add alertnotifications@message.truist.com to your safe senders list.

Truist Client Commitment: Protecting your information and identity is our priority. Truist will never send unsolicited emails asking clients to provide, update or verify sensitive personal or account information, such as passwords, Social Security numbers, personal identification numbers (PINs), credit or debit card numbers, or other confidential information. If you believe your account security has been compromised or have any concerns, call us immediately at 844-4TRUIST (844-487-8478). Learn more about security at www.truist.com/fraud-and-security or privacy at www.truist.com/privacy.

Truist Financial Corporation. Truist Bank, Member FDIC. Equal Housing Lender. ©2024 Truist Financial Corporation. Truist, Truist Purple, and the Truist logo are service marks of Truist Financial Corporation.

**Subject**: Your recurring payment series has been canceled
**From**: Truist Alerts <alertnotifications@message.truist.com>
**To**: ryan@mxt3.com
**Date Sent**: Tuesday, December 3, 2024 4:04:31 AM GMT-05:00
**Date Received**: Tuesday, December 3, 2024 4:04:32 AM GMT-05:00



## Your mortgage payment could not be processed
This is an automated message. Please do not reply directly to this email.

### Your recurring payment series has been canceled.

Hello RYAN,

We were unable to complete your requested transaction and have canceled the recurring series. You may try to initiate a new transaction request.

Here are the details:

| | |
|---|---|
| From account: | External Checking *6512 |
| To account: | Truist Mortgage *1385 |
| Transaction date: | 09/03/2024 |
| Amount: | $2,330.55 Every Month |

Questions about this transaction? Call us at 800-634-7928 or visit Truist.com.

Thanks for choosing Truist.

Need additional assistance with mobile or online banking? Please visit More > Help & support while signed in to Truist Mobile or Truist.com or call us at 888-228-6654. You can also make changes to your alerts preferences at any time in online banking or the app. If you found this email in your spam or junk, add alertnotifications@message.truist.com to your safe senders list.

Truist Client Commitment: Protecting your information and identity is our priority. Truist will never send unsolicited emails asking clients to provide, update or verify sensitive personal or account information, such as passwords, Social Security numbers, personal identification numbers (PINs), credit or debit card numbers, or other confidential information. If you believe your account security has been compromised or have any concerns, call us immediately at 844-4TRUIST (844-487-8478). Learn more about security at www.truist.com/fraud-and-security or privacy at www.truist.com/privacy.

Truist Financial Corporation. Truist Bank, Member FDIC. Equal Housing Lender. ©2024 Truist Financial Corporation. Truist, Truist Purple, and the Truist logo are service marks of Truist Financial Corporation.

**Subject**: A replacement payment is required
**From**: Citi Diamond Preferred Card <citicards@info6.citi.com>
**To**: RYAN WAGNER <rdc@mxt3.com>
**Date Sent**: Wednesday, December 4, 2024 8:39:52 AM GMT-05:00
**Date Received**: Wednesday, December 4, 2024 8:39:53 AM GMT-05:00

Please make a replacement payment.



**⬤ ACTION REQUIRED**





🔒 Ryan Wagner
Cardmember since 2021
Account ending in 8844

# ⚠ A payment was returned unpaid

Please make a replacement payment right away

Hi, Ryan. A recent payment of \$369.80 on your Citi® Diamond Preferred® Mastercard® account was returned unpaid by BANK OF AMERICA, NA.

## What happened and what's next?

BANK OF AMERICA, NA indicated the account doesn't have the funds needed to cover the payment. Before making a replacement payment, make sure this account has the necessary funds to cover it - a different payment account can also be used. You can quickly and easily manage your payment accounts and make a replacement payment in the Citi Mobile® App or Citi® Online. The payment will be credited same-day.

Please contact BANK OF AMERICA, NA directly for any further questions or clarifications about this returned payment.

If you are enrolled in AutoPay and set to pay the Minimum Payment Due, the automatic payment may still occur if the AutoPay Payment Date has not passed.

**Subject**: Action Needed: Your account is overdrawn
**From**: Bank of America <assist@customerassist.bankofamerica.com>
**To**: ryan@mxt3.com
**Date Sent**: Wednesday, December 4, 2024 3:06:58 PM GMT-05:00
**Date Received**: Wednesday, December 4, 2024 3:07:01 PM GMT-05:00

 **BANK OF AMERICA**

12/04/2024

Account ending: 6512

## RYAN A WAGNER, unfortunately, your checking account is overdrawn. Please deposit $249.91 as soon as possible to bring your balance to $0.

We understand that these things happen. If you've already made your deposit, thank you – you can ignore this reminder.

## Ways you can make a deposit

- **Online** – The quickest way to make a deposit is to use Online Banking or our Mobile Banking app[1] to deposit a check using the camera on your smartphone or tablet.[2]
- **In person** – visit a financial center or ATM near you to deposit funds. You can find one near you by visiting bankofamerica.com/locator.
- **Mail** - send a check, money order or cashier's check to Bank of America, PO Box 105576 Atlanta, GA 30348-5576.

You may be able to check to make sure we've received your deposit by logging in to your Online Banking account at bankofamerica.com or on our Mobile Banking app.

We want you to be financially successful. Learn more about understanding credit by visiting our Better Money Habits® website at bettermoneyhabits.com, which provides tools and information to help you manage your money.

## Thank you for taking care of this.

[1] Mobile Banking requires that you download the Mobile Banking app and is only available for selected mobile devices. Message and data rates may apply.

[2] Mobile check deposits are subject to verification and not available for immediate withdrawal. Other restrictions apply in the Mobile Banking app

**Subject**: An account has been reported as past due
**From**: American Express MyCredit Guide <noreply@mycredit-guide.americanexpress.com>
**To**: "amazon@mxt3.com" <amazon@mxt3.com>
**Date Sent**: Wednesday, December 4, 2024 1:38:00 PM GMT-05:00
**Date Received**: Wednesday, December 4, 2024 1:38:01 PM GMT-05:00



We've detected a delinquent account report. Learn how it can affect your credit score and what you can do.

**AMERICAN EXPRESS**    MyCredit Guide

Credit Alert

# A credit account has been reported as past due

Take action to help protect your FICO®* Score today

LOG IN

**Dear RYAN WAGNER,**

Your credit file has been updated.

| | |
|---|---|
| **Change:** | Delinquent Account |
| **Company:** | USAA FEDERAL SAVINGS B |
| **Reported by**: | Experian |

**What this means:**
One of your credit accounts has been reported as past due. This can lower your FICO® Score.

**Subject**: Need help? Sofi Loan is more than 30 days overdue!
**From**: SoFi <no-reply@o.sofi.org>
**To**: ryan@mxt3.com
**Date Sent**: Wednesday, December 4, 2024 4:12:16 PM GMT-05:00
**Date Received**: Wednesday, December 4, 2024 4:12:18 PM GMT-05:00

Please do not reply to this message.
This message was sent from an email address that does not accept incoming email.

 **SoFi**

SoFi Servicing
2750 East Cottonwood Pkwy
Suite 300
Salt Lake City, UT 84121

**Email Send Date 12/04/2024**

Dear Ryan,                                    Account Number: PA-1278581

We wanted to reach out to let you know that your personal loan is now **40** days
past due. As an FYI, your account status is sent each month to consumer
reporting agencies—which means this could affect your credit score.

At this point, here is a complete breakdown of how much you owe:

**Past due amount (Due immediately) - $1,191.72**
**Next due amount (Due 12/25/2024) - $597.69**
**Total due amount - $1,789.41**

If you're unable to make a payment, log in and review your options today.

You are past due
**40 days**



The good news? You can return your loan to good standing by making your
payment today. It is as easy as clicking here.

**Subject**: Take action to stop your subscription from being canceled
**From**: Intuit QuickBooks Team <do_not_reply@intuit.com>
**To**: tax@mxt3.com
**Date Sent**: Wednesday, December 4, 2024 5:00:05 AM GMT-05:00
**Date Received**: Wednesday, December 4, 2024 5:00:06 AM GMT-05:00



 Take action now

Ryan Wagner, please update
your payment details today.

> **Company name:** MXT3
> **Payment method:**
> AMEX ending in 1007
> **Amount due:** $35.00
> **Billing date:** 11/16/2024
> **Cancelation date:** 12/13/2024

We'll try one more time to renew your subscription, so please update your payment
info as soon as you can. If you'd prefer to use EFT as your payment method, you
can make that change now.



## Account details

**Affected subscriptions:**          QuickBooks Online Simple Start

We're here to help
Visit customer support.

INTUIT  turbotax  credit karma  quickbooks  mailchimp

You have received this business communication as part of our efforts to fulfill your request or service your account.
You will receive this and other business communications from us even if you have opted out of marketing messages.
All dates and times are Pacific Standard Time (PST).

EXHIBIT  106

**Subject**: Your credit card statement is available
**From**: Chase <no.reply.alerts@chase.com>
**To**: ryan@mxt3.com
**Date Sent**: Wednesday, December 4, 2024 9:31:17 AM GMT-05:00
**Date Received**: Wednesday, December 4, 2024 9:31:19 AM GMT-05:00



**CHASE** ⬤

**Statement ready**

# Your credit card statement is available

| Account | Chase Credit Card (...7130) |
|---|---|
| Due date | 12/28/2024 |
| Minimum payment due | $967.00 |
| Statement balance | $29846.11 |

ⓢ **Auto-pay enabled**

You're already enrolled in automatic payments. We'll pay the amount you scheduled from your account.

Visit our Resource Center to manage your account.

[ View statement ]

Securely access your accounts with the Chase Mobile® app or chase.com.

**ABOUT THIS MESSAGE**

Chase Mobile® app is available for select mobile devices. Message and data rates may apply.

This service email gives you updates and information about your Chase relationship.

Chase cannot guarantee the delivery of alerts and notifications. Wireless or internet service provider outages or other circumstances could delay them. You can always check chase.com or the Chase Mobile app for the status of your accounts including your latest account balances and transaction details.

To protect your personal information, please don't reply to this message. Chase won't ask for confidential information in an email.

If you have concerns about the authenticity of this message or have questions about your account visit chase.com/CustomerService for ways to contact us.

EXHIBIT 106

**Subject**: Your credit limit has been exceeded
**From**: American Express MyCredit Guide <noreply@mycredit-guide.americanexpress.com>
**To**: "amazon@mxt3.com" <amazon@mxt3.com>
**Date Sent**: Wednesday, December 4, 2024 1:38:01 PM GMT-05:00
**Date Received**: Wednesday, December 4, 2024 1:38:01 PM GMT-05:00



One of your credit cards is over its limit

**AMERICAN EXPRESS**    MyCredit Guide

Card over limit

# You've exceeded your card limit

Review your credit file

LOG IN

**Dear RYAN WAGNER,**

Your credit file has been changed.

| | |
|---|---|
| **Change:** | Card Over Limit |
| **Company:** | USAA FEDERAL SAVINGS B |
| **Reported by:** | Experian |

**What does this mean?**
One of your credit cards is over its maximum limit. Spending more than your credit limit allows can negatively impact your FICO$^®$ Score, particularly if you allow it to carry over in to

**Subject**: Update on your Bridgecrest account.
**From**: Bridgecrest <alerts@bridgecrest.com>
**To**: ryan@mxt3.com
**Date Sent**: Thursday, December 5, 2024 11:02:49 AM GMT-05:00
**Date Received**: Thursday, December 5, 2024 11:02:52 AM GMT-05:00

Act now to avoid paying late fees and additional interest!



# Your account is past due

Ryan,

We noticed you still haven't made your past due payment. In order to get back on track, please make a payment today.

**Total amount past due:** $379.00
**Account number:** 7401

Login to your account now to make your payment. Or better yet, sign up for AutoPay and never miss another payment again!

**Make a payment**

**Notice:** A missed payment can negatively affect your credit score so it's critical that you make your vehicle payment on time, every time.

Visit **bridgecrest.com**

 

This message was sent to ryan@mxt3.com.
Please do not reply.



©2024 Bridgecrest. All Rights Reserved.
7465 E Hampton Ave
Mesa, AZ 85209

Customer Support Center  |  Privacy Policy  |  View in Browser  |  Your Profile



**Subject**: Oops, did you forget your SoFi payment?
**From**: SoFi <no-reply@o.sofi.org>
**To**: ryan@mxt3.com
**Date Sent**: Friday, December 6, 2024 4:24:52 PM GMT-05:00
**Date Received**: Friday, December 6, 2024 4:24:53 PM GMT-05:00



SoFi Servicing
2750 East Cottonwood Pkwy
Suite 300
Salt Lake City, UT 84121

**Email Send Date 12/06/2024**

Dear Ryan,                                    Account Number: PA-1513878

Thank you for being a member of the SoFi community and your continued loyalty. We wanted to reach out to let you know that we haven't received your monthly payment for your personal loan yet and it's currently **20 days past due** with a payment due of **$986.19**. As a reminder, your payment was due on **11/16/2024**.

Your account status is sent each month to consumer reporting agencies—which means this could affect your credit score. But, good news—you can keep your loan in good standing by making your payment today.

Making a payment is as easy as clicking here:

**Make a Payment**

If you're unable to make a payment, log in and **review your options** today.

As a bonus note: Did you know based on your loan type you may be eligible to save 0.25% on your interest rate when you sign up for autopay? (Plus, it'll make it easier to ensure your monthly payments are on time.)

Questions? Concerns? We're here for you.

**Subject**: Update Your USAA Automatic Payment Plan
**From**: USAA <USAA.Customer.Service@mailcenter.usaa.com>
**To**: ryan@mxt3.com
**Date Sent**: Friday, December 6, 2024 12:33:48 AM GMT-05:00
**Date Received**: Friday, December 6, 2024 12:33:49 AM GMT-05:00

To ensure delivery to your inbox, please add USAA.Customer.Service@mailcenter.usaa.com to your address book.



USAA SECURITY ZONE
Ryan
Wagner
USAA # ending in:9088

## Your Automatic Payment Plan Needs Attention

Dear Ryan Wagner,

Thank you for trusting us with your insurance needs. We encountered a problem processing your automatic payment. Your payment was declined by your financial institution. Please make your payment in the amount of $546.79 as soon as possible.

## Ways You Can Make a Payment

You can make your payment today in one of the following ways:

| | |
|---|---|
| **Online:** | Log on to usaa.com (Keyword: Pay Bills) |
| **Phone:** | Pay by phone. |
| **Mail:** | USAA |
| | 9800 Fredericksburg Road |
| | San Antonio, TX 78288-0436 |

To make sure your automatic payment plan (APP) is correct, please log in to your account, review your bank or credit card information on usaa.com/APP, and update it. If the bank or credit card information is accurate, contact your financial institution.

### How to Contact Us
If you have questions about your APP, please contact us at one of the following numbers:

**Phone:** 210-531-USAA (8722), our mobile shortcut #8722 or 800-531-8722

We appreciate your business and the opportunity to serve all your insurance needs.

Thank you,

USAA Casualty Insurance Company



**Go Digital**
Review and edit your online document preferences at usaa.com.

**GO MOBILE**
apps & more

**Subject**: An account has been reported as past due
**From**: American Express MyCredit Guide <noreply@mycredit-guide.americanexpress.com>
**To**: "amazon@mxt3.com" <amazon@mxt3.com>
**Date Sent**: Saturday, December 7, 2024 11:29:44 AM GMT-05:00
**Date Received**: Saturday, December 7, 2024 11:29:44 AM GMT-05:00

We've detected a delinquent account report. Learn how it can affect your credit score and what you can do.



**Dear RYAN WAGNER,**

Your credit file has been updated.

| | |
|---|---|
| **Change:** | Delinquent Account |
| **Company:** | TRUIST MORTGAGE |
| **Reported by**: | Experian |

**What this means:**
One of your credit accounts has been reported as past due. This can lower your FICO®
Score.

**Subject**: Needs Attention: Pay Your Past Due USAA Insurance Bill
**From**: USAA <USAA.customer.service@mailcenter.usaa.com>
**To**: ryan@mxt3.com
**Date Sent**: Sunday, December 8, 2024 4:35:01 AM GMT-05:00
**Date Received**: Sunday, December 8, 2024 4:35:02 AM GMT-05:00

To ensure delivery to your inbox, please add USAA.customer.service@mailcenter.usaa.com to your address book.



**USAA SECURITY ZONE**
Ryan
Wagner
USAA # ending in:9088

## Make a Payment Today

Dear Ryan Wagner,

We want to remind you that your insurance payment is past due:

**Due date:**                December 5, 2024
**Minimum amount**           $546.79
**due:**

**Pay Bill**

Running late this month? You may be eligible for a special payment arrangement. Otherwise, visit your insurance billing homepage.

Retrieve policy information, review coverages, file a claim, and more at usaa.com and the USAA Mobile App.

Thank you,
USAA Casualty Insurance Company

**Bill ID: 012649088-PC001**

**Go Digital**
Review and edit your online document preferences at usaa.com.

**GO MOBILE**
apps & more

Please do not reply to this e-mail.
To contact USAA, visit our secure contact page.

**Privacy Promise**

United Services Automobile Association, 9800 Fredericksburg Road, San Antonio, Texas 78288

**133356-0824**

Display by **TransUnion** ⌄

# 498

Needs Work

▼ **90 pts** checked daily



Scores calculated using VantageScore 3.0 ⓘ

Display by **TransUnion** ⌄

# 477

## Needs Work

▼ **21 pts**  checked daily



|  | 700 |
|---|---|
|  | 650 |
|  | 600 |
|  | 550 |
|  | 500 |
|  | 450 |

Jul    Aug    Sep    Oct    Nov    Dec

## Scores calculated using VantageScore 3.0 ⓘ