| | |
|---|---|
| **OHANA GROWTH PARTNERS, LLC** | IN THE |
| *Plaintiff*, | CIRCUIT COURT |
| vs. | FOR |
| **RYAN DILLON-CAPPS** | BALTIMORE COUNTY |
| *Defendant*. | FILE NO.: C-03-CV-24-002264 |

### MEMORANDUM IN SUPPORT OF OHANA GROWTH PARTNERS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, Ohana Growth Partners, LLC. ("Plaintiff" or the "Ohana"), by its undersigned attorneys, submits this Memorandum in Support of its Motion for Temporary Restraining Order and Preliminary Injunction against Defendant, Ryan Dillon-Capps ("Defendant" or "Dillon-Capps).

### INTRODUCTION

This is an action brought as a result of Defendant's breaches of their duties as Plaintiff's employee, most significantly in refusing to provide Global Administrator rights, pertaining to Plaintiff's software systems and Internet domain name registrations, to Plaintiff's officers and designees. Instead, Defendant (they/them) has eliminated all Global Administrator rights other than those they possess, and through which Defendant currently exercises complete control over those systems and registrations. Because, in addition to constituting breaches of their duties to Plaintiff, Defendant's actions create a substantial risk to Plaintiff's systems, data and business, Plaintiff seeks an immediate injunction compelling Defendant to provide Global Administrator rights to Plaintiff's designee as directed.

## FACTUAL BACKGROUND

Ohana is a franchise division of Planet Fitness. Ohana owns and operates 78 Planet Fitness health clubs with over 500,000 members in Maryland, the District of Columbia, Tennessee, Florida, Washington state, and California. Ohana has 1,472 employees, 712 of whom live in Maryland.[1]

Ohana maintains a Microsoft 365 account (the "Ohana MS 365 Account"), through which it provides a full suite of software applications to the company's employees, including Microsoft Exchange for company email, Microsoft OneDrive and SharePoint for document management and storage, Microsoft Teams for videoconferencing, as well as other IT services. Ohana's Microsoft 365 Account also includes a subscription to Microsoft Azure, which provides Ohana the ability to deploy, operate and back up data created with those applications in the cloud.[2]

Through an account with Internet domain registrar GoDaddy.com, Ohana maintains and administers registrations for over a dozen second level internet domain names, which are directed to websites and Ohana's Microsoft Exchange company email (the "Ohana GoDaddy Account").[3]

Since February 10, 2020, Ryan Dillon-Capps (*nee* Wagner), the Defendant in the above-captioned matter ("Dillon-Capps"), has been employed by Ohana as its Vice President of Information Technology. On January 9, 2020 Ohana and Dillon-Capps executed an Employment and Non-Disclosure Agreement (the "Dillon-Capps Employment Agreement"). As of at least

---

[1] *See* Affidavit of Richard Hartman, filed as **Exhibit 1** hereto, ¶3-4.

[2] *Id.*, ¶5.

[3] *Id.*, ¶6.

2

. Memorandum of Law for TRO and PI    Page # 2 of 15    Exhibit SCD-4 [State Court Document File # 4 of 303] .

June 2, 2024 Dillon-Capps asked to be referred to using plural pronouns.[4] Dillon-Capps reports to Glenn Norris, the Chief Financial Officer of Ohana ("Norris"). In that capacity, Norris provides Dillon-Capps with supervision and issues directives in connection with the operation of Ohana's software systems.[5]

      Ohana granted to Dillon-Capps, in their capacity as Vice President of Information Technology and so that they could perform requested job duties, "Global Admin" rights to the Ohana MS 365 Account,[6] allowing Defendant "almost unlimited access to [Ohana's] settings and most of its data." Because "[a] Global Admin may inadvertently lock their account and require a password reset, . . .[Microsoft] recommend[s] [Ohana] have at least either one more Global Admin." *See* https://learn.microsoft.com/en-us/microsoft-365/admin/add-users/about-admin-roles?view=o365-worldwide Additionally, it is important that more than one person have full administrative right in case one person holding them is unavailable or, as in this case, refuses to cooperate with company directives regarding the IT system owned by the company. In part for those reasons, Ohana had also provided Global Admin rights to Ryan Brooks of Baltimore Consulting, an independent third-party contractor for Ohana that provides comprehensive IT services.[7]

      On May 20, 2024, without authorization from Norris or other senior executives, Dillon-Capps severed and discontinued all administrative access to the Ohana MS 365 Account that had been held by other Ohana employees, as well as the Global Admin rights provided to Mr. Brooks. On six (6) separate occasions between May 21, 2024 and May 24, 2024, Dillon-Capps

---

[4] *Id.*, ¶7.

[5] *Id.*, ¶8,

[6] *Id.*, ¶9,

was sent express written directives to reinstate Mr. Brooks' administrative access. Since May 24, 2024, management sent Dillon-Capps separate written directives to provide full administrative rights to Justin Drummond, Ohana's President, to Victor Brick, Ohana's CEO, and to Norris, the CFO, in addition to Mr. Brooks. All these directives were disobeyed. Despite these repeated written express directives from Ohana's management, and in violation of Section 1 of the Dillon-Capps Employment Agreement, Dillon-Capps refused to instate full administrative rights to the Ohana MS 365 Account to Ohana's President, CEO, and CFO.[8]

In their capacity as Vice President of Information Technology, Dillon-Capps acquired sole administrative control over the Ohana GoDaddy Account.[9] On June 13, 2024, Ohana's Vice President of Human Resources Richard Hartman sent an email to Defendant directing Defendant to provide the Global Administrator rights over the Ohana Microsoft 365 Account and the Ohana GoDaddy Account to Phil Leadore, of Hartman Executive Advisors, which Ohana engaged to assist Ohana with IT matters, and to do so by 3 pm that day. Defendant refused to comply with that directive and continues to maintain and exercise exclusive administrative rights to the Ohana Microsoft 365 Account and administrative control of the Ohana GoDaddy Account.[10]

As of 2:05 p.m. on June 13, 2024, Mr. Hartman discovered that he had been locked out of his Ohana company email account and in now unable to send or receive emails from that account to or from any of Ohana's 1,472 employees. As of 5 p.m. on June 13, 2024 Mr. Hartman

---

[7] *Id*.

[8] *Id*., ¶10.

[9] *Id*., ¶11.

[10] *Id*., ¶12.

discovered that he was unable to log into Ohana's Microsoft Teams account and is effectively locked out of the Microsoft 356 suite of applications in the Ohana MS 365 Account. Mr. Hartman's inability, caused by Dillon-Capps, to communicate with any of Ohana's 1,472 employees or to access any of Ohana's personnel records has effectively rendered it impossible for him to perform in his critical role as Vice President of Human Resources for the company.[11]

At 8:45 p.m. on June 13, 2024, at the direction of Ohana President Justin Drummond, Mr. Hartman sent an email to Dillon-Capps using Mr. Hartman's personal email account, to which Mr. Hartman attached a letter advising Dillon-Capps of the immediate suspension of his employment with Ohana. Dillon-Capps responded with an email, copying Ohana President Justin Drummond and stating that he did not recognize Mr. Hartman's authority as Vice President of Human Resources to suspend Dillon-Capps' employment, and falsely claimed that Dillon-Capps was acting upon the authority of Ohana President Justin Drummond.[12] Mr. Drummond responded to Dillon-Capps:

> Ryan:
>
> Your assertions that Rich Hartman did not suspend you or lacked the authority to suspend you are both incorrect and baseless.
>
> For the avoidance of any doubt by you, I incorporate into this email Rich Hartman's email to you today notifying you of your suspension and hereby confirm that you were suspended upon receipt of that email. Please follow fully the directives in that suspension notification.
>
> I also hereby confirm that you have been directed by me to immediately comply with Rich Hartman's email of 9:01 am this morning by immediately adding Phil Leodore from HEA as a Global Administrator

---

[11] *Id.*, ¶ 13

[12] *Id.*, ¶ 14; Affidavit of Justin Drummond, filed as **Exhibit 2** hereto, ¶5.

>regardless of whether he has confirmed any qualifications or involvement in the PCI DSS v4 review.
>
>Thank You,
>
>*Please excuse any typos. Email sent from iPhone*
>
>**Justin Drummond**[13]

As of the filing of Ohana' Motion Mr. Drummond has received no response from Dillon-Capps, nor has Dillon-Capps complied with the directive to add Phil Leodore from HEA as a Global Administrator on Ohana's Microsoft 365 account.[14]

Without administrative rights to the Ohana Microsoft 365 account, Ohana is unable to manage any of its Microsoft 365 software applications and related data. So long as Dillon-Capps continues to hold exclusive Global Admin rights to the Ohana MS 365 Account, and by extension Ohana's employee email accounts and data, those accounts and data are vulnerable to disruption by Dillon-Capps. So long as Dillon-Capps continues to hold exclusive administrative control over the Ohana GoDaddy Account, the direction of Ohana's registered domain names to Ohana's company email and websites are at risk.[15]

Even a temporary disruption of the Ohana MS 365 Account and/or the Ohana GoDaddy Account would result in tremendous disruption of Ohana's business operation and irreparable harm to Ohana. Given Dillon-Capps refusal to act as directed by his supervisors and other

---

[13] Exhibit 2, ¶5.

[14] *Id*.

[15] *Id*., ¶6; Exhibit 1, ¶ 15.

6

behavior, Ohana believes that, in the absence of a Court Order directing Dillon-Capps to immediately provide the Global Administrator rights to Phil Leadore there is a significant risk that Dillon-Capps will take action to disrupt Ohana's software systems and business operations and to destroy or corrupt Ohana's data.[16]

## LEGAL STANDARD

In deciding whether to grant a TRO and a preliminary injunction, Maryland courts apply the following four (4) factors:

(1) the likelihood that the plaintiff will succeed on the merits;

(2) the "balance of convenience" determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal;

(3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and

(4) the public interest.

*Eastside Vend Distribs. Inc. v. Pepsi Bottling Group Inc.*, 396 Md. 219, 240-41 (2006); *DMF Leasing, Inc. v. Budget Rent-A-Car of Maryland, Inc.,* 161 Md. App. 640, 647 (2005) (citing *Lerner v. Lerner,* 306 Md. 771, 783-85 (1986)).

## ARGUMENT

**I. Ohana's Claims are likely to Succeed on their Merits.**

As to the likelihood of success on the merits, Ohana is not required to *prove* its case during the TRO and preliminary injunction phase. Rather, at most, a plaintiff must "'establish…a real *probability* of prevailing on the merits, not merely a remote possibility of

---

[16] Exhibit 1, ¶14; Exhibit 2, ¶ 6.

7

. Memorandum of Law for TRO and PI                Page # 7 of 15                Exhibit SCD-4 [State Court Document File # 4 of 303] .

doing so.'" *Schade v. Maryland State Bd. of Elections,* 401 Md. 1, 36 (2007) (emphasis in original) (citation omitted). Moreover, when, as in this case, there is a "decided imbalance of the hardships in favor of the moving party" (*see* Section III *infra*), the likelihood of success may be satisfied with a lesser showing: "It will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for a more deliberate investigation." *Eastside Vend*, 396 Md. at 242; *Lerner*, 306 Md. at 784; *see also* MARYLAND RULES COMMENTARY, 5th Ed*.,* at 1011.

Here, Ohana's claims satisfy both standards. As explained below, Defendant's undisputed actions constitute violations of Defendant's employment agreement with Ohana, Defendant's common law duty of loyalty to Ohana as Defendant's employer, and MD. CODE ANN., CRIM. LAW., §7-302(c).

**A. Defendant's Conduct Clearly Violates Defendant's Employment Agreement.**

To state a claim for breach of contract under Maryland law, a plaintiff must prove "the existence of a contractual obligation owed by the defendant to the plaintiff, and a material breach of that obligation by the defendant." *RRC Northeast, LLC v. BAA Maryland, Inc*., 413 Md. 638, 658 (2010). In interpreting the contract and identifying the parties' respective rights and obligations, Maryland courts employ the objective theory of contract interpretation, under which the clear and unambiguous language of a document governs, regardless of the parties' actual intent. *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 393 (2019); *Myers v. Kayhoe*, 391 Md. 188, 198 (2006) (citation omitted). The undertaking requires a court to "restrict [its] inquiry to 'the four corners of the agreement' . . . and ascribe to the contract's language its 'customary, ordinary, and accepted meaning.'" *Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 86 (2010) (citations omitted).

There is no dispute that the Dillon-Capps Employment Agreement is an enforceable contract between Defendant and Ohana. It is indisputable that the requirement in Section 1 of the contract that Dillon-Capps "faithfully and diligently perform . . . duties as may be assigned by management from time to time"[17] is material to the contract. Moreover, Section 1 requires that Dillon-Capps perform their duties in an "efficient, *trustworthy, and businesslike manner*." (emphasis added).[18] There can be no dispute that Defendant's repeated refusal to comply with Ohana's directives to provide Global Admin rights to Mr. Leadore and his actions hold hostage all administrative access to Ohana's email systems and violates these material terms. Therefore, Ohana is likely to succeed on the breach of contract claim asserted in Count I of the Complaint.

**B. Defendant's Conduct Clearly Violates Defendant's Duty of Loyalty to Ohana.**

Generally, under the duty of loyalty, an employee has an obligation to avoid permitting his own interest to come into conflict with that of the employer, which presumably would result from improperly retaining and effectively converting employer's essential equipment and resources:

> [T]he duty of loyalty is an implied duty, "read into every contract of employment," and requires that an "employee act solely for the benefit of his employer in all matters within the scope of employment, avoiding all conflicts between his duty to the employer and his own self-interest." *Maryland Metals, Inc. v. Metzner, et al.,* 282 Md. 31, 38, 382 A.2d 564, 568 (1978).

---

[17] This is consistent with the common law of agency. "[A] principal has the right to control the conduct of the agent with respect to matters entrusted to him." *Restatement (Second) of Agency,* Sec. 14 (1958); *See*, *e.g.*, *Green v. H & R Block, Inc.*, 355 Md. 488, 508 (1999) (An agent even if permitted broad discretion remains subject to principal's "lawful directions which agent it under a duty to obey if he continues to act as such.")

[18] Exhibit 1, ¶ 7 and Exhibit A thereto.

9

Here Defendant has clearly acted in conflict with Ohana's interest by effectively precluding Ohana from effectively exercising control over its computer systems and data, and by locking Ohana's Vice President of Human Resources out of the company's computer system. Therefore, Ohana is likely to succeed on the breach of duty of loyalty claim asserted in Count II of the Complaint.

### C. Defendant's Conduct Clearly Violates MD. CODE ANN., CRIM. LAW., §7-302(c).

MD. CODE ANN., CRIM. LAW., §7-302(c)(1) makes it a crime in Maryland for a person to intentionally, willfully, and without authorization:

> (i) access, attempt to access, cause to be accessed, or exceed the person's authorized access to all or part of a computer network, computer control language, computer, computer software, computer system, computer service, or computer database; or

> (ii) copy, attempt to copy, possess, or attempt to possess the contents of all or part of a computer database accessed in violation of item (i) of this paragraph.

MD. CODE ANN., CRIM. LAW., §7-302(c)(2) makes it a crime for a person to commit an act prohibited by §7-302(c)(1) with the intent to:

> (i) cause the malfunction or interrupt the operation of all or any part of a computer, computer network, computer control language, computer software, computer system, computer service, or computer data; or

> (ii) alter, damage, or destroy all or any part of data or a computer program stored, maintained, or produced by a computer, computer network, computer software, computer system, computer service, or computer database.

The extent of Defendant's authorized access is defined by his supervisor Glenn Norris and the other officers and senior employees of Ohana. Defendant's authorized access never included taking actions to deactivate administrative accounts of other Ohana employees or contractors that

Ohana had specifically granted such access. It also never included taking action to leave Defendant in sole possession of administrative rights and to refuse Ohana's directions to reinstate administrative rights to officers or other contractors, such as Mr. Leadore. It never intended severing the email and computer system access of the Vice President of Human Resources. It is indisputable that Defendant has exceeded any authorized access to Ohana's computer systems.

It is likewise indisputable that, through unauthorized or exceeded access to Ohana's computer systems Defendant has intentionally disrupted the operation of those systems by (a) creating all of the risks associated with having administrative control reside with one individual; and (b) making unauthorized use of that action to lock Ohana's Vice President of Human Resources out of Ohana's computer systems.[19]

Holding a company's computer files and system hostage by limiting access and authority is precisely the type of conduct that the General Assembly sought to criminalize in enacting the current version of MD. CODE ANN., CRIM. LAW., §7-302(c). In *Briggs v. State*, 348 Md. 470 (1998), the States Attorney for Anne Arundel County succeeded in convicting a former employee of Scarborough Group, Inc., under the previous version of the statute, based upon Briggs' use of passwords to block the company from being able to access its own files. In an opinion issued January 22, 1998, the Court of Appeals reversed because, at that time, the statute only addressed "unauthorized" access to computer systems, and not actions "exceeding" previously granted authorized access. The General Assembly immediately moved to amend the statute in its 1998 session, expressly expanding it to include actions that "exceed the person's

---

[19] cite

authorized access." As the legislative history of the amendment shows, the express purpose of the amendment was to "criminalize the conduct in *Briggs*."[20]

There is no question that Defendant's conduct constitutes the very type of criminal activity that violates MD. CODE ANN., CRIM. LAW., §7-302(c). It is likewise clear that Ohana has suffered injury and is likely to continue to suffer injury as a result of Defendants' crime, such that Ohana is entitled to assert a civil action for damages and recovery of attorneys' fees under MD. CODE ANN., CRIM. LAW., §7-302(g). Therefore Ohana is likely to succeed on its claim under that statute asserted in Count III of the Complaint.

## II.   Absent the Requested Relief, Ohana will Suffer Immediate and Irreparable Harm.

Courts applying Maryland law have long recognized that injury to a company's customer goodwill and reputation in the marketplace constitute irreparable harm for which there is no adequate remedy at law. *De Simone v. VSL Pharmaceuticals, Inc*., 133 F.Supp.3d 776, 799-800 (D. Md. 2015) (Plaintiff's "loss of goodwill with some of its customers" constitutes irreparable harm"); *NutraLawn of America, Inc. v. West Group, LLC*, 484 F.Supp.2d 392, 401-02 (D. Md. 2007) (recognizing that "injury to goodwill and reputation" is irreparable harm).

Consistent with this authority, Maryland courts recognize the necessity of temporary and preliminary injunctive relief to enforce provisions of the Employment Agreement at issue here. *See, e.g., Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776, 785 (4th Cir. 2011) (affirming finding of irreparable harm where, "district court found that absent and injunction, [defendant] will continue to breach the contracts and [plaintiff] will continue to lose its customers, possibly lose its opportunity to attract new customers, and goodwill in the industry. . ."). Absent intervention, Plaintiff has no control over its systems, including who has

---

[20] *See* **Exhibit 3** filed herewith, pages 12-13.

12

access to its systems, leaving Plaintiff vulnerable to catastrophic loss of data and IT infrastructure that could irreparably harm Plaintiff by impacting its goodwill and reputation in the industry.

The monetary loss to Plaintiff is unascertainable. As the Court of Appeals noted decades ago in *Maryland-Nat'l Cap. Park and Planning Comm'n v. Washington Nat. Arena*, 282 Md. 588, 616 (1978), irreparable harm may be found where "monetary damages are difficult to ascertain or otherwise inadequate." Additionally, the damage to Plaintiff's systems is immediate and ongoing. Indeed, Defendant has already undertaken deliberate action to disrupt Ohana's systems and business. Within a few hours of Mr. Hartman's email directing Defendant to instate Mr. Leadore with administrative rights, Defendant took action to block Mr. Hartman's access to Ohana's computer systems.

Furthermore, the requested injunctive relief is necessary to maintain the *status quo* pending a final judgment on the merits. As repeatedly stated by the Maryland Supreme Court, "preliminary injunctions are designed to maintain the *status quo* between the parties." *Eastside Vend*, 396 Md. at 241 (quoting *Ehrlich v. Perez,* 394 Md. 691, 733 (2005)); *see also LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 301 (2004); MARYLAND RULES COMMENTARY, 5th Ed., at 1010. Failure to maintain the *status quo* not only undermines the ability of the court to render a meaningful judgment on the merits,[21] but can also impose irreparable harm upon the rights of litigants involved in the case. *Id.* Thus, under Maryland law, "the factor of irreparable injury 'can include the necessity to maintain the *status quo*.'" *Lerner*, 306 Md. at 791; *see also*

---

[21] *See Maloof v. State Dept of the Env't,* 136 Md. App. 682, 692-93 (2001); *see also* MARYLAND RULES COMMENTARY, 5th Ed., at 1010.

13

. Memorandum of Law for TRO and PI     Page # 13 of 15     Exhibit SCD-4 [State Court Document File # 4 of 303] .

*LeJeune*, 381 Md. at 301. Here, maintaining the *status quo* requires the rightful return of control over Plaintiff's systems to Plaintiff and enjoining Defendant from exercising further actions to Plaintiff's systems and data, thereby preserving Ohana's systems, its employees access to those systems, and Ohana's data from deletion, corruption, disruption or interference by Defendant.

**III.    The Balance of Hardships Tips Decidedly in Favor of Ohana.**

In sharp contrast to the irreparable harm visited upon Ohana in the absence of the requested injunctive relief, any inconvenience to the Defendant occasioned by the requested injunctive relief will pale in comparison to the irreparable harm that Plaintiff will continue to suffer in its absence. Afterall, if the requested injunction is granted, Defendant will only be required to comply with the reasonable contractual restraints to which he agreed in his Employment Agreement. He will not be deprived of any personal property or rights. Thus, the balance of the hardships tips decidedly in favor of Ohana.

**IV.    The Public Interest Favors Issuance of the TRO and Preliminary Injunction.**

Finally, the public interest supports entry of the requested injunction. Maryland courts recognize that the public interest "weighs in favor of enforcing the Agreements' reasonable contractual restrictions." <u>Gen. Parts Distribution, LLC v. St. Clair</u>, No. 11-CV-03556-JFM, 2011 WL 6296746, at *7 (D. Md. Dec. 14, 2011). Protecting the work and livelihoods of 1,472 employees---including 712 Maryland citizens, and their access to their company's email and data is likewise in the public's interest. Thus, again the public interest favors the requested injunctive relief.

**V.    Any Injunction Bond should be Nominal.**

Under Maryland Rule 15-503(a), except for circumstances not present here, "a court may not issue a temporary restraining order or preliminary injunction unless a bond has been filed."

14

MD. RULE 15-503(a). "The bond shall be in an amount approved by the court for the payment of any damages to which a party enjoined may be entitled as a result of the injunction." *Id*. Here, Defendant will not suffer during the term of the TRO and preliminary injunction, as Defendant is not entitled to any personal gain that could result from control over Ohana's systems. Thus, any bond should be in a nominal amount, especially for purposes of the requested short-term TRO. Any dispute as to the appropriate amount of a preliminary injunction bond can be addressed within the context of full adversary proceeding under Maryland Rules 15-501(b) and 15-505.

## **CONCLUSION**

**WHEREFORE,** Ohana respectfully requests that this Court enter the proposed TRO and Preliminary Injunction being submitted simultaneously with this Motion, and any and all other and further relief as justice and its cause require.

June 14, 2024                                  Respectfully submitted,

/s/ Robert S. Brennen
Robert S. Brennen (AIS # 8712010068)
e-mail: RBrennen@milestockbridge.com
Stephen D. Frenkil (AIS # 7712010110)
e-mail: SFrenkil@milesstockbridge.com
Victoria K. Hoffberger (AIS # 1912170195)
e-mail: VHoffberger@milesstockbridge.com
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, Maryland 21202
Telephone:   (410) 727-6464
Facsimile:    (410) 385-3700

*Counsel for Plaintiff Ohana Growth Partners, LLC*