1

                        IN THE CIRCUIT COURT
2                   FOR BALTIMORE COUNTY, MARYLAND

3

OHANA GROWTH PARTNERS, LLC
4
                                        CASE NO.
5              VERSUS                    C-03-CV-24-002264

6   RYAN DILLON-CAPPS

7

8   _____ /    June 26, 2024

9

        REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS
10           (Motion/Preliminary Injunction)

11

        BEFORE THE HONORABLE MICHAEL S. BARRANCO
12                    ASSOCIATE JUDGE

13

APPEARANCES ON BEHALF OF THE PLAINTIFF:
14
                        ROBERT BRENNEN, ESQUIRE
15                      VICTORIA HOFFBERGER, ESQUIRE

16  ON BEHALF OF THE DEFENDANT:

17                      RYAN DILLON-CAPPS, ESQUIRE

18

19

20

21

22

23  Transcribed from Digital Media by:
    Linda Lindsey, CSR
24  401 Bosley Avenue, Room 403
    Towson, Maryland 21204
25  410-887-2636

1

2                              I N D E X

3       WITNESSES                                        PAGE

4       RANDALL J. ROMES
             Direct Examination by Mr. Brennen           61

5

6

7

8

9

10      EXHIBITS                    MARKED              RECEIVED

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                    P R O C E E D I N G S

 2                         *    *    *    *

 3              (WHEREUPON, proceedings began at 9:18:15

 4      a.m.)

 5

 6              THE COURT:  All right.  Good morning

 7      everyone.

 8              MR. BRENNEN:  Good morning, your Honor.

 9              THE COURT:  The Court will call the case

10      of Ohana Growth Partners, LLC versus Ryan

11      Dillon-Capps, C-03-CV-24-002264.

12              Start with, uh, we're here for a hearing

13      on, uh, the plaintiff's Motion for Preliminary

14      Injunction.

15              Let's start with, uh, in terms of

16      identifying yourselves, the plaintiff's counsel and

17      who you're here with.

18              MR. BRENNEN:  Thank you, your Honor.

19      Robert Brennen and Victoria Hoffberger from Miles and

20      Stockbridge on behalf of the plaintiff Ohana Growth

21      Partners, LLC.

22              THE COURT:  Good morning, Mr. Brennen,

23      Ms. Hoffberger.

24              MR. BRENNEN:  Good morning.

25              MS. HOFFBERGER:  Good morning.
```

1          THE COURT:  Okay.  Sir?

2          MR. DILLON-CAPPS:  Uh, I'm Ryan

3     Dillon-Capps.

4          THE COURT:  Okay.  Are you represented

5     by an attorney?

6          MR. DILLON-CAPPS:  No.  I mean, I -- I

7     was, and then they had bereavement.

8          THE COURT:  Okay.  Have you all had a

9     chance to, erm, have a seat for a minute.

10         Have you all had a chance to talk about,

11    uh, this situation to see if this can be resolved

12    without a hearing?

13         MR. DILLON-CAPPS:  Erm, I did ask.

14         THE COURT:  You what?

15         MR. DILLON-CAPPS:  I did ask if we could

16    talk about it.  I -- I was actually submitting a

17    request to Ohana for weeks to speak to a lawyer to

18    resolve the FMLA issue, which is primarily what is

19    this problem.

20         THE COURT:  What is the problem?

21         MR. DILLON-CAPPS:  So --

22         THE COURT:  The family leave issue?

23         MR. DILLON-CAPPS:  No, no, not, uh, my

24    bereavement, my attorney had bereavement.

25         THE COURT:  Right.

```
 1                   MR. DILLON-CAPPS:  Sorry.  Erm, I've
 2   been on FMLA since January 4th.
 3                   THE COURT:  Right.
 4                   MR. DILLON-CAPPS:  And on 12th and on
 5   the 13th I requested for FMLA leave --
 6                   THE COURT:  Mm-hmm.
 7                   MR. DILLON-CAPPS:  -- erm, on both days
 8   I was forced to worked.  Erm, on the 13th I submitted
 9   a cease and desist saying they're encroaching on my
10   FMLA, please let me have my FMLA time.
11                   Erm --
12                   THE COURT:  All right.  But that's a
13   separate --
14                   MR. DILLON-CAPPS:  No, no, it --
15                   THE COURT:  I know you might think it's
16   related, uh, but in the Court's view that is a
17   separate matter.  And the question I have right now
18   is that, erm, so, you've been served with, uh, the
19   temporary restraining order, correct?
20                   MR. DILLON-CAPPS:  I got it late, yes.
21   I got it on Monday at like 10, not this Monday, last
22   Monday.
23                   THE COURT:  Okay.  Have you complied
24   with it?
25                   MR. DILLON-CAPPS:  Uh, no, I have --
```

```
 1                    THE COURT:  You were served with it on

 2   June 17th?

 3                    MR. DILLON-CAPPS:  I'm sorry?

 4                    THE COURT:  You were served with it on

 5   June 17th, correct?

 6                    MR. DILLON-CAPPS:  I -- I don't know

 7   what the days are, but, yes.  I --

 8                    THE COURT:  Or June 14th, I'm sorry.

 9                    MR. DILLON-CAPPS:  No, I definitely did

10   not get it the 14th, I think that was last Friday.

11                    MR. BRENNEN:  Uh, your Honor, he -- he

12   did receive the -- the temporary restraining order

13   was issued by the Court on June 17th, and he received

14   a copy via e-mail on the same day.

15                    THE COURT:  Okay.

16                    MR. DILLON-CAPPS:  At 10 p.m.

17                    THE COURT:  Okay.  Your process server

18   received the papers on June 14th, that's where I'm

19   getting that from, and then, on the 17th --

20                    MR. BRENNEN:  That's correct.

21                    THE COURT:  -- he was served.

22                    MR. BRENNEN:  He was -- he was served

23   with the --

24                    THE COURT:  Okay.

25                    MR. BRENNEN:  The papers that the
```

1   process server served him with included the complaint

2   and summons and the motion papers, and the proposed

3   TRO, which is identical to the one that was entered.

4              THE COURT:  Okay.  And then, how was he

5   -- how -- how, if at all, was he served with the TRO

6   signed by Judge DeSimone?

7              MR. BRENNEN:  He, uh, was sent a copy of

8   it via e-mail from me --

9              THE COURT:  Okay.

10             MR. BRENNEN:  -- erm, twice, including,

11  uh, uh, we -- we -- I got an e-mail from him on the

12  evening of -- of June 17th, erm, asking that I resend

13  e-mails that I had sent to his Ohanagp.com e-mail

14  address on the 14th, which included the papers that

15  we filed, and I complied with that.

16             I -- and I have copies of the e-mails I

17  could show the Court --

18             THE COURT:  Okay.

19             MR. BRENNEN:  -- that I sent him, uh,

20  resent him those e-mails so he had all the papers in

21  electronic form in addition to having been served on

22  that --

23             THE COURT:  Which shows that they were

24  sent.  Mr. -- did you receive them?  Did you receive

25  the e-mails?

```
 1                 MR. DILLON-CAPPS:  I was --

 2                 THE COURT:  With the TRO?

 3                 MR. DILLON-CAPPS:  I was -- I was

 4  suspend -- suspended on the evening of the 13th, and

 5  I did not.

 6                 THE COURT:  Just answer my question.

 7  Did you receive by -- did you receive actual notice

 8  that a TRO was entered?

 9                 MR. DILLON-CAPPS:  On Monday at 1:30

10  that was done, and then 10 o'clock that it was

11  ordered.

12                 THE COURT:  Okay.

13                 MR. DILLON-CAPPS:  I -- I did not have

14  any chance to defend myself on the TRO.

15                 THE COURT:  All right.  Have you

16  complied with the terms of Judge DeSimone's order?

17                 MR. DILLON-CAPPS:  No, I submitted a

18  letter.

19                 THE COURT:  Have you complied, just

20  answer my question.

21                 MR. DILLON-CAPPS:  I have not.

22                 THE COURT:  Okay.  All right.  Erm, and

23  I'll -- I'll ask my question again, do you have -- do

24  you have any interest in talking, to having a good

25  faith discussion with, uh, the plaintiff's counsel
```

1   about resolving this before we proceed?

2              MR. DILLON-CAPPS:  I have, and I do.  I

3   would very much.

4              MR. BRENNEN:  And, your Honor, uh, on at

5   least two occasions, erm, including Monday evening,

6   this -- the past Monday evening the 24th, uh, sent,

7   transmitted via e-mail, erm, it may not have been

8   Monday evening, but I transmitted via e-mail, a, uh,

9   a proposal, uh, that would make this hearing

10  unnecessary.  That, uh, it -- the only nonnegotiable

11  term was the trans -- compliance with the TRO --

12             THE COURT:  Mm-hmm.

13             MR. BRENNEN:  -- the transfer of the

14  admin rights, uh, for both the, uh, Microsoft 365

15  account and for the GoDaddy account.

16             THE COURT:  Okay.

17             MR. BRENNEN:  Erm, I got a response.

18  Uh, we -- we -- we wanted to get compliance by 5:30

19  p.m., erm, because, you know, we're getting ready for

20  this.  And I got a response after that, erm, via

21  e-mail, from the defendant saying "I'm not trying to

22  ignore you, erm, what are the orders that you are

23  referring to", uh, because I -- I had referenced,

24  erm, the -- the order, the show cause that was

25  entered on Friday by Judge Truffer, which was sent to

```
 1   the same e-mail address as everything else by Judge

 2   Truffer.

 3               THE COURT:  What order did Judge -- did

 4   he -- what show cause order was that, I'm sorry?

 5               MR. BRENNEN:  The show cause.

 6               THE COURT:  'Cause I was -- I was just

 7   assigned this yesterday, and I -- I read the

 8   complaint, the affidavits, the motion for, uh,

 9   preliminary injunction, but what -- what show cause

10   order was (unintelligible, speaking over).

11               MR. BRENNEN:  So on Thursday, uh, we

12   filed a motion, uh --

13               THE COURT:  For contempt?

14               MR. BRENNEN:  -- for contempt --

15               THE COURT:  Okay.

16               MR. BRENNEN:  -- on the TRO.  And on --

17               THE COURT:  And Judge Truffer issued a

18   show cause order?

19               MR. BRENNEN:  Judge Truffer issued a --

20               THE COURT:  When -- when --

21               MR. BRENNEN:  -- show cause.

22               THE COURT:  -- is his response due to

23   the show cause?

24               MR. BRENNEN:  Today.  It was --

25               THE COURT:  Today?
```

1           MR. BRENNEN:  -- the order was issued on

2  Friday to have him show cause today.

3           THE COURT:  Okay.  Was this put in, then

4  maybe you have to clarify, is this in today for, uh,

5  for this -- for a show cause hearing or a motion --

6  or on the preliminary injunction or both?

7           MR. BRENNEN:  It -- we --

8           THE COURT:  Because I was actually

9  surprised at how quickly -- often times after a TRO

10  is entered the Assignment Office isn't always able to

11  schedule a preliminary injunction hearing so

12  promptly, and the TRO's are often extended either by

13  consent or by motion, and then, it gets scheduled,

14  but in this case it seems to me that it was

15  scheduled, as it should be, I guess, prompt -- fairly

16  promptly before the TRO expired.

17           So, but go ahead.  What is -- what is

18  your --

19           MR. BRENNEN:  Well, we've arrived here

20  today under the impression that we're here on both

21  the preliminary --

22           THE COURT:  On both?

23           MR. BRENNEN:  -- injunction and per

24  Judge Truffer's order, uh, the -- the show cause.

25           THE COURT:  Okay.

```
1                MR. BRENNEN:  But we -- we have

2    attempted, erm --

3                THE COURT:  Well, let's -- let's start

4    with the show cause, because right now I guess what

5    you've said is, is that he's in violation of a court

6    order that he was, uh, served with or, at least, on

7    notice of.  And I think the Rules provide the TRO's

8    effective upon either service or, uh, or actual

9    receipt, or receipt of actual --

10               MR. BRENNEN:  Correct.

11               THE COURT:  -- notice, which it seems

12   that he has.

13               MR. BRENNEN:  He clearly has, and, erm,

14   that's evidenced by the June 18th, uh, correspondence

15   he submitted to the Court the day after the TRO was

16   entered making his case for why he felt he couldn't

17   comply.

18               So he acknowledges in his letter to the

19   Court that he has the TRO and that he's not complying

20   with it.  Uh, that he -- he also acknowledges that he

21   was directed by his employer to take these same

22   measures, and was disobeying those as well.

23               So we think his letter in essence, erm,

24   acknowledges all the material facts that go to not

25   only establishing the three claims that we've pled in
```

```
 1   our complaint, but also the contempt.
 2                 But we're happy, uh, to, uh, sit down
 3   and -- and allow the defendant an opportunity to show
 4   cause.
 5                 THE COURT:  All right.  Mr.
 6   Dillon-Capps, you were ord -- erm, first of all,
 7   Judge DeSimone's order required, his temporary
 8   restraining order required you to do certain things,
 9   and then, I now have it before me.
10                 Erm, on June 21st, Judge Keith Truffer
11   did enter an order to appear and show cause,
12   requiring you to be here and to show cause as to why
13   you should not be held in contempt of the Court's
14   June 17th temporary restraining orders.
15                 So, why haven't you complied with the
16   Court's order.
17                 First of all, let's put him under oath.
18                 THE CLERK:  Please stand and raise your
19   right hand.
20                     RYAN DILLON-CAPPS,
21   first duly sworn to tell the truth, the whole truth,
22   and nothing but the truth, testified as follows:
23                 THE WITNESS:  I do.
24                 THE CLERK:  Thank you, you may be
25   seated.
```

1                   For the record, please state and spell
2      your first and last name.
3                   THE WITNESS:  Erm, Ryan Dillon-Capps.
4      R-Y-A-N, Dillon-Capps is D-I-L-L-O-N hyphen
5      C-A-P-P-S.
6                   THE CLERK:  Thank you.
7                     EXAMINATION BY THE COURT
8                   THE COURT:  All right, sir.  Erm, as I
9      said, another judge on this bench, Judge Marc
10     DeSimone entered a temporary restraining order
11     requiring you to do certain things and restrain from
12     doing certain things.
13                  You were, erm, you're here today,
14     there's another order entered by Judge Keith Truffer,
15     another judge on this bench, requiring you to be here
16     to show cause as to why you shouldn't be held in
17     contempt of court for failing to comply with the, uh,
18     TRO; what do you want to tell me?
19                  You're under oath.
20                  MR. DILLON-CAPPS:  Thank you.  Erm, the
21     short is that this -- we have an SEC contract in
22     place our -- our --
23                  THE COURT:  Who's "we"?  You don't --
24                  MR. DILLON-CAPPS:  They just --
25                  THE COURT:  -- personally -- you worked

```
 1   -- you worked for the plaintiff, correct?

 2               MR. DILLON-CAPPS:  Yes.

 3               THE COURT:  You're an employee?

 4               MR. DILLON-CAPPS:  Yes.

 5               THE COURT:  Okay.  You have any

 6   ownership interest?

 7               MR. DILLON-CAPPS:  No.

 8               THE COURT:  Okay.  And you understand

 9   you owe a duty, as an employee you owe a duty of

10   loyalty to your employer; you understand that?

11               MR. DILLON-CAPPS:  Erm, well, yes,

12   that's true, except for the fact that our agreement,

13   the group's agreement, Planet Fitness has an

14   agreement with Ohana that allows them to operate,

15   and --

16               THE COURT:  Okay.

17               MR. DILLON-CAPPS:  -- in that agreement,

18   uh, certain things are said.

19               THE COURT:  What -- what concern is that

20   agreement and -- and Plant --

21               MR. DILLON-CAPPS:  For sure.

22               THE COURT:  -- and --

23               MR. DILLON-CAPPS:  Planet Fitness, the

24   franchisor --

25               THE COURT:  Yeah.
```

1           MR. DILLON-CAPPS:  -- is currently under

2   contract with the SEC to --

3           THE COURT:  Mm-hmm.

4           MR. DILLON-CAPPS:  -- maintain PCI

5   compliance standards.

6           THE COURT:  Mm-hmm.

7           MR. DILLON-CAPPS:  Erm, in addition to

8   that, the FTC has, erm, already shown that they have

9   the right to domain over, uh, data protection related

10  to consumers, and both of those things do, in fact,

11  apply in this case of federal jurisdiction.

12          In addition --

13          THE COURT:  What concern is that of --

14  yours as to whether or not the plaintiff is in

15  compliance with FTC regulations or not?

16          MR. DILLON-CAPPS:  Uh, because what

17  they're asking me to do is to violate PCI compliance.

18          THE COURT:  No, it's what the Court had

19  ordered you to do.

20          MR. DILLON-CAPPS:  Okay.  And I will

21  say, again, that if I do the thing that I'm asked to

22  do, it will be a violation of PCI compliance,

23  violating the SEC's --

24          THE COURT:  To give access back to your

25  employer?

```
 1                 MR. DILLON-CAPPS:  No, that is not what
 2    the request is to be done, that's a misunderstanding,
 3    along with several other statements that they made
 4    are misleading.
 5                 For example, uh, they did not note that
 6    they put my, uh, IT coordinator on a leave of
 7    absence.
 8                 It was a pure FMLA retaliation.  And --
 9    and FMLA's regulations, rules, rules, said that it's
10    all their burden to actually prove that it's not,
11    so --
12                 THE COURT:  That has nothing to do with
13    why we're here today.
14                 MR. DILLON-CAPPS:  But it is, because
15    their demand was I had to work and do this thing
16    immediately.  And their claim is that if I didn't --
17                 THE COURT:  No, the Court ordered you to
18    do this immediately.
19                 MR. DILLON-CAPPS:  For sure, and that is
20    why --
21                 THE COURT:  Why have you not complied
22    with the Court order?
23                 MR. DILLON-CAPPS:  Because I don't want
24    to violate a federal contract and the FTC, and be in
25    issue, 'cause that is a -- a -- really choice where
```

```
 1    this is --
 2              THE COURT:  Are you -- are you
 3    contending this would place you -- that -- that
 4    complying with what the Court has ordered you to do
 5    would cause you violate a federal law?
 6              MR. DILLON-CAPPS:  Yes, it would,
 7    actually.
 8              THE COURT:  What law?
 9              MR. DILLON-CAPPS:  Hmm, sorry.  I -- I
10    have a list.  Erm, erm --
11              THE COURT:  So what do you contend the
12    workaround would be to -- for you to relinquish your
13    control and give it back to the employer without --
14              MR. DILLON-CAPPS:  Oh --
15              THE COURT:  -- vio -- without putting
16    you at risk, if you believe you're at risk?  There's
17    got to be a workaround, so what is --
18              MR. DILLON-CAPPS:  Oh, there is.
19    There's -- there's been plenty of opportunities
20    provided, erm --
21              THE COURT:  No, what's the workaround?
22              MR. DILLON-CAPPS:  Oh, any -- any of
23    them that I suggest and offered them.  So, for
24    example, on there was actually -- Justin Drummond,
25    would actually already have access on Monday, if he
```

```
1    had simply met with me on Monday as we had planned.
2                 THE COURT:  Why should he have to meet
3    with you?  Why can't you just turn over access to
4    him?
5                 MR. DILLON-CAPPS:  Erm, because I would
6    have to, as an authorized personnel, he is not -- in
7    fact, none of their people that made the order
8    actually are qualified to be authorized personnel.
9                 THE COURT:  Well, what concern is that
10   of your's?
11                MR. DILLON-CAPPS:  Because they're --
12   they're --
13                THE COURT:  Why isn't that your
14   employer's concern?
15                MR. DILLON-CAPPS:  Oh, because they're
16   not given that right by like, just because they're my
17   employer, the right is given based on the standards
18   itself on who is actually allowed to give that such
19   order.
20                THE COURT:  A trade standard?
21                MR. DILLON-CAPPS:  Uh, a compliance
22   standard that we're required to follow, they're
23   required to follow, too.
24                THE COURT:  Okay.  A compliance
25   standard, a compliance standard issued by who, by a
```

```
 1   trade organization?
 2              MR. DILLON-CAPPS:  A SEC contract, and
 3   the FTC rule that allows them jurisdiction over, erm,
 4   the matters of consumer identity, protected data.
 5              I do actually have stuff I just --
 6              THE COURT:  So you're unwilling to
 7   comply with the Court's order?
 8              MR. DILLON-CAPPS:  Not unwilling, it's a
 9   misrepresentation.  I --
10              THE COURT:  No, I'm just asking --
11   answer my question.  You have Judge DeSimone's order,
12   are you going to comply with the order?
13              MR. DILLON-CAPPS:  As long as it doesn't
14   violate any federal laws or -- or contracts that
15   we're bound to, erm, yes.
16              THE COURT:  We're not -- it's not --
17   you're not the "we".  The "we" here is your employer.
18              MR. DILLON-CAPPS:  Sure.  If I don't
19   have to --
20              THE COURT:  You're -- you're an
21   employee, I mean, I don't -- I think you're missing
22   that, I'm not trying to step -- I want to give you
23   opportunity to talk to me and explain your position,
24   but I think the -- what I'm missing here is the "we"
25   here, because your employer is the owner of this
```

```
 1   computer system, of this IT system, correct?
 2                 MR. DILLON-CAPPS:  Yes.
 3                 THE COURT:  Okay.  So, there's no "we"
 4   here, it's them.  You're an employee.
 5                 MR. DILLON-CAPPS:  Yes.  And yeah --
 6                 THE COURT:  Okay.  And so if they -- if
 7   they're doing something that you think is
 8   noncompliant, that's on them, that's not -- what
 9   concern of that is your's?
10                 MR. DILLON-CAPPS:  Oh, because I'm the
11   one who actually, uh, it's my name on the paperwork
12   that like assumes and affirms that like we're
13   compliant.  And I'm the one that --
14                 THE COURT:  Well, they could --
15                 MR. DILLON-CAPPS:  -- I'm the one in
16   charge of the compliance for --
17                 THE COURT:  Who do you -- who do you --
18                 MR. DILLON-CAPPS:  -- our company.
19                 THE COURT:  -- have to certify that
20   compliance to?
21                 MR. DILLON-CAPPS:  Erm, we certify it
22   with Trustwave who is --
23                 THE COURT:  Which is what?
24                 MR. DILLON-CAPPS:  Erm, oh, they're the
25   actual accessors.
```

1            THE COURT:  Okay.  They're not the

2   federal government?

3            MR. DILLON-CAPPS:  No.

4            THE COURT:  It's --

5            MR. DILLON-CAPPS:  It is the federal

6   government, our SEC contract that is mandated, in

7   addition to our ABC processor, uh, master agreement,

8   in addition to the FTC ruling, all three of them

9   combined actually say that they have to do it, and

10  I'm doing --

11           THE COURT:  So your -- your contention

12  is simply giving back access to your employer

13  violates federal law?

14           MR. DILLON-CAPPS:  No, no.  I'm saying

15  that the way that they've mandated it to be done is

16  the issue, and I provided many opportunities to give

17  it to them, including, like I said, the one way that

18  I found to give Justin Drummond, on Monday, if he met

19  with me.

20           THE COURT:  Which is what?  What --

21  well, why does he have to meet with you, why can't

22  you just give him back access?

23           MR. DILLON-CAPPS:  Erm, because in order

24  to give someone access to the system, erm, the

25  there's two ways to do this.  One, their job role

```
 1   would have to, erm, give them some sort of task or
 2   duty that would account for --
 3               THE COURT:  According to who?
 4               MR. DILLON-CAPPS:  -- this.  erm, lease
 5   privilege, which is in the -- the, P, uh, the PCI
 6   compliance, which we're required to follow.
 7               THE COURT:  All right.  What else do you
 8   want to tell me on this issue of why you haven't
 9   complied with the order?
10               MR. DILLON-CAPPS:  So that's one way
11   that we could have resolved this issue.  But there's
12   no way to even justify executive to needing the
13   privilege that they need, it's -- it's ludicrous.
14               Erm, it's a technical matter.
15               THE COURT:  Let me ask -- let me ask,
16   erm, Mr. Brennen this, is -- is there, uh, I'm not
17   saying that what he's -- what -- if his argument has
18   any, uh, validity or not, but is there some -- is
19   there some workaround here for him to give access
20   back in -- in some way that, erm, takes him out of it
21   so that he's not, to the extent that he has concerns
22   about, uh, certifying compliance or being on the
23   hook; is there some -- there's not some workaround
24   here, other -- and I'm just asking, I'm trying to
25   understand.
```

```
1              MR. BRENNEN:  Yeah.  Erm, we have been
2    very clear about the steps he needs to take.
3              THE COURT:  Which -- explain them to me,
4    just in, uh, in all --
5              MR. BRENNEN:  Sure.
6              THE COURT:  I'll -- I'll cite, uh, uh, I
7    hate to use it, call for a reference sometimes, but,
8    erm, my former colleague Judge King used to say,
9    quoting the movie Philadelphia, uh, explain it to me
10   as if I'm, uh, it changed every, as if -- as if I'm a
11   second grader, or whatever, because this is an IT
12   issue, so explain to me in baby steps, I guess what
13   --
14             MR. BRENNEN:  Well, those are the only
15   steps that I know, your Honor, so --
16             THE COURT:  Okay.
17             MR. BRENNEN:  -- I'll do the best I can.
18             But, uh, I can do a couple of things
19   here, one, we have our -- a proposed order for the
20   preliminary injunction, which lays out the steps in
21   it.  I can hand that up.
22             THE COURT:  Has he seen it?
23             MR. BRENNEN:  He has not seen it.
24             THE COURT:  Do you want to show it to
25   him to see whether he --
```

```
1                MR. BRENNEN:  Sure.

2                THE COURT:  -- can comply with it?

3                MR. BRENNEN:  Steps are the same steps

4    that I e-mailed you a couple of times.  And I have

5    the same -- here's -- here's my, uh --

6                MR. DILLON-CAPPS:  Yes, I can defend

7    every point of this.

8                MR. BRENNEN:  Uh, I've got a, erm, I got

9    an e-mail from, uh, the defendant on late, uh,

10   evening of June 17th, the same day as the TRO was

11   entered, asking how can he comply with the TRO.

12               MR. DILLON-CAPPS:  Hmm.

13               MR. BRENNEN:  And so, I wrote to him at

14   8:39 a.m., the next morning, erm, that while we -- we

15   know that he knows the steps that he has to take, and

16   we give him four steps to take.

17               And one was to create an account in

18   Ohana's, uh, Microsoft 365 tenant, for

19   Pleador@Ohanagp.com.

20               THE COURT:  Okay.  What's the problem

21   with that, with that one step?

22               MR. DILLON-CAPPS:  So --

23               THE COURT:  What's the problem with that

24   one step, creating --

25               MR. DILLON-CAPPS:  They --
```

```
 1                    THE COURT:  -- creating an account?
 2                    MR. DILLON-CAPPS:  They've not actually,
 3      first of all, I'm not sure --
 4                    THE COURT:  What's the problem with --
 5      answer my question, sir, what's the problem with that
 6      one step?
 7                    MR. DILLON-CAPPS:  I don't know why they
 8      need access.
 9                    THE COURT:  That's -- what's the problem
10      -- you're not answering the Court's question.
11                    MR. DILLON-CAPPS:  That is actually the
12      standard, at least privilege is identified by you
13      telling me what is needed and then I --
14                    THE COURT:  We're going to take this one
15      step at a time.  The first is, that you create an
16      account, is there any issue with creating an account?
17                    MR. DILLON-CAPPS:  Erm, there's already
18      accounts created.
19                    THE COURT:  What's the problem with
20      creating the account as they've asked?
21                    MR. DILLON-CAPPS:  Logistically was my
22      statement, how do I do this when I can't enter the
23      acc -- the system?
24                    THE COURT:  Answer my -- what is the
25      problem, let's take this one step at a time.
```

```
1                    Is there any -- do you contend that it
2      violates any federal regulation, law, or other
3      standard that puts you at risk in creating a
4      Microsoft account for this individual on the Ohana
5      server, I guess, is that right, under their domain?
6                    MS. HOFFBERGER:  Yeah.
7                    MR. DILLON-CAPPS:  I think the more
8      accurate thing would be to say the creation of the
9      account, but never giving any access to them, it
10     already exists.
11                   THE COURT:  You're not answering the
12     Court's question.
13                   MR. DILLON-CAPPS:  No, it's already
14     existing.  It was created in advance.
15                   THE COURT:  Does it violate -- does it
16     violate any -- do you contend it violates any federal
17     regulation or statute, or rule in creating -- read
18     -- read it again, counsel.
19                   MR. DILLON-CAPPS:  I honestly, your
20     Honor, I would have to take time to like look at
21     everything that --
22                   THE COURT:  Well, you don't have time.
23                   MR. DILLON-CAPPS:  -- to --
24                   THE COURT:  You were -- you -- you're
25     here for a show cause today, that's what we're here
```

1    for.

2              MR. DILLON-CAPPS:  Off the top of my

3    head, I can't think of a reason why it is a problem

4    to create the account.

5              THE COURT:  Okay.  What's the second

6    step?

7              MR. BRENNEN:  Add the account into the

8    global administrator's group and send the password to

9    Pleadora@hartmanadvosos.com, via secure e-mail.

10             If you do not have access to a secure

11   e-mail, you may send the password to me via text at

12   my text number, which I gave.

13             THE COURT:  And -- and who was that that

14   was the author of that?

15             MR. BRENNEN:  Me, Robert Brennen.

16             THE COURT:  You, okay.

17             What's the problem with that?

18             MR. DILLON-CAPPS:  One, one there's no

19   such thing as a group administrator or global

20   administrator group.

21             THE COURT:  Well, he has a text, why

22   can't you send him the pass -- send counsel the

23   password?

24             MR. DILLON-CAPPS:  Erm, well, if I were

25   to send the password to him, that would be giving

```
 1   access to an account that's not his.

 2               THE COURT:  What concern of that is

 3   your's?  Why isn't that Ohana's concern?  They --

 4   they've -- he's their attorney, they've authorized

 5   him to do that.

 6               MR. DILLON-CAPPS:  It would have to be

 7   Mr. Leadore that would authorize it.  And I've asked

 8   to speak to Mr. Leadore a couple times and he's --

 9               THE COURT:  Who's Mr. Leadore?

10               MR. DILLON-CAPPS:  -- not responded to

11   --

12               THE COURT:  Who is Mr. Leadore?

13               MR. DILLON-CAPPS:  Their individual that

14   they've named.

15               MR. BRENNEN:  He's a consultant with,

16   uh --

17               THE COURT:  Okay.  A consultant?

18               MR. DILLON-CAPPS:  Mm-hmm.

19               MR. BRENNEN:  Hartman Executive

20   Advisors.

21               THE COURT:  All right.

22               MR. DILLON-CAPPS:  I've e-mailed him

23   multiple times, he's never responded.

24               THE COURT:  So you refuse to send the

25   pass -- so there's a password that would grant Ohana
```

```
 1   back access to its own account that you're
 2   refusing --
 3              MR. DILLON-CAPPS:  They have access to
 4   their account.
 5              MR. BRENNEN:  Global admin access.
 6              MR. DILLON-CAPPS:  And that is not a
 7   defining factor, in fact, they have other
 8   administrators already.
 9              THE COURT:  Why do you think you have a
10   right to the global access -- admin access?
11              MR. DILLON-CAPPS:  I -- I do not.  In
12   fact, I have documents showing that I have been
13   trying to give it away and giving other people
14   access.
15              THE COURT:  Give it away.  They want it.
16   You can resolve this whole thing now.  You can
17   resolve the contempt issue right now if you just give
18   him the --
19              MR. DILLON-CAPPS:  As long as they do it
20   in a way that like meets --
21              THE COURT:  You have no right to -- you
22   have no right to insist on --
23              MR. DILLON-CAPPS:  I have no right to
24   not do it.
25              THE COURT:  -- your terms.
```

```
 1                    MR. DILLON-CAPPS:  I have no right to
 2    give it to someone and -- and violate the thing.  I
 3    have no right to do that.
 4                    THE COURT:  Well, you may end up in
 5    contempt of Court.
 6                    MR. DILLON-CAPPS:  Well, is -- is it
 7    unreasonable for me to follow --
 8                    THE COURT:  Sir, this is --
 9                    MR. DILLON-CAPPS:  -- the law?
10                    THE COURT:  You haven't cited any law to
11    me, that you'd be violating.
12                    MR. DILLON-CAPPS:  Hmm, sorry.  I
13    actually, erm --
14                    THE COURT:  I'm not trying to argue with
15    you but --
16                    MR. DILLON-CAPPS:  Oh, I understand, I
17    --
18                    THE COURT:  -- just, you know, you have
19    to understand --
20                    MR. DILLON-CAPPS:  -- I -- I just want
21    an opportunity --
22                    THE COURT:  -- you're -- you're in
23    violation of a court order right now, and we're here
24    on a contempt proceeding.
25                    MR. DILLON-CAPPS:  For sure.  So, uh --
```

```
1              THE COURT:  And this can be easily, it
2    appears to the Court that this can be very easily
3    resolved here and now in a matter of seconds, if you
4    comply with the order.
5              MR. DILLON-CAPPS:  For sure.
6              THE COURT:  And I haven't heard any
7    reason why --
8              MR. DILLON-CAPPS:  At the --
9              THE COURT:  -- you -- to be honest at
10   this point, I haven't heard a valid reason as to why
11   you're not complying.
12             MR. DILLON-CAPPS:  It's a complex matter
13   and I -- I -- it's hard to explain in simple terms.
14   But the Rule, I looked up, is FTC's safeguard rule.
15             THE COURT:  You're telling me -- what
16   else?  That means nothing to me.
17             MR. DILLON-CAPPS:  Oh, well, erm in the
18   case of *FTC versus Wyndham Worldwide Corp.,* uh, they
19   established that violations of these regulations fall
20   squarely under federal restrictions.
21             THE COURT:  What regulation?  What
22   regulation would that violate?
23             MR. DILLON-CAPPS:  Erm, it's the
24   regulation that is protecting the data, and the
25   standard that which applies is how we do that.
```

```
1              THE COURT:  Doesn't that -- but doesn't
2   -- doesn't that govern the conduct, to the extent
3   there is even any regulation, and I don't have it
4   before me, doesn't that --
5              MR. DILLON-CAPPS:  I -- I --
6              THE COURT:  -- doesn't that govern the
7   conduct of the company?
8              MR. DILLON-CAPPS:  Oh, no, it actually
9   governs me more than the company.  And in my --
10             THE COURT:  Show me -- show me why --
11  show me some case law or -- or regulation or statute
12  that says that this -- that that -- that you would be
13  at risk complying, providing the password to counsel.
14             MR. DILLON-CAPPS:  Sure.  I have it.
15  Can I take a moment?
16             THE COURT:  Sure.
17             MR. DILLON-CAPPS:  Okay.  Erm, is it
18  possible that my wife could help?  Because she was
19  actually helping me staple some of this up.  She
20  might be able to help me locate that specific
21  document?  I'm sorry.
22             THE COURT:  Well, I'll give you -- I'll
23  go off the record for five minutes, you can go out in
24  the hallway and consult with her.
25             MR. DILLON-CAPPS:  Oh, no, I mean, she's
```

```
 1    right here.  She can just help me like go through
 2    this paperwork.
 3               THE COURT:  Well, she's not -- is she a
 4    licensed attorney?
 5               MR. DILLON-CAPPS:  She is not.
 6               THE COURT:  I mean, she can help you go
 7    through paperwork.  If you want to take a break and
 8    go back to the -- go back and try to find it, that's
 9    fine, I'll go off the record for a couple of minutes
10    while you locate that.
11               MR. DILLON-CAPPS:  Okay.  Do I have to
12    leave this spot?
13               THE COURT:  No, you can leave things
14    there.
15               MR. DILLON-CAPPS:  Okay.
16               THE COURT:  But if you want private --
17    if you want to go out in the hallway and talk to her
18    or --
19               MR. DILLON-CAPPS:  Oh, I don't think
20    that's the issue.
21               Erm, do you have any issue with that.
22               MS. DILLON-CAPPS:  No, I have no issue.
23               MR. DILLON-CAPPS:  She, yes --
24               MS. DILLON-CAPPS:  (Unintelligible).
25               MR. DILLON-CAPPS:  Thank you.
```

1          THE COURT:  You can come up, you can't

2    speak.  I mean, you're not an attorney, so you can't

3    advise --

4          MS. DILLON-CAPPS:  (Unintelligible).

5          THE COURT:  I mean, you can't -- you

6    can't advocate on his behalf, I guess I should say.

7          MS. DILLON-CAPPS:  I won't.

8          MR. DILLON-CAPPS:  So, uh, this is the,

9    uh, court case of Federal Trading Commission Wyndham

10   Worldwide, with the material facts on, hmm, I will

11   need a moment to get a page number.

12          But this case it said -- establishes,

13   and I have the Court's opinion here, establishes,

14   erm, that the FTC has ruling over the space.

15          THE COURT:  That -- that doesn't answer

16   the question.  How does that --

17          MR. DILLON-CAPPS:  Oh.

18          THE COURT:  -- how does that -- how does

19   that put you at risk by giving back your employer,

20   uh, the global access rights?

21          MR. DILLON-CAPPS:  Hmm, so we share, I'm

22   sorry, they share, erm, the privileges of processing

23   their payments through Planet Fitness global, uh,

24   worldwide --

25          THE COURT:  Okay.

```
 1              MR. DILLON-CAPPS:  -- as franchisor.
 2   Uh, it's not actually their --
 3              THE COURT:  Why is that your concern?
 4              MR. DILLON-CAPPS:  Because they have
 5   entrusted me with this.
 6              THE COURT:  Not anymore.  They've taken
 7   that authority.
 8              MR. DILLON-CAPPS:  No, no, Planet
 9   Fitness.
10              THE COURT:  They're saying now you --
11   you have no -- you no longer have authority to do --
12              MR. DILLON-CAPPS:  Hmm.
13              THE COURT:  -- to keep this password.
14   They've taken that authority away from you.
15              MR. DILLON-CAPPS:  So the authority is
16   actually granted --
17              THE COURT:  So -- so why -- so why, in
18   fact, why doesn't that relieve you from any liability
19   because you've been relieved from that
20   responsibility?
21              MR. DILLON-CAPPS:  Because the -- the
22   duty is given to me by the franchisor.
23              THE COURT:  What franchise order?
24              MR. DILLON-CAPPS:  No, franchisor, like
25   the Planet Fitness, themselves.
```

```
 1                    THE COURT:  It's given -- you have
 2      something in writing that gives a duty specifically
 3      to you?
 4                    MR. DILLON-CAPPS:  Erm, technically,
 5      yes.  I mean --
 6                    THE COURT:  No, not technically.  Tell
 7      me -- show me --
 8                    MR. DILLON-CAPPS:  Oh.
 9                    THE COURT:  -- show me where you have
10      some --
11                    MR. DILLON-CAPPS:  I am actually --
12                    THE COURT:  -- personal responsibility
13      to the franchisor Planet -- Planet Fitness.
14                    MR. DILLON-CAPPS:  That's -- that's
15      actually a really great question.  So the two things
16      that they would have to -- that Justin would have to
17      do, two things, one of them I would have taken
18      personally (unintelligible) for, one is they have to
19      show knowledge of the standard, the second was the
20      responsibility for it, 'cause that's actually part of
21      the standard --
22                    THE COURT:  Okay.
23                    MR. DILLON-CAPPS:  -- is you have to be
24      responsible for --
25                    THE COURT:  Would you -- would you
```

```
 1   provide the passwords if they indemnified --

 2                 MR. DILLON-CAPPS:  -- the environment.

 3                 THE COURT:  -- you from any, uh --

 4                 MR. DILLON-CAPPS:  If Planet Fitness --

 5                 THE COURT:  -- liability concerning --

 6                 MR. DILLON-CAPPS:  -- franchisor

 7   indemnified me, yes.  I cannot see --

 8                 THE COURT:  No, from Ohana, if Ohana

 9   they're the plaintiff here.

10                 MR. DILLON-CAPPS:  Well, they would have

11   to be the people that actually are authorized to do

12   that.  They're not.  And anyway --

13                 THE COURT:  So the answer to my question

14   is, no, you wouldn't accept --

15                 MR. DILLON-CAPPS:  No, I'm saying --

16                 THE COURT:  -- indemnification from the

17   plaintiff --

18                 MR. DILLON-CAPPS:  They're not.

19                 THE COURT:  -- of any --

20                 MR. DILLON-CAPPS:  I'm saying that

21   they're --

22                 THE COURT:  I'm not sure that they would

23   offer it, I'm just, again, asking.

24                 MR. DILLON-CAPPS:  I'm saying that they

25   don't have that power to do that.  They've not been
```

```
 1   given that right by --
 2                   THE COURT:  They don't have the power to
 3   indemnify you?
 4                   MR. DILLON-CAPPS:  Hmm, no.
 5                   THE COURT:  All right.
 6                   MR. DILLON-CAPPS:  But, no.  I mean, it
 7   really would have to be the franchisor.
 8                   THE COURT:  All right.  Well, this is
 9   your opportunity now, so I'm going to give you -- I'm
10   going to give you ten minutes, and you can provide to
11   me any authority that -- that you says prohibits
12   enforcement of that order.
13                   MR. DILLON-CAPPS:  Well --
14                   THE COURT:  Okay.  I'm --
15                   MR. DILLON-CAPPS:  Okay.
16                   THE COURT:  -- going to give you ten
17   minutes.
18                   (Whereupon, courtroom audio was turned
19   off at 9:46:40 a.m.)
20                   (Whereupon, proceedings resumed at 10:01
21   a.m.)
22                   THE COURT:  All right.  The Court will
23   recall the case of Ohana Growth Partners, LLC versus
24   Ryan Dillon-Capps, C-03-CV-24-002264.
25                   All right.  Mr. Dillon-Capps, erm, I
```

1    know I was interrupting you quite a bit when I was

2    out on the bench earlier, uh, I was really just

3    trying to get to the bottom of kind of where we are

4    and why, erm, and what your position is, and, uh, and

5    I was asking you some questions.

6              And I think at times the Court was

7    getting frustrated, to be honest with you, that you

8    weren't being responsive to my questions, and

9    instead, uh, just telling me what you wanted to tell

10   me, but, erm, we are here on the contempt hearing.

11             I'm going to give you, I've given you

12   some time --

13             MR. DILLON-CAPPS:  Mm-hmm.

14             THE COURT:  -- to, uh, to get your legal

15   authorities together.  Erm, I'm going to let -- I'm

16   going to give you a fair opportunity to tell me what

17   you want to tell me.

18             MR. DILLON-CAPPS:  Mm-hmm.

19             THE COURT:  Tell me why you don't think

20   that I should hold you in contempt for violation of

21   Judge DeSimone's order, okay.

22             MR. DILLON-CAPPS:  Okay.

23             THE COURT:  So you're still under oath.

24             MR. DILLON-CAPPS:  Thank you.

25             Erm, it sounds like you got a little,

1    I'm so sorry, that I was frustrated, too.

2                Erm, if I have one argument to make it's

3    this.  They don't -- the case doesn't have

4    jurisdiction.

5                Erm, FMLA regulations say that, erm, if

6    I can get exact -- but, basically, what they say is

7    once I have asserted that I have my FMLA time in

8    place, which I did at 7 o'clock in the morning, when

9    they demanded that I work at 9, erm, and later had a

10   cease and desist, and later had default (phonetic) to

11   cease and desist.

12               Erm, all of the actions throughout the

13   day tell a story where I was suspended, not for the

14   thing they claim, but truly suspended because they

15   were tired of like what I -- what I -- the material,

16   the material is that the law says that it's the

17   burden of the employer to establish that it wasn't an

18   FMLA thing, not that it's assumed that I have to

19   prove it.

20               And until it's proven, a TRO and an

21   injunction actually cannot occur, erm, that's

22   prohibited in federal.

23               And, erm, and I will be happy to send

24   you all the stuff in a much better fashion

25   immediately upon leaving, I just I'm sorry for being

1    disorganized.

2                So, I can articulate better the whole

3    reason of FMLA, but that's essentially the FMLA

4    piece.

5                They -- they can't do anything.

6                And I do have an FMLA case filed with,

7    erm, the Department of Labor, it is being reviewed

8    right now.

9                Second, erm, we have, erm, is it okay if

10   I combine SEC and FTC, 'cause my -- those things in

11   my head are jumbled?

12               Erm, so, first off, establishing that

13   they actually have an agreement.

14               So, this purchaser agreement, which was

15   last updated in June of this year, erm, establishes,

16   it's the purchase agreement dated June of this year,

17   in which, erm, the franchisor, the master issuer,

18   actually agrees with the SEC that under this contract

19   that they will apply PCI standards, it literally says

20   PCI.

21               In the, erm, ABC contract master terms,

22   which is the, uh, processor agreement, it also

23   reaffirms that they are using PCI standards to meet

24   the legal necessity, that is found in the standards

25   for safeguarding consumer information.

1          And this is -- the connection, is that

2   this doesn't says PCI, this says you have to follow

3   standards that accomplishes the task as is defined in

4   here.  PCI is how we accomplish in FTC erm, rule.

5          Erm, on the SEC side, you, I'm sorry, 15

6   USC 45, is about the unfair methods of competition,

7   unlawful prevention of commission.  Essentially, uh,

8   it's an extension of the stop guard act.

9          And in this case, it actually applies

10  to, erm, not allowing -- it's -- it's -- it's

11  literally used to in a couple of cases, okay.

12         So the cases it's used, 'cause I don't

13  want to speak when I'm not a lawyer, I want the law

14  to speak.

15         So in Fed Trade Commission, Walmart, in

16  Matters of Lab, Inc., a corporation, against, I don't

17  remember, erm, I think it actually went to

18  Commission, like, yeah, they went that far.  And

19  Federal Trade Commission, Wyndham Worldwide, that's

20  three great examples where the Court ruled in these

21  situation that it is absolutely a federal

22  jurisdictional issue, I cannot remember what it is.

23         But Maryland has, they already

24  established an appellate court case that argues, erm,

25  essentially, if something is a state law or a federal

1  law, it is a violation of the law, and as such it

2  needs to be treated as illegal and lawful (sic).

3          So, for these reasons I say, erm, this

4  is what the case is about, however, you slice and

5  dice it, it's federal, it's federal, it's federal, so

6  there's no jurisdiction.

7          Secondly, if -- if you wanted to narrow

8  it down to some bits and pieces, I can articulate

9  every single fact.

10          In fact, Justin Drummond's affidavit of

11  -- of 2C, I'm sorry 1A is his, no, 2A, 2A, is his

12  erm, exhibit, Exhibit 2A, contradicts the facts of

13  Exhibit 1A.

14          Erm, Exhibit 1B, erm, erm, 1B or 1C is

15  my contract, I might have flipped them.  Oh, sorry,

16  1C is not equal to 2A, that is the -- the e-mail, the

17  e-mail you can see in Justin has the additional

18  e-mail that is excluded.  Justin has the correct one,

19  Rich Hartman does not.

20          Erm, Rich Hartman, also, uh, in his

21  affidavit, is missing two of my addendums, making it

22  an incomplete piece.

23          The, erm, however, Rich Hartman's other

24  exhibit is missing the 2:05 e-mail, notably, the very

25  times to which Mr. Hartman says he lost access, that

1   is fundamentally not true.

2                 Erm, the order of events that day was, I

3   was fearful for my life, and here's why, when --

4   after receiving the 2:05, which follows the other

5   cease and desist, both of them are cease and desist,

6   basically, which followed the FMLA claim, or

7   notification of time off, that then followed by,

8   let's call it what it is, a six hour demand letter to

9   work or else.

10                And all I was saying is, allow me my

11  federally protected time, and then, I asserted my

12  federally protected right.

13                They, 15 minutes after that, he serves

14  my IT coordinator a leave of absence, and while

15  normally I shouldn't say this, but like

16  (unintelligible) affidavit, he -- he -- Rich Hartman

17  handed the letter to him and said, it's like a paid

18  vacation.

19                Erm, I then responded to find out if my

20  IT -- if my (unintelligible) Ellis was safe and sent

21  her home.

22                I was under the impression that he was

23  reacting irrationally, and all the facts support

24  this, because even if Justin Drummond's affidavit,

25  you'll see that he says Rich Hartman lost access to

```
1    his team's account at 5, so that is actually closer

2    to the accurate time of when I signalled (phonetic)

3    his account.

4              And I have a picture somewhere, or I can

5    give to you, that shows clearly, erm, there's a lot

6    of evidence, Justin Drummond is a Viva goals admin

7    (phonetic), we have an entire Help Desk team that are

8    user admins, exchange admins.  We're fully

9    functional.  Their -- their harm is not established,

10   that's -- it's a lie.

11             Erm, their claim, they claim that they

12   had no admin access.  They don't even understand what

13   a global administrator is and what it does, more

14   accurately, I could describe the global administrator

15   role as one that can give or take away rights from

16   other people in otherwise inaccessible means.  And is

17   able to, erm, hmm, escalate, or I can't think of the

18   right word right now, but can elevate its permission

19   to a level that is beyond its normal self, and do

20   things that even itself cannot normally do.

21             But, it is not designed, and, in fact, I

22   have proof where I and other people who have been

23   through global (phonetic) net shares, we actually had

24   to go give ourself the correct role to actually do

25   the thing we want.
```

1              So that's more in the fact that there's

2    actually no harm already done.

3              And, erm, I mean, I could literally -- I

4    can go through piece by piece, if you name -- just

5    tell me another claim that they made, please, anyone,

6    'cause I -- I can literally tell you how it's false

7    or misleading.

8              They have no case.  They have no

9    material (phonetic) this is retaliation pure and

10   simple.

11             THE COURT:  All right.  Mr. Brennen?

12             MR. BRENNEN:  Well, your Honor, erm,

13   I've not seen any of the citations that the defendant

14   has -- has put forth today.

15             I -- I see no basis for the

16   jurisdictional argument.  The three claims that we

17   brought against him in the case are all, well, one is

18   a breach of contract under Maryland common law,

19   another is common law, Maryland common law breach of

20   employer -- employee's duty of loyalty, and the third

21   is via a civil action brought under a Maryland

22   criminal statute.

23             Erm, my colleague, uh, Ms. Hoffberger is

24   -- is more than prepared to address the -- the why

25   FMLA has nothing to do, it doesn't rise to a defense

1    to any of this.

2                    The facts, which are established in the

3    record that's already before the Court, and I don't

4    think there's any dispute of it is, this concept that

5    the -- a demand was made to, uh, the defendant on

6    June 13th, an hour after he'd asked for -- for FMLA

7    leave, uh, and we're forcing him to work, ignores the

8    fact that he's been asked to do this going to at

9    least May 20th, when he terminated the only -- the

10   only other admin access, uh, for the -- the

11   consultant Ryan Brooks from, erm, Baltimore

12   Consulting.

13                   So this was not the first time he'd been

14   asked, uh, this was multiple times he'd been asked.

15   There's no dispute about that.

16                   So the -- the concept that -- that the

17   question, erm, directive from, erm, various, uh,

18   members of senior management at Ohana to the

19   defendant, uh, is in retaliation for his request on

20   June 13th to take additional leave is completely base

21   less.

22                   MR. DILLON-CAPPS:  Hmm, I can respond to

23   all of those with details, and I can provide evidence

24   in --

25                   THE COURT:  Sir, I gave you your chance

```
 1    to talk.

 2                    MR. DILLON-CAPPS:  Oh, sorry.  Sorry.

 3                    MR. BRENNEN:  So with -- with respect to

 4    the irreparable harm, uh, we heard acknowledgment

 5    that he did take action with respect to the Vice

 6    President of -- of People and Culture, which is

 7    essentially equivalent to human resources for the

 8    company.

 9                    Uh, he's prepared to testify consistent

10    with his affidavit, that he was unable to access his

11    company e-mail shortly after his exchange on -- on

12    June 13th.  And then, on at 5:05 was unable to access

13    most of the system, has been locked out until very

14    recently.

15                    Erm, and, uh, in addition to that, erm,

16    you know, so we have that act.

17                    We have a, uh, a party who has shown a,

18    uh, an unabashed willingness to defy the directives

19    of his employer with respect to critical systems.

20                    Uh, we have someone who has, uh,

21    repeatedly asserted, and I think it's in the June

22    18th correspondence to the Court, that he and -- and

23    the reason for the FMLA request is that he, uh,

24    claimed -- he suffers from some post-traumatic

25    stress, which at times renders him, you know, not
```

```
 1   functional, uh, in which case the only person with

 2   this access would -- would be unaccessible 'cause

 3   they wouldn't have -- they wouldn't be functional.

 4           Erm, then the tremendous, and I could

 5   -- we have affidavit testimony and, I have all three

 6   of our affiants are here, uh, including Mr. Romes,

 7   uh, who's in with -- in from Minneapolis, to -- to

 8   provide expert testimony with respect to the fact

 9   that the PCI, DSS, uh, does not provide any obstacle

10   to compliance with either the employer directors or

11   the Court order, which is what we are focused on

12   right now, and -- and happy to -- to do so.

13           But I don't think we've seen anything,

14   uh, we certainly haven't seen a case that says, if he

15   does this, he's going to be either subject to

16   criminal liability or any civil liability.

17           We -- we were able to pull up the *FTC*

18   *versus Wyndham* case on Ms. Hoffberger's cell phone,

19   and it appears that that case involves --

20           THE COURT:  Is -- is that 799 --

21           MR. BRENNEN:  Action --

22           THE COURT:  -- F.3d 236?

23           MS. HOFFBERGER:  Yes, your Honor.

24           THE COURT:  Okay.

25           MR. BRENNEN:  Seems to involve a
```

1   situation where the Wyndham hotel people had not

2   taken sufficient steps to protect consumer data,

3   which was then accessed by hackers, uh, third parties

4   with -- without any connection to the company, uh,

5   and they held that Wyndham was had some liability

6   there.

7              There's nothing in that opinion that

8   says the IT staff at Wyndham that failed to properly

9   protect the consumer data had any personal liability

10  to the FT -- to the SEC.

11             THE COURT:  Might the defendant be

12  considered a hacker at this point, given his direct

13  -- his failure to follow directives of his employer?

14             MR. BRENNEN:  We certainly believe that

15  at this point, yes, that he would be -- his access

16  other than to take the steps that he's been ordered

17  by the Court to do, and asked by his employer to

18  do --

19             THE COURT:  Yeah.

20             MR. BRENNEN:  -- would be unauthorized

21  access.

22             THE COURT:  I mean, I'm -- I -- this is

23  all out of context, but I'm reading parts of the

24  *Wyndham* case, and they talk about, and, of course,

25  this was also 2015, so it's nine years old, erm, but

```
 1    they talk about an FTC guidebook, erm, one of which

 2    talks about setting access controls, and to allow

 3    only trusted employees with a legitimate business

 4    need to access the network.

 5              So what -- I'm -- I'm having trouble

 6    understanding what legitimate business needs --

 7              MR. DILLON-CAPPS:  That -- that

 8    statement you just read is actually the principal of

 9    this privilege, and is the basis --

10              THE COURT:  Well, what legitimate

11    business need do you have to access --

12              MR. DILLON-CAPPS:  No, no.

13              THE COURT:  -- this data?

14              What -- answer my question.  What

15    legitimate business need --

16              MR. DILLON-CAPPS:  I've not accessing --

17              THE COURT:  What --

18              MR. DILLON-CAPPS:  -- data.  I'm not

19    accessing data.

20              THE COURT:  No, but you have access.

21    You have an access control.

22              MR. DILLON-CAPPS:  Hmm.

23              THE COURT:  You have the -- answer my

24    question.  Do you have any legitimate need to access

25    data?
```

```
 1                    MR. DILLON-CAPPS:  Erm, I'm not -- I'm

 2   not.

 3                    THE COURT:  Given -- given your status

 4   with the company right now?

 5                    MR. DILLON-CAPPS:  I know, that's why I

 6   haven't being doing it.

 7                    THE COURT:  Okay.  So why should you

 8   have access?  You're not -- you're not a -- you're

 9   not at this point considered a trusted employee with

10   a legitimate business need to access the network?

11                    MR. DILLON-CAPPS:  I -- I don't have --

12   okay.  There's technical terms in here that --

13                    THE COURT:  Answer my question.

14                    MR. DILLON-CAPPS:  -- I --

15                    THE COURT:  Do you have a legitimate

16   business need to access the network?

17                    MR. DILLON-CAPPS:  That's a false

18   statement to make.

19                    THE COURT:  No, answer --

20                    MR. DILLON-CAPPS:  Because I did tell

21   you.

22                    THE COURT:  That's a question, sir.  I'm

23   not trying to argue with you, but answer the

24   question.

25                    Do you have -- are you contending to me
```

1    that you have any legitimate business need to access

2    the network, if you do, I'm happy to hear about it.

3    I'm trying to give you your chance, but I want to

4    know if it's your contention that at this point,

5    given your status with the company, if you have any

6    legitimate business need to access the network?

7                    MR. DILLON-CAPPS:  My contention is I

8    don't have access right now.

9                    MS. HOFFBERGER:  Well --

10                    THE COURT:  You don't have access?

11                    MR. DILLON-CAPPS:  No.

12                    THE COURT:  You -- you don't have -- the

13   access controls aren't set to give you access?

14                    MR. DILLON-CAPPS:  I --

15                    THE COURT:  Then who does?  Who has

16   access?

17                    MR. DILLON-CAPPS:  I do not have access

18   right now.

19                    THE COURT:  Who has -- answer my

20   question, who has access?

21                    MR. DILLON-CAPPS:  Erm, the people and

22   accounts that have it, like the Help Desk and stuff.

23                    THE COURT:  So they could just give the

24   information that Mr. Brennen needs to remove you?

25                    MR. DILLON-CAPPS:  Erm --

```
 1                    THE COURT:  The people at the Help Desk?
 2                    MR. DILLON-CAPPS:  If -- if they use --
 3                    THE COURT:  And so you -- so the people
 4    at the Help Desk have this access, but you're
 5    unwilling to give it to their IT professionals and to
 6    their attorney, who have asked for access; is that
 7    -- is that your position?
 8                    MR. DILLON-CAPPS:  My position is that
 9    the access they've asked for is not an access that
10    exists in the way that they've described it.  And --
11                    THE COURT:  Well, all right.  But if
12    they're being imprecise, they're asking for -- at
13    this point Mr. Brennen just wants a password sent to
14    him by text.
15                    MR. DILLON-CAPPS:  I can't generate that
16    password.
17                    THE COURT:  Well, what can you do?  Then
18    explain to me, technically, what you can do to comply
19    with the order.
20                    MR. DILLON-CAPPS:  Hmm.
21                    THE COURT:  Right now you're not in
22    compliance with an order.
23                    MR. DILLON-CAPPS:  Right.
24                    THE COURT:  I haven't heard any reason
25    -- I've heard your arguments, I'm just going to tell
```

```
 1   you right now, that the Court disagrees.

 2              The Court has jurisdiction over the

 3   State court claims.  The case hasn't, I'm not sure

 4   that the -- it's not brought under federal law.

 5              MR. DILLON-CAPPS:  Okay.

 6              THE COURT:  So even if -- even if there

 7   were -- hold on.  Even if there were federal

 8   defenses, I'm not sure the case is removable 'cause

 9   it doesn't -- the complaint doesn't, on its face

10   state any federal claim, it hasn't been removed to

11   federal court.

12              The Court has jurisdiction over the

13   claim, so that's not an argument, I'm just telling

14   you right now.

15              Erm, and I haven't heard, as far as any

16   family law leave issue, if you contend that they're

17   violating the law, and I'm not sure I even need to

18   hear about that, but if they did, then if you have a

19   federal claim, assuming they're violating the law,

20   I'm making no such finding, fine, you can pursue that

21   claim either administratively or -- or by law.

22              You can go down to federal court and

23   file a -- a, if there is such a private cause of

24   action for violation of the FLMA (sic), you can do

25   that, that's not a defense to the, uh, claims here,
```

```
 1   breach of contract and the breach of loyalty to your

 2   employer.

 3                MR. DILLON-CAPPS:  It's -- it's a

 4   prohibited act federally --

 5                THE COURT:  Okay.  Then --

 6                MR. DILLON-CAPPS:  -- to do what they

 7   did.

 8                THE COURT:  -- then you can pursue that.

 9                MR. DILLON-CAPPS:  And, we will, but --

10                THE COURT:  Erm, the Court is not --

11                MR. DILLON-CAPPS:  -- to answer your

12   question --

13                THE COURT:  Hold on a second.  The Court

14   is not your employer, and you are under a Court order

15   to do something, okay.

16                So -- so far, I'm just telling you, I've

17   heard all your arguments and I'm -- I don't think

18   that constitutes a defense to -- to the contempt --

19                MR. DILLON-CAPPS:  I will --

20                THE COURT:  -- at this point, so the

21   Court -- I mean the next thing I'm going to have to

22   consider, potentially, is -- is what the appropriate

23   remedy is in holding you in con -- is, you know, I

24   haven't yet, but I'm about to find you in contempt

25   for violation of Judge DeSimone's order.  And then,
```

```
 1   the next step will be what's the appropriate remedy.
 2                MR. DILLON-CAPPS:  Erm, I have tried
 3   many times to do the thing that they want me to do,
 4   many times.
 5                THE COURT:  Well, right now the
 6   attorney's here, do what he wants to do, and this
 7   case will probably be dismissed.
 8                There would -- it seems to me that this
 9   is a one, even though there is a Motion for
10   Preliminary Injunction here to follow the TRO, but,
11   uh, I don't know all the intricacies of this, but it
12   seems to me that if the appropriate password is
13   provided they would probably lock you out, and do
14   what they have to do, and that would be the end of
15   it.
16                And they could -- if they want to pursue
17   a damage claim against you they can still do that,
18   but as far as injunctive relief there would be no
19   need -- they would probably, if you text the password
20   or whatever Mr. Brennen needs, he probably would
21   dismiss the preliminary injunction.
22                MR. DILLON-CAPPS:  I don't -- I don't
23   have the password.
24                MR. BRENNEN:  Uh, your Honor, in fact,
25   one of the things we had offered to do, uh, was,
```

```
 1   well, we asked that he consent, you're absolutely
 2   right, it would obviate the need for the injunctive
 3   relief compelling him to take the action, if he takes
 4   the action, but we would sill want preliminary
 5   injunctive relief in terms of the relief enjoining
 6   him from trying to or attempting any further access
 7   pending the case to the system.
 8              THE COURT:  To basically hack it?
 9              MR. BRENNEN:  Correct.
10              MR. DILLON-CAPPS:  No, I -- I have to
11   have access to do it, pure and simple.
12              THE COURT:  Well, maybe but they're --
13   they're asking, I mean you could consent, again, if
14   you -- if you're saying you have no intention --
15   well, first of all, the first step is giving them the
16   access they need, are you willing to do that?
17              MR. DILLON-CAPPS:  I have no ability at
18   this moment to do that.
19              THE COURT:  Well, tell me what you need?
20              MR. DILLON-CAPPS:  I would need --
21              THE COURT:  Okay.
22              MR. DILLON-CAPPS:  -- access to one of
23   the Break Glass accounts.
24              THE COURT:  One of the what?
25              MR. DILLON-CAPPS:  Break Glass accounts.
```

```
 1                    THE COURT:  Break Glass accounts?
 2                    MR. DILLON-CAPPS:  Yes.
 3                    THE COURT:  Who has that?
 4                    MR. DILLON-CAPPS:  I do not.
 5                    THE COURT:  Well, you have -- who does?
 6                    MR. DILLON-CAPPS:  I can find out.
 7                    THE COURT:  You have your IT
 8      professionals here, can you talk to them about what
 9      they need.
10                    UNKNOWN:  He is our IT professional.
11                    THE COURT:  Well, (laughing).
12                    MR. BRENNEN:  (Laughing).
13                    THE COURT:  Well, I understand that, but
14      I mean, he's --
15                    MR. BRENNEN:  I have Mr. -- Mr. Romes
16      who is an expert in all these systems.
17                    THE COURT:  Okay.  Why don't I hear --
18      why don't we put him under oath and he can tell me
19      what, uh, what the defendant needs -- what the
20      defendant could do.
21                    MR. BRENNEN:  Okay.
22                    THE COURT:  Come on up to the witness
23      stand.
24                         RANDALL J. ROMES,
25      first duly sworn to tell the truth, the whole truth,
```

```
 1    and nothing but the truth, testified as follows:
 2                   THE WITNESS:  I do.
 3                   THE CLERK:  Thank you please be seated.
 4    For the record please state and spell your first and
 5    last name.
 6                   THE WITNESS:  Randall J. Romes,
 7    R-A-N-D-A-L-L, last name Romes, R-O-M-E-S.
 8                   THE CLERK:  Thank you.
 9                   THE COURT:  All right.  You can proceed
10    Mr. Brennen.
11                   MR. BRENNEN:  Thank you.
12                      DIRECT EXAMINATION
13    BY MR. BRENNEN:
14           Q    Erm, Mr. Romes, are you employed?
15           A    Yes.
16           Q    And by whom?
17           A    Clifton Larson Allen.
18           Q    And what is Clifton Larson Allen?
19           A    Clifton Larson Allen is the eighth
20    largest professional services CPA firm in the
21    country.
22           Q    And what is your title with the CLA or
23    Clifton, do you mind I call it CLA?
24           A    Call it CLA, yes, please.
25           Q    Okay.  What is your title with CLA?
```

```
 1              A    I'm a principal in the Cyber Security
 2    Services Group.
 3              Q    And, uh, what, can you explain to the
 4    Court what you do for the company in that capacity?
 5              A    Sure.  We --
 6              Q    And how long you've been doing it?
 7              A    I -- I've been there for 27 years.  We
 8    help clients with, erm, IT and cyber security risk
 9    assessments, audit compliance, erm, penetration
10    testing.
11              We do incident response and forensics.
12    Erm, we help with independent security advisory, and
13    we're also what's referred to as a PCI QSA firm,
14    qualified security assessment firm.
15              So we are accredited by the SSC, the
16    Security Standards Counsel, which is the trade group
17    that defines the framework for executing compliance
18    assessments for PCI compliance on an annual basis.
19              MR. BRENNEN:  Your Honor, could I
20    approach with a copy of Exhibit A, it's the
21    biographical information, was -- this was Exhibit A
22    to his affidavit that was submitted yesterday and was
23    transmitted to the Court, and also to -- to opposing
24    counsel.
25              THE COURT:  Okay.
```

 1                    MR. DILLON-CAPPS:  I can see that he's

 2    an expert.   I --

 3                    MR. BRENNEN:  (Unintelligible).

 4                    MR. DILLON-CAPPS:  I absolutely would

 5    give him access, instantly, right now.

 6                    THE COURT:  Give him access now.

 7                    MR. DILLON-CAPPS:  Yes, I would give

 8    him --

 9                    THE COURT:  Give him access now.

10                    MR. DILLON-CAPPS:  I would right now.

11                    THE COURT:  Give it -- give it to him

12    now.

13                    MR. DILLON-CAPPS:  I don't have it.  I

14    literally don't have it on me.

15                    THE COURT:  Well, what do you have?

16    What do you need to do to get it?

17                    MR. DILLON-CAPPS:  Erm, well, we would

18    have to get one of the Break/fix accounts, his

19    tokens, to log -- to log in.

20                    THE COURT:  Well, why don't --

21                    MR. DILLON-CAPPS:  There's --

22                    THE COURT:  Is it worth having the

23    discuss -- you're willing to give it to him --

24                    MR. DILLON-CAPPS:  I can talk to him --

25                    THE COURT:  -- is what you're saying?

```
 1                MR. DILLON-CAPPS:  -- and he can confirm
 2   that I'm telling the truth, and that it makes sense.
 3                THE COURT:  Okay.  Fine.  Then why don't
 4   we take a five minute break and you can --
 5                MR. DILLON-CAPPS:  I mean, I just -- I
 6   can tell him right now.
 7                THE COURT:  Tell -- let me finish.  Sir.
 8                MR. BRENNEN:  Your Honor, I -- I think
 9   --
10                THE COURT:  All right.  Why don't we do
11   this on the record.  Go ahead tell him -- tell him
12   what you think he needs to do.
13   BY MR. BRENNEN:
14        Q    Mr. Romes, could you explain --
15                THE COURT:  Let me hear from Mr. Romes
16   first, as to what --
17                MR. BRENNEN:  Yeah.
18                THE COURT:  -- what -- what he needs.
19   But --
20                MR. BRENNEN:  You've heard --
21                THE COURT:  But he -- you can see he's
22   qualified?
23                MR. DILLON-CAPPS:  Yes.
24                THE COURT:  You can see, it wouldn't --
25   giving him the password would not put you at risk?
```

```
 1                    MR. DILLON-CAPPS:  No, it would not.

 2                    THE COURT:  What?

 3                    MR. DILLON-CAPPS:  It would not.

 4                    THE COURT:  You agree with me?

 5                    MR. DILLON-CAPPS:  A hundred percent.

 6                    THE COURT:  Okay.  So now, it's just

 7     about how do we logistically accomplish this.

 8                    MR. DILLON-CAPPS:  Exactly.

 9                    THE COURT:  Okay.  Let's figure that

10     out.

11                    MR. DILLON-CAPPS:  I -- I just need to

12     get to a security key that, erm, and then, get to a

13     password and give them to him.  That's it.

14                    He's -- he's -- he's -- he's more than

15     knowledgeable and I --

16                    THE COURT:  All right.  All right.

17     Break -- break that down, again.  Let's -- let's

18     break this down to a second grader level for me.

19                    MR. DILLON-CAPPS:  Yeah.

20                    THE COURT:  So what -- what -- what is

21     -- what do you --

22                    MR. DILLON-CAPPS:  There's a key fob.

23                    THE COURT:  From  --

24                    MR. DILLON-CAPPS:  There's a literal

25     Fidos key tag.
```

```
1                    THE COURT:  Who has -- it's a key fob,

2      like a physical key fob type of thing?

3                    MR. DILLON-CAPPS:  Yeah.

4                    THE COURT:  Who has that?

5                    MR. DILLON-CAPPS:  Erm, I do not have

6      the one that he (unintelligible).

7                    THE COURT:  Who has it?

8                    MR. DILLON-CAPPS:  I will find it.

9                    THE COURT:  Well, what does that mean?

10     Do you know where it is?

11                   MR. DILLON-CAPPS:  I -- I do know where

12     it's at.

13                   THE COURT:  Where is it?

14                   MR. DILLON-CAPPS:  Well, it's in an

15     envelope, and I have to find out --

16                   THE COURT:  It's where?

17                   MR. DILLON-CAPPS:  It's in a -- in an

18     envelope and I have to make sure --

19                   THE COURT:  What -- what is the

20     envelope?

21                   MR. DILLON-CAPPS:  I have to see if it's

22     been mailed out already.  I have to find --

23                   THE COURT:  Where did you mail it to?

24                   MR. DILLON-CAPPS:  -- out

25     (unintelligible) receipt.
```

```
 1                    THE COURT:  Who did you mail it to?

 2                    MR. DILLON-CAPPS:  Erm, it should be

 3      sent to, uh, Cello.

 4                    THE COURT:  To who?

 5                    MR. DILLON-CAPPS:  Because it was

 6      intended -- to Cello, our Help Desk.

 7                    THE COURT:  To your Help Desk?

 8                    MR. DILLON-CAPPS:  Yes.

 9                    THE COURT:  And when did you mail it?

10                    MR. DILLON-CAPPS:  I would have to

11      double check.  I don't think it went out.  I think it

12      went out --

13                    THE COURT:  And there's only one of

14      these key fobs?

15                    MR. DILLON-CAPPS:  That's one of them,

16      yeah.

17                    THE COURT:  Answer my question, sir.

18      You have a way of not answering my questions.

19                    MR. DILLON-CAPPS:  I'm sorry.

20                    THE COURT:  Is -- you said that one of

21      them, is there more than one?

22                    MR. DILLON-CAPPS:  Yes.

23                    THE COURT:  Who has the other ones?

24                    MR. DILLON-CAPPS:  Well --

25                    THE COURT:  Besides -- you have one that
```

```
 1   you put in an envelope which you don't -- and -- and
 2   -- have you mailed it or not?
 3            MR. DILLON-CAPPS:  I will find out.  I
 4   --
 5            THE COURT:  Well, that's a yes or no
 6   question though.
 7            MR. DILLON-CAPPS:  I have spent a large
 8   quantity of time since the incident, erm, not
 9   remembering what's going on.  I'm severely impacted
10   by PTSD right now.
11            THE COURT:  All right.  Okay.  Well, I
12   -- I don't want to cause you anymore PTSD, that's why
13   I'm trying to get a resolution to this.
14            MR. DILLON-CAPPS:  Sure.
15            THE COURT:  Because this is -- this is
16   so simple to resolve, sir.
17            MR. DILLON-CAPPS:  Right.
18            THE COURT:  It's --
19            MR. DILLON-CAPPS:  Can I just be given
20   an opportunity to -- 'cause he's qualified.
21            THE COURT:  Well, who else -- who else
22   has the key -- how -- who else had -- has a key fob?
23            MR. DILLON-CAPPS:  I can't answer that
24   question because I don't remember.  I have to like go
25   at my home, look at my notes and find out what's
```

1   going on.

2              THE COURT:  Would anyone else know?

3              MR. DILLON-CAPPS:  No, because I mailed

4   them out, or I tried to.

5              THE COURT:  Okay.  What else -- so what

6   else -- and I'm going to ask the witness whether he

7   thinks that's -- what else is necessary in your view?

8              MR. DILLON-CAPPS:  There's only two --

9   well, three problems, but, he's knowledgeable, check.

10  I don't have to -- he's QSA, I literally don't have

11  to do anything for that.

12             And then, he has to be responsible for

13  our environment so --

14             THE COURT:  He what?

15             MR. DILLON-CAPPS:  He has to be

16  responsible for the environment, so.

17             THE COURT:  Well, that's -- that's not

18  something you have --

19             MR. DILLON-CAPPS:  The admin --

20             THE COURT:  -- I'm asking what you have

21  to do to give him access.

22             MR. DILLON-CAPPS:  So --

23             THE COURT:  What your contention is?

24             MR. DILLON-CAPPS:  I -- I would

25  literally make an e-mail or a call to Planet Fitness

1    Headquarters, and have him added to our trust

2    (unintelligible) account.  Reasonable.  Very

3    reasonable.  Like literally it would --

4                    THE COURT:  So both things are needed or

5    just, or just you need to make a call to Planet

6    Fitness Headquarters?

7                    MR. DILLON-CAPPS:  I mean --

8                    THE COURT:  And how do you know that

9    they would, that Planet Fitness would even listen to

10   you at this point?

11                   MR. DILLON-CAPPS:  Erm, I have no reason

12   to believe that they wouldn't.

13                   THE COURT:  All right.  So is the first

14   -- is the key fob needed --

15                   MR. DILLON-CAPPS:  Yes.

16                   THE COURT:  -- yes or no?

17                   MR. DILLON-CAPPS:  Yes, because --

18                   THE COURT:  Okay.

19                   MR. DILLON-CAPPS:  -- he would need it

20   to actually log in.  He would --

21                   THE COURT:  And then, the --

22                   MR. DILLON-CAPPS:  -- need that and the,

23   uh, password to the secondary e-mail account and the

24   password to the account itself.

25                   THE COURT:  The password to second?

```
 1                   MR. DILLON-CAPPS:  Yes, 'cause that's
 2    how (unintelligible).
 3                   THE COURT:  Secondary.
 4                   MR. DILLON-CAPPS:  -- for that.
 5                   THE COURT:  I'm sorry, the password to
 6    the secondary?
 7                   MR. DILLON-CAPPS:  Account.
 8                   THE COURT:  Account?
 9                   MR. DILLON-CAPPS:  Mm-hmm.
10                   THE COURT:  Who has that?
11                   MR. DILLON-CAPPS:  It's with the e-mail
12    site.  It's actually on --
13                   THE COURT:  Who has -- what?
14                   MR. DILLON-CAPPS:  It's together.  It's
15    together, it's all together.
16                   THE COURT:  What -- to get -- it's
17    together with what?  A password is a password, how is
18    that together with anything?
19                   MR. DILLON-CAPPS:  They're two -- both
20    passwords are together.  I mean, they're written
21    down, not written, but like printed on a piece of
22    paper.
23                   THE COURT:  Printed on a piece of paper?
24                   MR. DILLON-CAPPS:  Yeah.
25                   THE COURT:  Where does that piece of
```

1   paper exist?

2              MR. DILLON-CAPPS:  I will let you know

3   as soon as I get home and find it and find the papers

4   --

5              THE COURT:  How about -- what I ordered

6   you to go home now and get it and bring it back?

7              MR. DILLON-CAPPS:  Then I would do what

8   I can.  I have not -- the misconception, your Honor,

9   is that I've been withholding something.

10             THE COURT:  Well, you are.

11             MR. DILLON-CAPPS:  I'm not withholding

12  anything.  No, I have not.

13             THE COURT:  All right.  All right.  Let

14  me hear from the witness --

15             MR. DILLON-CAPPS:  I tried to give it to

16  Justin.

17             THE COURT:  -- what -- All right.

18  Anything else that you think is needed, those three

19  things?  You said find the key fob, call Planet

20  Fitness Headquarters.

21             MR. DILLON-CAPPS:  Yeah.

22             THE COURT:  Add him, and then -- and

23  then a password to a secondary account --

24             MR. DILLON-CAPPS:  Yeah.

25             THE COURT:  -- that you don't know where

```
 1    that password is --
 2                    MR. DILLON-CAPPS:  I --
 3                    THE COURT:  -- somewhere?
 4                    MR. DILLON-CAPPS:  -- I have stuff
 5    written down because my memory is not great.
 6                    THE COURT:  Okay.  All right.  Let me
 7    hear from the witness.
 8                    What are the steps that you think --
 9    what could he do to instantly give you access?
10                    THE WITNESS:  I -- I believe the
11    question is to crea -- create an account.
12                    MR. DILLON-CAPPS:  Which already exists.
13                    THE COURT:  Sir.
14                    THE WITNESS:  And --
15                    THE COURT:  Do not interrupt the
16    witness.
17                    MR. DILLON-CAPPS:  Sorry.
18                    THE WITNESS:  -- put that --
19                    THE COURT:  All right.  Create an
20    account, meaning what?  Tell me exactly what that
21    means.
22                    THE WITNESS:  Create an account for one
23    of the individuals, a User ID, and then --
24                    THE COURT:  For one of what -- what
25    individuals?
```

```
 1                  MR. DILLON-CAPPS:  uh, Mr. Drummond,
 2       somebody at Planet Fitness.
 3                  THE COURT:  Okay.  So, the witness, so
 4       right now you're locked out of creating any kind of
 5       an account on the system?
 6                  THE WITNESS:  I don't have any access.
 7                  THE COURT:  Well, I mean, no, Planet
 8       Fitness, not Planet Fitness, but the plaintiff in the
 9       case has no ability to create any Microsoft, erm, 365
10       account right now?
11                  THE WITNESS:  I -- I believe they do not
12       have the ability to create administrative privilege
13       accounts, which is --
14                  THE COURT:  Okay.
15                  THE WITNESS:  -- what is needed.
16                  THE COURT:  So create an administrative
17       privilege account?
18                  MR. DILLON-CAPPS:  Mm-hmm.
19                  THE WITNESS:  And then put it --
20                  THE COURT:  Which only the witness can
21       do?
22                  THE WITNESS:  I believe that's the case.
23                  THE COURT:  All right.  Could he do, is
24       there -- is there like a computer here where he could
25       do that?
```

```
1                    THE WITNESS:  Uh, I can't answer that, I
2    don't know how --
3                    THE COURT:  All right.
4                    THE WITNESS:  -- the system is set up.
5                    THE COURT:  So, create an administrative
6    privilege account.
7                    THE WITNESS:  Create an account, give it
8    the appropriate permissions, put it in an admin
9    account, we're hearing the term "global admin", it's,
10   uh, --
11                   THE COURT:  Okay.
12                   THE WITNESS:  -- basically the
13   same thing.  And then --
14                   THE COURT:  Give it a glob -- give it a
15   global admin --
16                   THE WITNESS:  Provide the --
17                   THE COURT:  -- admin permission?
18                   THE WITNESS:  Yep.
19                   THE COURT:  Okay.  So create an account,
20   give it global admin permission, and what else?
21                   THE WITNESS:  Provide the account name
22   and the password to the specified individual, Mr.
23   Drummond, or somebody else at Ohana.
24                   THE COURT:  Provide the account name and
25   password?
```

1              THE WITNESS:  Yep, I -- I believe --

2              THE COURT:  To -- to the specified

3    individual?

4              THE WITNESS:  Yeah.

5              THE COURT:  And at this point it's going

6    to be who, Mr. Drummond?

7              MR. BRENNEN:  Well, we -- we wanted it

8    to be, uh, Phil Leadore with Hartman --

9              THE COURT:  Okay.

10             MR. BRENNEN:  -- Executive Advisors, who

11   we've retained, who Ohana has retained --

12             THE COURT:  Okay.

13             MR. BRENNEN:  -- to, uh, as a consultant

14   for their IT needs.

15             THE COURT:  Okay.  And what else?

16             THE WITNESS:  I believe the key he's

17   referring to is -- is a little token or device --

18             THE COURT:  Mm-hmm.

19             THE WITNESS:  -- that is part of the

20   multifactor authentication, so that's the additional

21   steps.

22             THE COURT:  So it is needed?

23             THE WITNESS:  Account, password and

24   token.

25             MR. DILLON-CAPPS:  Mm-hmm.

1                    THE COURT:  And there's probably a good

2     reason that this kind of security is hard to break,

3     but there's no way to contact, erm, Microsoft, like

4     the owner of the business to contact Microsoft and

5     say, we have an employee who's refusing to comply

6     with our request and we need to bypass all of this?

7                    MR. BRENNEN:  Excellent question, your

8     Honor.  Erm, in fact, uh, throughout this erm, we

9     have been, uh, both through Ohana's connections with

10    Microsoft as a customer --

11                   THE COURT:  Mm-hmm.

12                   MR. BRENNEN:  -- and then Miles &

13    Stockbridge's, erm, contacts with Microsoft's Legal

14    Department, have been trying to get them to do just

15    that.

16                   Uh, we sent them a copy of the TRO, uh,

17    in the hopes that that would, uh, enable them to take

18    action, and they could, they just won't, erm, because

19    they're not going to put their neck out and risk the

20    idea that the wrong person gets the stuff, and then

21    they get sued for giving it to the wrong person.

22                   THE COURT:  Okay.

23                   MR. BRENNEN:  So we sent them a copy,

24    well, I sent their legal, three of their lawyer --

25    in-house lawyers a copy of the TRO, and their

```
 1    response was, well, this TRO doesn't order Microsoft

 2    to do anything.

 3                And I said, well, what if we get the

 4    preliminary injunction and we include in it that,

 5    erm, Microsoft Corporation is directed to take these

 6    steps as well.

 7                And I sent them the draft, the proposed,

 8    uh, injunction order, uh, asked for their comments,

 9    they gave me some, we incorporated them in the order,

10    as late as yesterday.

11                I sent the existing order that we're --

12    that we were -- intended to submit to the Court and,

13    erm, to them, and they said "if this is issued they

14    will -- they will process it".

15                So that's another avenue, but I --

16    but -- and I am prepared to, and I would like the

17    Court to enter the order as proposed, erm, because

18    Microsoft is definitely not going to do anything if

19    -- if -- if that's not issued.  As far as my, our

20    experience so far is they will not do anything until

21    they see the words Microsoft Corporation on

22    something.

23                Erm, but I -- even if your Honor granted

24    that, I would still want it, the preliminary

25    injunction granted.
```

```
 1                    THE COURT:  That's an -- that's an order

 2    that orders Microsoft to do something?

 3                    MR. BRENNEN:  It is.

 4                    THE COURT:  Okay.  Well, would they have

 5    to be properly brought in?

 6                    MR. BRENNEN:  I, you know, I asked them,

 7    they did not raise that issue of -- of whether or not

 8    they would be a party, erm, and I'm -- I'm prepared

 9    to hand up to the Court to entire e-mail string.

10                    THE COURT:  Okay.  Well, I'm not sure I

11    need that right now.

12                    MR. BRENNEN:  Sure.

13                    THE COURT:  Erm, Mr. Dillon-Capps, how

14    long would it take you to go get the fob and find the

15    passwords?

16                    MR. DILLON-CAPPS:  It -- I cannot answer

17    that until I find out where exactly it is right now.

18                    THE COURT:  All right.  Well --

19                    MR. DILLON-CAPPS:  It could be in

20    another state.  It could be in Texas.

21                    THE COURT:  All right, given -- it could

22    be in Texas?

23                    MR. DILLON-CAPPS:  Yeah, that's where

24    they are.

25                    THE COURT:  Who's "they"?
```

1           MR. DILLON-CAPPS:  Cello.

2           THE COURT:  Well, you don't even know

3   if it's -- you mean, if you mailed it?

4           MR. DILLON-CAPPS:  Mm-hmm.

5           THE COURT:  Is that a yes?

6           MR. DILLON-CAPPS:  Yes, sir.

7           THE COURT:  You don't know if you have

8   or not.

9           MR. DILLON-CAPPS:  Like I said, my wife

10  actually has an affidavit here, but she's a licensed

11  C counselor (phonetic), and she can tell you I'm

12  spending huge amounts of time like --

13          THE COURT:  Well, you're causing

14  yourself to spend more time by -- All right.  Well,

15  you've now -- you've now conceded, that -- that the

16  witness, in other words, the --

17          MR. DILLON-CAPPS:  Yes, sir.

18          THE COURT:  -- uh, the contractor or

19  agent that the -- that the plaintiff is asking that

20  you provide access to, if you were to do that would

21  not put you at risk at all.

22          MR. DILLON-CAPPS:  No, no --

23          THE COURT:  So there's no reason not to

24  comply with the order.

25          MR. DILLON-CAPPS:  Your Honor, no one's

```
 1    ever asked me to give it to him.

 2                    MR. BRENNEN:  That -- that's the one

 3    point I was going to clarify.  He's been saying he

 4    would give it to him because he has got the PCI

 5    QSA --

 6                    THE COURT:  Okay.

 7                    MR. DILLON-CAPPS:  -- qualifications.

 8                    THE COURT:  All right.

 9                    MR. BRENNEN:  We would take that.

10                    THE COURT:  Fine.  Give it to him.

11                    MR. DILLON-CAPPS:  Absolutely.

12    BY MR. BRENNEN:

13         Q    And you're comfortable taking on that

14    role?

15         A    Yes.

16                    THE COURT:  All right.  Well, I am going

17    to hold the defendant in contempt.  He can purge the

18    contempt by providing what the defendant (sic) needs

19    within 24 hours.  And if not, you're going to be

20    subject to what -- what relief would you want if he

21    -- if he -- I'll hear from him as well, but if he

22    continues to not to comply, because at that, I mean

23    I've got to give him, uh, I can fine him and I can

24    give him an ability to purge, but I'm not -- you

25    haven't asked that he be jailed, nor would I do.
```

```
 1              MR. BRENNEN:  We -- we haven't asked
 2   that he be jailed.
 3              THE COURT:  But there's -- but there's
 4   got to be -- but there's got to be some teeth, I
 5   think, to require the defendant to comply with the
 6   order.
 7              MR. BRENNEN:  So, let me parse this out.
 8              The Motion For Contempt is to hold him
 9   in contempt for the TRO, which expires tomorrow.
10              THE COURT:  Right, which can be
11   extended.
12              MR. BRENNEN:  Which -- which can be
13   extended, that's true, and we can go that route
14   instead of entering the preliminary junction,
15   although that will not get me what I need to try to
16   use the other angle with Microsoft.
17              THE COURT:  Well, well, let me ask, do
18   you -- well, and again, this is all going to be --
19   the preliminary injunction will all become mute once
20   he complies, erm, presumably once access is given.
21              MR. BRENNEN:  Except --
22              THE COURT:  Well, except that you want
23   -- you want him to, uh --
24              MR. BRENNEN:  Hands off.
25              THE COURT:  -- you -- you don't want him
```

1   to attempt to get access even -- even though,

2   presumably, you will take him off the account.

3           MR. BRENNEN:  They'll (unintelligible,

4   speaking over), your Honor.

5           THE COURT:  But you don't want him

6   attempting to hack if the he's created a backdoor or

7   something, you know, whatever right?

8           Do you have -- do you have any problem

9   with entry of the preliminary injunction order, given

10  -- given what they're asking to do to provide it to a

11  qualified individual?

12          MR. DILLON-CAPPS:  I only of unknown

13  time.  I can tell you --

14          THE COURT:  "Unknown time", what does

15  that mean?

16          MR. DILLON-CAPPS:  I can -- 24 hours how

17  long it will take, and I promise you it will not take

18  more than Monday, and I will do it as fast as I can.

19          I also attest under oath that I have

20  tried to give access to four different people, Jeff

21  (phonetic) had it from (unintelligible) at one point,

22  and returned it back.

23          Erm, I've done everything I can.  I've

24  been acting in good faith beyond measure, it's just

25  been not disclosed to you.

84

```
 1                    THE COURT:  Well, I don't know about all
 2    of that, but all -- but what I know is right now,
 3    what's on -- what's on the table --
 4                    MR. DILLON-CAPPS:  Yes.
 5                    THE COURT:  -- which -- which I've heard
 6    you say that he -- you believe him to be qualified
 7    and have no issue in providing, erm -- so actually
 8    I'd have to modify, erm, the -- the TRO said
 9    providing access to Phil Leadore.
10                    MR. BRENNEN:  Correct.
11                    THE COURT:  Is it Leadore or Leadore?
12                    MR. BRENNEN:  Leadore --
13                    THE COURT:  Leadore.
14                    MR. BRENNEN:  -- from my understanding.
15                    THE COURT:  Okay.  And I guess now to
16    some extent to alleviate the defendant's concerns, we
17    would change it, change the name of the person.
18                    MR. BRENNEN:  That's fine.  And I -- and
19    I've -- would be prepared to change the names in the
20    proposed preliminary injunction order.  We could do
21    that with a pen right now.
22                    THE COURT:  Okay.  Do that.
23                    MR. BRENNEN:  Okay.
24                    THE COURT:  I mean, to the extent I have
25    to make any findings, I guess I -- I will -- I will
```

1   say that, erm, that based on what I've heard at the

2   hearing today, I do think -- I do believe that the

3   plaintiff has a high likelihood of succeeding on the

4   matters, erm, a high probability of prevailing, erm,

5   on the merits.

6              Uh, there's no question that the

7   defendant is an employee of -- of the plaintiff and

8   that he owes -- he owes a duty of loyalty to the

9   plaintiff, as well.

10             And, erm, at -- at this point has

11  refused to, you know, he says that he had issues.  He

12  denies that he refused, but at this point, erm, and

13  the Court -- and this isn't -- this isn't a finding

14  on the merits, that would have to await, uh, a -- a

15  trial on the merits of the case, and that would be up

16  to a judge -- a jury down the line to decide if there

17  was any liability.

18             But I do think that there's a high

19  likelihood, or there is a likelihood of the plaintiff

20  prevailing on the merits.

21             I do, erm, also agree with the plaintiff

22  that, uh, not having access to, erm, to its IT

23  system, including Microsoft 365, and to it's GoDaddy

24  account and whatnot, erm, and actually it being, I

25  would say that it being in the hands of an employee

```
 1   who has, erm, at least shown some signs of being

 2   uncooperative, erm, that Ohana, erm, is at risk and,

 3   erm, and is suffering and will continue to suffer

 4   immediate and irreparable harm, unless the injunctive

 5   relief is granted.

 6              And, uh, in terms of the balance of

 7   convenience, erm, the, uh, here the, uh, the risk and

 8   -- and the harm is entirely on the plaintiff.

 9              I really don't -- I haven't -- I really

10   can't, erm, I have not heard, let me put it that way,

11   and I can't really think on my own of -- of any

12   reason why the defendant, you know, what harm would

13   come of the defendant in complying, erm, with the

14   requested injunctive relief, and, in fact, he's

15   conceded today that, uh, if -- if modified so that he

16   was directed to, erm, provide -- provide access to

17   the witness, that this witness does have the proper

18   certifications, qualifications.  That it -- not --

19   not that I necessarily agree that he would be, that

20   the defendant would be at risk anyway, but he -- he

21   concedes that providing the access to this

22   individual, Mr. Romes, erm, would alleviate that

23   concern.

24              Erm, and, erm, although public interest

25   is not a huge factor in the case, the Court does
```

1   believe that it serves the public interest in

2   granting the relief.  And, again, uh, the Court does

3   find that the plaintiff will suffer irreparable

4   injury, if not.

5                  The only questions I have in terms of

6   modifying the TRO, do we want to, erm, do you want to

7   be anymore specific in terms of the affirmative

8   relief you're seeking to ask him, you know, following

9   whatever this witness says is necessary to require

10  him, erm, to do that?

11                 And then, as far as the -- and then,

12  we'll have -- we'll have to come back and kind of tie

13  the bow on the contempt as to how much time I'm going

14  to give the, uh, defendant to comply with the order.

15                 MR. BRENNEN:  Yeah, I -- I think, erm,

16  we could very quickly revise the order to -- to work

17  in the, first of all, change the addresses to -- to,

18  erm, Mr. Romes's addresses.  Erm, and, uh, to add the

19  specific points with respect to the -- although

20  create a creator account and give it the rights are

21  already in the order, erm, the only thing is missing

22  is the token piece, I think.

23                 Erm, so, but we will make sure that --

24  that the order --

25                 THE COURT:  Okay.  Well, why don't you

```
 1    -- why don't you word it precisely that makes it
 2    clear, so there's no ambiguity to the defendant as to
 3    what he has to do, erm, don't -- don't go beyond kind
 4    of what's been discussed in court today.
 5                I'm not going to impose additional
 6    requirements where we haven't -- I haven't heard
 7    testimony on or don't understand.
 8                Yes, sir?
 9                MR. DILLON-CAPPS:  Can I suggest the
10    actual task?  So I --
11                THE COURT:  You can.  I mean, you know,
12    I'll hear what the witness has to say, I may or may
13    not follow it, but go ahead, let's hear it.
14                MR. DILLON-CAPPS:  I -- I --
15                THE COURT:  And, sir, I'm not trying to
16    be difficult.  I'm trying to -- you know, what you've
17    told me is that this is causing you -- that -- that
18    you suffer from PTSD and memory issues, and I'm
19    guessing that being in court and having a judge
20    lecture to you probably doesn't help the PTSD.
21                And I'm not trying to exacerbate any
22    condition.  I'm trying to get to the bottom here,
23    particularly now that you've conceded the expertise
24    of this witness.
25                MR. DILLON-CAPPS:  Mm-hmm.
```

```
 1                    THE COURT:  And this is a very easily
 2      solvable situation.
 3                    MR. DILLON-CAPPS:  Mm-hmm.
 4                    THE COURT:  Erm, it can't go on forever.
 5      You're putting this company, erm, you know, at a
 6      minimum you're inconveniencing them, and at worse
 7      you're putting them at -- at risk of the very
 8      protections, which you claim that -- as to why you've
 9      kind of protested and stood in the way of doing this.
10                    And so I want this resolved sooner than
11      later, and I have to bring, you know, I have to think
12      about or I'm opening -- opened to listening about
13      whether we're going to come back tomorrow and have a
14      hearing to see where we stand or not, because I don't
15      want this, you know, you know, hanging out there for
16      a long time.  And that's not only for the benefit of
17      the plaintiff, but also to give you proper guidance
18      as to how to comply.
19                    I don't want to hold you in contempt.  I
20      want compli -- all I want is compliance with the
21      Court order here.  And I want, this, you know, again,
22      particularly given you're conceding that this
23      witness, erm, you know that there's not a concern in
24      giving it to him.  I want this resolved, you know, I
25      think that's quite clear.
```

```
 1              MR. DILLON-CAPPS:  I want to make it
 2   very clear, your ruling is brought us a lot of relief
 3   in tremendous amounts.
 4              Erm, I will -- he gives me his e-mail
 5   and I will coordinate with him promptly, and as fast
 6   as possible to give him everything he needs.  I'm not
 7   kidding.
 8              THE COURT:  All right.  Well, I'm going
 9   to want a status on this.
10              I'll tell you what, I'll accept your --
11   I'll accept your proffer to representations of good
12   faith.
13              MR. DILLON-CAPPS:  Mm-hmm.
14              THE COURT:  And I'm going to hold, I'm
15   not going to rule against or for it right now, but
16   I'm going to hold the contempt in sub curia, but, uh,
17   we're going to come back for a status conference, and
18   if you're not cooperating then I'm going to rule on
19   the contempt.
20              MR. DILLON-CAPPS:  Mm-hmm.
21              THE COURT:  And provide specific, erm,
22   orders as to what you need to do and the timeframe
23   for doing it.  And if you don't do it there's likely
24   to be a substantial monetary fine to give you some
25   incentive to purge the contempt.
```

```
 1              MR. DILLON-CAPPS:  I reiterate, I've
 2   been trying to get rid of this thing for a long time.
 3              THE COURT:  Okay.  Well then, let's do
 4   it.
 5              MR. DILLON-CAPPS:  I will absolutely
 6   coordinate, you will -- can I cc your, uh, who, I
 7   forgot the name of the person, but the -- your --
 8   your staff member, can I cc that person while
 9   e-mailing this gentleman?
10              THE COURT:  If you'd like to you can cc
11   my law clerk at the same time you cc'ing counsel and
12   the witness.
13              MR. DILLON-CAPPS:  Absolutely, yep.
14              THE COURT:  When are we coming back
15   to -- on a status?
16              MR. DILLON-CAPPS:  I -- you will see an
17   update in the next like, what time is it now?  By
18   noon tomorrow you will have a timeline that says how
19   long it will take, and it will stick to that time.
20   If you disagree, you can just tell me anything that's
21   reasonable.
22              THE COURT:  All right.  Counsel, I don't
23   think I need witnesses here, but when can you come
24   back for a status conference?
25              MR. BRENNEN:  I'm at the Court's
```

1    disposal.

2              THE COURT:  1 o'clock tomorrow?

3              MR. BRENNEN:  1 o'clock tomorrow.

4              MR. DILLON-CAPPS:  I -- I need time to

5    -- I will e-mail at noon where (unintelligible) I

6    promise you.

7              THE COURT:  Noon today?

8              MR. DILLON-CAPPS:  No, noon tomorrow, I

9    will have an answer of how long it's going to take me

10   to get it.

11             THE COURT:  No, you don't need to --

12             MR. DILLON-CAPPS:  I don't think it will

13   take --

14             THE COURT:  -- that much time.  I mean,

15   I don't know how much time you need for an answer,

16   but it doesn't take -- I don't want to wait until

17   noon tomorrow, and then have a hearing at 1 o'clock.

18             MR. DILLON-CAPPS:  I'm telling you what

19   I can guarantee.  I'm going to go as fast as I can.

20   It might be today, it might be Monday, I don't

21   know -- I will know by noon tomorrow.

22             THE COURT:  Regardless, we're coming

23   back at 1 o'clock tomorrow so you can report specific

24   -- your specific progress.

25             MR. DILLON-CAPPS:  Okay.

```
 1                    THE COURT:  And we can have, if we need,
 2      erm, the witness available maybe he can be available
 3      by Zoom or telephone.  I know you have witnesses and
 4      people here, I don't think it's necessary for them to
 5      come back --
 6                    MR. BRENNEN:  Understood.
 7                    THE COURT:  -- for it.
 8                    And I'll sign the -- if you -- if you
 9      send me the preliminary injunction hearing as
10      modified -- uh, order, if it looks acceptable to me I
11      will -- I will apply my own eyes to it and -- and,
12      uh, copy the defendant on it as well, but I'm -- I'm
13      likely to sign it today, assuming it comports with
14      what we've discussed.
15                    MR. DILLON-CAPPS:  The only thing I ask,
16      your Honor, is that I am able to e-mail him at least
17      one time because in his --
18                    THE COURT:  You can e-mail him more than
19      once, I don't care, just get it done.
20                    MR. DILLON-CAPPS:  I will -- in his
21      affidavit he actually doesn't know any information,
22      he never saw the analysis that were provided to the
23      -- the anyone (unintelligible).
24                    THE COURT:  Okay.  Well, you might be
25      making this more complicated than --
```

1              MR. DILLON-CAPPS:  No, no, no.

2              THE COURT:  -- it has to be.

3              MR. DILLON-CAPPS:  I just want to

4    provide him with the analysis because he --

5              THE COURT:  I don't think he needs the

6    analysis.

7              MR. DILLON-CAPPS:  -- deserves the right

8    to know.

9              THE COURT:  He told you what he needs.

10   Just provide him what he needs.

11             MR. DILLON-CAPPS:  Ask -- ask him if he

12   needs that.

13             THE COURT:  Analysis of what?

14             MR. DILLON-CAPPS:  Ask him if he

15   needs -- in order to make a judgment as to

16   compliance, and if it does comply.

17             THE COURT:  No.

18             MR. BRENNEN:  We're not --

19             THE COURT:  We're not going there.

20             MR. BRENNEN:  We're not going there.

21             MR. DILLON-CAPPS:  I'm just saying that

22   is --

23             THE COURT:  It's not up to you to

24   challenge what, it's -- you know, you've already

25   conceded he's an expert, I'll accept his expertise.

1          MR. DILLON-CAPPS:  I can see that.  He

2     needs to be given information to be an expert though.

3          THE COURT:  You know, you're going

4     backwards on me here.  I thought we had -- I thought

5     we were going in the right direction, but --

6          MR. DILLON-CAPPS:  I'll -- let -- he --

7     you ask him if he needs information to know if it's

8     PCI compliance?

9          THE COURT:  Do you need information?

10          THE WITNESS:  This isn't about PCI

11     compliance.  We just need the credentials.

12          THE COURT:  Okay.

13          MR. DILLON-CAPPS:  That -- that makes me

14     worried 'cause --

15          THE COURT:  All right, sir, are you

16     going to agree to do it or not 'cause otherwise, I'm

17     -- I'll just proceed with the contempt now.

18          MR. DILLON-CAPPS:  I'll meet you

19     tomorrow at 1.  I -- I -- I can't say what I'm not

20     going to do until I know how long its going to take.

21          THE COURT:  All right.  We'll come back

22     at 1 o'clock tomorrow, but be prepared to report

23     fully on the status of things.

24          MR. DILLON-CAPPS:  I will.

25          THE COURT:  And if you're not in

1    compliance then you're going to be facing contempt.

2                    MR. DILLON-CAPPS:  I -- I appreciate

3    that, uh, and thank you for your time.  I mean, I

4    wish there was things I could do right now

5    (unintelligible) I just --

6                    MR. BRENNEN:  Your Honor, I -- I'd like

7    to have Mr. Romes has had an opportunity to address

8    the Court on -- on how logistically that works with

9    him.

10                    THE COURT:  Okay.  Tell me how.

11                    THE WITNESS:  We -- we can either have

12    an account set up, given the right permissions, get

13    the -- get the, uh, multifactor key or, erm, the

14    defendant could just give us his credentials.

15                    MR. DILLON-CAPPS:  I don't have my

16    credentials.

17                    THE WITNESS:  As far as -- as far as I

18    know he hasn't been --

19                    THE COURT:  How could you not --

20                    THE WITNESS:  -- logically locked out of

21    the system.  He says he's not accessing it --

22                    THE COURT:  Mm-hmm.

23                    THE WITNESS:  -- which means he's

24    choosing not to, but he still has --

25                    THE COURT:  So if you just -- and these

1    are his credentials for this system and this company?

2                    THE WITNESS:  His -- his credentials

3    probably have the global admin rights.

4                    MR. DILLON-CAPPS:  They still do, but my

5    key doesn't exist anymore.

6                    THE WITNESS:  So your key doesn't --

7    then -- then that doesn't -- then it doesn't work.

8    If his key doesn't work, the multifactor doesn't

9    work.

10                    THE COURT:  Okay.  So that doesn't work.

11                    THE WITNESS:  Never mind.

12                    THE COURT:  Okay.

13                    THE WITNESS:  Sorry I brought it up.

14                    THE COURT:  The key, again, is that --

15    is that -- is that a key fob type, is that a physical

16    object that's a multifactor -- what -- what is the

17    key in this context?

18                    THE WITNESS:  It -- it -- it could

19    either, you know, you think of the old RSA ones that

20    have a digit, it might be literally a physical key

21    you plug in and -- and it does it without any

22    numbers.

23                    THE COURT:  Where is that key?

24                    MR. DILLON-CAPPS:  Mine is gone.

25                    THE COURT:  Well, where is it?

 1                    MR. DILLON-CAPPS:  The only systems that

 2     -- I can't log into an administrative system without

 3     it.

 4                    THE COURT:  Where -- where is --

 5                    MR. DILLON-CAPPS:  I got rid of it.

 6                    THE COURT:  When?

 7                    MR. DILLON-CAPPS:  When I was told to.

 8                    THE COURT:  Okay.  And what does "get

 9     rid" of it mean?

10                    MR. DILLON-CAPPS:  I mean, I --

11                    THE COURT:  Like you threw it in the

12     trash?

13                    MR. DILLON-CAPPS:  Yes.

14                    THE COURT:  Is that a safe thing to do?

15                    MR. DILLON-CAPPS:  I mean, it just -- I

16     got rid of it because I was told to remove my ability

17     to have access, so I did.

18                    THE COURT:  What did you do with it,

19     tell -- tell me specifically what did with it.

20                    MR. DILLON-CAPPS:  I don't know.  I got

21     rid of it.  It's not where it was.

22                    THE COURT:  All right.  We're going to

23     come back at 1 o'clock tomorrow.  I -- I suggest that

24     you think long and hard about -- about all this.

25                    Erm, the Court's going to, uh, enter the

1    preliminary injunction, I'm sorry, yeah, I'm going to

2    enter the preliminary injunction order after I've had

3    a chance to review it, make sure it's in proper order

4    and form.

5            It would be based upon the testimony and

6    arguments that I've heard today, and the findings and

7    the Court has made.

8            Erm, you know, as I'm -- I'm going to

9    hold sub curia until tomorrow at 1 o'clock, erm, the,

10   uh, the contempt, erm, but I'm going to, you know,

11   I'm hoping that there'll be some progress.

12           You know, it doesn't seem to me, erm,

13   that there's any, at this point, legitimate reason to

14   withhold, given you're conceding that this -- that

15   this witness, erm, has the -- is credentialed, erm,

16   and has whatever, I don't know if certifications is

17   the right term or not but, erm, is credentialed

18   enough to and trusted enough to, uh, been given the

19   information.

20           And -- and so I don't -- I don't see any

21   legitimate purpose in you refusing at this point to

22   comply with the Court order.

23           Again, to the extent that you claim that

24   there's any family, FMLA issues, those are separate,

25   as far as the Court's concerned.  To the extent that

1    you have any remedies, the Court is certainly making

2    no ruling on those, that would be up to you to pursue

3    that as a separate matter, okay, that's not a defense

4    to this case.  So, that's where I am.

5              We're going to come back to this -- we

6    are free here tomorrow, aren't we, Rachel, do we

7    have, 1, do you have anything scheduled?

8              Even if we are, we're going to come back

9    here to the courtroom, Courtroom 8 here, 1 o'clock

10   tomorrow, okay?

11             MR. DILLON-CAPPS:  Mm-hmm.

12             THE COURT:  And, uh, if we need a

13   witness or anyone available we can arrange, uh, can

14   put the witness up by Zoom on that television.  I

15   don't want to hold any -- are you from out of town?

16             THE WITNESS:  I am.

17             THE COURT:  Okay.

18             THE WITNESS:  I -- I might be able to

19   arrange to stay.

20             THE COURT:  Okay.  That's -- that's

21   between you and --

22             THE WITNESS:  We'll -- we'll work it

23   out.

24             THE COURT:  -- your counsel or the --

25   the plaintiff's counsel, I should say, not your

101

```
 1   counsel.
 2            Any -- All right.  Did I cut him off?
 3   Did he finish saying what he needed to say?
 4            MR. BRENNEN:  I think he did.
 5            THE WITNESS:  We're good.
 6            THE COURT:  All right.  Why don't you
 7   tell us one more time just so we have a very clear
 8   record of what -- what is it that you need the
 9   defendant to do.
10            THE WITNESS:  We need --
11            THE COURT:  We ruled out the issue,
12   assuming that he's disposed of his key, that's --
13            THE WITNESS:  I'm not going to specify
14   the names of people in case I get them wrong.  We
15   need an account set up.  We need a password for it,
16   that account needs to be given global admin rights,
17   and we need whatever is required for the multifactor
18   authentication so we can get in it and administer the
19   system.
20            THE COURT:  Okay.  Can you please
21   include that in an order?
22            MR. BRENNEN:  Sure.
23            MR. DILLON-CAPPS:  Strong factor.
24            THE COURT:  All right.  All right.
25   Anything else?
```

1          MR. DILLON-CAPPS:  Just make sure it's a

2    strong factor.

3          MR. BRENNEN:  A strong password?

4          MR. DILLON-CAPPS:  Strong factor.

5          MR. BRENNEN:  Factor?

6          MR. DILLON-CAPPS:  Yeah.

7          MR. BRENNEN:  Okay.

8          THE COURT:  All right.  See you tomorrow

9    at 1 o'clock.

10         (Whereupon, the proceedings concluded at

11   10:52:47 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3            I, Linda Lindsey, CSR do hereby certify

4    that I recorded stenographically from Digital Media

5    from Baltimore County the proceedings in the matter

6    of Ohana Growth Partners, LLC versus Ryan

7    Dillon-Capps, Case Number C-03-CV-224-002264, on June

8    26, 2024

9            I further certify that the aforegoing

10   pages numbers one through 102 constitute the official

11   transcript of proceedings as transcribed by me to the

12   within typewritten matter in a complete and accurate

13   manner.

14            In Witness Whereof, I have hereunto

15   subscribed my name this 30th day of June, 2024.

16

17   _____

                 Linda Lindsey, CSR

18

19

20

21

22

23

24

25