1

2                         IN THE CIRCUIT COURT
                    FOR BALTIMORE COUNTY, MARYLAND

3

OHANA GROWTH PARTNERS, LLC

4
                                        CASE NO.
5              VERSUS                    C-03-CV-24-002264

6    RYAN DILLON-CAPPS

7

8    _____ /    June 27, 2024

9
          REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS
10                    (Trial on the Merits)

11

          BEFORE THE HONORABLE MICHAEL S. BARRANCO
12                        ASSOCIATE JUDGE

13

APPEARANCES ON BEHALF OF THE PLAINTIFF:

14
                         ROBERT BRENNEN, ESQUIRE
15                       VICTORIA HOFFBERGER, ESQUIRE

16   ON BEHALF OF THE DEFENDANT:

17                       RYAN DILLON-CAPPS, ESQUIRE

18

19

20

21

22

23   Transcribed from Digital Media by:
     Linda Lindsey, CSR
24   401 Bosley Avenue, Room 403
     Towson, Maryland 21204
25   410-887-2636

I N D E X

WITNESSES                                                    PAGE

RYAN DILLON-CAPPS
        Examination by the Court                          6
        Direct Examination by Mr. Brennen                29

RANDALL J. ROMES
        Direct Examination by Mr. Brennen                44
        Cross Examination by Mr. Dillon-Capps            45

CAROLINE DILLION-CAPPS
        Direct Examination by Mr. Dillon-Capps           53
        Cross Examination by Mr. Brennen                 53


EXHIBITS                    MARKED              RECEIVED

Plaintiff's 1                  5
Plaintiff's 2                  5

```
 1                  P R O C E E D I N G S

 2                     *     *     *     *

 3          (WHEREUPON, proceedings began at 1:16 p.m.)

 4

 5          THE COURT:  All right.  Good afternoon,

 6   everyone.  The Court will call the case of Ohana

 7   Growth Partners, LLC versus Ryan Dillon-Capps,

 8   C-03-CV-24-002264.

 9          The Court conducted, uh, a hearing

10   yesterday, uh, that pertained to the, uh -- (noise in

11   courtroom) what was that?

12          You can -- you all can have a seat for a

13   second.

14          Erm, the Court conducted a hearing

15   yesterday, including taking testimony of the

16   defendant and hearing arguments, uh, from both sides

17   that pertained to the, uh, request for contempt that

18   had been pending, as well as the preliminary

19   injunction motion, and the Court, uh, following the

20   hearing entered an order granting the preliminary

21   injunction.

22          I see that there's a typo, actually, in

23   the, uh, at the top of the page where preliminary is

24   misspelled, but it's spelled properly in the body of

25   the order.
```

1              Erm, and as part of that order the

2    defendant was to expeditiously and without delay

3    comply with the requirements of the order, and to

4    fully comply with the terms of the order no later

5    than 1 p.m. today.

6              So, Mr. Brennen, I'll start with you,

7    what's the status of things?

8              First of all, identify yourself for the

9    record, I'm sorry --

10             MR. BRENNEN:  Yes, I'm sorry, your

11   Honor.

12             THE COURT:  -- forgot that.

13             MR. BRENNEN:  Robert Brennen, uh, here

14   with Victoria Hoffberger with Miles & Stockbridge on

15   behalf of Plaintiff Ohana Growth Partners, LLC.

16             THE COURT:  Okay.  And we have the

17   defendant here as well, Mr. Dillon-Capps.  Yes?

18             MR. DILLON-CAPPS:  Yes, your Honor.

19             THE COURT:  Okay.

20             MR. BRENNEN:  Uh, your Honor, the status

21   is, uh, we have Mr. Romes by (unintelligible) joining

22   us via Zoom from, I believe, in Florida.  And, uh, as

23   recently as, a text of a few seconds ago, he's not

24   received any e-mails from the defendant relative to

25   the instructions and the steps in the preliminary

```
 1   injunction order.

 2                 THE COURT:  Okay.

 3                 MR. BRENNEN:  Erm, so, as far as we can

 4   tell there's been no, uh, movement towards

 5   compliance.

 6                 Uh, I did want to, erm, submit to the

 7   Court as -- as your Honor knows, we submitted earlier

 8   today a, erm, proposed order of contempt --

 9                 THE COURT:  Yeah, I have it.

10                 MR. BRENNEN:  -- uh, barring any -- and

11   I reference a couple of e-mails in the order, uh,

12   that I'd like to submit to the Court which, uh,

13   reference, uh, Judge Truffer's judicial, uh,

14   assistant e-mailing the show cause order to, uh, the

15   defendant on last Friday, and then my subsequent

16   e-mail forwarding it to him, again.

17                 THE COURT:  All right.  Well, let's have

18   those marked as Exhibits 1 and 2 for today's hearing.

19                 (Plaintiff's Exhibits 1 and 2,

20                 were marked for identification

21                 purposes.)

22                 THE CLERK:  This will be 1.

23                 MR. BRENNEN:  With that, your Honor, I

24   think that every, uh, everything that I -- we put in

25   our proposed findings of fact in the contempt order
```

1   is now on the record before the Court.

2              THE COURT:  All right.  All right, let's

3   swear in Mr. Dillon-Capps, please.

4              THE CLERK:  Would you please raise your

5   right hand.

6                   RYAN DILLON-CAPPS,

7   first duly sworn to tell the truth, the whole truth,

8   and nothing but the truth, testified as follows:

9              THE WITNESS:  I do.

10             THE CLERK:  All right.  Thank you.  You

11  can have a seat.

12             THE COURT:  All right.

13             THE CLERK:  Just state and spell your

14  -- I'm sorry.

15             THE COURT:  Go ahead, I'm sorry, I cut

16  you off.  Go ahead.

17             THE CLERK:  I was going to ask that you

18  state and spell your name for the record.

19             THE WITNESS:  Uh, Ryan Dillon-Capps,

20  R-Y-A-N, D-I-L-L-O-N hyphen C-A-P-P-S.

21             THE CLERK:  Okay.

22             THE COURT:  All right.  Mr.

23  Dillon-Capps, you were here yesterday for all the

24  hearing, and it seemed that, erm, I thought that we

25  were on our way to getting this resolved.

1             And the Court then did enter a

2    preliminary injunction order that required you to do

3    some very specific, uh, things that the witness had

4    requested in order to get this resolved, and for you

5    to do so by 1 o'clock, erm, today.

6             And it's been represented to me that you

7    haven't complied with any part of my order yet.

8    What's -- what's going on?

9             MR. DILLON-CAPPS:  Uh, uh, erm, I do

10   remember looking for it.  I don't -- I don't have it.

11   I don't find it.  I -- I don't know where it's at

12   right now.

13            THE COURT:  Looking for what?

14            MR. DILLON-CAPPS:  I don't know where

15   any of them are at -- the key fobs.  I don't know

16   where they're at right now.

17            THE COURT:  All right.  Well, you

18   haven't done any -- but there were other things you

19   were supposed to do, you haven't done any of them.

20            MR. DILLON-CAPPS:  I actually don't

21   remember what the other things were, I'm sorry.

22            THE COURT:  You don't remember what the

23   other things were?

24            MR. DILLON-CAPPS:  No, I don't, can you

25   refresh my memory?

1          THE COURT:  Well, you were -- weren't

2    you e-mailed a copy of my preliminary injunction

3    order yesterday?

4          MR. DILLON-CAPPS:  I'm sure I was.  I

5    -- I -- I don't recall off my head, I mean.

6          THE COURT:  You don't recall?

7          MR. DILLON-CAPPS:  I know I read it.  I

8    remember seeing several e-mails go by, that's what I

9    remember.

10          THE COURT:  All right.  You haven't

11    complied with any part of my order.

12          MR. DILLON-CAPPS:  I'm sorry, I'm doing

13    the best I can.

14          THE COURT:  Well, what -- what have you

15    done?  Tell -- tell me one thing you've done to

16    comply with my order.

17          MR. DILLON-CAPPS:  Erm, looked

18    through --

19          THE COURT:  Did you contact Mr. Brennen

20    if you had any confusion about what to do?

21          MR. DILLON-CAPPS:  Erm, I did send an

22    e-mail to get a transcript to like have a reference

23    point of actually what was said, and what I -- I

24    needed to do.

25          THE COURT:  Okay.  Well, you sent that

1    to my chambers which was the wrong place to send it,

2    but we did forward that down to the Clerk's Office,

3    you have to contact them for a transcript.

4              But did you, uh, did you contact Mr.

5    Brennen asking him for clarification?

6              MR. DILLON-CAPPS:  I'm sorry, I don't

7    know the procedure.  I'm -- I'm doing the best I can.

8              THE COURT:  That's a yes or no question,

9    did you contact Mr. Brennen's office for any

10   clarification?

11             MR. DILLON-CAPPS:  I -- I don't think I

12   did.

13             THE COURT:  Okay.  Did you contact the

14   witness, uh --

15             MR. DILLON-CAPPS:  I don't believe I

16   have his contact -- I mean, I know -- I remember I

17   got the card, I can't find it.

18             THE COURT:  Okay.  You didn't contact,

19   and I know you didn't contact my chambers except to

20   request a transcript.

21             MR. DILLON-CAPPS:  I'm so sorry that was

22   the incorrect procedure.  I did say I didn't know,

23   and I was apologizing in advance, I just didn't know

24   what the process was 'cause I was I trying my best.

25             THE COURT:  All right.

```
 1                    MR. DILLON-CAPPS:  Is -- is it possible

 2    for me to file a motion of continuance?

 3                    THE COURT:  Well, I -- tell me why --

 4    I'm just going to give you uninterrupted time now,

 5    tell me why -- I'm -- I'm about to sign an order

 6    holding you in constructive contempt.

 7                    MR. DILLON-CAPPS:  Mm-hmm.

 8                    THE COURT:  And you're going to be fined

 9    $2500 for every 24 hour period after I sign this

10    order until you comply.

11                    MR. DILLON-CAPPS:  Mm-hmm.

12                    THE COURT:  With it.  Tell -- tell me

13    why I should not enter this order?

14                    MR. DILLON-CAPPS:  Erm --

15                    THE COURT:  And -- and that's where the

16    -- and this is also subject to change --

17                    MR. DILLON-CAPPS:  Mm-hmm.

18                    THE COURT:  -- as the -- the contempt

19    could, uh, the remedies or -- or what I'm doing and

20    what is requested could change.

21                    MR. DILLON-CAPPS:  Mm-hmm.

22                    THE COURT:  And penalize you, not

23    penalize you but, uh, in -- and you can purge it by

24    complying.

25                    But why -- why haven't you done any of
```

1   this, I don't understand.

2               MR. DILLON-CAPPS:  I did what look --

3               THE COURT:  You -- you had no trouble

4   understanding -- yesterday, the Court's observations,

5   so I have a clear record for this, is that you

6   were -- you seemed quite -- you did not seem

7   incompetent to me.  You seemed aware of what was

8   going on, this is my observations, the findings I'm

9   making.

10              You seemed capable of responding to my

11  questions and making arguments, and maybe not as good

12  as a lawyer would have, and you're not a lawyer, but

13  you -- you had no troubling understanding.

14              You don't have a hearing issue do you?

15              MR. DILLON-CAPPS:  No.  Erm --

16              THE COURT:  Okay.

17              MR. DILLON-CAPPS:  It's not --

18              THE COURT:  And --

19              MR. DILLON-CAPPS:  -- auditory.

20              THE COURT:  You -- okay.

21              MR. DILLON-CAPPS:  Erm --

22              THE COURT:  And you're here with your

23  wife.  You're wife heard everything.

24              MR. DILLON-CAPPS:  Mm-hmm.

25              THE COURT:  She knows what you have to

```
 1   do.  Did you ask her what you had to do?

 2              MR. DILLON-CAPPS:  Yes.  We need to talk

 3   about it.

 4              THE COURT:  Okay.  Well, what if -- why

 5   didn't you do one thing in compliance?  there were --

 6              MR. DILLON-CAPPS:  I -- I --

 7              THE COURT:  -- besides finding -- and

 8   also, by the way, you just told me that you looked

 9   for the key fob and couldn't find it, so you

10   understood that.

11              MR. DILLON-CAPPS:  Mm-hmm.

12              THE COURT:  Yes?

13              MR. DILLON-CAPPS:  Yes.  I did --

14              THE COURT:  You understood that, but you

15   didn't understand that you had to send, uh, that

16   there were other things you were supposed to do in so

17   far as sending e-mails to --

18              MR. DILLON-CAPPS:  I did not.

19              THE COURT:  -- the witness?

20              MR. DILLON-CAPPS:  I did not.

21              THE COURT:  You didn't understand that?

22              MR. DILLON-CAPPS:  No.  I --

23              THE COURT:  Okay.  Do you have any

24   doctor's report that says you're incapable of

25   understanding things?
```

```
 1              MR. DILLON-CAPPS:  Erm, in not so many

 2   words, yes.

 3              THE COURT:  Do you have it with you now?

 4              MR. DILLON-CAPPS:  No, but I can have it

 5   e-mailed to you, it's on record --

 6              THE COURT:  Okay.

 7              MR. DILLON-CAPPS:  -- with my employer.

 8              THE COURT:  All right.  I'm -- I'm just

 9   going to give you a couple of minutes.  Tell me why,

10   I'm going to -- I'm -- I'm telling you, based on the

11   record right now, erm, I'm not hearing any good

12   reason why you haven't complied with the order or, at

13   least, made any attempt to comply with part of it.

14              So, uh, make -- make your record, but

15   I'm going to --

16              MR. DILLON-CAPPS:  Mm-hmm.

17              THE COURT:  -- you know, unless I hear

18   something much greater than what I'm hearing from you

19   right now, I'm going to enter the order, and the

20   fines will start accruing at $2500 per day.

21              MR. DILLON-CAPPS:  I understand.  Erm,

22   it's not --

23              THE COURT:  I don't think you do.  I

24   mean, I think you do, I think you just don't want to,

25   you know, you -- I -- I think, uh, you say you
```

1  understand, but then you come, the next time you're

2  here you'll say you didn't understand.

3            And I think you do understand, but I

4  think you selectively don't want to understand.

5            MR. DILLON-CAPPS:  It's -- it's not a

6  choice.

7            THE COURT:  That's -- that's my

8  observation of what's happening here --

9            MR. DILLON-CAPPS:  I understand you --

10            THE COURT:  -- based on your demeanor

11  and your testimony.  And absent any medical, and I'm

12  not trying to be mean, but I'm just, you know.

13            MR. DILLON-CAPPS:  I think I can fight

14  it, right.  I mean, I have a therapist I meet twice a

15  week.  I can --

16            THE COURT:  Okay.  That --

17            MR. DILLON-CAPPS:  -- provide a

18  (unintelligible, speaking over each other).

19            THE COURT:  Okay.

20            MR. DILLON-CAPPS:  My -- my wife is a

21  therapist as well, she can attest to like --

22            THE COURT:  Do I need to -- do I need to

23  order her to do these things for you?  Am I'm going

24  to bring her into this, I don't think you want that.

25            MR. DILLON-CAPPS:  She cannot remember

```
 1    what I don't remember.  Erm --
 2                 THE COURT:  All right.
 3                 MR. DILLON-CAPPS:  -- but --
 4                 THE COURT:  All right.  Go ahead.  Tell
 5    me -- tell what you want to, and otherwise I'm going
 6    to sign the order.
 7                 MR. DILLON-CAPPS:  Sure.  Erm, so
 8    there's, uh, I want to have a motion for, erm,
 9    continuance because --
10                 THE COURT:  Denied.
11                 MR. DILLON-CAPPS:  -- the -- my
12    exasperation (phonetic) of like since the -- since
13    the, erm, suspension, erm, have rendered me, erm, uh,
14    it's impacted my cog -- cognition and -- and
15    emotional fluctuations from time to time, erm, I have
16    periods where --
17                 THE COURT:  From time to time, what does
18    that mean?
19                 MR. DILLON-CAPPS:  So I have periods of
20    dissociative (unintelligible) and catatonic behavior.
21    Erm, they, the -- the type of situation is -- is
22    discussed in the Psychiatric Times highlights, erm,
23    and a citation of reexperiencing hyper
24    (unintelligible) and dissociative states and PTSD.
25                 Psychiatrist Times 2005 it says "stress
```

```
 1   can lead to dissociative states characterized by

 2   abnormal brain activity (unintelligible) in areas

 3   responsible for emotional regulation, suggesting the

 4   need for accommodation to manage stress levels

 5   effectively".

 6               And other case --

 7               THE COURT:  Okay.  Tell me -- tell me

 8   what accommodation you needed to comply with

 9   yesterday's court order, make your record.

10               What accommodation did you need to

11   comply with some very simple steps here?

12               MR. DILLON-CAPPS:  I don't -- I don't

13   know, right.  I -- I -- I'm doing --

14               THE COURT:  Tell me a single

15   accommodation you needed to comply with my order

16   yesterday.

17               MR. DILLON-CAPPS:  Erm, I don't -- I

18   can't answer that right now.  I don't -- my brain is

19   not working right now very well.

20               I'm -- I'm doing -- I'm reading

21   (phonetic) 'cause I'm doing the best I can.  I had a

22   service dog for six years that I couldn't even go

23   outside without.

24               I'm not like faking it or pretending.

25   This is not a new thing.  I --
```

```
 1              THE COURT:  Well, I believe you have

 2   issues, but I -- I also -- I don't find you credible

 3   that you don't want to comply with this order.  I do

 4   find that you have issues, I can see that, and I

 5   think that by noncompliance --

 6              MR. DILLON-CAPPS:  No.

 7              THE COURT:  -- with the -- with the

 8   order, that shows that there's something, and I don't

 9   -- I'm not, you know, I don't have a mental health

10   professional here on your behalf to speak as to

11   exactly what's going on, but I -- but my finding is

12   that based on your demeanor yesterday and your

13   ability to understand what was going on, and your

14   lack of any explanation to the Court as to why you

15   haven't, apparently, lifted a finger, that I can tell

16   of, including, you know, seeking the help of your

17   wife or anyone else to help you, or contacting anyone

18   to -- to comply with the order, it just doesn't make

19   any sense to me.

20              And I -- tell me what it's going to take

21   for you to comply with this order.

22              MR. DILLON-CAPPS:  May -- may I -- may I

23   finish my explanation of my --

24              THE COURT:  Tell me what it's going to

25   take to get you to comply with this order.
```

```
1                MR. DILLON-CAPPS:  Erm, I -- I --

2                THE COURT:  Did you -- did you call --

3     did you call -- who's your -- did you call your

4     mental health professional to get help?

5                MR. DILLON-CAPPS:  I met with my mental

6     health professional at noon yesterday, yes.

7                THE COURT:  Okay.  And -- I -- I don't

8     want you to -- and -- and did you discuss that you

9     that you might need some assistance to comply with

10    the order?

11               MR. DILLON-CAPPS:  Erm, we did talk

12    about how difficult that this has been.  She's aware

13    of my condition and aware of the challenges that I

14    have.

15               THE COURT:  Yeah.  But you're not

16    answering my question.  Did you discuss how, that you

17    -- that you were under the order of a court to do

18    something and that you might need some support to

19    get, uh, to comply with the order?  That you might

20    need someone to hold you hand to get it done

21    yesterday or today?

22               MR. DILLON-CAPPS:  I -- I'm basically

23    asking for that in my petition.

24               THE COURT:  In what petition?

25               MR. DILLON-CAPPS:  My -- I -- I -- I
```

```
 1   don't have representation and I am not capable of
 2   representing myself effectively.  I'm not even able
 3   to --
 4               THE COURT:  Okay.  Well --
 5               MR. DILLON-CAPPS:  -- to cognitively
 6   explain to you how --
 7               THE COURT:  Do you own a laptop?
 8               MR. DILLON-CAPPS:  -- the very --
 9               THE COURT:  Do you own a laptop?
10               MR. DILLON-CAPPS:  Uh, I -- I don't --
11   yeah, I had one.
12               THE COURT:  Yeah.  Did you bring it with
13   you today?
14               MR. DILLON-CAPPS:  Of course not, no.
15               THE COURT:  Okay.
16               MR. DILLON-CAPPS:  I don't know -- I --
17   I think I know where one's at, but like I don't
18   remember if it's on my desk or not.
19               I'm not --
20               THE COURT:  Did you bring -- did you
21   bring an iPhone or a smart phone that you can e-mail?
22               MR. DILLON-CAPPS:  E-mail who, sir?
23               THE COURT:  The gentleman who's on the
24   screen, Mr. Romes.
25               MR. DILLON-CAPPS:  What would you --
```

1   what do you want me to e-mail -- e-mail him?

2              THE COURT:  All right.  All right.  Tell

3   me -- tell me what else -- I'm going to give you a

4   couple of minutes, and then -- then I'm going to hear

5   from Mr. Brennen, and then I'm going to rule.

6              MR. DILLON-CAPPS:  Okay.  I, erm, I --

7   so, erm, what was that.  Erm, erm, oh, erm, I've not

8   slept for two days.  Erm, and erm, sleep deprivation

9   can lead to severe cognitive deficits, social

10  (unintelligible) and impaired judgment.

11             I cite American Psychological

12  Association.

13             THE COURT:  Okay.

14             MR. DILLON-CAPPS:  Uh, sleep, uh,

15  deprive can lead to severe cognitive deficits,

16  emotional instability and impaired judgment, all of

17  which are critical for my ability to engage in the

18  legal process.

19             During bereavement of the previous,

20  attorney as I mentioned I think yesterday, erm, I

21  definitely mentioned it in e-mails, uh, leaving me

22  without legal counsel at a critical junction.

23             And, erm, I -- I need the -- the -- the

24  attorney to help me because I can't manage long

25  enough to be lucid and think straight to like

1    articulate.  I loop, and I -- I, literally, sorry,

2    I'm going to start talking.

3                THE COURT:  What efforts did you make to

4    retain an attorney between yesterday and today?

5                MR. DILLON-CAPPS:  Erm, oh, oh, I -- I

6    -- I e-mailed a person who got referred to me, erm,

7    who, while not in-state, they were going to help me

8    to, erm --

9                THE COURT:  Not in -- they're not a

10   licensed attorney in the state?

11               MR. DILLON-CAPPS:  No, but they were

12   going to help me to, erm, uh, figure out like how I

13   can get assistance.

14               THE COURT:  Okay.  Tell -- tell me how I

15   can help you comply with this order now?

16               MR. DILLON-CAPPS:  I don't think it's

17   physically possible.

18               THE COURT:  Because?

19               MR. DILLON-CAPPS:  I can't be -- you're

20   asking a person who has no legs to run.

21               THE COURT:  All right.  How did you know

22   to be here in court today?

23               MR. DILLON-CAPPS:  Because of notes

24   and -- and markings, and I wrote it down.  And I'm

25   doing the best I can.

1          THE COURT:  How -- did you -- how did

2    you get here?

3          MR. DILLON-CAPPS:  My wife drove me.

4          THE COURT:  You sought the assistance of

5    your wife?

6          MR. DILLON-CAPPS:  Yes.

7          THE COURT:  But you didn't seek her

8    assistance to help you comply with the order?

9          MR. DILLON-CAPPS:  No, no, we -- we tore

10   up my office and we looked, and we -- we cleaned up

11   and we looked through stuff, and it was like --

12         THE COURT:  Yeah, that was one thing to

13   find the key fob, what about the other things?

14         MR. DILLON-CAPPS:  I didn't remember

15   them.  I -- I would have done, I mean --

16         THE COURT:  Well, your wife was here in

17   court --

18         MR. DILLON-CAPPS:  I mean, I e-mailed to

19   try to get the transcript.  I literally e-mailed

20   trying to get the record so I knew what to do.  I was

21   making a good faith effort.

22         THE COURT:  Did you -- did you ask your

23   wife what she remembered about the hearing?

24         MR. DILLON-CAPPS:  I did not.

25         THE COURT:  You did not?

```
 1                MR. DILLON-CAPPS:  I -- I --

 2                THE COURT:  She was here, you knew she

 3  was here.

 4                MR. DILLON-CAPPS:  Cognitive judgment

 5  problems.  I -- I -- I'm sure it would be highly

 6  reasonable to ask that question and reasonable to

 7  expect that.  You're asking me to do something that's

 8  not reasonable in my state.

 9                THE COURT:  Well, I didn't, erm, that

10  wasn't my observation yesterday.

11                MR. DILLON-CAPPS:  It's -- it's not --

12  even in my -- even in my --

13                THE COURT:  And, frankly, that's not my

14  observation today.

15                MR. DILLON-CAPPS:  -- notes.

16                THE COURT:  I -- I don't find it

17  credible.

18                MR. DILLON-CAPPS:  I --

19                THE COURT:  I -- I find it credible that

20  you have an issue, but I don't find it credible that

21  you can't comply with the order.

22                MR. DILLON-CAPPS:  How can I -- hum, I

23  don't understand how I can possibly do that when I

24  don't have the ability to do that, like physically,

25  technically, logically I don't possess the materials.
```

1                THE COURT:  What physically -- can --

2   your fingers can move to type on a keyboard?

3                MR. DILLON-CAPPS:  They --

4                THE COURT:  I'm not trying to be, you

5   know --

6                MR. DILLON-CAPPS:  Well, it's a --

7                THE COURT:  -- funny here, but --

8                MR. DILLON-CAPPS:  I'm not -- if it was

9   simply typing, yeah, I can type, but I need a

10  physical object I don't have.

11               THE COURT:  That -- all right.  That was

12  one of -- there were -- you were ordered to create an

13  account in Ohana's Microsoft 365 tenant.

14               MR. DILLON-CAPPS:  I need the key to log

15  in to do that.

16               THE COURT:  You need -- you need the key

17  fob to log in to do that?

18               MR. DILLON-CAPPS:  Yes.

19               THE COURT:  Okay.  All right.  Tell me

20  what efforts, so do -- is there any -- Mr. Brennen,

21  is there anything that he needed to do that didn't

22  require the key fob?

23               MR. DILLON-CAPPS:  No.

24               MR. BRENNEN:  Your Honor, uh, he was

25  directed to, erm, provide the root level

1  administrator account password for the Ohana GoDaddy

2  account, uh, which is unrelated to the key fob issue.

3              MR. DILLON-CAPPS:  The key fob's tied to

4  that, too.

5              MR. BRENNEN:  That -- my understanding

6  from the testimony yesterday there was some list or

7  -- or some written list of passwords somewhere that,

8  erm --

9              THE COURT:  All right.

10             MR. BRENNEN:  -- needed to be located.

11 I don't recall there being any connection with the

12 key fob.

13             MR. DILLON-CAPPS:  I -- I don't --

14 (unintelligible) --

15             THE COURT:  All right.  Tell me, you're

16 under a -- tell me what you did to look for the key

17 pob -- key fob.  Tell me everybody you did to look

18 for the look for the key fob.

19             MR. DILLON-CAPPS:  There's no password

20 list.

21             THE COURT:  Tell me what you did to look

22 for the key fob.

23             MR. DILLON-CAPPS:  We looked through

24 everywhere that I would possibly put it.

25             THE COURT:  Which is where?  Tell me

1    every -- tell me under oath everywhere you looked.

2              MR. DILLON-CAPPS:  Erm, all through my

3    office and the closet of the office.  Erm, my wife

4    looked downstairs in a -- in the other areas.  And

5    like I went through stuff -- the other areas, but

6    like the basement and the -- the service, erm, erm,

7    the unfinished part of the basement, I don't know

8    what it's called.

9              Erm, but we looked --

10             THE COURT:  You wouldn't just randomly

11   put the key fob in some part of your house.

12             MR. DILLON-CAPPS:  No.

13             THE COURT:  Where did you keep it?

14             MR. DILLON-CAPPS:  I -- it's not where I

15   would keep it.  It's not where I would --

16             THE COURT:  All right.  Where would you

17   have kept -- where did you keep it before you had,

18   uh, these alleged issues that you have?

19             MR. DILLON-CAPPS:  It's not select

20   issues.  I was ordered to remove my ability to access

21   the system and I did that.

22             THE COURT:  What do you mean "you did

23   that"?

24             MR. DILLON-CAPPS:  The -- the, erm, the

25   letter or e-mail, one of things that I was told to do

1   is, in there, was to literally like, uh, make it so

2   that I'm not able to do like -- like remove my

3   ability to do this, essentially is how I read it, and

4   I did that.  I complied with their request.

5              THE COURT:  Well, you told me yesterday

6   you mailed -- you told me yesterday you may have

7   mailed the key fob, but you didn't seem sure about

8   that.

9              MR. DILLON-CAPPS:  I do --

10             THE COURT:  What did you do?

11             MR. DILLON-CAPPS:  I don't remember.  I

12  -- I -- here's what I know, okay.

13             I have these, erm, slips of -- of like,

14  uh, thinking right, that have like, I -- I believe

15  that because I bought them with the intention of --

16  of providing, erm, Ms. Butler from Miles &

17  Stockbridge, uh, a hard drive, so I bought like, you

18  know, certain -- like things to protect electronics,

19  things like that, and since I have torn

20  (unintelligible) I assume that I did something with

21  them to do this --

22             THE COURT:  Okay.

23             MR. DILLION-CAPPS:  -- because that's

24  the correlation, because there's one missing and one

25  extra.  Now, it's -- that's -- that's my logic of --

```
 1   of reasoning.

 2                THE COURT:  All right.  All right.

 3   Anything else you want to tell me before I sign this

 4   order?

 5                MR. DILLON-CAPPS:  I, erm, yes.

 6   Maryland Rule 205, erm, I, uh, on motion of any party

 7   or on its own initiative, the Court may continue to

 8   postpone a trial or proceeding, erm, citation of

 9   Jones and State.  The Court recognizing in accordance

10   with fair trial and the right of adequate

11   representation, erm, neurological -- neurological,

12   biological evidence, studies of PTSD studies shows

13   what I'm saying.  Studies of meta analysis shows what

14   I'm saying.  Sleep deprivation studies show what I'm

15   saying.

16                (Unintelligible) status is literally

17   built on the idea of what I'm saying.

18                Erm, I -- I -- I need due process.

19                THE COURT:  Mr. Brennen?  Mr. Brennen?

20                MR. DILLON-CAPPS:  And -- and -- they're

21   not actually have been harmed.  I don't have the

22   ability to articulate, but --

23                THE COURT:  You know, it seems to me

24   like you're speaking at it, like you're saying you

25   need to -- you just -- you're saying you can't comply
```

1    'cause you can't find the fob, and now you're saying

2    you need -- what do you need due process of?

3              MR. DILLON-CAPPS:  I can't even

4    articulate effectively what the problem is.  How --

5    how is that fair to like --

6              THE COURT:  Okay.  What -- other than

7    calling an out-of-state lawyer what did you do to get

8    representation?

9              MR. DILLON-CAPPS:  I -- I've met with

10   other attorneys.  I've met with other people.  I had

11   an attorney.  We were going to sue them.

12             THE COURT:  Okay.  All right.  Mr.

13   Brennen?

14             MR. BRENNEN:  Thank you, your Honor.  If

15   I could, I'd like to ask a couple of questions of --

16             THE COURT:  Yeah.  He's under oath.

17             MR. BRENNEN:  Okay.

18             THE COURT:  All right.  I'm going to let

19   Mr. Brennen ask you some questions.

20                    DIRECT EXAMINATION

21   BY MR. BRENNEN:

22        Q    So you told the Judge -- Judge you

23   looked for your key fob, the one that you used to

24   access your admin rights, correct?

25        A    Yes.  And I will even answer that, erm,

```
 1   there's somewhere between four or five actual --

 2             Q     Key fobs?

 3             A     Yeah.

 4             Q     Okay.  So you looked for the ones you

 5   used to use?

 6             A     And I -- actually, I use two.  And I

 7   also used, uh, I looked for two that don't even tie

 8   to Ohana's account.  These are my personal key fobs,

 9   by the way, it's not like the company property.

10             Q     Do they -- do they contain credentials

11   to, uh, to -- for multifactor aut -- authentication

12   to obtain global access to --

13             A     So --

14             Q     -- admin access to the --

15             THE COURT:  Let him -- let him finish --

16             Q     -- Ohana accounts?

17             A     I can't guarantee that they are, because

18   when I went to use one of the ones that I had it had

19   already been reset, already reset, all this things

20   were gone.  I had to reset it.  I had to reinitiate

21   my first log in with it.

22             Q     Where is that key fob?

23             A     Uh, that one is on my desk, and it's --

24   it was wiped, like.  And it is not even like the one

25   that was like was tagged for the old.  I knew what
```

```
 1    the one olds were, and they were tagged certain ways.

 2              So I can't find two of my own that are

 3    not related to Ohana account.  I can't find two that

 4    have my own stuff, but also had Ohana's, but -- and

 5    all I --

 6         Q    So you have -- there's four key fobs

 7    that you're aware of?

 8         A    Five, because one of them went to

 9    Victor.

10         Q    Five?

11         A    Yeah.

12         Q    Victor who?

13         A    Victor Brick.

14         Q    Victor Brick --

15         A    Mm-hmm.

16         Q    -- has one of these key fobs?

17              When did he -- when did you send it to

18    him?

19         A    Uh, well, I mean it was for him.  I have

20    one for Victor Brick.  I have one for Justin Drummond

21    who is supposed to get it on Monday -- the Monday

22    before the 13th, which would have been, uh, 10, 10.

23         Q    Okay.  Where are either the key fob for

24    Mr. Brick or Mr. Drummond now?

25         A    Those, I don't know.
```

```
 1          Q    What -- when was the last time you saw
 2    either one of them?
 3          A    Well, I -- I had to be, uh, logged in
 4    with it when I, erm, uh, uh, disabled Richard
 5    Hartman's account, at like 4 something --
 6          Q    On June 13th?
 7          A    Yes.  Which was in response to his
 8    threats, erm, of harm, not like verbal threats, but
 9    like the actions that he took.
10          Q    So you had these key fobs on June --
11          A    Mm-hmm.
12          Q    -- 13th?
13          A    Mm-hmm.
14          Q    In the afternoon?
15          A    Mm-hmm.
16          Q    At the time you disabled Mr. Hartman's
17    access?
18          A    Yes, I -- I was at --
19          Q    Uh, uh, that's a yes or no.
20          A    It was after I talked to Justin and --
21    and Victor.
22          Q    We will aim (unintelligible) an hour
23    here?
24          A    Okay.
25          Q    So --
```

1        A    But --

2        Q    So you had the key fobs that you used

3   for access then?

4        A    Yes.

5        Q    That's the last time you saw them?

6        A    Erm, with certainty, yes.

7        Q    Where were you?

8        A    I was working on my laptop.

9        Q    And where were you physically located

10   with your laptop?

11        A    In my office.

12        Q    At your home?

13        A    Which is -- which is where we started to

14   look.  I looked first and -- and we both looked.

15        Q    Has anybody been in your home other than

16   you and your wife since then?

17        A    Yes.

18        Q    Who?

19        A    Friends, people, family, I mean like no,

20   no family, but friends.

21        Q    Have they had access to your desk?

22        A    Erm, no, no, because even if the people

23   were nearby the proximity of the door and the space

24   in there, erm, they would not have had access.

25        Q    So the only people who have had access

1    to the last place you saw the key fobs you used for

2    access --

3            A    Mm-hmm.

4            Q    -- are you and your wife?

5            A    My key fobs that I personally own, yes.

6            Q    Okay.  So we have established that.

7            A    Mm-hmm.

8            Q    And you don't know where those are now?

9            A    No.

10           Q    And the key fob for Mr. Brick, when was

11    the last time you saw that?

12           A    The 7th.

13           Q    The 7th of June?

14           A    Yes.

15           Q    And where was that?

16           A    Erm, it was in an envelope wrapped up,

17    erm, with his name on it.  Uh, for -- for mailing.

18           Q    And where was this envelope when you

19    last had it?

20           A    Erm, it was -- it was on the right side

21    of my desk.

22           Q    At your home?

23           A    Mm-hmm.

24           Q    And did you take it to the post office?

25           A    Erm, no, I checked my post office

1    account, erm, and I don't see a mailing of it, which

2    I did for -- check everyone's to see if --

3        Q    When was the last time you saw the key

4    fob for Mr. Drummond?

5        A    Erm, erm, it -- it was earlier it was

6    between the 10th and the 13th, erm, because I reached

7    out to him on the 7th to schedule a meeting on the

8    10th to give it to him, and then he, erm, wasn't able

9    to make that meeting.  So we were going to do it on

10   Tuesday, but that also fell through, so he's like I'm

11   going to be gone, I will be back and we'll do it next

12   week, and that was the plan.

13       Q    And so, where was the key fob since you

14   last saw it?

15       A    Erm, so after I initially initiated,

16   erm, and I didn't test it, I should have tested it in

17   my laptop, but I didn't, and I was going to do that,

18   and that was the last time I saw it.

19            So it was like I said the -- the -- the

20   10th, 11th or 12th.

21       Q    So, and this would have all taken place

22   at your desk in your home?

23       A    Yes.

24       Q    And the only people who have had access

25   to that area have been you and your wife since point?

1          A    More specifically me, my wife doesn't

2    get on my space.  She can touch it, but like she

3    doesn't touch it.  I'm the only one who accesses it.

4          Q    Okay.  Any other key fobs that could be

5    used to gain access to the Ohana Microsoft 365

6    account?

7          A    That requires me to remember, and I

8    would -- so the assumption is, no, but that is not

9    totally possible.  I did -- I -- I did, erm, look at

10   mine and it was reset, so I don't think that one.

11              But, honestly, if -- if I'm given any

12   latitude, and that was the logistical question that I

13   have asked for was like, logistically how do I do it,

14   like get access.  Am I'm allowed now, am I not

15   allowed now.

16              I -- I just, erm, but even if I wanted

17   to, every time I find that there's something that has

18   a notification or alert, I just blocked it, so I

19   don't get it.

20              So I'm constantly taking efforts to

21   follow through with the command of, uh, returning it.

22         Q    So if you can't find your key fobs?

23         A    Mm-hmm.

24         Q    And you can't find Mr. Drummond's key

25   fob?

```
 1            A      Mm-hmm.

 2            Q      And you can't find Mr. Brick's key fob?

 3            A      Mm-hmm.

 4            Q      Who currently has the ability to access

 5     the Ohana Microsoft 365 with global admin rights?

 6            A      I don't know the answer.  There's --

 7     there's at least three accounts, so I don't have

 8     access to all three of them.

 9            Q      Who does?

10            A      Well, Jeff had the fourth one, and so he

11     turned it off.  I don't know if the fourth -- the

12     third one is even at the office anymore because it

13     was just sitting on my desk.

14            Q      Sitting on your desk at home?

15            A      No.

16            Q      So what -- what -- precisely what are

17     you describing is sitting on you desk at the office?

18            A      It was a smaller key that we didn't

19     normally use.  Uh, it was a (unintelligible) key.

20            Q      And it would sit right on top of your

21     desk?

22            A      No, it actually would sit inside of a

23     locked toy thingy.

24            Q      And who's got the key to the locked toy

25     thingy?
```

```
 1              A     It's a puzzle.

 2                    THE COURT:  What was that word?

 3                    MR. BRENNEN:  Puzzle.

 4                    MR. DILLON-CAPPS:  Puzzle.

 5                    THE COURT:  Which means what.

 6                    MR. DILLON-CAPPS:  It's like a -- it was

 7   a gift from, uh, my gay analyst.

 8   BY MR. BRENNEN:

 9              Q     So you have to know how to unlock the

10   puzzle to get to the key?

11              A     I'm sure someone could -- if they knew

12   it was there, yeah.  But no one knows it's there, and

13   it sits on my desk in a spot that, erm, is noticeable

14   if it moves, and it would have tripped the little

15   sensor, and that sensor was tripped on Thursday or

16   Friday of, 13th or 14th, something like that.

17              Q     So if you had that key --

18              A     Mm-hmm.

19              Q     -- could that be used to give Mr. Romes

20   the global admin rights?

21              A     Erm, I don't know the password.  Is,

22   that is also the second place for standard

23   processing.

24              Q     Where is the password?  What second

25   place is the password in?
```

```
1          A    Erm, I don't remember, but I do remember

2    it being something that was like, uh, in the office

3    for like Victor's space.

4          Q    Okay.  You don't remember?

5          A    Yes.

6          Q    So I'm returning to my question, who

7    right now --

8          A    Mm-hmm.

9          Q    -- as we're in this courtroom at 1:41 --

10         A    Mm-hmm.

11         Q    -- p.m. on June 27th, 2024, who has

12   access to global admin rights in the Ohana Microsoft

13   365 account?

14         A    There's no way for me to answer that.

15   More importantly, I just want to ask a question

16   like --

17         Q    Let me rephrase the question.  Are you

18   aware as you sit here right now --

19         A    Mm-hmm.

20         Q    -- of anyone presently having global

21   admin right access to the Ohana Microsoft 365

22   account?

23         A    How would I be able to answer that?

24         Q    Because you know what you know.  I'm

25   asking you if you are aware, you --
```

```
 1              A      Today is the --

 2              Q      -- Mr. Dillon-Capps?

 3              A      Today's the 27th, it's been, I don't

 4      know, two weeks -- two weeks, basically two weeks,

 5      how would I know what's happened in two weeks.  I've

 6      not been on the scene.

 7              Q      I'm not asking you about things you

 8      don't know.

 9              A      Right.

10              Q      I'm asking you to tell me whether you

11      are aware of anyone having right now --

12              A      Mm-hmm.

13              Q      -- global admin access to the -- the

14      Ohana Microsoft account?

15              A      You're asking me to know something that

16      is impossible for me to know.  Two weeks is a long

17      time.  In two weeks we changed a lot of people in and

18      out of admin roles.

19              Q      Okay.  So, you can't answer my question

20      as to whether you know of anybody right now?

21              A      It's an unrealistic question.

22              Q      Okay.  Can you identify for me anyone

23      who has that access right now?

24              A      Unrealistic question.

25              Q      No, it's not.
```

```
 1              A    You're expecting me to --
 2              Q    You can, either you can or you can't?
 3              A    You're presuming that I'm accessing the
 4    system, how would I --
 5              Q    I'm not presuming anything, sir.  I'm
 6    asking you a question, whether you know right now of
 7    anyone who has that type of global admin right access
 8    to the Ohana Microsoft 365 account?
 9              A    This seems, I mean, I know it's -- it's
10    a technical question, but I -- I mean, unless I'm --
11    maybe I'm just cognitively impaired right now.  But
12    like, I can't think of a possible way to answer that
13    so say, well, if I knew then I would be -- clearly
14    have had access to the system and (unintelligible)
15    you that.  I -- why would I -- why -- my whole thing.
16              Q    Do you know, as you're sitting here you
17    don't have access, you said that you don't have
18    access right now?
19              A    I have not accessed the system, ergo --
20              Q    Okay.
21              A    -- there's no way --
22              THE COURT:  Hold it, sir.  Access -- you
23    said you haven't accessed --
24              THE WITNESS:  Have not.
25              THE COURT:  The question Counsel is
```

```
 1   asking you, do you have access to the system, yes or

 2   no?

 3                   THE WITNESS:  No.

 4                   THE COURT:  You have no access to the

 5   system?

 6                   THE WITNESS:  At this exact second.

 7                   THE COURT:  The answer to his question,

 8   do you know as you sit here today --

 9                   THE WITNESS:  No.  Right now --

10                   THE COURT:  -- to the -- to the best of

11   your knowledge and ability, do you know of anyone who

12   has, word it, the global access, Counsel?

13          Q    Global admin --

14                   THE COURT:  Global admin access --

15   BY MR. BRENNEN:

16          Q    -- access to the Ohana Microsoft 365

17   account?

18          A    I cannot tell you if Karen --

19          Q    No, you can tell me --

20          A    -- Justin, Renaldo --

21          Q    -- if you know.  You can tell me if you

22   know.

23          A    I don't know.  I know that there was

24   attention --

25          Q    So you don't know, the answer to my
```

1    question is, you don't know of anyone right now, you

2    personally, do not know of anyone right now who has

3    global admin access to the Ohana Microsoft 365

4    account?

5          A    Between Victor, Justin, Karen, erm, and

6    Renaldo, I don't know if they are enacted (phonetic)

7    in their system and turned it on and done stuff to

8    their accounts.  I have no idea what they've did you

9    know with their accounts.

10         Q    So the answer to my question is you

11   don't know of anyone who has?

12         A    Exactly, because no one would know that

13   unless they were in the system.  I can only tell you

14   that the accounts exist, because that was the last

15   day.

16              MR. BRENNEN:  I don't have any further

17   questions at this time, your Honor.  I don't know

18   what more I can do to accomplish --

19              THE COURT:  All right.  Are you going to

20   continue to call Mr. Romes at all?

21              But I understand he has a hard stop at 2

22   o'clock, so before we do anything else, do you need

23   to call him to testify as to anything?

24              MR. BRENNEN:  Well, has he been able to

25   listen to what's been going on in the courtroom?

```
 1              THE COURT:  Yes.

 2              MR. BRENNEN:  He has.  Okay.  Erm, Mr.

 3   Romes --

 4              THE COURT:  Let's put him under oath.

 5              MR. BRENNEN:  Yeah, let's put him under

 6   oath.

 7                   RANDALL J. ROMES,

 8   first duly sworn to tell the truth, the whole truth,

 9   and nothing but the truth, testified as follows:

10              THE WITNESS:  I do.

11              THE CLERK:  Thank you.

12                 DIRECT EXAMINATION

13   BY MR. BRENNEN:

14         Q    Uh, Mr. Romes, you've already been

15   stipulated, your expertise was stipulated yesterday

16   by the defendant.  Erm, can you in somewhat -- all on

17   the fly, because you and I have not had an

18   opportunity to have any discussion in real-time,

19   having listened to the defendant's, uh, uh,

20   description of things, erm, based upon, uh, you know,

21   you know what I -- anything that you've heard this

22   afternoon that strikes you as technically impossible

23   or incorrect, given your knowledge of how these

24   systems operate?

25         A    It really depends on how the Office 365
```

```
 1   as your tenant is configured and whether or not it

 2   requires the multifactor key, in conjunction with the

 3   password to log in.

 4           The -- I think the key question is, at

 5   the time the defendant left or stopped were there

 6   other people that had user account profiles that did

 7   have global admin access, and if so, who were those

 8   people.

 9           Because if the defendant has not had any

10   access since then, the other people should still have

11   that, unless the other people disabled it on their

12   own, which seems very unlikely.

13           MR. BRENNEN:  I don't have anything

14   further from Mr. Romes, your Honor.

15           THE COURT:  All right.  Mr. Dillon-Capps

16   do you have any cross-examination?

17                   CROSS EXAMINATION

18   BY MR. DILLON-CAPPS:

19       Q    Erm, erm, it -- it sounds like you

20   understand what I'm affirming, that, erm, so I'll be

21   clear.  At, uh, on the 20th, uh, only two accounts

22   were disabled.  Erm, system was which an account that

23   Mr. Brooks had shared with his staff to use, which

24   also is like the key, uh, tenant, like it holds the

25   key for the intro, erm, which was -- and was elevated
```

46

1    and privileged when I -- when I found it, and I

2    disabled that as well.

3            Erm, there will be records in the logs

4    as well that reflect, uh, a re-enabling of it and

5    doing it, and the Brian Brooks one was disabled until

6    I set up the honey pots, and uh, let it back open to

7    see if he had to reveal how he would access the

8    system, so I could see it (unintelligible) that way,

9    which he did, and then it was resecured.

10           Erm, at that same time, uh, or on the

11   23rd or 24th I, uh, provided Jeff the

12   (unintelligible) on account, e-mailed to him, uh, I

13   feel like both my personal and work e-mail, he

14   ultimately declined.

15           I disabled his account, but I forgot to

16   turn off his additional e-mail, and later that

17   afternoon when I was doing roles to the group of the

18   help desk to improve -- increase their privileges,

19   erm, more accurately, to move them into a group, be

20   better managed.

21           THE COURT:  Is there a question that --

22           MR. DILLON-CAPPS:  Yes, yes, yes.

23           THE COURT:  Okay.

24   BY MR. DILLON-CAPPS:

25       Q    Okay.  So, erm, and then, there was

1    another Break/fix account, and two more Break/fix

2    accounts, one is named "Null", and, Null something,

3    and then other one is something else.  So, if

4    everything I said is true, erm, then, it would be, in

5    fact, impossible for me to know the state of those

6    accounts right now which, erm, I would have to be

7    able to access the system to know; is that correct?

8            A    And I think the question was, are there

9    other accounts that have this access?

10           Q    Absolutely.

11                THE COURT:  I think his question was --

12           A    What are they?

13           Q    Like I said, one is Null, erm, one of

14   them is something else, they're both named very

15   similarly though.  Like you'll see in the system,

16   like they both labelled like with a note that says

17   like "do not use" or "for Break/fix" or something

18   like that.  They were intended to go to, erm, Justin

19   Drummond, well, Jeff's was disabled because he asked

20   for it.

21                One was supposed to go to Justin

22   Drummond, uh, one was going to go to either --

23                MR. BRENNEN:  Okay.  Your Honor, can I

24   --

25           Q    -- Karen, Victor or Renaldo.

1          THE COURT:  Hold on a second.

2          MR. DILLON-CAPPS:  And I had been

3   talking to Renaldo and -- and Shannon Anderson

4   (phonetic) to get him the stuff, we were

5   (unintelligible).  And lots of efforts was being made

6   to comply, in fact, like I said yesterday, Justin

7   would have it already.

8          MR. BRENNEN:  Uh --

9          THE COURT:  All right.

10          MR. BRENNEN:  You -- your Honor, I think

11   Mr. Romes was mistaken.  The question that the

12   defendant ultimately posed to him was, whether he

13   agreed that if the defendant did not currently have

14   access to the system that he wouldn't know the status

15   of those other accounts; is that something you would

16   agree with Mr. Romes?

17          THE WITNESS:  If -- if he has no access

18   to the system now he has no way to speak to the

19   access of other systems in this account right now.

20          THE COURT:  All right.  If -- if he

21   found a key fob would he have access to the system?

22          THE WITNESS:  I believe so, yes.

23          THE COURT:  All right.

24          MR. DILLON-CAPPS:  Assuming to the

25   degree, that's assuming that I knew the password for

```
1    it.

2                    By the way one of them -- one of them

3    which --

4                    THE COURT:  This isn't a time to make a

5    speech.  I, sir, I have a question.

6                    MR. DILLON-CAPPS:  Mm-hmm.

7                    THE COURT:  All right.  Anything else

8    for Mr. Romes?

9                    MR. BRENNEN:  No.

10                   MR. DILLON-CAPPS:  I have one more

11   question.

12   BY MR. DILLON-CAPPS:

13        Q    To clarify your -- your affidavit, I

14   just want to make sure I understood it correctly.

15   You did not read any statements or e-mails that have

16   any of my analysis with regulation codes attachment;

17   is that correct, you did not see --

18                   THE COURT:  What's the --

19        Q    -- those?

20                   THE COURT:  With -- with what?

21                   MR. DILLON-CAPPS:  So I provided

22   multiple analysis to Ohana, but has he affirmed he

23   had never seen any of those.

24                   THE COURT:  Any of what?

25                   MR. DILLON-CAPPS:  My analysis of
```

1    (unintelligible).

2                    THE COURT:  Hold you you're -- you're

3    talking to -- your analysis of what?

4                    MR. DILLON-CAPPS:  Why the environment

5    is PSEC (phonetic) compliant.  His affidavit --

6                    THE COURT:  Okay.  Where -- I thought we

7    got I don't understand that issue yesterday.

8                    MR. DILLON-CAPPS:  No, I'm just

9    confirming that that's what he meant by his

10   statement.

11                   THE COURT:  No, that's beyond the scope

12   of the direct examination anyway, I'm not going to

13   get into that.

14                   MR. DILLON-CAPPS:  Okay.

15                   THE COURT:  Now, you told me yesterday

16   that you had mailed a key fob, was it to Texas?

17                   MR. BRENNEN:  To Cello (phonetic).

18                   MR. DILLON-CAPPS:  Yes -- yes, one was.

19                   MR. BRENNEN:  (Unintelligible).

20                   MR. DILLON-CAPPS:  I don't know if it

21   was mailed, but one was intended 'cause we were

22   talking to, I was talking to Renaldo, and we --

23                   THE COURT:  So now you don't -- you

24   don't have any -- and you testified just a moment ago

25   that you checked your mail account and you couldn't

```
 1   find any information you had mailed --
 2                  MR. DILLON-CAPPS:  That's correct.
 3                  THE COURT:  -- anything, right?
 4                  MR. DILLON-CAPPS:  That's correct.
 5                  THE COURT:  All right.  Anyone else you
 6   want to call?  Do you want to call -- are you calling
 7   your wife as a witness?
 8                  MR. DILLON-CAPPS:  Erm, she can speak
 9   directly about what she has seen and observed, yes.
10                  THE COURT:  No, it's not up to me.  It's
11   up to you.  Are you calling -- do you -- do you --
12   are there any other witnesses you want to call before
13   I rule?
14                  MR. DILLON-CAPPS:  Yes.  Yes.  Because
15   she can talk about my state and how I've been.
16                  THE COURT:  Besides that --
17                  MR. DILLON-CAPPS:  She's a
18   professionalized therapist.  She's an expert witness.
19                  THE COURT:  Is she going to talk about
20   where the key fob is?
21                  MR. DILLON-CAPPS:  No, but she can talk
22   about my state and the inability to know where it's
23   at.
24                  THE COURT:  Did you -- did you ask her
25   to help you find the key fob?
```

```
 1              MR. DILLON-CAPPS:  You can ask her that.
 2    She will -- she will affirm that.
 3              THE COURT:  Okay.  Well, it's up to you,
 4    I can't tell you who to call as a witness.
 5              MR. DILLON-CAPPS:  Erm.
 6              Do you fell comfortable?
 7              MRS. DILLON-CAPPS:  Yeah.
 8              MR. DILLON-CAPPS:  Okay.  Yes.
 9              THE COURT:  All right.  Come up to the
10    witness stand.
11              THE CLERK:  Stay standing and raise your
12    right hand.
13                  CAROLINE DILLON-CAPPS,
14    first duly sworn to tell the truth, the whole truth,
15    and nothing but the truth, testified as follows:
16              THE WITNESS:  Yes.
17              THE CLERK:  All right.  Have a seat.
18              THE WITNESS:  Thank you.
19              THE CLERK:  Would you state and spell
20    your name for the record.
21              THE WITNESS:  My name is Caroline,
22    C-A-R-O-L-I-N-E, last name Dillon-Capps, D-I-L-L-O-N
23    hyphen C-A-P-P-S.
24              THE CLERK:  All right.
25              THE COURT:  Okay.  What do you want to
```

```
 1   ask her?

 2                    DIRECT EXAMINATION

 3   BY MR. DILLON-CAPPS:

 4        Q    Erm, has everything I said about being

 5   erratic, erm, memory loss, uh, moments of cognition,

 6   erm, not there, erm, has -- have you observed that to

 7   be true?

 8        A    Yes.

 9        Q    Has there been any indication that like

10   the -- the things that I do in this courtroom have

11   been not observed at home?

12        A    No, it's been true to what's been going

13   on at home for ever, weeks.

14        Q    I'm sorry.

15             THE COURT:  Is that it?

16             MR. DILLON-CAPPS:  That's

17   (unintelligible) me.

18             THE COURT:  Cross?

19                    CROSS EXAMINATION

20   BY MR. BRENNEN:

21        Q    Can you describe, uh, ma'am, did you,

22   uh, engage in any effort at your home to look for key

23   fobs or other materials, uh, relevant to this matter?

24        A    Yes, I was told to look through the

25   basement, erm, we have a bedroom down there and a
```

1    bathroom down there.  We have the ox room, what I

2    call the ox room, it's like the unfinished part, it's

3    like 20 percent basement the rest of it finished.

4            Erm, and I went through everything and

5    couldn't find a key fob or key fobs, I guess.  Erm,

6    but I did go downstairs to see if there was anything

7    down there that might have like been down there.

8        Q    Who, if anyone, searched the office

9    where your husband works?

10       A    Erm, he primarily searched his office.

11   I was in the office, erm, and I helped kind of go

12   over things a little bit together, but I didn't see

13   anything.  Like as far as a key fobs or passwords or

14   things of that nature.

15       Q    Did anyone look through the trash?

16       A    No, I did not look through the trash.

17       Q    When is your trash picked up?

18       A    It was picked up this morning.

19       Q    Did you see any envelopes addressed to

20   Mr. Drummond or Mr. Brick?

21       A    No.

22       Q    Or Cello?

23       A    No, sir.

24       Q    You heard your husband testify about

25   who's has access to his desk since the last time he

```
 1    saw these key fobs?

 2            A    Yes.

 3            Q    Is his testimony accurate to your

 4    knowledge?

 5            A    Yes.

 6                 MR. BRENNEN:  Nothing further.

 7                 THE COURT:  Okay.

 8                 Have you taken any envelopes to your

 9    knowledge containing a key fob or something --

10                 THE WITNESS:  No, sir.

11                 THE COURT:  -- uh, like what to the post

12    office?

13                 THE WITNESS:  No, sir.

14                 THE COURT:  All right.  All right.  You

15    can step down.  Thank you.

16                 THE WITNESS:  Thank you.

17                 THE COURT:  All right.  All right.  Well

18    the Court, as I said, I heard testimony yesterday,

19    and I've heard testimony, uh, today, and, erm, I -- I

20    continue to find, erm, that Mr. Dillon-Capps seems to

21    have selective, erm, ability to do things.

22                 Erm, and uh, the Court just doesn't find

23    credible that he's done a sufficient search of his

24    office area, based on the testimony today, to find

25    the key fob that he needs, and I think that maybe he
```

1    needs an incentive, erm, to do it.

2                    I do think, erm, that the, uh, based

3    upon all of what I've heard, that, uh, that the

4    defendant is, erm, choosing not to comply with the,

5    uh, with the Court's order. And, erm, that, I'm not

6    a professional, I haven't heard any testimony from

7    any mental health professional, but based on the --

8    the observation of the defendant yesterday, this

9    isn't just today, but yesterday and today, and I

10   don't doubt that he has -- that he has some issues.

11                   He testified that he has, uh, yesterday,

12   that he has PTSD, and, erm, and it -- it's clear that

13   the defendant may have some issues, but I don't think

14   that -- I'm not finding that the defendant is

15   incompetent.

16                   It appears -- he appears to know that

17   he's in a courtroom, that he's testifying under oath.

18   That, he appears to understand the subject matter of

19   his testimony.

20                   He appears to the Court to understand

21   the importance of, uh, of finding the key fob, but

22   seems to have a selective memory, erm, when it comes

23   to exactly what happened to it. Erm, so I'm -- I am

24   going to find that the defendant is in contempt. He

25   can purge the contempt by complying with the Court's

1   order.

2                    But as I'm, you know, beginning now, I'm

3   going with -- I'm going to sign the order, we're

4   going to serve him with it, erm, it's 1:57 p.m., and

5   I'm also -- so I'm going to have the Clerk of the

6   Court make a copy of this, and I'm also going to, I

7   have an extra copy to -- to, uh, to make sure there's

8   no doubt about the defendant having received the

9   preliminary injunction order, I'm going to let the

10  Court reflect that that's -- my Court Clerk is going

11  to hand that to, erm, to the defendant, and here is a

12  copy of the order holding the defendant in

13  constructive civil contempt.

14                   And as I said, it provides that, uh,

15  there are -- there are findings of fact in here.  I'm

16  not going to read them all again, but I do, uh, but

17  the defendant was on actual notice of the Court's

18  temporary restraining order.  He acknowledged receipt

19  of it.

20                   But, erm, he's -- he also, erm, was on

21  knowledge -- on notice yesterday of the Court's, uh,

22  intention to enter the preliminary injunction order,

23  which was e-mailed to him, and he hasn't -- he hasn't

24  complied with that, as well, so I do think he's in

25  constructive contempt.

1            For every 24-hour period that passes

2    after the date and time this Order without the

3    defendant's full compliance, he's going to incur a

4    fine of $2500, and he can purge the contempt by

5    complying with the order.

6            So, that's the original.  So if you

7    could make a copy of that, hand it to both -- a copy

8    to both parties and enter it.

9            MR. DILLON-CAPPS:  Your Honor, she's a

10   licensed (unintelligible) therapist.  She's a

11   professional (unintelligible).

12            Your statement that you haven't heard

13   from one, you've heard from --

14            THE COURT:  I haven't heard from your's.

15            MR. DILLON-CAPPS:  I will make that

16   happen.

17            THE COURT:  Okay.  Erm, counsel, erm,

18   yesterday, the -- the proposed preliminary

19   injunction, erm, had a reference to Microsoft that I

20   thought maybe, I don't know if that was a typo or

21   not, erm, uh, but Microsoft is not a party to this.

22   I didn't see that I had any authority to enter

23   anything, but I guess I would say, that given the

24   situation, erm, I -- I'm not trying to tell you, I

25   mean, you know very well what to do, but if you want

1   to reach out to Microsoft, and if you and Microsoft

2   can agree on some Consent Order that you need me to

3   sign, erm, I'll act on it promptly to try to bring

4   about a resolution to this, it would actually --

5   which would also to some extent take the defendant

6   off the hook here.

7            I -- I just want to, uh, you know, I

8   want to get the situation resolved, as I'm sure your

9   client does, as well.

10           I'm not trying to -- and to be clear,

11  this is not in any way intended to penalize the

12  defendant, but what we have here is a situation

13  where, uh, the company is with, you know, is without

14  an important ability with its IT system, and, uh, as

15  I've already said, I'm not satisfied that the

16  defendant has exercised all of the efforts that he's

17  capable of, of locating the key fob and complying

18  with the Court's order.

19           If he needs assistance, including a

20  mental health professional to help to, erm, or if he

21  needs medication, whatever he needs, I don't know, I

22  didn't hear about that, but to, uh, to assist him in

23  complying with the order, if he needs, uh, to have

24  his wife help him do a more thorough, uh, uh, search

25  of his office area, whatever it takes, but, uh, you

1    know, until there's compliance there's going to be,

2    uh, he's in -- he's in contempt of my orders and, uh,

3    there's going to be a fine imposed of $2500 for every

4    24-hour period until.  And I'll consider, uh,

5    modifying that or purging that fine if -- if there's

6    compliance, but until there's compliance, it's going

7    to continue to accrue.

8                    So that's, I think I've made sufficient

9    findings on all of this.  But, uh, but anyway, if

10   there's some other way to, erm, for you to get access

11   that you can work out with Microsoft, let me know.

12                   And, you know, you can proceed with

13   whatever portion of the case you want to with the

14   defendant, but it seems to me that might mute the,

15   uh, the need for the continuing preliminary

16   injunction or, at least, portions of it.

17                   MR. BRENNEN:  Your Honor, I can assure

18   the Court that, uh, my client and I are pulling out

19   all stops.

20                   THE COURT:  Okay.

21                   MR. BRENNEN:  And covering all bases in

22   an effort to resolve this --

23                   THE COURT:  Well --

24                   MR. BRENNEN:  -- situation.  And I think

25   that with a transcript of today's hearing and we

1    will --

2                    THE COURT:  I was going to just

3    suggest --

4                    MR. BRENNEN:  -- and we're going to get

5    that.

6                    THE COURT.  -- I mean, wouldn't -- I

7    mean, if -- if the testimony, if Mr. Dillon-Capps is

8    to be believed, that he has no -- that he doesn't

9    currently have any access and can't find the key fob,

10   if that's to be believed, and the Court doesn't --

11   the Court -- the Court does believe that he doesn't

12   have it in his possession here to present to you,

13   that part I do believe.

14                   As to whether or not he exercised, uh,

15   due.  Due diligence to, uh, and -- and all reasonable

16   efforts, and that's really the key here is, I don't

17   believe the defendant in -- in my view he said

18   contradictory things, and it's not because of any,

19   erm, uh, kind of mental inability to do it, it just

20   seems like it's a selective ability, uh, to comply or

21   not to comply.

22                   But, based on the testimony today it

23   would seem to me that Microsoft should, a reasonable,

24   you know, it would not be an unreasonable request to

25   say, that we -- that no one has access to our system,

1    we need -- we need assistance, so.

2                    MR. BRENNEN:  I -- I agree.  We will do

3    what we can.

4                    MR. DILLON-CAPPS:  May I --

5                    THE COURT:  Yes, sir, you can be heard.

6                    Did you -- did you -- did you do provide

7    a copy to the defendant?

8                    THE CLERK:  Yes.

9                    THE COURT:  All right.  The record will

10   reflect that a copy of the Court's, uh, order that I

11   signed today holding him in constructive contempt, as

12   well as a copy of the preliminary injunction that was

13   entered yesterday was also handed to the defendant,

14   so there can't be any contention that he hasn't been

15   served or has any unawareness of what, exactly what

16   he has to do to comply.

17                    Yes, sir.

18                    MR. DILLON-CAPPS:  If I could have, I

19   would have.  And if it's true that I really was just

20   woefully, willfully disobeying orders, yeah, like

21   that make sense, but the fact is that the true record

22   in writing is that there were other people, including

23   Justin Drummond, that I tried to give access to.

24                    THE COURT:  That has nothing to do with

25   whether or not you -- you --

1              MR. DILLON-CAPPS:  It's material.

2              THE COURT:  -- searched your office

3    adequately.

4              MR. DILLON-CAPPS:  It's -- I --

5              THE COURT:  And whether or not you've

6    destroyed the key fob or whatever it is.  You're not

7    being -- the Court, I don't believe -- I'm not

8    finding that you, and I found, my observation

9    yesterday is that you were not being candid with the

10   Court.

11             There was not full candor, and you --

12   you were evasive and you chose not to answer my

13   questions, unless pressed, and that has continued

14   today with Counsel -- what I've seen of Counsel's

15   questions.  And I don't think it's because, again,

16   I'm not -- I'm not saying that you might not suffer

17   from some mental health conditions.  I think that it

18   may be pretty clear that you do, by your refusal to

19   comply with this order.

20             That -- that may, if anything, I think

21   that that may be, uh, you know, but -- but I, but I

22   don't have any assessment from your mental health

23   provider.  Erm, I've heard your wife say that she's

24   observed some things in the past couple of weeks, but

25   that to me doesn't mean that you're not -- you're not

1    lucid and capable, and even if it's sporadic, of not

2    complying with the order.

3                And I've given you, look if you -- if

4    you comply with the Court's Order, the Court will

5    purge the contempt, and I'll consider, erm, what to

6    do with the -- with the fine that's going to start

7    accruing in 24-hour periods.

8                I mean, you have 24 hours now to, uh, to

9    comply with the order before the first fine goes into

10   effect.  But if you don't it's going to accrue until

11   the Court is satisfied that there's some reason for

12   it not or you comply with the order.

13               MR. DILLON-CAPPS:  May I ask to

14   understand, what would be the requirement that would

15   demonstrate that what I'm saying is true in any way?

16   Like I can give you --

17               THE COURT:  Well, I've already made a

18   finding that I -- I don't find your testimony to be

19   credible.

20               MR. DILLON-CAPPS:  But I haven't had the

21   opportunity to present any evidence.

22               THE COURT:  This was your opp -- you

23   presented your own testimony.  You presented your

24   wife's testimony.

25               MR. DILLON-CAPPS:  I mean, there's --

1    I've -- I've not had a -- I've had less than six

2    conversations with these people, anyone in the

3    company.

4            THE COURT:  The -- do it -- sir, then

5    all I can advise --

6            MR. DILLON-CAPPS:  It's all.

7            THE COURT:  -- I can't give you legal

8    advice, okay, but I can tell you this, that you

9    obviously need counsel --

10            MR. DILLON-CAPPS:  Yes.

11            THE COURT:  You need --

12            MR. DILLON-CAPPS:  Yes.

13            THE COURT:  -- legal counsel, and so,

14    but you had that opportunity, you know, you had an

15    opportunity even yesterday to -- to reach out.  You

16    had an opportunity before yesterday to find counsel.

17            Erm, you know, the Court doesn't find,

18    uh, that your efforts have been adequate, you know,

19    so one attorney had bereavement, the details on that

20    were -- were kind of slim, but, erm, you know, you

21    can find legal counsel.  You can comply.

22            You can do what you have -- I mean, the

23    easiest thing to do is to -- is to produce the key

24    fob, which -- which you're refusing to do.

25            MR. DILLON-CAPPS:  I have not -- I would

```
1    have done it, and there's been five --

2                    THE COURT:  I -- I don't believe -- I'm

3    sorry --

4                    MR. DILLON-CAPPS:  -- in ten days.

5                    THE COURT:  -- sir, but I just don't

6    believe that.  I don't find that to be credible,

7    based on my observation of your demeanor, your

8    testimony.  I'm making these factual findings based

9    on my observation of you and what I've heard, that I

10   don't think that you're being candid with the Court,

11   and I don't find your testimony to be credible, and

12   that's my finding.

13                   MR. DILLON-CAPPS:  What can I do to show

14   why otherwise?  What do you need to see?

15                   THE COURT:  Produce the key fob, that's

16   how you can purge it, okay.

17                   All right.  We're done.

18                   (Whereupon, the proceedings concluded at

19   2:11:18 p.m.)

20

21

22

23

24

25
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, Linda Lindsey, CSR do hereby certify

 4   that I recorded stenographically from Digital Media

 5   from Baltimore County the proceedings in the matter

 6   of Ohana Growth Partners, LLC versus Ryan

 7   Dillon-Capps, Case Number C-03-CV-224-002264, on June

 8   27, 2024

 9            I further certify that the aforegoing

10   pages numbers one through 66 constitute the official

11   transcript of proceedings as transcribed by me to the

12   within typewritten matter in a complete and accurate

13   manner.

14            In Witness Whereof, I have hereunto

15   subscribed my name this 28th day of June, 2024.

16

17            _____

18                 Linda Lindsey, CSR

19

20

21

22

23

24

25
```