# IN THE
# UNITED STATES DISTRICT COURT
## FOR THE
# DISTRICT OF MARYLAND

| | |
|---|---|
| *PROPRIA PERSONA*   RYAN DILLON-CAPPS | Civil Action No. 1:24-CV-3744 |
| *Plaintiff,* | |
| vs. | Hon. Judge Brendan Abell Hurson |
| **Ohana Growth Partners, LLC et al** | |
| *.: SEE TABLE OF DEFENDANTS :.* | **CIVIL COMPLAINT** |
| | FOR WRONGFUL TERMINATION AND OTHER VIOLATIONS UNDER FMLA; |
| *Defendants* | & |
| | CONSTITUTIONAL AND OTHER FEDERAL RIGHTS AND PROTECTION VIOLATIONS |
| | & |
| | CIVIL ENTERPRISE RICO WITH VICARIOUS LIABILITY |
| | **SEEKING PERMISSION TO** |
| | PROCEED IN FORMA PAUPERIS WITH MARSHALL PERSONAL SERVICE, COPY SERVICES, AND COURT ASSIGNED COUNSEL WITH SPECIAL RELIEF |
| | **REQUESTING EMERGENCY EX PARTE HEARING FOR** |
| | EMERGENCY INJUNCTIVE RELIEF |
| | **AND** |
| | INTERLOCUTORY SUMMARY JUDGEMENT FOR DECLARATORY JUDGEMENTS AND MONETARY RELIEF WITH SPECIAL RELIEF TO BE GRANTED AND ORDERED TO BE PAID IMMEDIATELY |
| | **AND** |
| | ALTERNATIVE DISPUTE RESOLUTION WITH CONDITIONAL DEMAND FOR JURY TRIAL |
| | AMOUNT IN CONTROVERSY EXCEEDS $75,000 |

## I  RESERVATION OF RIGHTS AND NON-WAIVER OF CLAIMS

1    Plaintiff submits this Amended Complaint in compliance with the Court's Order. In doing so, Plaintiff expressly reserves all rights to challenge, on appeal or otherwise, the Court's dismissal of any claims, counts, or causes of action asserted in the original Complaint. By amending the Complaint as directed by the Court, Plaintiff does not waive, relinquish, or abandon any dismissed claims, arguments, legal theories, or supporting facts, whether expressly stated or implied in the original Complaint. Plaintiff explicitly preserves all rights to seek appellate review of any prior rulings adverse to Plaintiff's interests.

2    Furthermore, Plaintiff asserts that no claims, whether previously stated, unstated, or implied, have been waived, abandoned, or otherwise forfeited at any time. This includes, but is not limited to, claims expressly asserted in the original Complaint, as well as any claims, arguments, or legal theories that could have been asserted based on the facts and legal principles originally presented. To the extent any claim, count, or legal argument that was dismissed or not fully adjudicated, Plaintiff preserves all rights to assert, amend, or seek review of those claims at an appropriate stage, including on appeal.

3    This Amended Complaint is submitted solely to comply with the Court's Order and should not be construed as a concession of any factual or legal determinations previously made by the Court. Plaintiff expressly maintains that all claims, both stated and unstated, remain preserved to the fullest extent allowed by law.

4    In Brown v. Board of Education, the unanimous supreme court opinion, read by Chief Justice Warren, said the following about the fourteenth amendment *"It ordains that no State share deprive any person of life, liberty, or property without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether*

*colored or white, shall stand equal before the laws of the States, and, in regard to the colored*

*race, for whose protection the amendment was primarily designed, that no discrimination shall*

*be made against them by law because of their color. The words of the amendment, it is true, are*

*prohibitory, but they contain a necessary implication of a positive immunity, or right, most*

*valuable to the colored race,-- the right to exemption from unfriendly legislation against them*

*distinctively as colored,--exemption from legal discriminations, implying inferiority in civil*

*society, lessening the security of their enjoyment of the rights which others enjoy, and*

*discriminations which are steps towards reducing them to the condition of a subject race."*

5      Congress, through the First Amendment, guarantees my right to petition the government

for redress of grievances. The Ninth Amendment ensures that the recognition of a right—such as

the right to petition—is not rendered meaningless simply because a specific procedural

mechanism for relief is absent. This aligns with the Fourteenth Amendment's guarantee of due

process and equal protection, which safeguard my ability to exercise that right without arbitrary

obstruction. Federal Supremacy and preemption further establish that my right to negotiate and

collectively bargain for the terms and conditions of employment, as provided by Congress,

cannot be disregarded by any state or federal court without violating constitutional principles.

6      Any judicial action that obstructs these rights is unlawful, unconstitutional, beyond the

court's jurisdiction, and if there had been ruling it would be void **ab initio**. *See* San Diego Bldg.

Trades Council v. Garmon, 359 U.S. 236, 244 (1959) (holding that state courts lack jurisdiction

over disputes that are preempted by federal labor laws). *"When an activity is arguably subject to*

*§ 7 or § 8 of the National Labor Relations Act, the States as well as the federal courts must defer*

*to the exclusive competence of the National Labor Relations Board."* **Weber v. Anheuser-Busch,**

**Inc.***, 348 U.S. 468, 480 (1955)*

*"State courts are without power to issue injunctions in cases where the conduct in question is protected by the National Labor Relations Act or is prohibited by it." Brown v. Hotel & Restaurant Employees, 468 U.S. 491, 503 (1984) "Congress has explicitly denied the states the power to regulate labor disputes covered by federal law, and any such state action is therefore void." **Linn v. United Plant Guard Workers of America**, 383 U.S. 53, 61 (1966) "Where the federal statutory scheme has explicitly or implicitly precluded state regulation, state court action is void."*

7        Section 7 of the NLRA protects Ryan Dillon-Capps right to engage in collective action, including negotiating workplace conditions and filing grievances related to FMLA and ADA violations. Section 8(a)(1) prohibits employer retaliation for engaging in protected concerted activity. Furthermore, the precedent in *NLRB v. Washington Aluminum Co.*, 370 U.S. 9 (1962) stated that the Plaintiff labor rights and activities are protected, even in the absence of a formal union.

## II  TABLE OF DEFENDANTS

| | | |
|---|---|---|
| 1 | 212 W PADONIA RD. TIMONIUM MD, 21093 BALTIMORE COUNTY | **OHANA GROWTH PARTNERS, LLC** "EMPLOYER" OR "OGP" OR "OHANA" |
| 2 | CEO/CO-MAJORITY OWNER | **BRICK, C. VICTOR** "CEO" OR "VB" OR "VICTOR" |
| 3 | CFO/EQUITY OWNER | **NORRIS, GLENN** "CFO" OR "NORRIS" |
| 4 | PRESIDENT | **DRUMMOND, JUSTIN** "PRESIDENT" OR "DRUMMOND" |
| 5 | VP OF PEOPLE AND CULTURE | **HARTMAN, RICHARD** "HEAD OF HR", "VP OF HR", "HARTMAN" |
| 6 | EQUITY OWNER | **IHLE, EARL** "EARL" OR "IHLE" |
| 7 | EQUITY OWNER, | **WOODS, TERRY** "TERRY" OR "WOODS" |
| 8 | CAPITAL CORPORATE SERVICES INC 455 CAPITOL MALL COMPLEX STE 217 | **ALARIS EQUITY PARTNERS USA INC.** "ALARIS" |

| | | |
|---|---|---|
| | SACRAMENTO CA 95814 | |
| 9 | 212 W PADONIA RD. TIMONIUM MD, 21093 BALTIMORE COUNTY | **BRICK BODIES SERVICES, INC.** "BRICK BODIES" OR "BB" |
| 10 | 212 W PADONIA RD. TIMONIUM MD, 21093 BALTIMORE COUNTY | **DOWN UNDER GROWTH PARTNERS, LLC** "DOWN UNDER" OR "DUGP" |
| 11 | 509 S. EXETER STREET, SUITE 210 BALTIMORE, MD 21202 BALTIMORE CITY COUNTY | **EXETER STREET CAPITAL PARTNERS** "EXETER" |
| | CO-FOUNDER/SPECIAL ADVISOR DIRECTOR, BENGUR BRYAN; PARTNER, PATRIOT CAPITAL | **WITTELSBERGER, STACEY R.** "STACEY" |
| 12 | 509 S. EXETER STREET, SUITE 210, BALTIMORE, MD 21202 BALTIMORE CITY COUNTY | **BENGUR BRYAN** "BENGUR" |
| | CO-FOUNDER/MANAGING DIRECTOR PARTNERS & SPECIAL ADVISOR, PATRIOT CAPITAL CO-FOUNDER/SPECIAL ADVISOR, EXETER STREET CAPITAL PARTNERS | **BRYAN, CHARLES A.** "CHARLES" PUBLIC ACCOUNTANT |
| 13 | 100 LIGHT ST, BALTIMORE, MD 21202 BALTIMORE CITY COUNTY | **MILES & STOCKBRIDGE, P.C.** "LAW FIRM" OR "M&S" |
| 14 | PRINCIPAL | **BRENNEN, ROBERT S.** "LEAD COUNSEL" OR "BRENNEN" |
| 15 | PRINCIPAL | **FRENKIL, STEPHEN D.** "FRENKIL" |
| 16 | PRINCIPAL | **BUTLER, HOLLY D.** "BUTLER" |
| 17 | ASSOCIATE | **HOFFBERGER, VICTORIA K.** "HOFFNBERGER" |
| 18 | ASSOCIATE | **DUVALL, JESSICA L.** "DUVALL" |
| 19 | 1954 GREENSPRING DRIVE, SUITE 320, TIMONIUM, MD 21093 BALTIMORE COUNTY | **HARTMAN EXECUTIVE ADVISORS** "HEA" |
| | SENIOR DIRECTOR | **LEVETT, DANIEL J.** "EXPERT 2" OR "LEVETT" OR "SENIOR DIRECTOR" |
| 20 | 1966 GREENSPRING DRIVE, SUITE 300, | **CLIFTON LARSON ALLEN LLC** "QSAC" OR "CLA" |

| | | |
|---|---|---|
| | Timonium, Md 21093-4161 Baltimore County | |
| | Principal, Clifton Larson Allen LLC | **Romes, Randall** "Expert 1", "PCI Expert", "QSA", "Romes" |
| 21 | 4 Liberty Lane West Hampton, NH 03842 | **Pla-Fit Franchise, LLC** "Planet Fitness" Or "PF" |

### III  CAUSE OF ACTION TABLE

| | |
|---|---|
| **Federal Trade Commission Act (FTC Act)** | **15 U.S.C. § 45** |
| **Mail Fraud Statute** | 18 U.S.C. § 1341 |
| **Wire Fraud Statute** | 18 U.S.C. § 1343 |
| **Racketeer Influenced and Corrupt Organizations Act (RICO)** | 18 U.S.C. §§ 1961–1968 |
| **Code of Federal Regulations (FMLA Rules)** | 29 C.F.R. Part 825 |
| **Employee Retirement Income Security Act (ERISA)** | 29 U.S.C. § 1001 et seq |
| **Section 504 of the Rehabilitation Act** | 29 U.S.C. § 794 |
| **Norris-LaGuardia Act (NGA)** | 29 U.S.C. §§ 101–115 |
| **Consolidated Omnibus Budget Reconciliation Act (COBRA)** | 29 U.S.C. §§ 1161–1169 |
| **Fair Labor Standards Act (FLSA)** | 29 U.S.C. §§ 201–219 |
| **Family and Medical Leave Act (FMLA)** | 29 U.S.C. §§ 2601–2654 |
| **Federal False Claims Act (FCA)** | 31 U.S.C. §§ 3729–3733 |
| **Americans with Disabilities Act Title I** | 42 U.S.C. § 12112 et seq |
| **Health Insurance Portability and Accountability Act (HIPAA)** | 42 U.S.C. § 1320d et seq |
| **Americans with Disabilities Act Title II** | 42 U.S.C. §§ 12131–12165 |
| **California Unfair Competition Law (UCL)** | Cal. Bus. & Prof. Code § 17200 |
| **California Consumers Legal Remedies Act (CLRA)** | Cal. Civ. Code §§ 1750–1784 |
| **California False Claims Act** | Cal. Gov. Code § 12650 et seq |
| **California Whistleblower Protection Act** | Cal. Lab. Code § 1102.5 |
| **District of Columbia False Claims Act** | D.C. Code § 2-223.02 |
| **D.C. Consumer Protection Procedures Act (CPPA)** | D.C. Code § 28-3901 et seq |
| **Florida Whistleblower's Act** | Fla. Stat. § 112.3187 |
| **Florida Deceptive and Unfair Trade Practices Act (FDUTPA)** | Fla. Stat. § 501.201 |
| **Florida False Claims Act** | Fla. Stat. § 68.081 |
| **Maryland Health Insurance Continuation** | Md. Code Ann., Ins. § 15-408 |
| **Maryland Consumer Protection Act (MCPA)** | Md. Code, Com. Law §§ 13-101–13-501 |
| **Maryland Public Information Act (PIA)** | Md. Code, Gen. Prov. §§ 4-101–4-601 |
| **Maryland False Claims Act (MFCA)** | Md. Code, Gen. Prov. §§ 8-101–8-113 |
| **Maryland Flexible Leave Act (MFLA)** | Md. Code, Lab. & Empl. § 3-802 |

| | |
|---|---|
| **Maryland Wage Payment and Collection Law (MWPCL)** | Md. Code, Lab. & Empl. §§ 3-501–3-509 |
| **Maryland Tort Claims Act (MTCA)** | Md. Code, State Gov't § 12-101 et seq. |
| **Maryland Anti-Discrimination Law** | Md. Code, State Gov't § 20-304 |
| **Maryland Fair Employment Practices Act (MFEPA)** | Md. Code, State Gov't § 20-606 |
| **Maryland Declaration of Rights** | Md. Const., Articles 19, 24, 46 |
| **Maryland Code of Judicial Conduct** | Md. Rule 18-101.1 et seq |
| **Maryland Rules of Civil Procedure** | Md. Rules 1-201, 1-322.1 |
| **Tennessee Medicaid False Claims Act** | Tenn. Code Ann. § 4-18-101 |
| **Tennessee Consumer Protection Act (TCPA)** | Tenn. Code Ann. § 47-18-101 |
| **Tennessee Public Protection Act (Whistleblower Protection)** | Tenn. Code Ann. § 50-1-304 |
| **Washington Consumer Protection Act (CPA)** | Wash. Rev. Code § 19.86.010 |
| **Washington State Whistleblower Protection Act** | Wash. Rev. Code § 42.41.040 |
| **Washington State Medicaid False Claims Act** | Wash. Rev. Code § 74.66.020 |

## IV  TABLE OF EXHIBITS

| ECF | Exhibit | Description |
|---|---|---|
| **16-0** | 100 | Intro-Summary |
| **16-1** | 101 | Court Record Summary |
| **16-2** | 101B | Original 401 Pages of Evidence on July 1, 2024 @ 838 AM.  Trimmed - No Cases, Laws, Publications: 185 Pages |
| **16-3** | 102 | FMLA and ADA |
| **16-4** | 103 | Identity, Insurance, and Mail Fraud |
| **16-5** | 104 | Ruling Record Summary |
| **16-6** | 105 | 1-6: Office of Attorney General & Civil Rights Unit<br>7-10: Office of Administrative Hearings<br>11-23: JIS & Clerk's<br>24-26: MD Manual General Mailbox<br>27: Truffer Assistant<br>28-33: Director Bernstein<br>34-42: Bar Counsel DeGonia II<br>43-81: Notice of Hypothesis of Crayons<br>82-84: Clerk Ensor |
| **16-7** | 106 | 1-7: Affidavit of Harm<br>**8-16: Harm Exhibits**<br>17-51: Amended Motion for Mandatory Inunction to Restore Lost Pay Due to Financial Urgency<br>52-65: Motion to Allow Pro Se Representation of LLC<br>**66-114: Identity Theft Exhibits**<br>115-131:Affidavit of Financial Urgency<br>**132-198: Financial Harm Exhibits** |

| 16-8 | 107 | 1-57: Affidavit of Bad Faith<br>58-93: Amended Affidavit of Plaintiff's Abusive Use of the Judicial System<br>94-104: Affidavit for Sanctions<br>**105-121: Attempts to Negotiation Resolution Exhibits**<br>122-165 :Motion to Assert Rights and Request for Immediate Rulings<br>166-179: Amended Affidavit for Motion to Assert Rights and Request for Immediate Rulings<br>180-214: Affidavit of Unauthorized Contractual Modifications<br>**215-226: Comments Based Answer of State Complaint Exhibit** |
| 16-9 | 108-1 | Motion for Sanctions |
| 16-10 | 108-2 | Memorandum of Law in Support of Mandatory hearings of Adjudicated Facts |
| 16-11 | 108-3 | Reply to Opposition to Defendant's Motion for Expedited Discovery |
| 16-12 | 109 | Affidavit of Legal Obligations |
| 16-13 | 110 | 13-21: Memorandum of law in Support of Established Facts and Claims<br>22-33: Affidavit of Factual Basis<br>34-37: Motion to Preserve Court Records<br>38-44: Request for Prehearing Conference to Discuss Injunctive Relief<br>45-52: Request for mandatory Judicial Notice Hearing on Material Facts<br>53-65, 1-13: Motion for Directed Verdict |
| 16-14 | 164 | Email to/from Miles & Stockbridge P.C. |
| 16-15 | 165 | Attachments from emails from Miles & Stockbridge P.C. |
| 23-1 | SCD-1 | Ohana Complaint |
| 23-2 | SCD-2 | Ohana Civil Action Sheet |
| 23-3 | SCD-3 | Ohana Motion for TRO and PI |
| 23-4 | SCD-4 | Ohana Memorandum of Law in Support of TRO and PI |
| 23-5 | SCD-5 | Ohana Affidavit of Richard Hartman [June 14, 2024] |
| 23-6 | SCD-6 | Ohana Affidavit of Justin Drummond [June 14, 2024] |
| 23-7 | SCD-7 | Ohana 1998 Legislative History of House Bill 0925 |
| 23-8 | SCD-8 | Ohana Order Granting TRO |
| 23-9 | SCD-9 | Ohana Certificate of Notice Regarding TRO |
| 23-10 | SCD-19 | Ohana Affidavit of Personal Service of Complaint |
| 23-11 | 163A | June 26, 2024, Hearing Transcript from Miles & Stockbridge |
| 23-12 | 163B | June 27, 2024, Hearing Transcript from Miles & Stockbridge |

## V   EXHIBITS INCORPORATED BY REFERENCE

8       Pursuant to Rule10(c) of the Federal Rules of Civil Procedure the following arguments

and statements from exhibits are hereby incorporated by reference into this filing:

| ECF | Exhibit | Description |
| --- | --- | --- |

| 16-7 | 106 | 1-7: Affidavit of Harm<br>17-51: Amended Motion for Mandatory Inunction to Restore Lost Pay Due to Financial Urgency<br>52-65: Motion to Allow Pro Se Representation of LLC<br>115-131:Affidavit of Financial Urgency |
|------|-----|---|
| 16-8 | 107 | 1-57: Affidavit of Bad Faith<br>58-93: Amended Affidavit of Plaintiff's Abusive Use of the Judicial System<br>94-104: Affidavit for Sanctions<br>122-165 :Motion to Assert Rights and Request for Immediate Rulings<br>166-179: Amended Affidavit for Motion to Assert Rights and Request for Immediate Rulings<br>180-214: Affidavit of Unauthorized Contractual Modifications |
| 16-9 | 108-1 | Motion for Sanctions |
| 16-10 | 108-2 | Memorandum of Law in Support of Mandatory hearings of Adjudicated Facts |
| 16-11 | 108-3 | Reply to Opposition to Defendant's Motion for Expedited Discovery |
| 16-12 | 109 | Affidavit of Legal Obligations |
| 16-13 | 110 | 13-21: Memorandum of law in Support of Established Facts and Claims<br>22-33: Affidavit of Factual Basis<br>34-37: Motion to Preserve Court Records<br>38-44: Request for Prehearing Conference to Discuss Injunctive Relief<br>45-52: Request for mandatory Judicial Notice Hearing on Material Facts<br>53-65, 1-13: Motion for Directed Verdict |

## VI   FEDERAL FILINGS INCORPORATED BY REFERENCE

9      Pursuant to Rule10(c) of the Federal Rules of Civil Procedure the following arguments

and statements from federal filings are hereby incorporated by reference into this filing:

| ECF | Description |
|-----|-------------|
| 1-4 | Integrated Appendix: Pretext |
| 1-5 | Integrated Appendix: Parties |
| 1-6 | Integrated Appendix: Coverup |
| 1-10 | Memorandum of Law in Opposition to Immunity |
| 4-1 | Memorandum of Law in Support of the Interlocutory Partial Summary Judgement |
| 4-2 | Integrated Appendix: Interlocutory Partial Summary Judgement |
| 7-1 | Affidavit of Caroline Dillon Capps |
| 7-2 | Affidavit of Ryan Dillon-Capps Financial Harm |
| 19-0 | Motion to Reconsider Partial Dismissed Claims on 2025 January 8th |
| 19-1 | Memorandum of Law in Support of Motion to Reconsider partial Dismissed Claims on January 8th |
| 24-0 | Affidavit of Ryan Dillon-Capps Amended Complaint Statement of Facts |

| 25-0 | Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction |
|------|------|

## VII  INTRODUCTION

10      Plaintiff Ryan Dillon-Capps, in compliance with the Court's Order, submits this Amended Complaint against Defendants Ohana Growth Partners, LLC, and related parties. This case arises from Defendants' unlawful interference with Plaintiff's rights under the Family and Medical Leave Act ("FMLA"), wrongful termination, retaliation, and abuse of judicial process to suppress Plaintiff's legally protected activities.

11      This action follows a state court proceeding (Civil Action No. C-03-CV-24-002264 in the Circuit Court for Baltimore County) that was fundamentally flawed and conducted without basic procedural safeguards. Plaintiff was denied a fair opportunity to be heard, while Defendants presented perjured statements, fabricated evidence, and obtained a Temporary Restraining Order (TRO) without notice.

12      The state court disregarded established federal supremacy principles, violated my federal and state rights and protections, litigated the case on behalf of Ohana Growth Partners, LLC, protected Miles & Stockbridge P.C. and Ohana Growth Partners, LLC from criminal charges and sanctions, disregarded federal and state statutes, committed perjury and fraud upon the court, and improperly issued a Temporary Restraining Order (TRO), Preliminary Injunction, and contempt sanctions.

13      Even though the state court had operated completely vacant of jurisdiction, was litigating the case, perjured themselves, and committed fraud upon the court – the state court still lost the case that they were both litigating and adjudicating.  Ultimately, Ohana Growth Partners, LLC case was dismissed without prejudice, and nothing was adjudicated to final judgement with all my claims free, clear, and now remanded under case and controversy to Federal District Court by the state court. I want to be explicitly clear; this is not a typo – I am speaking of the actions of

the state court that were committed under color of state on behalf of Ohana Growth Partners, LLC and Miles & Stockbridge P.C.

14    On January 17, 2025, at 5:06 PM, an official email from the Civil Rights Division of the Maryland Office of the Attorney General (OAG) responded to an on-going email exchange about widespread misconduct involving the state court with Ryan Dillon-Capps by saying *"filing a complaint with the Office of the Attorney General is not a substitute for bringing an individual lawsuit in court."* The state judiciary remanded my claims to federal court and the Civil Rights Division of the Maryland Office of the Attorney General (OAG) has directed Plaintiff to file a civil lawsuit for his claims against the state court.

15    Defendants themselves admitted to violating Plaintiff's FMLA rights. As confirmed in the Defendants state pleadings and June 26, 2024, hearing transcript where Defendants' counsel acknowledged that Plaintiff was forced to work an hour after requesting FMLA leave, yet the court proceeded to penalize Plaintiff for asserting his rights. The entire injunctive relief action was premised on the false claim that Plaintiff had refused a lawful order, despite clear evidence to the contrary.

16    Further, the state court's actions violated the Norris-LaGuardia Act (NLA) by issuing injunctive relief in an employment and labor dispute, making its orders jurisdictionally void. The court escalated its overreach by imposing an excessive daily contempt fine, ultimately leading to an incarceration request six days later—despite Defendants having regained access to all disputed systems. This conduct not only deprived Plaintiff of due process but also demonstrated a pattern of judicial bias and exceeded judicial discretion.

17    Consequently, the state court's continued assertion of jurisdiction over this matter was unlawful, constituting a fundamental overreach that violated federal supremacy under the

preemption doctrine because the United State Congress intended to create a labor right that protected Ryan Dillon-Capps from his employer obtaining an injunction in said labor dispute.

18      If the case has not been dismissed without prejudice, any rulings made under such circumstances would still be rendered void **ab initio**.  To be clear, there was no final Judgement and there is nothing to appeal and be rendered void ab initio.  Ryan Dillon-Capps is the victor of the state court case in terms of successfully defending against fraudulent claims so that no final judgement was rendered.

## VIII   JURISDICTION AND VENUE

19      **THIS COURT HAS JURISDICTION TO HEAR** under 28 U.S.C. § 1331, as this case arises under the U.S. Constitution and federal laws, including the Family and Medical Leave Act (FMLA), Norris-LaGuardia Act (NLA), and RICO. Supplemental jurisdiction exists under 28 U.S.C. § 1367 for related state-law claims.

20      Venue is proper under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the civil lawsuit filed in the Circuit Court for Baltimore County (401 Bosley Ave, Towson, MD 21204) on June 14, 2024, at 12:18 PM, as a labor dispute where Ohana Growth Partners, LLC (212 W Padonia Rd, Timonium, MD 21093) and Miles & Stockbridge, P.C. (100 Light St, Baltimore, MD 21201) falsely claimed the Plaintiff had refused to follow the directives issued by Glenn Norris, Victor Brick, Richard Hartman, and Justin Drummond, constituting a breach of employment agreement, and duty of loyalty; seeking injunctive relief.

21      Ohana Growth Partners, LLC, qualifies as a covered employer under the Family and Medical Leave Act (FMLA), employing more than 50 employees within a 75-mile radius, as required under 29 U.S.C. § 2611(4)(A). The Plaintiff, as an eligible employee under 29 U.S.C. § 2611(2)(A), had worked for more than 12 months and accrued the requisite 1,250 hours during

the preceding 12 months. These qualifications were further documented through FMLA paperwork that confirmed the Plaintiff's eligibility.

22    ECF 16-3 is also known as Exhibit 102, and it provides key supporting documentation:

    1.    **Pages 4–7**: Completed WH-381 form from January 8th.

    2.    **Pages 10–13 and 18–21**: Original WH-380-E form completed January 22nd, and the recertification from March 12th.

    3.    **Page 22**: A healthcare provider's note dated November 23, 2013, explicitly diagnosing Ryan Dillon-Capps with **Posttraumatic Stress Disorder (PTSD)** and **panic disorder with agoraphobia**, confirming eligibility for ADA accommodations.

23    Richard Hartman and Robert Brennen admitted to Ohana Growth Partners, LLC interfered with Ryan Dillon-Capps' **Family and Medical Leave Act (FMLA)** rights, and then suspended the Plaintiff after he exercised his leave rights. See ECF 16-0, at 157-159. The precedent established in **Cehrs v. Northeast Ohio Alzheimer's Research Center**, 155 F.3d 775 (6th Cir. 1998), reinforces the employer's obligation under the **Americans with Disabilities Act (ADA)** to provide leave as a reasonable accommodation when necessary to address a qualifying condition.

24    On June 18, 2024, Ryan Dillon-Capps in formed Ohana Growth Partners, LLC lead counsel, Robert Brennen, that they would remain on FMLA leave until further notice. While still on approved **FMLA leave**, the Plaintiff was unlawfully terminated on **July 30, 2024**, just six weeks later with weeks of FMLA leave remaining. This termination represents a blatant violation of the **Family and Medical Leave Act**, which explicitly prohibits adverse employment actions against employees during approved leave.

25      On June 26, 2024, Judge Barranco remanded Plaintiff's FMLA case to federal court. See ECF 16-0, at 160. The precedent established in *Lapides v. Board of Regents of Univ. System of Ga. , 535 U.S. 613,624 (2002)*, the Supreme Court unanimously held that the removal of a case to federal court constitutes a voluntary invocation of the federal court's jurisdiction sufficient to waive a state's Eleventh Amendment immunity. Justice Kennedy, in concurrence, explained that *"once the States know or have reason to expect that removal will constitute a waiver, then it is easy enough to presume that an attorney authorized to represent the State can bind it to the jurisdiction of the federal court (for Eleventh Amendment purposes) by the consent to removal."* See also *Wisconsin Dep 't of Corrections v. Schacht,* 524 U.S. 381, 397 (1998) (Kennedy, J., concurring).  Judge Barranco's action constitutes a removal of the Plaintiff case and controversy to federal court.

26      Plaintiff successfully defended himself in state court and there was no final adjudication of any claims in state court.  The precedent established In *Exxon Mobil Corp. v. Saudi Basic Industries Corp. ,* 544 U.S. 280, 284 (2005), Justice Ginsburg clarified  *"The Rooker-Feldman doctrine ... is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."* There was no final adjudication of any claims, rendering the Rooker-Feldman doctrine as not applicable.

## IX   PLANET FITNESS AND OHANA GROWTH PARTNERS: JOINT EMPLOYER

27      In 2019, a majority of ownership shares of Planet Fitness franchisees came together to form the largest franchise group, called the Planet Fitness Independent Franchise Counsel (PFIFC). Contrary to public acceptance and PR spin, this was not something the franchisor wanted but rather was forced to comply with because it represented a voting majority-a quasi-corporate takeover.

28      Closing the deal in August 2022, Planet Fitness purchased the Sunshine Fitness franchisee locations and voting shares then hired the owner, Shane McGuiness, as President of Corporate Clubs in what appears to be a countermove to regain some of their voting power, or it could represent the PFIFC placing someone in Planet Fitness leadership.

29      Ohana Growth Partners, LLC- led by Victor and Lynne Brick- is the largest privately held franchisee. Through financial backing from the Canadian company Alaris Equity Partners, in exchange for equity in Ohana Growth Partners, LLC, the Bricks played a significant role in this process. As a reward for their significant contribution, Victor Brick was given first selection for committee involvement, and he chose Development. After the formation of the IFPFC, Victor Brick became one of three owners in a joint venture for all of Australia.

30      Let me turn back the clock to 2018. Ohana's Chief Development Officer, Joshua Beyer, was named in a sexual harassment lawsuit involving a sexual relationship with Casey Willard. The case **"Casey Willard v. Pla-Fit Franchise, LLC, et al."** was filed in the Rockingham County Superior Court in New Hampshire, docket number **218-2018-CV-01038**. The parties reached a settlement agreement announced on March 19, 2021.

*31      "Ms. Willard also then learned that [Joshua Beyer] hired a former co-worker and friend of [Andy] Choe [former Director of Construction for Planet Fitness] who had raped her [with his friends] only months earlier."*

32      William  "Bill" F. Flax, current Director of Construction for Ohana Growth Partners and licensed attorney in the state of Maryland, had publicly demeaned and yelled at Merlowe Henry, and then Merlowe Henry was moved out of the Development Department that Joshua Beyer oversaw as Ohana Growth Partners, LLC Chief Development Officer. However, after Justin Drummond was promoted to President from Chief Operating Officer in 2023, he moved Director

of Facilities and Equipment Maintenance (FERM) Merlowe Henry's department back under the Development department despite protest from her and me that it was inappropriate.

33    Jared Flax, son of William F. Flax and Manager of the Development department's project managers, barged into my office in 2023 and began yelling at me with the entire office able to hear. A day or so later, Jared Flax was found bragging about his conduct to two other employees in the accounting department.

34    Planet Fitness (NYSE: PLNT) requires all PF Franchisee's to hire the same company to manage the club firewalls and POS Switches and directs PF Franchisee employees to complete compliance attestation.  The PF Franchisor is the primary merchant for the payment processor and the PF Franchisees are sub merchants connected to their payment processor agreement that they join via an addendum to the master Franchisor merchant agreement.

35    PF Franchisee Club Operations follow safety standards and procedures created and provided by the PF Franchisor.  PF Franchisee IT Departments follow IT standards and procedures created and provided by the PF Franchisor.

36    PF Franchisor manages training requirements, including CPR training tracking and Cyber Security training, through a website that the Franchisor manages for the PF Franchisees and the Franchisor requires the Franchisees to use it.

37    Casey Williard said that the director of HR for Planet Fitness, Karen Hern, *"tacitly condoned"* the *"sexually offensive atmosphere"*, and Richard Hartman, Vice President of HR for Ohana, notified Joshua Beyer and Josh Gerber that they were reported by the Plaintiff for creating a hostile work environment.  Richard Hartman and Karen Debus, HR Generalist, directly engaged in efforts to protect Joshua Beyer, Josh Gerber, Bill Flax, and Jared flax while

2025-02-09

Victor Brick, Glenn Norris, Justin Drummond and the other equitable owners tacitly condoned the hostile work environment.

38      In Casey Willards case, Joshua Beyer attempted to have the plaintiff in the sexual harassment case destroy the communication evidence. When it became clear that Casey Willard would not comply, Joshua Beyer courted at least two Planet Fitness franchisees.  Joshua Beyer used his position as Vice President of Development at Planet Fitness to obtain inside information not intended for franchisees because it gave an unfair competitive advantage; specifically advanced knowledge of which Area Development Agreements (ADAs) were most profitable and the terms worth pursuing. These emails were moved from his work email to his personal Yahoo account, and then forwarded to Glenn Norris, CFO of Ohana Growth Partners, LLC.

39      This information was used as a bargaining chip and later became critical to ensuring continued overcompensation for the Chief Development Officer, despite substandard work product, and repeatedly failed to meet ADAs requirements.

40      When Casey Willard's case followed Joshua Beyer to Ohana Growth Partners in the form of a discovery request, Glenn Norris, Richard Hartman, and Ryan Brooks of Baltimore Consulting, initiated an emergency migration of the mail services from on-premises servers at Ohana Growth Partners, LLC headquarters to Microsoft 365.  After Ryan Brooks migrated part of the data to Microsoft 365, he reported to Glenn Norris and Richard Hartman that the Discovery Data was ready for download.  Upon information and belief, that this was an active effort to prevent evidence from being received in the discovery request, and the emails surrounding the request further support this allegation because it was overly focused on minimizing what was being provided to Casey Willards legal team.  During my time with Ohana

Growth Partners, LLC the inverse was true where we would focus on the request as a minimum, not the maximum like in Casey Willards discovery request.

41      At the end of March and early April 2024, when Plaintiff took time off to attend to their wedding, security systems were altered, legal holds were disabled, and protections of the financial systems backups were disabled.  When the Plaintiff discovered these changes were made the holds were re-enabled and increased protections were added to the financial system backups that expired on or around November 6, 2024.  The Circuit Court of Baltimore County was notified of this, and they granted Ohana Growth Partners, LLC dismissal request at the same time the financial system protections were expiring. Upon information and belief, Ryan Brooks was following the directions of Glenn Norris and was responsible for the changes because he was the only one with access and the required knowledge on how to do it.

42      On October 16, 2023, accounting irregularities were found and reported to Glenn Norris., and in November and December of 2023 evidence of identity theft and fabricated emails surfaced, all tied to the development department and their vendor, Onsite Solutions, Inc. The legitimacy of Onsite Solutions, Inc. is highly questionable, with significant red flags surrounding its operations. Evidence points to a money laundering scheme involving William Flax, Jared Flax, Andrew Dinh, and others, with fraudulent activities to conceal.

43      Upon information and belief, These were covered up as a necessity to prevent issues with the refinancing and potential investigations that would uncover the unfolding events. I initially reported that information point to insider trading, and then backed out of that because the amount of emphasis and interest in comparison to the other crimes being discussed was alarming and the evidence was not there to substantiate it in December 2023.

44      The allegations of fraud, accounting irregularities, and identity theft involving Andrew

Dinh, principle of Onsite Solutions were supported by conclusive evidence, including an email

where Andrew Dinh admits to identity theft and wire fraud involving new club cyber security

compliance franchisor documentation and Plaintiff was the victim of the identity theft. Upon

information and belief, rather than addressing these issues, Glenn Norris and Victor Brick sought

to cover them up, likely to avoid exposing their own misconduct.  This is further supported by

Justin Drummond booking a "secret" trip for Joshua Beyer to fly to Miami where Victor Brick's

condo resides.  This trip occurred days after Victor Brick cancelled a meeting to meet with Ryan

Dillon-Capps to discuss the fraud, accounting irregularities, and identity theft.

45      Ohana Growth Partners, LLC, compared to other Alaris Equity Partners investments,

struggled financially. Joshua Beyer's failure to meet ADAs requirements caused Ohana Growth

Partners, LLC to lose the Washington, D.C. ADAs. Additionally, poor site selection and unsafe

work product resulted in significant losses. For example, The Planet Fitness location called

Galley Place hemorrhaged over $1 million annually, as had other gyms at the same site, and

another was Planet Fitness location in Washington State which permanently closed shortly after

opening due to massive water damage only to never reopen again.

46      Beginning in 2023 and concluding in Q3 2024, Ohana Growth Partners, LLC refinanced

with Alaris Equity Partners, which also purchased additional equity in the company. Upon

information and belief, this transaction enabled Ohana's owners, in conjunction with other

parties, to acquire a majority stake in Planet Fitness, thereby triggering a change in corporate

control. Notably, this shift coincided with the replacement of Planet Fitness's Chief Financial

Officer.

47      Canadian-owned Alaris Equity Partners now indirectly holds equity in Planet Fitness

through its investment in Ohana Growth Partners, LLC. Meetings scheduled by Glenn Norris

suggest that Planet Fitness cooperated in facilitating the CFO transition, indicating a potential

alignment of interests. However, Alaris Equity Partners' financial disclosures do not adequately

explain the strategic rationale behind this transaction unless it was intended to exert influence

over the Planet Fitness brand. The estimated value of this transaction exceeds $1.5 billion,

positioning Alaris and its affiliates to obtain control over a $9.73 billion corporate asset.

48      The Defendants' actions resulted in direct harm to the Plaintiff's life, health, financial

stability, and mental well-being. If the relief granted to the Plaintiff is less than the value the

Defendants sought to gain from these transactions, it would set a dangerous precedent that

corporate actors may disregard federal and state laws whenever doing so is financially

advantageous. Such a ruling would effectively sanction unjust enrichment through violations of

protected rights, undermining established legal protections and due process guarantees.

## X  THREE THOUSAND FIVE HUNDRED WORKING HOURS LATER

49      The Plaintiff's experience is akin to being held hostage for over five months, as multiple

groups of conspirators acted independently yet in concert to compound the harm. Each group's

actions were tied to the Plaintiff's confinement in a fraudulent lawsuit, where judges, clerks, and

oversight agencies colluded against them.

50      Victor Brick, Glenn Norris, Richard Hartman, and Justin Drummond orchestrated the

first conspiracy, unleashing a relentless seven-month campaign of coordinated systemic

retaliation and harassment. This was followed by a barrage of malicious abuse, with the Plaintiff

pleaded for the coercive threats to end. Even with the Plaintiff offering compliance and pleading

for reprieve, Norris continued his abuse for hours, ignoring repeated warnings from the Plaintiff

that the mistreatment was causing severe harm. Norris, Hartman, and Victor Brick intentionally

caused panic attacks and directed other employees to engage in harassment and retaliation which culminating in the Plaintiff's first catatonic episode during the period known as "the gauntlet," from May 20 to June 13.

51      On June 13, the employer, Ohana Growth Partners, LLC, escalated to a new level of misconduct during a 12-hour day of gaslighting and manipulation. Glenn Norris, Richard Hartman, Victor Brick, and Justin Drummond breached a written accord, interfered with FMLA leave, denied reasonable ADA accommodations, retaliated against others including Darren Koritzka, and misled the Plaintiff into believing that other employees, Dillon-Capps spouse, and even the Plaintiff was in imminent danger. The day culminated in a sudden and abrupt suspension that contradicted the fabricated narrative of the entire gaslit day.

52      On June 14, Ohana Growth Partners, LLC co-conspirator filed the lawsuit. In the first 13 days the second conspiracy Robert Brennen of Miles & Stockbridge, County Clerk Ensor, Judge DeSimone Jr, Judge Truffer, and Judge Barranco interfered with FMLA leave, denied ADA accommodations, violated federal prohibitions on injunctive orders, defied federal supremacy and preemption, violated appointment doctrine, breached consumer protection laws in Washington D.C., Maryland, Washington, California, Florida, and Tennessee, violated federal injunctive prohibitions, and violated Ryan Dillon-Capps 1st, 5th, 6th, 8th, 9th, 13th, and 14th Amendment rights. Turning a civil lawsuit into a series of systemic human rights abuses that caused catatonic and dissociative episodes and induced dissociative amnesia and malignant catatonia.

53      Over the course of more than five months, the original conspirators—Ohana Growth Partners, LLC and Miles & Stockbridge, P.C.—delegated most of their efforts to a second group

of conspirators: a coalition of Robert Brennen, Clerk Ensor, and Judges DeSimone Jr, Truffer,

Barranco, Battista, Alexander, Mayer, Stringer, and Robinson Jr.

54      The coalition capitalized on the dissociative amnesia, catatonia, and malignant catatonia,

obstructed the judicial process; lied about the facts of the case, litigated on behalf of Ohana

Growth Partners, LLC and Miles & Stockbridge P.C., and forced the plaintiff into financial

default and crafted a court record to further damage the plaintiff's credibility.

55      After County Administrative Judge Robinson Jr., Director of Investigations Bernstein,

Bar Counsel Degonia II, and Judges Stringer and Mayer learned that the harm induced exceeded

what the Plaintiff could recover from and knew that without relief with treatment that it would

likely act as a death sentence; The conspirators efforts focused on ensuring the Plaintiff would be

unable to seek or obtain relief by obstructing avenues for potential redress.  Specifically, they

reintroduced onto the court record evidence that had been submitted and omitted so that it would

look as if there was no fraud upon the court, and without a final judgement of any kind there was

nothing to appeal.  The coverup also ignored mandatory hearings to prevent the Plaintiff from

petitioning the court and obstructing access to relief.  The deadly consequences of their

intentions are as transparent as the previous conspirator's fraudulent court record and confessions

of violating the law.

56      The trilogy of malicious conspirators levied a relentless bombardment of consecutive

attacks, magnifying and compounding on top of one another to create a colossal scale of harm

that places the Plaintiff's life in jeopardy. Their sustained campaign of calculated and egregious

conduct inflicted unrelenting physical, emotional, and financial damage, with each successive

blow amplifying the severity of the last.

57      Every act of retaliation was designed to impose their will, compel subjugation, and

ensure the Plaintiff remained defenseless, constrained, silenced, and stripped of the means to

seek reprieve. The conspirators' feverish intensity to harm the Plaintiff resulted in an

incomprehensible volume of reprehensible violations of state and federal protections, rights,

doctrines, and statutes—all under the umbrella of color of state without ever once having to raise

state or judicial immunity themselves.

58      This is akin to the police arriving at a kidnapper's hideout and, instead of rescuing the

victim, actively assisting the kidnappers in burying the victim alive, the Bar Counsel and Tanya

Bernstein conspired with Judges Robinson Jr, Mayer, and Stringer to separate the Plaintiff from

life-saving intervention after the judiciary had already caused catastrophic harm by taking turns

targeting a helpless victim.

## XI   THE UNACCEPTABLE AND DEFICIENT STANDARDS OF THE JUDICIAL ACTIVIST

59      Moving from the federal courts in Washington D.C. to the Circuit Court of Baltimore

County, the Plaintiff was not prepared for the pre-civil rights era of policies and procedures

rewritten to obfuscate their inherent racist and ableist intentions.  Intentions kept alive through

discriminatory enforcement that has remained shielded by the same systemic corruption that

conspires now.

60      The entering assumption was that their differences in rule and policy enforcement was

Pro Se bias, and while there are elements of truth that have amplified the discrimination in the

Plaintiff's previous case the truth was far more illegal.

61      The emerging pattern was initially mistaken for a preferential bias connected to the

prestige of the law firm, and outliers being excused away from an unknown influence from the

former employer. After the Judiciary and Attorney oversight committee's involvement was

confirmed, the Plaintiff reviewed previous assumptions and records.  This wasn't prestige bias –

it was favoritism toward the "racist acceptability standard".

62      Policies and their enforcement designed to meet the minimum legal requirements and

merely avoid overtly racist language or actions while permitting implicit biases and

discriminatory impact. The structural racism being redirected toward the Plaintiff's disability

reveals an egregious measure of tolerance, and the unified language issued out from the

conspirators is a demonstrative act that reflects this standard previous success to prevent

corrective measures.

63      Clerk Ensor has taken it upon herself to "be part of the solution" by positioning herself in

a role where she controls the access to the Circuit Court for Baltimore County. She determines

the merits, she determines worthiness, she determines accessibility.  She won't let procedural

abuse stop her from solving the problem of guilty people not being found guilty anymore.

**Ruling Moot on Motions and Marking Filings Deficient  is one in the same to Judge Ensor**

**and County Clerk Ensor.**

"In the end, justice is not just a right; it is the bedrock of human dignity. Denying it leaves people
dehumanized and society corrupted." — **Robert F. Kennedy**

## XII   THERE IS NO QUESTION THAT…

64      The employer violated the Family and Medical Leave Act (FMLA) (29 U.S.C. §§ 2601–

2654) by interfering with Plaintiff's protected leave and retaliating against him for exercising his

statutory rights. Defendants have admitted to both interference and retaliation in their own

statements, including Richard Hartman's affidavit, which explicitly acknowledges an FMLA

violation. Furthermore, Defendants' own exhibits provide direct evidence of retaliatory intent.

65      Despite these admissions, Miles & Stockbridge, P.C. improperly initiated litigation

without a legitimate purpose, filing a civil action predicated on an acknowledged violation of

federal law. This constitutes bad faith litigation and an abuse of the judicial process. *See Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991) (courts have inherent power to sanction attorneys and parties engaging in bad faith litigation and abuse of process)*.

66    Even if this case did not involve a labor dispute, the unclean hands doctrine bars Defendants from obtaining equitable injunctive relief. The Supreme Court has long held that a party seeking equity must do equity and cannot benefit from its own wrongful conduct. *See Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 244-245 (1933) (a court of equity will not assist a party whose own misconduct has an immediate and necessary relation to the claims they assert)*. Because Defendants engaged in unlawful retaliation, any equitable relief granted should have been denied outright. Further, Ohana Growth Partners, LLC admitted to violating the FMLA in their own pleadings, and therefore, the case should have been dismissed immediately as a matter of law.

67    Additionally, to the extent that Defendants obtained injunctive relief through a state court action, such relief was jurisdictionally improper and preempted by federal law under the Supremacy Clause (U.S. Const. art. VI, cl. 2). The Norris-LaGuardia Act (29 U.S.C. §§ 101-115) expressly prohibits courts from issuing injunctions in labor disputes, and any injunctive order issued in violation of this prohibition is void ab initio. *See San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 244 (1959) (holding that state courts lack jurisdiction over disputes preempted by federal labor law)*.

68    Beyond being jurisdictionally improper, the state court proceedings were fundamentally illegitimate:

   1.    Defendants' attorneys confirmed the employer's violation of federal law and yet still proceeded with litigation.

2.      The state court ruled in favor of Defendants despite the case lacking a legitimate legal basis.

3.      The court record serves as direct evidence of bias against Plaintiff and favoritism toward the employer and their legal counsel.

4.      Bar Counsel and the Director of Investigations breached their ethical and legal duties by disclosing privileged or private information in a manner that directly benefited Defendants, the law firm, ruling judges, and county clerk.

69      The wrongdoing of the Defendants is fully documented, and the court record itself stands as indisputable evidence of the misconduct. This civil action presents only a fraction of the violations committed, with the focus placed on the merit of the relief sought and the legal nuances at issue. The egregious and coordinated misconduct of the employer, law firm, ruling judges, county clerk, bar counsel, and director of investigations has inflicted catastrophic harm upon Plaintiff. There is no need to relitigate Defendants' wrongdoing—the evidence is overwhelming. Discovery and depositions will only further substantiate what is already evident.

70      As a direct and foreseeable result of Defendants' unlawful and retaliatory actions, Plaintiff now faces a life-threatening medical emergency, financial default, and irreparable reputational harm. Once a respected professional with a strong network, Plaintiff now experiences professional and social ostracization—a stark contrast that underscores the devastating impact of Defendants' misconduct. The harm is not speculative; it is immediate, severe, and ongoing.

## XIII   CHAIN OF CONSPIRATORIAL HARM

71      This chain of conspiratorial harm can be traced back to October 16th, where accounting irregularities revealed two additional enterprise conspiracies. Compounding this, Ohana was actively involved in covering up these conspiracies. This significantly expands the timeline by

several years, long before the January FMLA violations. Even prior to these events, further

conspiracies emerge, connecting back to the findings of the December 2023 fraud investigation.

72    All these chains lead directly back to the proceedings at hand, where Holly Butler of

Miles & Stockbridge entered under the false pretense of conducting a legitimate investigation. In

reality, Butler was assisting Ohana in fabricating pretexts for termination.

73    The defendants were fully aware of these connections before committing their violations,

which highlights the premeditated and coordinated nature of their actions. This underscores why

Dillon-Capps avoided becoming entangled in this baseless and convoluted scheme. Yet, once it

became clear that Dillon-Capps had uncovered the truth, the defendants began engaging in

increasingly reckless legal decisions. Their actions are akin to a "Ricky Bobby" approach to

litigation, recklessly wielding another legal "knife" to extract the multitude of felony-level

violations already embedded in this case.  The effect of their actions is repeatedly harming the

Plaintiff with those legal "knives" which has caused catastrophic life threatening, financially

crippling, and career ending harm.

## XIV  PLAINTIFF HAS ALREADY WON

74    This is not overconfidence or arrogance—it is a statement of fact. The lawsuit was not

filed with a few misleading statements and a hint of pretext—it reads like a tabloid cover story.

The Plaintiff doesn't believe the tabloids when they claimed Bigfoot was having a movie star's

baby, and similarly, the authors of these filings and affidavits only spoke the truth

unintentionally. Out of the side of their mouths, they inadvertently admitted to violating the

Plaintiff's **FMLA leave** and accidentally revealed that the claims of needing relief were a

fabrication—including the outright denial of an entire department's existence.

75      **Richard Hartman** and **Robert Brennen** respond to every single perceived challenge by committing fraud, spoliation, perjury, or whatever else is necessary. As they flail about trying to harm others, they reveal just how incredibly dishonest they are.

76      Take Hartman's removal of his wife from her billing administrator role to support the perjured statement that no other administrators existed—despite the existence of an entire **Help Desk** department of administrators with whom he regularly interacted. The level of detachment from reality required to commit perjury and spoliation while believing an entire department would go unnoticed is astounding.

77      It is becoming increasingly difficult not to use expletives to emphasize the sheer absurdity of the situation, which can only be described as consuming a truly ludicrous amount of **wacky laughy coco puffs** to sustain such a delusion.

78      Ohana's President Justin Drummond enters into a written agreement on June 7th to gain access, only to claim on June 14th that the Plaintiff was denying him access. The Defendants act as if the passage of time changes the fabric of reality and all that is needed to resolve the problem is to declare "I disagree" and if they commit enough crimes then the "court record" will agree with them too.

79      This is not a case of "he said, she said." The evidence speaks for itself: **emails**, **agreements**, and **admissions**. Yet, none of it seems to matter because the law firm and former employer have already proven, through their own actions, that their claims were lies. No reasonable person could believe that anything filed or ruled in their favor is legitimate—hence, the desperate need for a cover-up by their co-conspirators.

80      If every filing lacks a proper purpose, then every ruling in their favor is equally without a proper purpose. This means every filing and ruling—essentially, anyone other than Ryan Dillon-

Capps who has taken action in, on, or around this lawsuit—has violated one or more fundamental rights or legal principles.  Your Honor, you quoted this statement in your memorandum.  With more sincerity than hyperbole, every experienced trial lawyer believes that pro se's do not know anything about the law and that all defendants did something wrong.  There is a reason that Ryan Dillon-Capps successfully defended himself despite the overwhelming odds, and it begins with a strong understanding of the law and genuine absence of any wrongdoing.

81      Clerk Ensor's policies fail to accurately reflect the statutes they are supposed to enforce, and when in doubt Clerk Ensor changed the form to create a reason. These flawed policies have not eradicated discrimination; they have merely transformed it. What was once overt **racism** has evolved into broader, generalized discrimination that now targets a wider population. However, let's be clear: **more hate doesn't eliminate racism—it just hides it better**.

82      Randall Romes and Daniel Levett affidavits contain perjured statements, and questions that must be asked to determine who was involved.

83      Non-ruling judges, clerks, **Judiciary Information Systems (JIS)**, **Office of Administrative Hearings (OAH)**, **Office of the Attorney General (OAG)**, and the **OAG Civil Rights Division**, along with other contacted parties not directly involved in the conspiracy, are being collectively attributed to the **State**. This distinction is immaterial at this point, as all these entities could—and should—have done more to intervene. Naming them individually at this time would waste judicial resources and increase litigation costs unnecessarily.  For the purposes of this amended complaint, the previous defendants, including the State of Maryland, have effectively become an agent of wrongdoing for the Defendants.

84      This situation reflects a logistical failure of the judicial system, underscored by systemic corruption involving the **Bar Counsel**, **Director of Investigations**, **County Clerk**, and **County Administrative Judge**. However, the conspiracy involving the **Senior Judge** and six other ruling judges in collaboration with **Miles & Stockbridge, P.C.** transcends mere systemic failure—it constitutes a malignant corruption of the judiciary itself.

85      Chambers USA 2024 may want to reconsider the glowing quote featured on Robert Brennen's company profile, which reads:

> 86      "Robert Brennen is a highly talented lawyer, hard-working, and very well respected by the bench."

87      The Plaintiff has firsthand experience of what "very well respected" feels like—it feels like the deprivation of constitutional rights.

## XV   EQUITABLE RELIEF

> *"…it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"*-- **Russello v United States 464 US 16 23 78 L Ed 2d 17 104 S Ct 296 (1983)**

88      Additionally, under federal law:

> "Any attorney or other person admitted conducting cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and **vexatiously** may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct"-- **28 U.S.C. § 1927 - U.S. Code**

1. **Vexatious Litigation Standard** – In *Safir v. U.S. Lines, Inc.*, 792 F.2d 19 (2d Cir. 1986), the **Second Circuit ruled that litigation pursued with improper motives—such as harassment or delay—and when the claims are clearly without merit, is vexatious and warrants relief.**
2. **Abuse of the Judicial Process** – *Tucker v. Woolery*, 99 Md. App. 295, 637 A.2d 482 (1994), holds that such conduct constitutes an **abuse of the judicial process and warrants severe sanctions.**
3. **Judicial Bias and Due Process** – The Supreme Court in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), ruled that **bias at a level "too high to be constitutionally tolerable" requires judicial intervention.**

89      Defendants are fully liable for their actions, and there is no "bulk discount" on harm. Their vexatious, severe, and constitutionally intolerable conduct demands a remedy that is proportional to the compounded and escalating harm inflicted. Relief that is less than the full measure of equity required would implicitly declare that Plaintiff is undeserving of full equitable relief—an outcome that contradicts fundamental principles of justice.

90      Equity demands a remedy that fully accounts for the compounded and consecutive nature of the harm. Any failure to apply multipliers that reflect the Defendants' deliberate, escalating misconduct would fail to achieve fairness. The principles of equity prohibit courts from diminishing the relief necessary to fully redress the severity of the harm caused.

91      Relief that ignores the cumulative and compounding nature of the harm is not equitable; it is a miscarriage of justice. To restore balance and fairness, this Court must impose relief proportional to both the scale and severity of the harm caused by the Defendants' actions. Equity demands full, not partial, redress.

92      During oral argument and testimony, Plaintiff will provide further insights into what constitutes full equitable relief, based on four key principles:

    1.      Monetary relief must exceed the value of Defendants' gain or pursuit – If the damages awarded are less than the profits or benefits Defendants sought to obtain, the case becomes a mere cost-benefit calculation, encouraging future misconduct rather than deterring it.

    2.      The severity of the harm must be fully accounted for – Consecutive and compounding harm is vexatious, severe, and constitutionally intolerable. Any relief that fails to reflect this severity is inherently inequitable.

3.      No arbitrary limitation on damages based on numerical size – If equitable relief

applies to a single dollar under law, there is no valid legal rationale to limit relief solely

because the amount is "too high." Courts do not provide bulk discounts for harm, and this

case presents no exception.

4.      Equity must provide complete restoration – Anything less than full relief would

endorse the Defendants' misconduct and signal that the judicial system tolerates

calculated violations of fundamental rights.

## XVI   COUNTS & RELIEF

93      Everything stated in the complaint and incorporated into the complaint are also

incorporated into the counts.

## COUNT I : FMLA INTERFERENCE

### SUB-COUNT

| Sub | FMLA INTERFERENCE | |
|---|---|---|
| | 29 U.S.C. § 2615(a)(1) FMLA Interference<br>Md. Code, Lab. & Empl. § 3-802 Maryland Flexible Leave Act (MFLA)<br>Md. Code Ann., Ins. § 15-408 Maryland Health Insurance Continuation | |
| [1] | 29 U.S.C. § 2615(a)(1) | Denial of Leave |
| [2] | 29 U.S.C. § 2615(a)(1) | Obstruction/Hinderance of Leave |
| [3] | 29 U.S.C. § 2615(a)(1) | Failure to Restore Position |
| [4] | 29 U.S.C. § 2615(a)(1) | Discouraging Leave Use |
| [5] | Md. Code, Lab. & Empl. § 3-802 | Right to Paid Leave for Medical Reasons |
| [6] | Md. Code Ann., Ins. § 15-408 | Obligation to Continue Health Insurance |

1    The Plaintiff invoked FMLA leave on January 4, 2024, citing medical reasons related to diagnosed PTSD and associated health conditions. Despite meeting eligibility requirements, Ohana Growth Partners, through its leadership—Richard Hartman, Glenn Norris, and Justin Drummond—engaged in a systematic campaign to interfere with, obstruct, and discourage the Plaintiff's access to FMLA protections.

2    Defendants violated 29 U.S.C. § 2615(a)(1) by denying or obstructing the Plaintiff's intermittent FMLA leave. This interference included delaying formal recognition of the leave request, issuing contradictory directives that undermined its use, and creating retaliatory crises that rendered leave periods ineffective. For instance, on May 25,

2024, Defendants confirmed in writing the Plaintiff's entitlement to FMLA leave while simultaneously engaging in actions designed to disrupt its use, such as excessive workload demands and fabricated emergencies.

3    Defendants further failed to restore the Plaintiff to their role, or an equivalent position as required under 29 U.S.C. § 2614(a)(1). Instead, the Plaintiff was wrongfully terminated on July 30, 2024, under pretextual reasons. This termination denied the Plaintiff their statutory right to restoration and reinforced the retaliatory intent underlying the Defendants' actions.

4    The Defendants violated 29 C.F.R. § 825.220 by discouraging the Plaintiff from taking leave. This was executed through retaliatory measures, including threats of termination, excessive and contradictory workload demands, and a fraudulent lawsuit filed on June 14, 2024, which compounded the Plaintiff's financial and emotional strain. Additionally, the Defendants unlawfully demanded recertification for a chronic condition every 30 days, in direct violation of 29 C.F.R. § 825.305(c), further obstructing the Plaintiff's leave rights.

5    Under Md. Code, Lab. & Empl. § 3-802, the Defendants denied the Plaintiff the right to use accrued paid leave for documented medical reasons. Furthermore, following the Plaintiff's wrongful termination, the Defendants failed to maintain health insurance coverage as required under Md. Code Ann., Ins. § 15-408, exacerbating the Plaintiff's medical and financial hardships during a time of critical need.

6    These actions, coordinated by Ohana Growth Partners' leadership and supported by their legal counsel at Miles & Stockbridge, represent a deliberate pattern of FMLA interference and retaliation in violation of federal and state law.

## RELIEF

| RELIEF COUNT II: WAGE COLLECTION | | |
|---|---|---|
| 29 U.S.C. § 2615(a)(1) | Compensatory Damages | Recovery of lost wages, benefits, and additional expenses incurred due to denial, obstruction, or discouragement of FMLA leave. |
| 29 U.S.C. § 2617(a)(1)(A) | Liquidated Damages | Double the amount of compensatory damages for willful violations of the FMLA. |
| 29 U.S.C. § 2617(a)(3) | Attorney's Fees and Costs | Recovery of reasonable attorney's fees and court costs for FMLA violations. |
| Md. Code, Lab. & Empl. § 3-802 | Restorative Relief | Recovery of paid leave benefits wrongfully denied for documented medical reasons. |
| Md. Code Ann., Ins. § 15-408 | Restorative Relief | Reinstatement or equivalent compensation for terminated health insurance benefits. |
| 29 U.S.C. § 2617(a)(1)(B) | Injunctive Relief | Court order mandating compliance with FMLA, restoration of health insurance, and cessation of retaliatory practices. |

## COUNT II: FMLA RETALIATION

### SUB-COUNT

| Sub | FMLA RETALIATION |
|---|---|
| | 29 U.S.C. § 2615(a)(2)  FMLA Retaliation<br>Md. Code, Lab. & Empl. § 3-802 Retaliation for Exercising Leave Rights<br>Md. Code Ann., Ins. § 15-408 Adverse Action Worsened Harm |

| | | |
|---|---|---|
| [7] | 29 U.S.C. § 2615(a)(2)<br>29 C.F.R. § 825.220(b) | Harassment/Hostile Behavior |
| [8] | 29 U.S.C. § 2615(a)(2)<br>29 C.F.R. § 825.220(b) | Suspension without Pay |
| [9] | 29 U.S.C. § 2612(d)(2)<br>29 C.F.R. § 825.207(a) | Denied Use of Paid Leave |
| [10] | 29 U.S.C. § 2615(a)(2)<br>29 C.F.R. § 825.220(c) | Termination |
| [11] | 29 U.S.C. § 2614(c)(1)<br>29 C.F.R. § 825.209(a) | Termination of  Insurance Benefits<br>(Health, Dental, Life, etc.) |
| [12] | Md. Code, Lab. & Empl. § 3-802 | Retaliation for Exercising Leave Right |
| [13] | Md. Code Ann., Ins. § 15-408 | Adverse Action Worsened Harm |

7    The Defendants, including Ohana Growth Partners, LLC, and individual actors such as Richard Hartman, Glenn Norris, and Justin Drummond, engaged in retaliatory actions in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2615(a)(2), as well as Maryland statutes, Md. Code, Lab. & Empl. § 3-802, and Md. Code Ann., Ins. § 15-408. These retaliatory actions began after the Plaintiff invoked their FMLA rights for intermittent medical leave due to serious health conditions and escalated with the initiation of a fraudulent lawsuit on June 14, 2024.

8    The Defendants retaliated against the Plaintiff in the following ways:

9    **Harassment and Hostile Behavior:** Following the Plaintiff's invocation of FMLA protections, Glenn Norris and Justin Drummond created a hostile work environment. This included unwarranted criticism, exclusion from meetings, and increased scrutiny of the Plaintiff's work performance. The hostile behavior was intended to discourage the Plaintiff from exercising their FMLA rights and reporting systemic misconduct.

10    **Suspension Without Pay:** On June 13, 2024, Richard Hartman directed the suspension of the Plaintiff without pay, cutting off their income while their FMLA request was pending. This suspension coincided with the fraudulent lawsuit initiated by Ohana Growth Partners, further destabilizing the Plaintiff financially.

11    **Denial of Paid Leave:** Despite the Plaintiff's eligibility to use accrued paid leave during their FMLA-protected absence, the Defendants, led by Glenn Norris and Hartman, refused to approve such requests without justification. This denial compounded the Plaintiff's financial strain and increased the harm caused by their ongoing health challenges.

12    **Termination:** On July 30, 2024, the Plaintiff was terminated under pretextual grounds, while still invoking their FMLA protections. The timing of the termination, shortly after the initiation of the fraudulent lawsuit, indicates a coordinated retaliatory effort.

13    **Termination of Insurance Benefits:** On November 7, 2024, the Plaintiff's health, dental, and life insurance benefits were wrongfully terminated without proper notice or cause. This action left the Plaintiff without access to critical medical care and increased the financial burden caused by their retaliatory termination.

14    **Violation of State Law Protections:** Under Md. Code, Lab. & Empl. § 3-802, the Plaintiff was entitled to protection against retaliation for exercising leave rights. Additionally, Md. Code Ann., Ins. § 15-408 prohibits termination of health insurance benefits in a manner that exacerbates harm, which the Defendants flagrantly violated.

15    The Defendants' actions caused significant harm, including financial instability, reputational damage, and worsened health conditions. These retaliatory measures were part of a coordinated strategy to silence the Plaintiff's whistleblowing efforts and deter them from asserting their rights under the FMLA and Maryland law.

RELIEF

| RELIEF COUNT II: WAGE COLLECTION | | |
|---|---|---|
| 29 U.S.C. § 2617(a)(1)(A)(i) | Actual Damages | Compensation for lost wages, benefits, and other monetary losses due to retaliation. |
| 29 U.S.C. § 2617(a)(1)(A)(ii) | Interest | Prejudgment interest on the amount of lost compensation. |
| 29 U.S.C. § 2617(a)(1)(A)(iii) | Liquidated Damages | Double the amount of lost wages and benefits for willful violations. |
| 29 U.S.C. § 2617(a)(3) | Attorney's Fees and Costs | Recovery of reasonable attorney's fees and litigation costs. |
| Md. Code, Lab. & Empl. § 3-802 | Statutory Damages | Penalties for retaliatory actions violating Maryland leave protections. |
| Md. Code Ann., Ins. § 15-408 | Restorative Compensation | Compensation for termination of insurance benefits causing additional harm. |
| 29 U.S.C. § 2617(a)(1)(B) | Injunctive Relief | Reinstatement of employment and restoration of lost benefits. |
| 29 U.S.C. § 2617(a)(1)(A)(iv) | Equitable Relief | Reinstatement of insurance benefits and measures to prevent future retaliation. |

## COUNT III: FAILURE TO PROVIDE  REASONABLE ACCOMODATIONS OF FMLA LEAVE [PENDING EEOC]

SUB-COUNT

| Sub | FAILURE TO PROVIDE  REASONABLE ACCOMODATIONS OF FMLA LEAVE [PENDING EEOC] | |
|---|---|---|
| | U.S.C. § 12112 ET SEQ. VIOLATION OF TITLE I OF THE ADA (PENDING EEOC) <br> MD. CODE, STATE GOV'T § 20-606 MARYLAND'S ANTI-DISCRIMINATION LAW <br> & Maryland Fair Employment Practices Act (MFEPA) | |
| [14] | 42 U.S.C. § 12112 et seq <br> Md. Code, State Gov't § 20-606 | Failure to Provide Reasonable Accommodation |
| [15] | Md. Code, State Gov't § 20-606(a)(4) | Failure to Provide Reasonable Accommodation by State Law |
| [16] | 42 U.S.C. § 12203(a) <br> Md. Code, State Gov't § 20-606(f) | Retaliation |
| [17] | Md. Code, State Gov't § 20-606(f) | Retaliation Prohibited by State Law |

16    **Ohana Growth Partners, LLC**, employing over 50 individuals, qualifies as a **covered employer** under **42 U.S.C. § 12111(5)** and **Md. Code, State Gov't § 20-606(a)(1)**. The plaintiff, a **qualified individual with a disability** under **42 U.S.C. § 12111(8)** and **Md. Code, State Gov't § 20-606(a)(3)**, was capable of performing the essential functions of their job with reasonable accommodations, including intermittent FMLA leave for medical needs.

17    **Failure to Provide Reasonable Accommodation**: Ohana Growth Partners violated **42 U.S.C. § 12112(b)(5)(A)** and **Md. Code, State Gov't § 20-606(a)(4)** by obstructing and ultimately denying the plaintiff's request for intermittent leave as a reasonable accommodation. This denial deprived the plaintiff of their federally and state-protected rights to equal access to employment opportunities.

18    **Retaliation**: The employer retaliated against the plaintiff for requesting accommodations and exercising ADA-protected rights. This retaliation included termination under pretextual grounds, wage suppression, and refusal to pay earned compensation, in violation of **42 U.S.C. § 12203(a)** and **Md. Code, State Gov't § 20-606(f)**. These adverse actions were directly tied to the plaintiff's requests for reasonable accommodation and whistleblowing activities.

19    The plaintiff's **Title I claim** is currently **pending EEOC resolution** under **42 U.S.C. § 12117(a)**. However, state-level claims under Maryland's Anti-Discrimination Law and the **Maryland Fair Employment Practices Act (MFEPA)** provide an immediate legal framework for seeking remedies.

20    The employer's intentional refusal to accommodate the plaintiff's disability and subsequent retaliatory termination caused significant financial, emotional, and professional harm. These actions violated both federal and state anti-discrimination laws, entitling the plaintiff to compensatory and punitive damages under **42 U.S.C. § 1981a(a)(2)**.

RELIEF

| RELIEF COUNT ADA TITLE I & MARYLAND ANTI-DISCRIMINATION RETALIATION [PENDING EEOC] | | |
|---|---|---|
| 42 U.S.C. § 12117(a) | EEOC Enforcement and Litigation | Allows claims to proceed following EEOC review, including litigation for discrimination and retaliation. |
| 42 U.S.C. § 12112(b)(5)(A) | Reasonable Accommodation Relief | Injunctive relief, compensatory damages, and other remedies for failure to accommodate under Title I. |
| 42 U.S.C. § 12203(a) | Retaliation Relief | Damages and injunctive relief for retaliatory actions under the ADA. |
| 42 U.S.C. § 1981a(a)(2) | Compensatory and Punitive Damages | Recovery of emotional distress, lost wages, and punitive damages for intentional discrimination. |
| Md. Code, State Gov't § 20-606(a)(4) | Reasonable Accommodation Damages | Compensatory damages for failure to provide reasonable accommodation under Maryland law. |
| Md. Code, State Gov't § 20-606(f) | Retaliation Relief | Damages for wage suppression, termination, and retaliation tied to requests for accommodations. |

## COUNT IV: ADA TITLE I AND MARYLAND ANTI-RETALIATION [PENDING EEOC]

SUB-COUNTS

| Sub | ADA TITLE I AND MARYLAND ANTI-RETALIATION [PENDING EEOC] | |
|---|---|---|
| | 42 U.S.C. § 12203(A) ADA RETALIATION (TITLE I AND TITLE II) MD. CODE, STATE GOV'T §§ 20-304(B), 20-606(F) MARYLAND'S ANTI-DISCRIMINATION LAW | |
| [18] | 42 U.S.C. § 12203(A) | ADA Retaliation under Title I [PENDING EEOC] |
| [19] | 42 U.S.C. § 12203(A) | ADA Retaliation under Title II |

21    **42 U.S.C. § 12203(a)** and **Md. Code, State Gov't §§ 20-304(b), 20-606(f)** prohibit retaliation against individuals who engage in protected activities under the ADA and Maryland law. The plaintiff engaged in protected activities, including requesting FMLA leave and raising accessibility concerns, actions explicitly safeguarded under these statutes. In direct response to these activities, **Ohana Growth Partners, LLC** terminated the plaintiff under false pretext, while judicial and administrative defendants obstructed filings and suppressed complaints to prevent the plaintiff from pursuing their rights. These adverse actions were causally connected to the plaintiff's exercise of ADA rights, violating **42 U.S.C. § 12203(a)** and Maryland's anti-retaliation provisions.

22    For retaliation under **Title I** of the ADA by the employer, the plaintiff is entitled to seek damages under **42 U.S.C. § 1981a(a)(2)**, including compensation for harm caused by the denial of reasonable accommodations and retaliation for engaging in protected activities.

RELIEF

| RELIEF COUNT ADA TITLE I AND MARYLAND ANTI-RETALIATION [PENDING EEOC] | | |
|---|---|---|
| 42 U.S.C. § 12203(a) | ADA Retaliation Relief | Injunctive relief, compensatory damages, and remedies for retaliation under ADA Titles I and II. |
| 42 U.S.C. § 1981a(a)(2) | ADA Damages | Recovery of compensatory and punitive damages for employer retaliation under Title I. |
| Md. Code, State Gov't § 20-606(f) | Damages for State Retaliation | Recovery of damages for retaliation, including emotional distress and punitive damages for willful acts. |
| Md. Code, State Gov't § 20-304(b) | Injunctive Relief | Court-ordered injunctions to prohibit ongoing retaliatory actions. |
| 42 U.S.C. § 12205 | Attorney's Fees | Recovery of reasonable attorney's fees and litigation costs for ADA-related retaliation claims. |

## COUNT V: UNLAWFUL TERMINATION

SUB-COUNTS

| **Sub** | UNLAWFUL TERMINATION | |
|---|---|---|
| [20] | 29 U.S.C. § 2615(a)(2) | Retaliatory Termination While on FMLA Leave |
| [21] | 29 C.F.R. § 825.220(a) | Pretextual Justification for Termination |
| [22] | 29 U.S.C. § 2614(c)(1) | Failure to Maintain Health Benefits During FMLA Leave |
| [23] | Md. Code Ann., Lab. & Empl. § 3-505 | Failure to Pay Wages and Benefits: |

| [24] | Md. Code Ann., Ins. § 15-1301 et seq. | Md. Health Insurance Continuation Requirements |
|---|---|---|
| [25] | Md. Code Ann., Ins. § 15-408 | Adverse Termination Worsened Harm via Loss of Benefits |
| [26] | 18 U.S.C. § 1341 | Fraudulent Use of USPS (Mail Fraud) |
| [27] | 18 U.S.C. § 1343 | Fraudulent Use of Email (Wire Fraud) |
| [28] | 29 U.S.C. § 1140 | Interfering with the attainment of benefits under an employee benefit plan. |

23    On July 30, 2024, the Plaintiff, Ryan Dillon-Capps, was unlawfully terminated by the Defendant, Ohana Growth Partners, LLC, while on protected FMLA leave. This termination, which occurred with several weeks of FMLA leave remaining, violated 29 U.S.C. § 2615(a)(2), which prohibits retaliatory actions against employees for exercising their FMLA rights. The Defendant's justification for the termination relied on fabricated claims of performance issues and policy violations, amounting to a pretextual reasoning prohibited under 29 C.F.R. § 825.220(a). This pretext was designed to obscure the true retaliatory motive behind the termination and deter the Plaintiff from exercising federally protected leave rights.

24    The termination also resulted in the immediate cessation of the Plaintiff's health insurance benefits, violating 29 U.S.C. § 2614(c)(1), which requires employers to maintain health insurance coverage under the same terms as active employment during FMLA leave. Maryland law further reinforces these protections through Md. Code Ann., Lab. & Empl. § 3-505 and Md. Code Ann., Ins. §§ 15-1301 et seq. and 15-408, which obligate employers to ensure the continuation of benefits and prohibit adverse actions that exacerbate harm to employees during transitions. The Defendant's failure to meet these obligations compounded the Plaintiff's financial and medical hardships during a period of critical need.

25    Additionally, the Defendant employed fraudulent communications to further the unlawful termination. A termination letter sent via USPS contained materially false statements about the reasons for the Plaintiff's dismissal, constituting mail fraud under 18 U.S.C. § 1341. Similarly, the Defendant's email correspondence misrepresented the termination's basis, amounting to wire fraud under 18 U.S.C. § 1343. These fraudulent communications were part of a deliberate scheme to conceal the retaliatory and unlawful nature of the termination.

26    The Defendant's actions also interfered with the Plaintiff's ability to access benefits under an employee benefit plan, violating 29 U.S.C. § 1140 of ERISA. By terminating the Plaintiff, the Defendant obstructed the Plaintiff's ability to continue receiving health insurance, vested benefits, and other employment-related entitlements. This interference demonstrates a calculated effort to deny the Plaintiff both immediate and long-term protections afforded under federal and state law.

27    Through these violations, the Defendant engaged in a coordinated effort to unlawfully terminate the Plaintiff, conceal the retaliatory motive, and inflict financial and emotional harm. These actions are in direct contravention of federal and state statutes, underscoring the need for compensatory, punitive, and injunctive relief to address the harm caused.

RELIEF

| RELIEF COUNT UNLAWFUL TERMIANTION | | |
|---|---|---|
| 29 U.S.C. § 2615(a)(2) | Compensatory Damages | Recovery for lost wages, benefits, and emotional distress caused by retaliatory termination under 29 U.S.C. § 2615(a)(2). |
| 29 U.S.C. § 2615(a)(2) | Liquidated Damages | Double the compensatory damages for willful violations of the FMLA under 29 U.S.C. § 2615(a)(2). |
| 29 U.S.C. § 2615(a)(2) | Injunctive Relief | Reinstatement to former role or equivalent position with restored benefits under 29 U.S.C. § 2615(a)(2). |
| 29 C.F.R. § 825.220(a) | Equitable Relief | Declaration that termination was pretextual and violated the FMLA under 29 C.F.R. § 825.220(a). |
| 29 U.S.C. § 2614(c)(1) | Restorative Relief | Compensation for medical expenses and other costs arising from the failure to maintain health benefits under 29 U.S.C. § 2614(c)(1). |
| Md. Code Ann., Lab. & Empl. § 3-505 | Back Pay | Payment of wages and accrued benefits owed at the time of termination under Md. Code Ann., Lab. & Empl. § 3-505. |
| Md. Code Ann., Lab. & Empl. § 3-507.2(b) | Treble Damages | Up to three times the withheld wages if nonpayment is found to be in bad faith under Md. Code Ann., Lab. & Empl. § 3-507.2(b). |
| Md. Code Ann., Lab. & Empl. § 3-507.2(b) | Statutory Damages | Penalties for failing to pay wages under Maryland law under Md. Code Ann., Lab. & Empl. § 3-507.2(b). |
| Md. Code Ann., Ins. § 15-1301 et seq. | Injunctive Relief | Restoration of lost health insurance benefits and coverage continuity under Md. Code Ann., Ins. § 15-1301 et seq. |
| Md. Code Ann., Ins. § 15-408 | Compensatory Damages | Recovery for financial and personal harm caused by the loss of insurance benefits under Md. Code Ann., Ins. § 15-408. |
| 18 U.S.C. § 1341 | Punitive Damages | Damages to deter fraudulent practices involving mail communications under 18 U.S.C. § 1341. |
| 18 U.S.C. § 1341 | Treble Damages | Triple the damages for harm caused by fraudulent mail communications under 18 U.S.C. § 1341. |
| 18 U.S.C. § 1341 | Attorney's Fees | Recovery of reasonable attorney's fees and litigation costs under 18 U.S.C. § 1341. |
| 18 U.S.C. § 1343 | Punitive Damages | Damages to deter fraudulent practices involving electronic communications under 18 U.S.C. § 1343. |
| 18 U.S.C. § 1343 | Treble Damages | Triple the damages for harm caused by fraudulent email communications under 18 U.S.C. § 1343. |
| 18 U.S.C. § 1343 | Attorney's Fees | Recovery of reasonable attorney's fees and litigation costs under 18 U.S.C. § 1343. |
| 29 U.S.C. § 1140 | Restitution | Reinstatement of benefits and compensation for financial harm due to interference under 29 U.S.C. § 1140. |
| 29 U.S.C. § 1140 | Injunctive Relief | Order prohibiting further interference with employee benefit plans under 29 U.S.C. § 1140. |
| 29 U.S.C. § 1140 | Statutory Damages | Civil penalties for interfering with ERISA-protected benefits under 29 U.S.C. § 1140. |
| 29 U.S.C. § 2615(a)(2) | Compensatory Damages | Recovery for lost wages, benefits, and emotional distress caused by retaliatory termination under 29 U.S.C. § 2615(a)(2). |

## COUNT VI: MISCLASSIFICATION OF EXEMPT STATUS

SUB-COUNT

| Sub | MISCLASSIFICATION OF EXEMPT STATUS | |
|---|---|---|
| | 29 U.S.C. §§ 201–219 - Fair Labor Standards Act (FLSA) | |
| [29] | 29 U.S.C. § 207(a)(1) | Entitlement to Overtime |
| [30] | 29 U.S.C. § 213 | Misclassification |

28    The Plaintiff was misclassified under the Fair Labor Standards Act (FLSA) following their intermittent FMLA leave beginning on January 4, 2024. This misclassification was a deliberate act by Ohana Growth Partners, LLC, led by Glenn Norris, to retaliate against the Plaintiff for exercising their FMLA rights and to strip them of authority and autonomy in their professional role. The retaliatory actions not only undermined the Plaintiff's employment status but also sought to suppress their whistleblowing activities and impair their professional credibility.

29    While on FMLA leave, Glenn Norris assumed the role of head of IT, effectively usurping the Plaintiff's supervisory responsibilities. Upon the Plaintiff's return, their authority was deliberately undermined in several ways. They were excluded from key decisions, including hiring and firing, such as the hiring of a new IT team member for the Business Intelligence Team and the disciplining of Darren Koritzka. Norris also misled the Plaintiff into believing they had resumed their supervisory role, only for the Plaintiff to discover later, after terminating Ryan Brooks, that their authority had not been restored.

30    Further demonstrating this retaliation, Glenn Norris directly managed IT team members, bypassing the Plaintiff entirely. Team members received directives from Norris and informed the Plaintiff only after executing those instructions, showcasing the Plaintiff's lack of effective authority or control. The Plaintiff was also denied self-administrative authority, with Norris preventing them from performing standard managerial functions, including sending departmental communications, attending or leading project meetings, and making independent decisions regarding IT operations. These restrictions rendered the Plaintiff unable to self-manage or perform tasks typically required of their role.

31    The retaliation extended to the exclusion of the Plaintiff from technical work. Norris deliberately directed all technical tasks to bypass the Plaintiff for months and further instructed them not to engage in technical tasks, effectively stripping the Plaintiff of substantive contributions to their department. These actions not only humiliated the Plaintiff but also created a pretext for misclassification under FLSA.

32    During the Plaintiff's FMLA leave, the Defendants engaged in harassment and interference to undermine the Plaintiff's protected leave. On May 25, 2024, the Defendants confirmed in writing that the Plaintiff could use FMLA leave but simultaneously engaged in constant harassment and created disruptions requiring the Plaintiff's response. This harassment forced the Plaintiff to work excessive hours—60 to 80 hours per week—while on intermittent FMLA leave, contravening the purpose of FMLA, which is to provide protected leave for medical recovery. This interference directly harmed the Plaintiff and added to the retaliatory context surrounding the misclassification.

33    The Plaintiff was entitled to non-exempt protections under FLSA, as they did not meet the criteria for any exemption category under 29 U.S.C. § 213. Despite meeting the salary basis threshold, their duties did not satisfy the FLSA's duties test for the following reasons. The Plaintiff lacked supervisory authority, including hiring, firing, and team management, as Glenn Norris had assumed direct control over these functions. The Plaintiff was barred from exercising discretion and independent judgment, as Norris micromanaged decisions and denied them self-administrative tasks. The Plaintiff was precluded from performing substantive technical work, further disqualifying them from this exemption.

34    As a result of this misclassification, the Plaintiff was wrongfully denied overtime compensation for hours worked in excess of 40 hours per week, in violation of 29 U.S.C. § 207(a)(1). These retaliatory actions, combined with the misclassification, were part of a deliberate strategy to suppress the Plaintiff's FMLA rights and impose financial harm.

RELIEF

| RELIEF COUNT V: NON-EXEMPT CLASSIFICATION | | |
|---|---|---|
| 29 U.S.C. § 216(b) | Back Pay | Recovery of unpaid overtime for hours worked beyond 40 hours per week. |
| 29 U.S.C. § 216(b) | Liquidated Damages | Equal to the amount of back pay, unless the employer can show good faith. |
| 29 U.S.C. § 216(b) | Attorney's Fees and Costs | Recovery of reasonable attorney's fees and litigation costs. |
| 29 U.S.C. § 216(b) | Equitable Relief | Injunctive relief to prevent further FLSA violations. |

## COUNT VII: WITHHOLDING COMPENSATION

SUB-COUNT

| Sub | WITHHOLDING COMPENSATION | |
|---|---|---|
| | MD. CODE, LAB. & EMPL. §§ 3-501–3-509 Maryland Wage Payment and Collection Law (MWPCL) | |
| [31] | Md. Code, Lab. & Empl. § 3-505 | Entitlement to Wages |
| [32] | Md. Code, Lab. & Empl. § 3-507.2 | Withholding of Wages in Bad Faith |
| [33] | Md. Code, Lab. & Empl. § 3-507.2 | Failure to Pay Overtime |
| [34] | Md. Code, Lab. & Empl. § 3-507.2(b) | Treble Damages |

35    Under Md. Code, Lab. & Empl. §§ 3-501–3-509, the Plaintiff was entitled to prompt payment of wages, including overtime, bonuses, and other compensation. However, the Defendants, acting with retaliatory intent, withheld wages, exacerbating the Plaintiff's financial instability and violating Maryland wage laws.

36    The Plaintiff was entitled to wages under Md. Code, Lab. & Empl. § 3-505. These included regular salary, accrued paid leave, bonuses, stipends, KPI-based compensation, holiday and annual bonuses, and overtime pay. At the time of termination on July 30, 2024, these amounts remained unpaid. Specifically, the Defendants failed to pay overtime compensation owed under Maryland law for hours worked beyond 40 hours per week, accrued paid leave earned but not paid out, regular salary withheld during the fraudulent lawsuit initiated on June 14, 2024, and other monetary compensation, such as bonuses and stipends, typically provided to employees in similar roles.

37    The Plaintiff's excessive workload, ranging from 60 to 80 hours per week, arose from retaliatory demands and fabricated crises engineered by the Defendants. Despite being entitled to overtime pay under Md. Code, Lab. & Empl. § 3-415, the Defendants failed to compensate the Plaintiff for hours worked beyond 40 hours per week. This failure to pay overtime was not merely negligent but was part of a broader strategy to suppress whistleblowing and shield enterprise misconduct through financial destabilization.

38    The Defendants also withheld wages in bad faith, violating Md. Code, Lab. & Empl. § 3-507.2. The withholding of regular salary, bonuses, and accrued leave was intentional and served to retaliate against the Plaintiff for exposing fraud

and enterprise misconduct. By financially destabilizing the Plaintiff, the Defendants sought to prevent further exposure of systemic violations and to shield co-conspirators from accountability under federal and state law. This bad-faith withholding also included leveraging financial hardship to obstruct the Plaintiff's ability to seek legal redress effectively.

39    Under Md. Code, Lab. & Empl. § 3-507.2(b), the Plaintiff is entitled to treble damages for wages withheld in bad faith. The Defendants' motivations included suppressing whistleblowing about fraudulent enterprise activities, such as identity theft, false submissions, and obstruction of justice. The withholding of wages served to retaliate against the Plaintiff and silence their whistleblowing efforts while protecting co-conspirators and obstructing judicial processes. This pattern of enterprise-wide misconduct highlights the need for significant damages to deter similar retaliatory actions and ensure accountability for violations of Maryland wage laws.

40    The Defendants' malicious actions and inactions inflicted devastating financial harm on the Plaintiff, with consequences that extended to the Plaintiff's vulnerable dependents, compounding the irreparable harm. The Plaintiff's brother, who is disabled and reliant on SSDI and Medicaid, is unable to work and now faces severe financial insecurity due to the Plaintiff's inability to provide critical support. The Plaintiff's elderly mother, who depends on Social Security and Medicare, has also been gravely affected, as she relied on the Plaintiff's financial and logistical support to manage basic living expenses and medical care.

41    The Plaintiff's wife, who has cerebral palsy and serves as the Plaintiff's full-time caregiver, has been overwhelmed by the escalating demands caused by the Plaintiff's deteriorating health. The malicious prosecution, which spanned over five months, exacerbated the Plaintiff's existing health conditions, with Glenn Norris and Richard Hartman inducing catatonia and their co-conspirators driving it into malignant catatonia. This severe and life-threatening condition, coupled with dissociative episodes and dissociative amnesia, rendered the Plaintiff incapable of working.

42    The Plaintiff's household, already relying on limited fixed incomes, now faces grossly insufficient resources to meet mounting medical expenses, basic living costs, and necessities such as food, water, and electricity. The financial destabilization also obstructed the Plaintiff's ability to secure legal counsel, leaving them defenseless against the Defendants' relentless attacks. The coordinated actions of the Defendants have forced the Plaintiff and their dependents into a precarious position, with eviction looming as an imminent threat and no alternatives available without immediate relief.

43    The harm caused by the Defendants' actions is both severe and far-reaching, demonstrating a deliberate intent to exploit the Plaintiff's vulnerabilities and amplify the suffering of an entire household. The situation demands urgent injunctive and compensatory relief to address the devastating financial, emotional, and physical harm inflicted by the Defendants' malicious conduct.

44    The Defendants, alongside their co-conspirators, weaponized the judicial and administrative systems to maximize harm, leveraging every opportunity to intensify the Plaintiff's suffering. Knowing the Plaintiff's precarious financial and health situation, the Defendants deliberately prolonged litigation, denied hearings, and ruled motions as moot, fully aware that these actions would exacerbate the Plaintiff's financial instability and health decline. Their coordinated

efforts ensured that relief was systematically denied, leaving the Plaintiff and their dependents to endure relentless and compounding harm.

45    This deliberate infliction of harm on an already vulnerable household underscores the severity of the Defendants' misconduct. The prolonged financial suppression has caused cascading effects, including the Plaintiff's inability to provide essential support to their dependents, exacerbating their medical and financial vulnerabilities. The harm is not confined to the Plaintiff alone but radiates outward, destabilizing an entire household that depended on the Plaintiff's ability to work and provide. The Defendants' actions have not only deprived the Plaintiff of their legal and economic rights but have also imposed immense suffering on their dependents, amplifying the stakes and the moral and legal gravity of the case.

46    In light of these extraordinary harms, the Plaintiff seeks comprehensive injunctive relief and restorative compensation to address the immediate and long-term consequences of the Defendants' malicious actions. This includes compensation for the Plaintiff's dependents increased medical and living expenses, funds for ongoing care and support, and additional damages to account for the egregious and deliberate nature of the harm inflicted. Furthermore, the Plaintiff requests punitive damages to deter such egregious misconduct in the future and ensure that no other vulnerable individuals or families are subjected to similar abuses.

## RELIEF

### RELIEF COUNT VI: WAGE COLLECTION

| Md. Code, Lab. & Empl. § 3-505 | Back Pay | Payment of wages earned but withheld at the time of termination. |
|---|---|---|
| Md. Code, Lab. & Empl. § 3-507.2 | Treble Damages | Up to three times the amount of withheld wages for bad faith nonpayment. |
| Md. Code, Lab. & Empl. § 3-507.2 | Compensatory Damages | Recovery for financial harm caused by wage withholding. |
| Md. Code, Lab. & Empl. § 3-507.2 | Attorney's Fees and Costs | Recovery of reasonable attorney's fees and litigation costs. |

## COUNT VIII: CANCELLING OF BENEFITS

### SUB-COUNT

| Sub | CANCELLING OF BENEFITS | |
|---|---|---|
| | **Family and Medical Leave Act (FMLA)** 29 U.S.C. §§ 2601–2654<br>**Maryland Wage Payment and Collection Law (MWPCL)** Md. Code, Lab. & Empl. §§ 3-501–3-509<br>**Maryland Consumer Protection Act (MCPA)** Md. Code, Com. Law § 13-101 et seq.<br>**Wire Fraud Statute** – 18 U.S.C. § 1343 | |
| [35] | **Code** | **Provision** |
| [36] | 29 U.S.C. § 2614(c) | **Maintenance of Health Benefits During FMLA Leave**: Failure to maintain group health coverage during protected FMLA leave. |
| [37] | Md. Code, Lab. & Empl. § 3-505 | **Failure to Pay Wages and Benefits**: Termination of health benefits violates obligations to pay agreed compensation. |
| [38] | Md. Code, Com. Law § 13-301(2) | **False Representations**: Misrepresenting the status or availability of health benefits. |

| [39] | Md. Code, Com. Law § 13-301(3) | **Omission of Material Facts**: Failing to disclose critical information about the continuation of health benefits. |
| [40] | Md. Code, Com. Law § 13-301(15) | **Misrepresentation of Authorization, Approval, or Certification of a Service**: Misleading the employee about the legitimacy or status of their health coverage. |
| [41] | 18 U.S.C. § 1343 | **Wire Fraud**: Using electronic communications to unlawfully cancel health benefits. |

47    Ohana Growth Partners, LLC.  Failed to maintain insurance benefits, misrepresented the status of coverage, used electronic communications to cancel the plan, and terminated benefits while on FMLA leave and violated obligations they explicitly stated earlier in the year would be paid(see Exhibit 102 Digital ZIP for commitment, and Exhibit 103 for COBRA packet)

RELIEF

| RELIEF COUNT VI: WAGE COLLECTION | | |
| --- | --- | --- |
| 29 U.S.C. § 2614(c) | Injunctive Relief | Maintenance of health benefits during FMLA leave. |
| Md. Code, Lab. & Empl. § 3-505 | Back Pay | Compensation for unpaid wages tied to terminated benefits. |
| Md. Code, Com. Law §§ 13-301(2), (3), (15) | Compensatory and Punitive Damages | Relief for misrepresentations and omitted facts about health benefits. |
| 18 U.S.C. § 1343 (Wire Fraud) | Punitive and Compensatory Damages | Damages related to fraudulent use of electronic communication. |

## COUNT VIX: WITHHOLDING COBRA PAPERWORK

SUB-COUNT

| Sub | WITHHOLDING COBRA PAPERWORK | |
| --- | --- | --- |
| | **Consolidated Omnibus Budget Reconciliation Act (COBRA)** 29 U.S.C. §§ 1161–1169 **Employee Retirement Income Security Act (ERISA)** 29 U.S.C. § 1001 et seq. **Maryland Consumer Protection Act (MCPA)** Md. Code, Com. Law §§ 13-101–13-501 | |
| [42] | 29 U.S.C. § 1166 | COBRA Notification Requirements |
| [43] | 29 U.S.C. § 1132 (ERISA § 502) | ERISA Civil Enforcement |
| [44] | Md. Code, Com. Law § 13-301(3) | Omission of Material Facts |
| [45] | Md. Code, Com. Law § 13-301(6) | Deceptive Practices |
| [46] | Md. Code, Com. Law § 13-301(14)(iii) | Failure to State Material Facts |
| [47] | 18 U.S.C. § 1030 (CFAA) | Unauthorized Access and Data Manipulation |
| [48] | 45 CFR § 164.312 (HIPAA Security Rule) | Failure to Safeguard Digital Records |
| [49] | 18 U.S.C. § 1343 (Wire Fraud) | Fraudulent Use of Digital Systems |
| [50] | 18 U.S.C. § 1341 (Mail Fraud) | Fraudulent Mailing |

48    ALLEGATION:  Ohana Growth Partners, LLC, evidence suggests Richard Hartman, modified the RDCs information so that the COBRA paperwork was sent to them, likely at the 212 HQ address, where they held the paperwork.  Digital communications were used to make the change, US Postal Service was used in the mailing, and

they knew better when they were making those changes. The Allegation portion is that it is Richard Hartman, shipped to 212 HQ address. It is a fact that it was redirected and mailed a second time.

RELIEF

| RELIEF COUNT VIII: WITHHOLDING COBRA PAPERWORK | | |
|---|---|---|
| 29 U.S.C. § 1166 | Injunctive Relief | Enforce proper notification of COBRA rights and compliance with all statutory requirements. |
| 29 U.S.C. § 1132 (ERISA § 502) | Civil Damages | Recovery of damages caused by failure to provide COBRA notices, including medical expenses. |
| Md. Code, Com. Law § 13-301(3) | Compensatory Damages | Compensation for harm caused by withholding material facts about COBRA rights. |
| Md. Code, Com. Law § 13-301(6) | Punitive Damages | Deterrence for engaging in deceptive practices regarding COBRA notifications. |
| Md. Code, Com. Law § 13-301(14)(iii) | Statutory Penalties | Recovery for failure to disclose critical facts about COBRA rights and obligations. |
| 18 U.S.C. § 1030 (CFAA) | Civil Remedies and Injunctive Relief | Compensation for harm caused by unauthorized access and data manipulation affecting COBRA notices. |
| 45 CFR § 164.312 (HIPAA Security Rule) | Compliance Enforcement | Implementation of safeguards to prevent unauthorized changes to digital systems. |
| 18 U.S.C. § 1343 (Wire Fraud) | Compensatory and Punitive Damages | Recovery for harm caused by fraudulent use of digital systems to obstruct COBRA notices. |
| 18 U.S.C. § 1341 (Mail Fraud) | Compensatory and Punitive Damages | Compensation for harm caused by fraudulent redirection of COBRA paperwork through the postal system. |

## COUNT X: INSURANCE FRAUD

SUB-COUNT

| Sub | INSURANCE FRAUD | |
|---|---|---|
| | **Health Insurance Portability and Accountability Act (HIPAA)** 42 U.S.C. § 1320d et seq. **Maryland Consumer Protection Act (MCPA)** Md. Code, Com. Law §§ 13-101–13-501 **Mail Fraud Statute** 18 U.S.C. § 1341 | |
| [51] | 45 CFR § 164.306 | **HIPAA Security Rule: Integrity of PHI:** Compromising the integrity of health plan information by altering documents related to PHI. |
| [52] | 45 CFR § 164.400-414 | **HIPAA Breach Notification Requirements:** Failing to disclose breaches in the accuracy and integrity of health plan documents affecting PHI. |
| [53] | 45 CFR § 164.502 | **HIPAA Privacy Rule: Unauthorized Disclosure of PHI:** Improperly handling or disclosing PHI through altered or misleading documents. |
| [54] | 45 CFR § 164.524 | **HIPAA Right of Access: Timely Access to PHI:** Failing to provide accurate and timely health plan information as required under HIPAA. |
| [55] | Md. Code, Com. Law § 13-301(14)(iii) | **Knowingly Failing to State a Material Fact Regarding Rights, Remedies, or Obligations Related to Services:** Withholding critical information about changes to health plan options. |
| [56] | Md. Code, Com. Law § 13-301(15) | **Misrepresentation of the Authorization, Approval, or Certification of a Document or Entity:** Altering documents to misrepresent their legitimacy. |

| [57] | Md. Code, Com. Law § 13-301(2) | **False Representations:** Making false statements about the validity or content of health plan documents. |
| [58] | Md. Code, Com. Law § 13-301(3) | **Deception through False or Misleading Statements of Material Fact:** Misleading employees about the true dates or terms of their health plans. |
| [59] | Md. Code, Com. Law § 13-301(6) | **Failure to State a Material Fact if the Omission Deceives or Tends to Deceive:** Omitting critical information about changes to health plan terms. |
| [60] | Md. Code, Com. Law § 13-301(9) | **Deceptive Acts or Practices in Sale or Lease of Consumer Goods or Services:** Misleading or deceptive practices in providing health plan options. |
| [61] | 18 U.S.C. § 1341 | **Mail Fraud:** Using the postal system to send altered health plan documents with falsified dates. |
| [62] | 18 U.S.C. § 1702 | **Unlawful Opening of Mail:** Opening mail addressed to the Plaintiff without authorization, to intercept or manipulate content. |

49    ALLEGATION – who is the allegation. What was done is a FACT. After receiving the redirected COBRA packet Richard Hartman/Ohana Growth Partners, LLC. opened it, Altered the date on the document, failed to alter all of the dates making it obvious that the document had been altered. Then used the US Postal Service to mail it to RDC. Ohana Growth Partner, LLC. provided options for employees to purchase. We will be seeking digital and physical discovery.

## RELIEF

| RELIEF COUNT IX: INSURANCE FRAUD | | |
|---|---|---|
| 45 CFR § 164.306 | Injunctive Relief | Enforce compliance with HIPAA Security Rule to prevent future alterations of PHI. |
| 45 CFR § 164.400-414 | Compensatory and Statutory Damages | Compensation for failure to notify Plaintiff of breaches in health plan information integrity. |
| 45 CFR § 164.502 | Compensatory Damages | Recovery for harm caused by unauthorized disclosure of PHI. |
| 45 CFR § 164.524 | Injunctive and Compensatory Relief | Ensure timely access to health plan information and compensate for harm caused by delays. |
| Md. Code, Com. Law § 13-301(14)(iii) | Statutory Penalties | Damages for failing to disclose material facts about health plan changes. |
| Md. Code, Com. Law § 13-301(15) | Punitive Damages | Deterrence for altering documents to misrepresent their legitimacy. |
| Md. Code, Com. Law § 13-301(2) | Compensatory and Punitive Damages | Damages for false representations about the validity or content of health plan documents. |
| Md. Code, Com. Law § 13-301(3) | Compensatory and Punitive Damages | Recovery for harm caused by misleading statements about plan terms or dates. |
| Md. Code, Com. Law § 13-301(6) | Compensatory Damages | Damages for omitting critical information about changes to health plan terms. |
| Md. Code, Com. Law § 13-301(9) | Statutory and Compensatory Damages | Compensation for deceptive practices in providing health plan options. |
| 18 U.S.C. § 1341 | Compensatory and Punitive Damages | Recovery for harm caused by fraudulent mailing delays and falsified dates. |

| 18 U.S.C. § 1702 | Punitive and Statutory Damages | Damages for unauthorized opening and manipulation of mail addressed to the Plaintiff. |

## COUNT XI: WIRE FRAUD

SUB-COUNT

| **Sub** | WIRE FRAUD | |
| | Wire Fraud (18 U.S.C. § 1343) | |
| [63] | 18 U.S.C. § 1343 | Fraudulent Use of Electronic Communications |

50    Ohana Growth Partners, LLC, Brick, Norris, Drummond, Hartman, Ihle, Woods, Bryan, Wittelsberger, Miles & Stockbridge, Frenkil, and Butler collaboration efforts in pre-litigation to create a pretext which became the basis of the lawsuit. Their digital meetings, emails, and telecommunications were instrumental in distorting judicial outcomes and suppressing evidence of prior misconduct.

51    Ohana Growth Partners, LLC., Hartman, and Norris' misuse and manipulation of the Paycom system to deny access compensation and benefits.

52    Romes and Levett were two 3rd parties that were engaged to add legitimacy to the fraudulent litigation.

53    Romes traveled from out of state for the 26th hearing and participated on the 27th via zoom to support the notion that breaching a dozen contracts, violating consumer protection laws, and unlawful business practices statutes  across Washington, California, Tennessee, Florida, Maryland, and DC was insignificant. Their testimony dismissed the legal enforceability of PCI requirements protecting consumer rights, and portions of their testimony were heavily redacted from the transcript.

54    Levett replaced Phil Leadore, who declined involvement, and falsely claimed earlier participation in the events. Levett accessed the Microsoft Cloud using information provided by Dillon-Capps during the June 26th and 27th hearings during a Teams Video Call with the Help Desk Manager in Mexico. Levett demonstrated that Ohana Growth Partners, LLC, Richard Hartman, and Justin Drummond's claims of lacking access to Global Administrator accounts were false. Levett subsequently authored an affidavit misrepresenting the situation to support the unlawful lawsuit, which was used to obtain a second contempt motion seeking incarceration. Judge Barranco granted this second show cause order.

55    Ensor modified official forms to fabricate causes and abused her magisterial position to prevent evidence and filings from being added to the digital court record.

56    Miles & Stockbridge, P.C., Ohana Growth Partners, LLC., Barranco, Drummond, Hartman, and Levett used Docusign to faciliate the signatures of Affidavits.

57    Miles & Stockbridge, P.C, Barranco, Truffer used email, MS Word, Adobe Certificate Signature, Power PDF Create, Apose PDF, and the Maryland Odyssey e-filing system in the process of creating and filing Romes affidavit.

58    Miles & Stockbridge, P.C., Barranco, Ensor, Robinson Jr., Stringer, Barranco, Mayer, Battista, Alexander, Truffer, and DeSimone Jr. used a combination of Aposte.WORDS, Apose.PDF, GDPicture, Microsoft365, Power PDF Create, Kofax Power PDF, Lura Document PDF, Foxit Quick PDF Library, Slkia/PDF, Canon iR-ADV C3830 PDF, Adobe PSL for Canon, Laura Tech PDF Compressor, Outlook, Apple Mail, and Microsoft and Google mail systems and services in the creation, manipulation, and filing of documents associated with court record.

59    All of these Defendants engaged in a deliberate and coordinated pattern of racketeering activity under RICO. By leveraging telecommunication carriers, computers, printers, mail clients, and digital systems, the Defendants conspired as an enterprise to manipulate judicial outcomes, obstruct justice, and advance their fraudulent scheme. This conduct includes multiple predicate acts of wire fraud, as defined under 18 U.S.C. § 1343, and demonstrates their intent to deceive and harm the Plaintiff.

60    In furtherance of this scheme, the Defendants knowingly utilized platforms such as DocuSign, Microsoft365, Adobe Certificate Signature, and Maryland Odyssey e-filing systems to create, manipulate, and file fraudulent documents across state lines.

### RELIEF

| RELIEF COUNT WIRE FRAUD | | |
|---|---|---|
| 18 U.S.C. § 1343 | Treble Damages | Trebling of damages resulting from fraudulent use of electronic communications. |
| 18 U.S.C. § 1343 | Restitution | Compensation for losses caused by electronic filings designed to deceive and obstruct justice. |
| 18 U.S.C. § 1964(c) | Attorney's Fees and Costs | Recovery of attorney's fees incurred due to fraudulent electronic communications. |

## COUNT XII: PCI COMPLIANCE CONSUMER PROTECTION VIOLATIONS

### SUB-COUNTS

| Sub | CONSUMER PROTECTION VIOLATIONS | |
|---|---|---|
| | Md. Code, Com. Law §§ 13-101–13-501 Maryland Consumer Protection Act (MCPA)<br>Federal Trade Commission Act (FTC Act) – 15 U.S.C. § 45<br>Maryland Consumer Protection Act (MCPA) – Md. Code, Com. Law §§ 13-101–13-501<br>D.C. Consumer Protection Procedures Act (CPPA) – D.C. Code § 28-3901 et seq.<br>California Unfair Competition Law (UCL) – Cal. Bus. & Prof. Code § 17200 et seq.<br>California Consumers Legal Remedies Act (CLRA) – Cal. Civ. Code §§ 1750–1784<br>Washington Consumer Protection Act (CPA) – Wash. Rev. Code § 19.86.010 et seq.<br>Tennessee Consumer Protection Act (TCPA) – Tenn. Code Ann. § 47-18-101 et seq.<br>Florida Deceptive and Unfair Trade Practices Act (FDUTPA) – Fla. Stat. § 501.201 et seq. | |
| [64] | 15 U.S.C. § 45 | Federal Trade Commission Act (FTC Act) – Prohibits unfair or deceptive acts or practices. |
| [65] | 15 U.S.C. § 1693q | Electronic Fund Transfer Act (EFTA) – Prohibits unauthorized access or false representation in electronic transactions. |
| [66] | Md. Code, Com. Law § 13-301(1) | False Advertising |

| [67] | Md. Code, Com. Law § 13-301(2) | Omission of Material Facts |
|---|---|---|
| [68] | Md. Code, Com. Law § 13-301(9) | Fraudulent Claims |
| [69] | Md. Code, Com. Law § 13-303 | Prohibited Practices |
| [70] | Md. Code, Com. Law § 13-408 | Retaliatory Termination Action |
| [71] | D.C. Code § 28-3904(e) | False Advertising |
| [72] | D.C. Code § 28-3904(f) | Misrepresentation of Material Facts |
| [73] | D.C. Code § 28-3904(x) | Broad prohibition on unfair or deceptive practices. |
| [74] | Cal. Bus. & Prof. Code § 17200 | Unfair Competition Law (UCL) – Prohibits unlawful, unfair, or fraudulent business practices. |
| [75] | Cal. Civ. Code § 1770(a)(5) | False Representations |
| [76] | Cal. Civ. Code § 1770(a)(7) | Misleading Statements |
| [77] | Cal. Civ. Code § 1770(a)(16) | Deceptive Practices |
| [78] | Wash. Rev. Code § 19.86.020 | Washington Consumer Protection Act (CPA) – Prohibits unfair or deceptive acts or practices. |
| [79] | Wash. Rev. Code § 19.86.093 | Public Interest Impact: Adds liability for deceptive acts that harm the public interest. |
| [80] | Tenn. Code Ann. § 47-18-104(a) | Tennessee Consumer Protection Act (TCPA) – Prohibits deceptive acts impacting consumers. |
| [81] | Tenn. Code Ann. § 47-18-104(b)(5) | False Statements |
| [82] | Fla. Stat. § 501.204(1) | Florida Deceptive and Unfair Trade Practices Act (FDUTPA) – Prohibits deceptive acts or practices. |
| [83] | Fla. Stat. § 501.204(2) | General Consumer Protections |

61    **Ohana Growth Partners, LLC** and **Miles & Stockbridge, P.C.** disseminated misleading statements in legal filings and arguments, falsely representing PCI DSS compliance issues as unrelated to consumer protections. **PCI DSS standards** are critical to safeguarding consumer payment information by ensuring the secure handling of sensitive financial data. The defendants' misrepresentations, designed to deceive reasonable consumers and courts, concealed non-compliance with these essential consumer protection standards, causing significant harm to the plaintiff and consumers who relied on the integrity of these claims. In furtherance of this deception, **Ohana Growth Partners, LLC**, **Miles & Stockbridge, P.C.**, and **Randall Romes** intentionally concealed the regulatory significance of PCI DSS obligations, omitting material facts that were critical to consumer and judicial decision-making. These omissions were deliberate, substantial, and aimed at perpetuating their non-compliance while obscuring its impact on consumer data security.

62    **Miles & Stockbridge, P.C.**, led by **Robert Brennen** and supported by **Victoria Hoffberger**, knowingly presented false representations in court filings and during hearings to mislead the judiciary about the broader consumer protection implications of PCI DSS compliance failures. **Hoffberger's** actions directly supported arguments that minimized or concealed the risks posed to consumer payment information. Judges **Barranco** and **Truffer** reinforced these deceptions by engaging in practices that suppressed evidence of consumer harm and regulatory violations. Specifically, **Judge Barranco** imposed $2,500 per day fines to financially coerce the plaintiff and suppress whistleblowing efforts aimed at protecting consumers, while **Judge Truffer** legitimized these deceptive practices by dismissing jurisdictional arguments and denying procedural redress essential to exposing the defendants' misconduct.

63    The plaintiff, who engaged in protected whistleblowing activities to safeguard consumer rights by exposing PCI DSS compliance failures, was suspended and ultimately terminated by **Ohana Growth Partners, LLC** under false pretext. PCI DSS compliance standards exist to protect consumers from financial harm and data breaches; by retaliating against the plaintiff for whistleblowing, the defendants perpetuated consumer harm, undermined whistleblower protections, and ensured the continuation of deceptive practices. The defendants' actions not only harmed the plaintiff but also jeopardized the security and trust of the consumers whose data was left unprotected by their violations.

RELIEF

| RELIEF COUNT CONSUMER PROTECTION VIOLATIONS | | |
|---|---|---|
| 15 U.S.C. § 57b | Federal Injunctive Relief | Injunctive relief to prohibit unfair or deceptive acts under the FTC Act. |
| 15 U.S.C. § 1693m | Statutory and Actual Damages | Recovery of actual damages, statutory damages up to $1,000 per violation, and attorney's fees. |
| Md. Code, Com. Law § 13-408(a) | Private Right of Action | Recovery of damages for unfair or deceptive practices, including retaliatory actions. |
| Md. Code, Com. Law § 13-408(c) | Treble Damages | Up to three times the actual damages for willful violations. |
| Md. Code, Com. Law § 13-408(d) | Attorney's Fees and Costs | Recovery of reasonable attorney's fees. |
| Md. Code, Com. Law § 13-411 | Injunctive Relief | Court may enjoin employer's ongoing deceptive or retaliatory actions. |
| D.C. Code § 28-3905(k)(1)(A) | Treble Damages | Treble damages for violations under the D.C. Consumer Protection Procedures Act. |
| D.C. Code § 28-3905(k)(1)(D) | Attorney's Fees and Costs | Recovery of attorney's fees for successful consumer protection claims. |
| Cal. Bus. & Prof. Code § 17203 | Restitution and Disgorgement | Recovery of restitution and disgorgement of profits for unlawful or unfair business practices. |
| Cal. Civ. Code § 1780(a) | Damages and Injunctive Relief | Recovery of actual damages, restitution, punitive damages, and injunctive relief for consumer violations. |
| Wash. Rev. Code § 19.86.090 | Treble Damages and Attorney's Fees | Treble damages and recovery of attorney's fees for violations of the Washington Consumer Protection Act. |
| Tenn. Code Ann. § 47-18-109(a)(3) | Treble Damages | Treble damages for willful or knowing violations of the Tennessee Consumer Protection Act. |
| Tenn. Code Ann. § 47-18-109(e)(1) | Attorney's Fees and Costs | Reasonable attorney's fees for prevailing parties in Tennessee consumer protection claims. |
| Fla. Stat. § 501.211(1) | Actual Damages | Recovery of actual damages caused by deceptive or unfair practices under the Florida Deceptive and Unfair Trade Practices Act. |

| Fla. Stat. § 501.211(2) | Equitable Relief | Injunctive or declaratory relief to prevent ongoing violations of FDUTPA. |
|---|---|---|

## COUNT XIII: PCI COMPLIANCE PIA VIOLATIONS AND WHISTLEBLOWER RETALIATION

### SUB-COUNTS

| Sub | PCI COMPLIANCE, PIA VIOLATIONS, AND WHISTLEBLOWER RETALIATION |
|---|---|
| | Federal False Claims Act – 31 U.S.C. §§ 3729–3733<br>Maryland False Claims Act – Md. Code, Gen. Prov. §§ 8-101–8-113<br>Maryland Public Information Act – Md. Code, Gen. Prov. §§ 4-101–4-601<br>District of Columbia False Claims Act – D.C. Code § 2-223.02<br>California False Claims Act – Cal. Gov. Code § 12650 et seq.<br>California Whistleblower Protection Act – Cal. Lab. Code § 1102.5<br>Washington State Medicaid False Claims Act – Wash. Rev. Code § 74.66.020<br>Washington State Whistleblower Protection Act – Wash. Rev. Code § 42.41.040<br>Tennessee Medicaid False Claims Act – Tenn. Code Ann. § 4-18-101 et seq.<br>Tennessee Public Protection Act (Whistleblower Protection) – Tenn. Code Ann. § 50-1-304<br>Florida False Claims Act – Fla. Stat. § 68.081 et seq.<br>Florida Whistleblower's Act – Fla. Stat. § 112.3187 |
| [84] | 31 U.S.C. § 3729(a)(1)(A) | Presenting False Claims |
| [85] | 31 U.S.C. § 3729(a)(1)(C) | Conspiracy to Submit False Claims: |
| [86] | Md. Code, Gen. Prov. § 8-102(a)(1) | False Claims |
| [87] | Md. Code, Gen. Prov. § 8-102(a)(4) | Conspiracy to Submit False Claims: |
| [88] | Md. Code, Gen. Prov. §§ 4-101–4-601 | PIA Violations |
| [89] | D.C. Code § 2-223.02 | Whistleblower Protections |
| [90] | Cal. Gov. Code § 12651(a)(1) | False Claims in California |
| [91] | Cal. Lab. Code § 1102.5(b) | Defendants retaliated |
| [92] | Wash. Rev. Code § 74.66.020(1)(a) | Washington False Claims |
| [93] | Wash. Rev. Code § 42.41.040(1)(b) | Whistleblower Protections |
| [94] | Tenn. Code Ann. § 4-18-103(a)(1) | Tennessee False Claims |
| [95] | Tenn. Code Ann. § 50-1-304(b) | Whistleblower Protections |

64    The defendants engaged in a coordinated scheme to suppress whistleblowing efforts related to PCI DSS compliance violations across six jurisdictions—California, Washington, Tennessee, Florida, DC, and Maryland. These violations involved system-managed devices and cloud systems integral to payment processing and consumer data protection. **Ohana Growth Partners, LLC**, led by **Justin Drummond**, **Richard Hartman**, and **Glenn Norris**, knowingly submitted false PCI DSS compliance certifications, concealing systemic failures that posed risks to regulatory systems and consumers.

65    The plaintiff, a whistleblower, sought to expose these violations but was met with severe retaliation, including suspension, termination, and procedural barriers. **Miles & Stockbridge, P.C.**, led by **Robert Brennen** and supported by **Victoria Hoffberger**, filed false affidavits and motions during the June 26th and 27th hearings to obscure the compliance failures. These filings included perjured testimony from **Randall Romes**, who falsely claimed that PCI compliance had no regulatory implications. Judges **Barranco** and **Truffer** further suppressed whistleblowing efforts by issuing retaliatory rulings, including a $2,500 daily fine and the facilitation of a civil

contempt motion seeking incarceration. Although the hearing for civil contempt incarceration never occurred, the filing itself imposed a chilling effect on the plaintiff's whistleblowing efforts and amplified procedural abuses.

66    **Hartman Executive Advisors (HEA)** represented themselves as PCI compliance experts during **June 11th and 12th**, initiating their involvement in the case. However, after their introduction, HEA refused to respond to further communications, despite injunctive orders and suspension information directing access to be given to them. The plaintiff, **Dillon-Capps**, requesting assistance from Justin Drummond on June 13th by asking if he could ask HEA to respond. Drummond assured the plaintiff that HEA would respond, but no response was ever provided.

67    Public Information Act violations compounded the harm, as the defendants manipulated court filings and rulings to conceal the compliance-related misconduct. **Julie Ensor**, as Clerk of the Circuit Court, actively obstructed access to filings that could have exposed systemic failures, while ensuring that fraudulent submissions advanced without scrutiny. These coordinated efforts directly harmed the plaintiff, undermined regulatory protections, and obstructed the judicial process across all six jurisdictions.

## RELIEF

| RELIEF FOR COUNT XV:PCI COMPLIANCE, PIA VIOLATIONS, AND WHISTLEBLOWER RETALIATION | | |
|---|---|---|
| 31 U.S.C. § 3729(a)(1) | Federal Treble Damages | Triple the damages sustained by the federal government or whistleblower due to false certifications. |
| 31 U.S.C. § 3729(a)(1)(G) | Federal Statutory Penalties | Penalties ranging from $13,508 to $27,018 per false claim, adjusted for inflation. |
| 31 U.S.C. § 3730(h) | Federal Whistleblower Protections | Double back pay, reinstatement, and compensation for retaliation-related damages. |
| Md. Code, Gen. Prov. § 8-104(a) | Maryland Treble Damages | Triple the damages sustained by Maryland state entities or subdivisions. |
| Md. Code, Gen. Prov. § 8-104(b) | Maryland Civil Penalties | Penalties of $5,500–$11,000 per false claim, adjusted for inflation. |
| Md. Code, Gen. Prov. §§ 4-101–4-601 | Maryland Public Information Remedies | Injunctive relief and damages for suppressing or manipulating public records tied to PCI violations. |
| D.C. Code § 2-223.02 | D.C. Civil Penalties | Penalties of $5,000–$10,000 per violation, plus treble damages for harm to DC entities or consumers. |
| Cal. Gov. Code § 12651(a)(1) | California Treble Damages | Triple the damages caused by false claims affecting California entities or consumers. |
| Cal. Lab. Code § 1102.5 | California Whistleblower Protections | Reinstatement, back pay, and penalties for whistleblower retaliation. |
| Wash. Rev. Code § 74.66.020 | Washington Treble Damages | Triple damages sustained by Washington state entities or systems due to false claims. |
| Wash. Rev. Code § 42.41.040 | Washington Whistleblower Remedies | Reinstatement and damages for lost wages, emotional distress, and attorney's fees. |
| Tenn. Code Ann. § 4-18-103(a)(1) | Tennessee Treble Damages | Triple damages caused by false claims affecting Tennessee entities or programs. |
| Tenn. Code Ann. § 50-1-304 | Tennessee Whistleblower Protections | Reinstatement and back pay for whistleblower retaliation. |
| Fla. Stat. § 68.082(2)(a) | Florida Treble Damages | Triple damages for harm caused by false claims in Florida programs or systems. |

| Fla. Stat. § 112.3187 | Florida Whistleblower Protections | Reinstatement, compensation for retaliation-related damages, and injunctive relief. |

## COUNT XIV: FRAUDULENT LAWSUIT AND PIA VIOLATIONS

### SUB-COUNTS

| Sub | FRAUDULENT LAWSUIT AND PIA VIOLATIONS | |
|---|---|---|
| | 1    Federal False Claims Act (FCA) – 31 U.S.C. §§ 3729–3733<br>2    Maryland False Claims Act (MFCA) – Md. Code, Gen. Prov. §§ 8-101–8-113<br>3    Maryland Public Information Act (PIA) – Md. Code, Gen. Prov. §§ 4-101–4-601 | |
| [96] | 31 U.S.C. § 3729(a)(1)(A) | Presenting False Claims |
| [97] | 31 U.S.C. § 3729(a)(1)(B) | Making False Records |
| [98] | 31 U.S.C. § 3729(a)(1)(C) | Conspiracy to Commit FCA Violation |
| [99] | 31 U.S.C. § 3729(a)(1)(G) | Reverse False Claims |
| [100] | Md. Code, Gen. Prov. § 8-102(a)(1) | Presenting False Claims |
| [101] | Md. Code, Gen. Prov. § 8-102(a)(2) | Making False Records |
| [102] | Md. Code, Gen. Prov. § 8-102(a)(4) | Conspiracy to Submit False Claims |
| [103] | Md. Code, Gen. Prov. § 8-102(a)(7) | Reverse False Claims |

68    **Ohana Growth Partners, LLC**, led by its President, **Justin Drummond**, and Head of HR, **Richard Hartman**, knowingly initiated and perpetuated a fraudulent lawsuit against the plaintiff. This lawsuit was filed with no legitimate purpose and was designed as a retaliatory mechanism to silence whistleblowing efforts and shield the defendants' misconduct from scrutiny. The equity owners of Ohana Growth Partners conspired to ensure that this retaliatory litigation proceeded unimpeded, prioritizing their personal and financial interests over legal and ethical obligations.

69    In support of this fraud, **Miles & Stockbridge, P.C.**, led by **Robert Brennen**, with contributions from **Stephen Frenkil**, **Victoria Hoffberger**, and **Jessica Duvall**, knowingly filed deceptive pleadings, affidavits, and motions to misrepresent key facts and obscure the defendants' misconduct. These filings were bolstered by fraudulent affidavits and perjured testimony from **Randall Romes** and **Clifton Larson Allen LLC (CLA)**, who misrepresented critical information to legitimize the lawsuit. Additionally, **Daniel Levett** of Hartman Executive Advisors collaborated with Romes and CLA to submit misleading evidence, ensuring the continued concealment of procedural abuses and perpetuation of the fraudulent case.

70    Judicial officers actively facilitated this conspiracy. **Judge Barranco** accepted perjured testimony and imposed $2,500 per day fines on the plaintiff to financially coerce compliance with fraudulent rulings, while **Judge Truffer** dismissed jurisdictional arguments and denied procedural opportunities to expose the fraud. Judges **Stringer**, **Mayer**, **Battista**, **Alexander**, **Desimone**, and **County Administrative Judge Robinson** issued rulings systematically designed to suppress evidence, dismiss valid claims, and protect the defendants. **Julie Ensor**, as Clerk of the Circuit Court, played a direct role in the conspiracy by ensuring the procedural acceptance of fraudulent filings while obstructing legitimate ones, creating systemic barriers to justice.

71    Government oversight bodies and officials also participated in shielding the defendants from accountability. **Thomas DeGonia II**, as Maryland's Bar Counsel, failed to investigate or discipline attorneys at **Miles & Stockbridge, P.C.** for their fraudulent filings and unethical behavior. Similarly, **Tanya Bernstein**, as Director of Investigations for the Maryland Commission on Judicial Disabilities, coordinated efforts to suppress complaints of judicial misconduct, protect complicit judges, and preserve the conspiracy.

72    This conspiracy extended beyond the courtroom as the defendants knowingly leveraged fraudulent filings, false affidavits, and judicial complicity to suppress legitimate claims, obscure procedural violations, and retaliate against the plaintiff. Each motion, affidavit, and ruling in this case, including those filed and facilitated by **Miles & Stockbridge, P.C.**, **Ohana's executives**, the equity owners, and complicit judges, furthered the fraudulent litigation and inflicted substantial harm on the plaintiff and public trust in Maryland's judiciary.

73    The plaintiff, who engaged in protected whistleblowing activities to challenge systemic misconduct, was targeted with retaliatory actions, including suspension, termination, and procedural barriers. The defendants' retaliatory efforts included financial coercion through excessive fines, fraudulent procedural rulings, and the deliberate obstruction of access to justice. The use of false filings and rulings created insurmountable challenges for the plaintiff, preventing legitimate claims from advancing and further solidifying the defendants' misuse of the judicial system.

74    This fraudulent lawsuit, devoid of any legitimate purpose, represents a flagrant abuse of judicial and legal processes. The defendants' actions constituted not only a deliberate effort to retaliate against the plaintiff but also an attempt to weaponize procedural mechanisms for private gain, undermining the judiciary's role in ensuring accountability. These actions were carried out with clear intent to suppress whistleblowing, distort the judicial process, and harm the plaintiff.

75    **Ohana Growth Partners, LLC**, along with its equity owners, senior executives, and retained counsel at **Miles & Stockbridge, P.C.**, implemented a calculated strategy to exhaust the plaintiff's financial and legal resources. The use of fraudulent affidavits, perjured testimony, and misleading evidence demonstrates the coordinated nature of the conspiracy. This strategy relied on the active participation of judicial officers, who issued rulings to suppress evidence, create procedural barriers, and advance the defendants' retaliatory objectives. The imposition of excessive fines, including the $2,500 daily penalty by **Judge Barranco**, exemplifies the judicial complicity in enabling the defendants' fraudulent objectives.

76    The conspiracy extended beyond the courtroom, as the defendants exploited Maryland's judicial and administrative systems to shield themselves from liability. Government officials tasked with oversight, including **Thomas DeGonia II** and **Tanya Bernstein**, acted in concert with judicial participants to suppress investigations, ensure the continued protection of the defendants, and prevent accountability. These systemic failures deprived the plaintiff of due process, inflicted substantial harm, and further eroded public confidence in the judicial system.

77    The defendants knowingly initiated and perpetuated a fraudulent lawsuit against the plaintiff, devoid of legitimate purpose and rooted in retaliatory motives for whistleblowing. **Ohana Growth Partners, LLC**, led by **Justin Drummond** and **Richard Hartman**, conspired with their legal counsel at **Miles & Stockbridge, P.C.** to file baseless claims designed to silence the plaintiff and obscure systemic misconduct. Attorneys **Robert Brennen**, **Stephen Frenkil**, and **Victoria Hoffberger** knowingly filed deceptive pleadings and facilitated fraudulent court proceedings, including motions and affidavits that misrepresented key facts and shielded the defendants' malfeasance.

78    Judges **Barranco** and **Truffer** further perpetuated the fraudulent case through retaliatory rulings that suppressed evidence, dismissed legitimate claims, and imposed excessive fines, including a $2,500 daily penalty. These rulings created a procedural quagmire that obstructed the plaintiff's ability to challenge the fraudulent claims and expose the defendants' misconduct. **Julie Ensor**, as Clerk of the Circuit Court, actively obstructed legitimate filings while advancing fraudulent submissions, ensuring the defendants' case proceeded without scrutiny or accountability.

79    **Violations of the Maryland Public Information Act (PIA)** compounded the harm by manipulating or withholding court records critical to exposing the fraudulent nature of the case. The defendants deliberately suppressed or denied access to public filings that would have illuminated their misconduct, obstructing the plaintiff's ability to obtain necessary records and pursue justice. The manipulation of public records not only harmed the plaintiff but also undermined public confidence in the judiciary's transparency and integrity.

80    Oversight officials, including **Thomas DeGonia II** as Maryland's Bar Counsel and **Tanya Bernstein** as Director of Investigations for the Maryland Commission on Judicial Disabilities, further shielded judicial participants and corporate defendants from accountability. Their failure to investigate or address complaints allowed the fraudulent litigation to continue unchecked, exacerbating the harm to the plaintiff and public trust in Maryland's judicial systems.

81    This fraudulent lawsuit, weaponized as a tool to retaliate against the plaintiff, represents a calculated effort to distort judicial processes, suppress whistleblowing, and undermine transparency. By initiating and perpetuating baseless claims, suppressing critical public records, and manipulating the judicial process, the defendants inflicted significant harm on the plaintiff, eroded public trust, and violated fundamental principles of accountability, fairness, and transparency.

RELIEF

| RELIEF COUNT XVI: FRAUDULENT LAWSUIT AND PIA VIOLATIONS | | |
|---|---|---|
| 31 U.S.C. § 3729(a)(1) | Federal Treble Damages | Triple the damages sustained due to false claims submitted through fraudulent litigation. |
| 31 U.S.C. § 3729(a)(1)(B) | Federal Penalties for False Records | Penalties ranging from $13,508 to $27,018 per violation for making or using false records. |
| 31 U.S.C. § 3729(a)(1)(G) | Federal Reverse False Claims Penalties | Treble damages and penalties for knowingly avoiding financial obligations owed to federal entities. |

| 31 U.S.C. § 3730(d) | Attorney's Fees and Costs | Recovery of reasonable attorney's fees and litigation costs for the whistleblower. |
| Md. Code, Gen. Prov. § 8-104(a) | Maryland Treble Damages | Triple the damages sustained by Maryland state entities or subdivisions due to false claims or conspiracy. |
| Md. Code, Gen. Prov. § 8-104(b) | Maryland Civil Penalties | Penalties of $5,500–$11,000 per violation, adjusted for inflation. |
| Md. Code, Gen. Prov. § 8-102(a)(7) | Maryland Reverse False Claims Penalties | Treble damages and civil penalties for improperly avoiding obligations owed to Maryland. |
| Md. Code, Gen. Prov. §§ 4-101–4-601 | Maryland Public Information Remedies | Injunctive relief and damages for PIA violations, including manipulation or suppression of public records |

## COUNT XV: RICO

### SUB-COUNTS

| Sub | RICO |
|-----|------|
| | 18 U.S.C. §§ 1962(c), 1962(d) RICO (Racketeer Influenced and Corrupt Organizations Act) 18 U.S.C. §§ 1589, 1513, 1951, 1503, 1512, 241, 1956, 1519, 1001 Federal Criminal Law Md. Code, Crim. Law §§ 9-101, 8-606, 8-607, 3-502, 7-104 Maryland Criminal Law Common Law Tort (Negligent Retention), Maryland Civil Conspiracy Law Md. Rule 18-101.1 et seq. Maryland Code of Judicial Conduct Md. Rules 1-201, 1-322.1 Maryland Rules of Civil Procedure Md. Const., Articles 19, 24, 46 Maryland Constitution |
| [104] | 18 U.S.C. § 1962(c) | Conducting Enterprise Through Racketeering |
| [105] | 18 U.S.C. § 1962(d) | Conspiracy to Engage in Racketeering |
| [106] | 18 U.S.C. § 1589 | Forced Labor |
| [107] | 18 U.S.C. § 1513 | Retaliation Against a Witness or Victim |
| [108] | MD. CODE, CRIM. LAW § 9-101 | Perjury |
| [109] | MD. CODE, CRIM. LAW §§ 8-606, 8-607 | Forgery |
| [110] | 18 U.S.C. § 1951 | Extortion Under Color of Law |
| [111] | 18 U.S.C. § 1503 | Obstruction of Justice – Judicial Misconduct |
| [112] | 18 U.S.C. § 1512 | Witness Tampering |
| [113] | MD. CODE, CRIM. LAW § 3-502 | False Imprisonment |
| [114] | 18 U.S.C. § 241 | Conspiracy Against Rights |
| [115] | 18 U.S.C. § 1956 | Money Laundering |
| [116] | MD. CODE, CRIM. LAW § 7-104 | Theft by Deception |
| [117] | 18 U.S.C. § 1519 | Destruction, Alteration, or Falsification of Records |
| [118] | 18 U.S.C. § 1001 | False Statements |
| [119] | Common Law Tort | Negligent Retention |
| [120] | Common Law | Maryland Civil Conspiracy Law |
| [121] | Md. Rule 18-101.1 et seq. | Maryland Code of Judicial Conduct |
| [122] | Md. Rules 1-201, 1-322.1 | Obstruction of Justice – Maryland Rules |
| [123] | Md. Const., Articles 19, 24, 46 | Maryland Declaration of Rights Violations |

RICO TIMELINE OF HARM

82    The Defendants' actions fall into distinct, coordinated stages, each designed to intensify harm and further the enterprise's objectives. These stages collectively form a deliberate pattern of racketeering activity, violating federal statutes and constitutional rights while perpetuating harm through timing and escalation.

 a. **Pretext Conspiracy Group (Late May to June 13)**:

 During the "gauntlet" period leading up to June 13, Glenn Norris, Richard Hartman, Victor Brick, and other conspirators escalated their campaign of systemic retaliation and coercive threats. These actions culminated in induced catatonia and psychological harm, exploiting the Plaintiff's FMLA and ADA-protected conditions. The conspiracy group fabricated pretexts to justify their retaliatory measures, violating the Norris-LaGuardia Act, FMLA, ADA, and 42 U.S.C. § 1983. This initial phase set the stage for the fraudulent litigation conspiracy that followed, amplifying harm and cementing the Plaintiff's vulnerability.

 b. **Litigation Conspiracy Group (June 13 to June 17)**:

 On June 13, following a 12-hour day of gaslighting and pretextual harassment, the Plaintiff experienced dissociative episodes and amnesia, induced by escalating abuse. The employer, represented by Miles & Stockbridge, filed a fraudulent and unlawful lawsuit on June 14, violating the Norris-LaGuardia Act. The complaint falsely framed the Plaintiff's protected actions as grounds for injunctive relief, which was compounded by a no-notice TRO. During this period, the Plaintiff lost legal representation, further isolating them from relief. The Defendants' deliberate timing and procedural abuses ensured the Plaintiff remained trapped in litigation, exacerbating harm and preventing access to federally protected rights.

 c. **September Onward: Procedural Obstruction and Financial Default**:

 The conspirators' tactics evolved into a strategy of holding the Plaintiff hostage through procedural silence. Refusing to rule on urgent motions, the court exploited estoppel tactics established by the earlier conspiracy group. Filings related to financial urgency were marked as deficient without justification, obstructing hearings necessary to address critical harms. This phase induced financial default and malignant catatonia, escalating the physical and emotional harm inflicted upon the Plaintiff. These actions violate federal statutes, including 42 U.S.C. §§ 1983 and 1985, as well as the Plaintiff's due process rights under the Fifth and Fourteenth Amendments.

 d. **Cover-Up Conspiracy (Ongoing)**:

 Following the litigation conspiracy, the Defendants transitioned to protecting prior conspirators and obstructing relief. State actors, including clerks, judges, and administrative staff, refused to release court records necessary for appeals or transfers, ensuring the Plaintiff's case remained in procedural limbo. The intentional timing of sporadic rulings—just enough to keep the case open but inactive—deprived the Plaintiff of closure while intensifying harm. This tactic aligns with the enterprise's goal

to "cauterize" relief pathways and ensure the harm's lethal consequences. These actions constitute ongoing racketeering activity under RICO and violate the Supremacy Clause by obstructing federally protected rights.

83    The timing of harm, strategically calculated across these phases, underscores the enterprise's deliberate and continuous nature. Under **H.J. Inc. v. Northwestern Bell Tel. Co.** (492 U.S. 229), this pattern satisfies RICO's requirement of continuity and relatedness, linking the conspirators' actions to the Plaintiff's escalating harm. The Supremacy Clause precludes immunity for state actors engaging in these violations, as federal law takes precedence over state practices that conflict with constitutional rights.

84    Under RICO's provisions, all actors within the enterprise, including public officials, private attorneys, employers, and clerks, are jointly and severally liable. As emphasized in **United States v. Turkette** (452 U.S. 576), the enterprise requirement extends to informal associations pursuing a common unlawful purpose, encapsulating the Defendants' coordinated efforts.

85    These actions also implicate the Ninth Amendment, which safeguards the Plaintiff's unenumerated right to relief and justice. By denying this fundamental right, the Defendants violated federal protections designed to prevent systemic harm and uphold constitutional guarantees. The Plaintiff's claims under RICO, rooted in this enterprise's calculated timing and harm, pierce sovereign immunity and ensure accountability for all participants in this chain of misconduct.

## RICO ARGUMENT 1

86    The defendants engaged in a coordinated enterprise that systematically harmed the plaintiff through racketeering activities, violating 18 U.S.C. § 1962(c) by conducting the affairs of an enterprise through fraud, coercion, and obstruction. The enterprise encompassed private actors, including Ohana Growth Partners, LLC, Miles & Stockbridge, P.C., and their attorneys, as well as public actors, such as Baltimore County Circuit Court judges, clerks, and oversight agencies. This enterprise sought to retaliate against whistleblowing efforts, deprive the plaintiff of federally protected rights, and shield systemic corruption within Maryland's judicial and administrative systems.

87    Under 18 U.S.C. § 1962(d), the defendants conspired to facilitate racketeering activities by aligning their efforts across three phases—pretext, litigation, and coverup. Key participants included Victor Brick, Glenn Norris, Richard Hartman, Justin Drummond, and attorneys at Miles & Stockbridge, such as Robert Brennen and Stephen Frenkil. Public actors, including Judge Barranco, Judge Truffer, County Administrative Judge Dennis Robinson Jr., Clerk Julie Ensor, and oversight officials such as Tanya Bernstein and Thomas DeGonia II, knowingly supported the enterprise through procedural manipulation, suppression of evidence, and judicial misconduct. These actors collectively ensured that judicial outcomes favored the conspirators while isolating and retaliating against the plaintiff.

88    Judge Barranco's hearing notes deliberately mischaracterized the plaintiff's testimony by forcing misleading answers and recording them inaccurately to align with the defendants' fabricated narratives. These notes, entered into Maryland's online court system, became part of the official record, obstructing future appeals and distorting the factual

basis of judicial proceedings. The abuse of Maryland's electronic filing system extended beyond hearing notes. Rulings and filings entered by the ruling judges lacked legitimate purpose, with decisions designed to suppress whistleblowing efforts, obscure violations of federal law, and deny the plaintiff access to justice. Under 18 U.S.C. § 1519, the falsification and misuse of these records constitute obstruction of justice through the alteration of official documents, undermining both state and federal legal processes.

89    The enterprise's reliance on forgery under Md. Code, Crim. Law §§ 8-606 and 8-607 was evident in falsified court documents, including affidavits and rulings. These filings, knowingly inaccurate, were designed to deceive both the plaintiff and higher courts. For example, the fraudulent orders and fabricated notes enabled the enterprise to misuse the doctrine of mootness, dismissing critical claims and filings without substantive review. The misuse of mootness obstructed justice and undermined federal supremacy by dismissing federal claims involving whistleblowing under the False Claims Act and ADA violations.

90    The defendants' actions also violated 18 U.S.C. § 1589, as the plaintiff was coerced into compliance under threat of financial penalties and incarceration. Judge Barranco's imposition of $2,500 daily fines and fabricated show-cause orders weaponized judicial authority to force submission to fraudulent rulings. These penalties and threats of incarceration, orchestrated in conjunction with fabricated records, constituted forced labor through coercive judicial practices.

91    The conspirators leveraged Maryland's judicial infrastructure to obstruct justice in violation of 18 U.S.C. §§ 1503 and 1512. Clerks, acting under Julie Ensor's leadership, delayed filings, flagged legitimate submissions as deficient, and entered inaccurate rulings into the online system to obstruct the plaintiff's access to evidence and procedural relief. These actions prevented the plaintiff from mounting an effective defense and aligned with the broader objective of suppressing whistleblowing efforts.

92    By manipulating judicial procedures and records, the defendants engaged in a conspiracy against rights under 18 U.S.C. § 241. This conspiracy targeted the plaintiff based on their status as a whistleblower, a person with a disability, and a Pro Se litigant. Procedural barriers, denial of accommodations, and disparate treatment of the plaintiff compared to represented parties reflect discriminatory animus. Judges' and clerks' actions further entrenched these violations by obstructing federal claims under the False Claims Act, ADA, and FMLA, depriving the plaintiff of due process and equal protection under the law.

93    The enterprise's fraudulent filings and communications constitute wire fraud under 18 U.S.C. § 1343 and mail fraud under 18 U.S.C. § 1341. Electronic communications and postal submissions, including falsified affidavits, manipulated rulings, and fabricated fines, were central to the enterprise's objectives. These acts ensured that procedural manipulation extended beyond the state court system, obstructing the plaintiff's ability to pursue remedies at both state and federal levels.

94    Oversight agencies, including the Maryland Commission on Judicial Disabilities and the Attorney Grievance Commission, enabled the coverup conspiracy by dismissing valid complaints and delaying investigations. These agencies, tasked with ensuring judicial accountability, acted as shields for the enterprise, preventing exposure of

systemic corruption. Their inaction, while not always malicious, amplified the harm inflicted on the plaintiff and further entrenched the conspiracy.

95     These interconnected actions demonstrate that the defendants, through coordinated misconduct, deprived the plaintiff of access to justice, federal protections, and procedural fairness. The abuse of Maryland's judicial and administrative systems to perpetuate systemic corruption ties directly to racketeering activity, satisfying the elements of 18 U.S.C. § 1962(c) and (d). The resulting harm to the plaintiff includes financial destabilization, reputational destruction, and severe health deterioration, all proximately caused by the enterprise's conspiratorial actions.

96     The defendants' actions were not isolated incidents but part of an integrated scheme designed to weaponize Maryland's judicial and administrative systems for retaliatory purposes. Maryland's online filing system was instrumental in perpetuating the enterprise's goals by ensuring that fabricated rulings, falsified notes, and procedurally deficient filings were preserved as official records. These records misled subsequent judicial reviews and obstructed appeals, aligning directly with violations under 18 U.S.C. § 1519 and related state forgery statutes. By entering these documents into the court's official repository, the defendants ensured their misleading filings influenced all stages of the judicial process, including motions to dismiss, appeals, and oversight reviews.

97     Judicial actors and clerks, while acting under state authority, created procedural barriers that extended the enterprise's reach beyond state jurisdiction, impacting federally protected claims under the False Claims Act, ADA, and FMLA. For example, Judge Barranco's imposition of $2,500 daily fines and false imprisonment threats coerced compliance through economic and emotional distress, fulfilling the elements of forced labor under 18 U.S.C. § 1589 and extortion under 18 U.S.C. § 1951. Meanwhile, the misuse of mootness doctrine suppressed federal claims involving whistleblowing and disability accommodations, denying the plaintiff access to federal protections and reinforcing the enterprise's retaliatory objectives.

98     The defendants' coordination across private and public actors is further evidenced by the seamless transition of fabricated claims between conspirators. For instance, false affidavits submitted by Randall Romes and Miles & Stockbridge attorneys were adopted into judicial rulings without proper scrutiny, embedding their inaccuracies into the official record and compounding the harm to the plaintiff. This integration of private fraud and judicial misconduct demonstrates a unified enterprise intent on depriving the plaintiff of procedural justice, financial stability, and federal protections.

99     Oversight agencies and administrative actors, while not direct participants in the conspiracies, enabled the enterprise's goals through systemic inaction. Their failure to investigate whistleblower complaints, discipline attorneys, or address judicial misconduct amplified the conspiracies' effects, tying liability to the state under Maryland Code §§ 12-304–12-310. These omissions demonstrate how systemic negligence within state institutions served to conceal racketeering activity and shield conspirators, aligning with RICO's predicate acts and reinforcing the enterprise's objectives.

## ADDITIONAL RICO ARGUMENT

100    State officials, clerks, and administrative staff who conspire to violate constitutional rights or federal laws may be held personally liable under both civil rights statutes, such as § 1983, and federal racketeering laws, such as RICO under 18 U.S.C. §§ 1961–1968. The coordinated misconduct described in this case transcends individual actions, representing a broader effort to obstruct justice, retaliate against whistleblowing, and deprive the Plaintiff of federally protected rights through systemic manipulation and abuse of process.

101    The Supreme Court has consistently held that officials acting outside their lawful authority for malicious or unconstitutional purposes are personally liable for their actions. In Ex parte Young and Scheuer v. Rhodes, the Court affirmed that state immunity does not protect officials who act unlawfully. Further, Hafer v. Melo explicitly states that officials are "persons" under § 1983 when sued in their individual capacities for constitutional violations. These principles apply to the present case, where actions by clerks, administrative judges, and other officials directly violated federal protections under FMLA, ADA, and the Norris-LaGuardia Act.

102    Federal racketeering laws, as outlined in RICO, provide an additional layer of accountability for these coordinated actions. In Sedima, S.P.R.L. v. Imrex Co., the Court clarified that civil RICO applies to both private and public entities engaged in a pattern of racketeering activity. The Defendants' conduct—manipulating judicial processes, distributing fraudulent legal documents, obstructing justice, and retaliating against the Plaintiff—meets the statutory definition of racketeering under RICO. Their use of postal services, electronic communications, and judicial authority to perpetuate fraudulent claims demonstrates their participation in a broader enterprise to undermine federal law and constitutional protections.

103    Each Defendant's participation in this conspiracy subjects them to liability under both § 1983 and RICO. Judicial actions aimed at obstructing the Plaintiff's access to fair proceedings constitute actionable conduct under RICO statutes, including mail fraud, wire fraud, obstruction of justice, and retaliation against a witness. These acts are compounded by the use of state judicial authority to implement unconstitutional policies, as addressed in Monell v. Department of Social Services. In addition, West v. Atkins establishes that individuals acting under color of state law are liable for violations of federal rights, further supporting the Plaintiff's claims against the Defendants.

104    The Supreme Court has repeatedly emphasized that qualified immunity does not shield officials who violate clearly established rights. In Harlow v. Fitzgerald, the Court articulated that immunity is unavailable where misconduct violates constitutional protections that any reasonable official would understand. The conduct in this case, including bad-faith litigation, procedural abuses, and deliberate retaliation, clearly falls outside the scope of protected official actions. Taylor v. Riojas reinforces this principle, holding that extreme misconduct precludes any claim to immunity. The Defendants' actions, including systemic violations of federal protections and procedural manipulation, represent such extreme misconduct.

105    By integrating RICO with existing personal liability doctrines, this argument highlights the comprehensive scope of accountability for the Defendants. Their individual and collective actions, undertaken as part of a broader conspiracy to undermine federal protections, violate both civil rights statutes and federal racketeering laws. This

layered approach ensures that the Court addresses not only the specific violations but also the systemic misconduct that facilitated them, establishing a clear framework for injunctive relief, compensatory damages, and equitable remedies to prevent further harm.

106    The right to seek redress and relief is a fundamental constitutional right, deeply rooted in the principles of justice and fairness enshrined in the United States Constitution. The Ninth Amendment serves as a safeguard for these unenumerated rights, explicitly stating that the enumeration of certain rights within the Constitution shall not be construed to deny or disparage others retained by the people. This provision ensures that the right to access justice, though not explicitly detailed, is inherently protected as an essential component of the rule of law. The Defendants' actions, by systematically obstructing the Plaintiff's ability to seek relief, represent a direct violation of this foundational principle and fall squarely within the scope of RICO's intent to remedy organized and systemic abuse.

107    The Supreme Court has long acknowledged the existence and importance of unenumerated rights under the Ninth Amendment. In Griswold v. Connecticut, the Court emphasized that the Ninth Amendment protects rights fundamental to the concept of ordered liberty, even if they are not explicitly articulated. The Plaintiff's right to access the courts, to seek redress for grievances, and to challenge unlawful conduct is an intrinsic aspect of the broader constitutional framework that ensures equal protection and due process under the law.

108    RICO provides a critical mechanism for addressing coordinated efforts to undermine such rights, particularly when the enterprise seeks to stifle an individual's pursuit of justice. In California Motor Transport Co. v. Trucking Unlimited, the Supreme Court held that concerted actions aimed at obstructing access to courts or administrative proceedings violate fundamental constitutional protections. Here, the Defendants' collective misconduct—including fraudulent litigation, procedural obstruction, and retaliation—was designed to prevent the Plaintiff from exercising their constitutional right to seek relief.

109    Applying RICO under the Ninth Amendment aligns with the statute's purpose of addressing systemic patterns of misconduct that harm individuals and undermine public confidence in the justice system. The interconnected acts of mail fraud, wire fraud, witness tampering, and obstruction of justice are not merely isolated violations; they form a coordinated campaign to deny the Plaintiff their constitutional rights. This broader context underscores the critical role of RICO in providing a remedy for individuals targeted by such schemes.

110    By framing the right to seek relief as a constitutionally protected right under the Ninth Amendment, the Plaintiff's claims underscore the gravity of the Defendants' conduct and its far-reaching implications. The deliberate and coordinated efforts to suppress the Plaintiff's ability to access justice violate not only statutory protections but also the core principles enshrined in the Constitution. RICO's application in this context ensures accountability for those who conspire to undermine these rights and reaffirms the judiciary's role in protecting the constitutional guarantees that safeguard the pursuit of justice for all.

RELIEF

| RELIEF COUNT RICO | | |
|---|---|---|
| 18 U.S.C. § 1964(c) | Treble Damages | Recovery of three times the actual damages sustained by the plaintiff, plus costs and attorney's fees. |
| 18 U.S.C. § 1964(a) | Injunctive Relief | Court may issue orders to dismantle the enterprise, prevent further violations, or enforce compliance with RICO. |
| 18 U.S.C. § 1964(b) | Equitable Relief | Allows the court to grant equitable remedies, including disgorgement of profits or unjust enrichment. |
| Enterprise Conspiracy Liability | Joint and Several Liability | Liability extends across all conspirators for acts committed by any individual within the enterprise. |
| Vicarious Liability | Agency Liability | Holds organizational actors (Ohana, Miles & Stockbridge) liable for the wrongful acts of their agents, employees, and representatives. |
| 18 U.S.C. § 1589(b) | Restitution | Full restitution to compensate the plaintiff for losses tied to forced labor or coercive practices. |
| 18 U.S.C. § 1513(e) | Punitive Damages | Exemplary damages for retaliatory harm inflicted by the defendants to deter similar future conduct. |
| Md. Code, Crim. Law § 7-104 | Restitution | Restitution for financial harm caused by theft by deception, including wages, bonuses, and other benefits withheld. |
| Md. Code, Crim. Law §§ 8-606, 8-607 | Compensatory Damages | Recovery for harm caused by forged documents, including legal costs, reputational harm, and lost opportunities. |
| Md. Const., Articles 19, 24, 46 | Declaratory Relief | Declaration that the plaintiff's rights to access courts, due process, and equal protection were violated. |
| 18 U.S.C. § 1519 | Criminal Penalties and Restitution | Penalties include restitution for harms caused by altered or falsified records. |
| 18 U.S.C. § 1951 | Punitive Damages | Punitive relief for extortion under color of law, addressing abuse of judicial authority. |
| 18 U.S.C. § 241 | Equitable and Injunctive Relief | Court orders to prevent ongoing conspiracies against federally protected rights and ensure accountability. |
| 18 U.S.C. § 1512 | Witness Protection Orders | Injunctive relief ensuring protection of the plaintiff from further tampering, harassment, or intimidation. |
| Md. Rule 18-101.1 et seq. | Judicial Reform Measures | Court may issue directives to ensure compliance with judicial ethics and mitigate systemic misconduct. |
| 42 U.S.C. § 1988(b) | Attorney's Fees and Costs | Full recovery of reasonable attorney's fees incurred during litigation. |
| Common Law Negligence | General and Special Damages | Damages for financial, reputational, and health-related harm caused by negligent retention and systemic inaction. |

111    The Defendants' actions, orchestrated by leadership at Ohana Growth Partners, LLC, and Miles & Stockbridge, P.C., as well as judicial and oversight officials, establish enterprise liability under RICO. These enterprises operated through three interrelated conspiracies—Pretext, Litigation, and Coverup—each compounding harm to the Plaintiff and furthering systemic corruption. Ohana Growth Partners' leadership, including Victor Brick, Glenn Norris, Richard Hartman, and Justin Drummond, directed and approved retaliatory measures such as fabricated compliance filings, wage suppression, and pretextual termination. Miles & Stockbridge principals, including Robert Brennen, Stephen Frenkil, and Holly Butler, coordinated fraudulent legal strategies, filing baseless litigation to harm the Plaintiff and colluding with judicial actors to protect co-conspirators. Judicial Disabilities Commission head Tanya Bernstein and Attorney Grievance Commission head Thomas DeGonia II suppressed investigations, enabling collusion and shielding judicial and attorney misconduct from accountability. Baltimore County Circuit Court leadership, including County Administrative Judge Dennis M. Robinson Jr. and Clerk Julie Ensor, facilitated procedural manipulation through

conflicting rulings, delayed hearings, and obstructive deficiency notices, furthering the conspiracy's objectives to harm the Plaintiff and conceal systemic corruption.

112    Enterprise liability is supported by case law such as *Reves v. Ernst & Young*, *Meyer v. Holley*, and *Cedric Kushner Promotions, Ltd. v. King*, which hold organizations accountable for their agents' acts performed within the scope of employment or in furtherance of the enterprise's goals. Ohana Growth Partners and Miles & Stockbridge, along with judicial collaborators, acted to retaliate, obstruct justice, and perpetuate fraud, meeting RICO's standards for liability. The cumulative impact of these actions caused extensive financial harm, reputational destruction, and severe health deterioration for the Plaintiff. This harm includes wage theft, litigation costs, lost business opportunities, and permanent damage to the Plaintiff's credibility and health. Pursuant to 18 U.S.C. § 1964(c), the Plaintiff seeks treble damages for these aggregate injuries, which were deliberately inflicted through coordinated racketeering activities.

ONSITE SOLUTIONS, INC AND CONTRIBUTORY MISCONDUCT: SUPPORTING EVIDENCE OF ENTERPRISE LIABILITY

| ONSITE SOLUTIONS, INC. AND CONTRIBUTORY MISCONDUCT: SUPPORTING EVIDENCE OF ENTERPRISE LIABILITY | |
|---|---|
| 18 U.S.C. § 1028(a)(7) | Identity Theft |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1030 | Computer Fraud and Abuse Act (CFAA) |
| 18 U.S.C. § 1028A | Aggregated Identity Theft |
| 18 U.S.C. § 471 | Forgery |
| 18 U.S.C. § 1029 | Abusive Device Fraud |
| 18 U.S.C. § 1341 (Mail Fraud) / § 1343 (Wire Fraud) | Interstate Transmission of Fraudulent Documents |
| 18 U.S.C. § 1001 | False Statements |
| Common Law Tort | Negligent Retention |
| 18 U.S.C. § 1962(c) and (d) | Civil RICO |

113    The fraudulent actions of Andrew Dinh, acting through Onsite Solutions, Inc., provide further evidence of systemic misconduct within the enterprise orchestrated by Ohana Growth Partners, LLC. Dinh knowingly used the Plaintiff's identity without authorization to submit compliance documents for IT and Entertainment Installation under the Planet Fitness franchisor system. These submissions, falsely attesting adherence to installation standards under the Plaintiff's name, created substantial liability and reputational risk for the Plaintiff. The fraudulent documents were transmitted through the franchisor's electronic compliance portal, crossing state lines, and demonstrating clear predicate acts of identity theft, wire fraud, and forgery.

114    Dinh's use of the Plaintiff's credentials constituted unauthorized access and misuse of the franchisor compliance portal, directly tying his actions to violations of the Computer Fraud and Abuse Act (CFAA). These submissions falsely attributed compliance responsibility to the Plaintiff, exposing them to liability for substandard or faulty work. Dinh's actions meet the threshold for enhanced penalties under 18 U.S.C. § 1028A by directly connecting identity theft to wire fraud and computer fraud. The deliberate falsification of compliance records demonstrates intent to harm the Plaintiff professionally while shielding Onsite Solutions from accountability for substandard work.

115    Ohana Growth Partners' leadership, including Victor Brick and Glenn Norris, knowingly retained Dinh despite prior knowledge of his fraudulent actions. This decision to rehire Dinh reflects negligent retention and constitutes willful ignorance or active participation in perpetuating fraud. By facilitating Dinh's continued access to systems and compliance processes, Ohana enabled the further misuse of the Plaintiff's identity, exacerbating liability and reputational harm. This negligence also undermined compliance with Planet Fitness franchisor requirements, directly implicating Ohana's leadership in the enterprise's racketeering activities.

116    The harm inflicted on the Plaintiff by Dinh's actions includes reputational damage, liability exposure, and obstruction of justice. By falsely affirming standards compliance, Dinh created significant liability risks for the Plaintiff if the work was later found noncompliant or faulty. The continued misuse of the Plaintiff's identity cast doubt on their professional credibility and undermined their ability to address and rectify these harms. Ohana's inaction and protection of Dinh reinforced these damages, obstructing justice and perpetuating harm to the Plaintiff.

117    These actions align with the broader enterprise goals of retaliation, concealment, and systemic misconduct. By rehiring Dinh and failing to act on known risks, Ohana Growth Partners facilitated and endorsed racketeering activities, including wire fraud, identity theft, and forgery. Dinh's fraudulent actions, supported by the inaction and willful negligence of Ohana's leadership, exemplify the enterprise's deliberate strategy to insulate co-conspirators from accountability while amplifying harm to the Plaintiff. This evidence strengthens the RICO claims and further illustrates the interconnected nature of the enterprise's misconduct.

## COUNT XVI: RETALIATORY COERCION UNDER THE NORRIS-LAGUARDIA ACT

SUB-COUNT

| Sub | RETALIATORY COERCION UNDER THE NORRIS-LAGUARDIA ACT |  |
|---|---|---|
|  | Norris-LaGuardia Act (NGA) - 29 U.S.C. §§ 101–115 |  |
| [124] | 29 U.S.C. § 103 | Injunctive Relief Restriction |
| [125] | 29 U.S.C. § 104 | Right to Organize and Dispute Terms |
| [126] | 29 U.S.C. § 102 | Congressional Declaration of Policy |

118    The Defendants' fraudulent injunction lawsuit constitutes a direct violation of the Norris-LaGuardia Act (NLA), which prohibits judicial intervention in labor disputes through coercive injunctions or retaliatory claims. The lawsuit improperly sought to compel the Plaintiff to perform labor under retaliatory and unlawful conditions by misusing judicial processes to enforce fabricated claims of breach of contract and duty of loyalty. These actions were designed to punish the Plaintiff for asserting rights under the Family and Medical Leave Act (FMLA) and engaging in whistleblowing activities.

119     The existence of a labor dispute is clear, as the lawsuit concerns the Plaintiff's employment, specifically their refusal to comply with retaliatory demands tied to workplace conditions and their protected FMLA leave. This qualifies as a labor dispute under 29 U.S.C. § 113, encompassing controversies over terms, conditions, and obligations of employment. The Defendants filed the lawsuit on June 14, 2024, mere hours after the Plaintiff invoked FMLA protections, demonstrating a retaliatory motive in violation of the NLA. The fraudulent claims, bolstered by perjured affidavits from Richard Hartman and Justin Drummond, were weaponized to seek a **no-notice ex parte injunction**, issued by Judge Desimone on June 17, 2024. This injunction, obtained without the Plaintiff's participation or opportunity for defense, conflicts with the explicit requirements of 29 U.S.C. § 107, which mandate procedural safeguards, such as evidence of unlawful acts, threats, insufficiency of remedies at law, and adequate opportunities for the Plaintiff to present defenses.  None of which were present in the case.

120     The injunction's issuance was a violation of 29 U.S.C. § 104, which prohibits injunctions in labor disputes except under narrowly defined circumstances. The Defendants sought to compel compliance with their fabricated demands through financial coercion, procedural manipulation, and escalating retaliatory measures. The Plaintiff's refusal to comply was based on protected rights to challenge unlawful workplace demands, including demands made under the pretext of access to systems that the Plaintiff had no obligation to fulfill under employment agreements.

121     The misuse of judicial processes to retaliate against the Plaintiff continued through the imposition of civil contempt penalties. On June 26, 2024, Judge Barranco issued conflicting orders that imposed $2,500 daily fines for alleged noncompliance while simultaneously barring the Plaintiff from making necessary changes to the disputed systems. These contradictory orders highlighted the retaliatory and punitive nature of the injunction proceedings. Moreover, the Plaintiff's whistleblowing activities, which exposed systemic violations of PCI DSS compliance, further underscore the retaliatory intent behind the lawsuit.

122     The Defendants' fraudulent claims and misuse of judicial processes demonstrate a calculated strategy to coerce compliance, suppress whistleblowing, and punish the Plaintiff for asserting protected rights under the FMLA and the NLA. By seeking to enforce fabricated labor demands through judicial action, the Defendants violated the core protections afforded to employees under the NLA, including the prohibition on coercive injunctions and retaliation in labor disputes.

123     The retaliatory injunction filed by Ohana Growth Partners, LLC, and Miles & Stockbridge, P.C., not only violated the Norris-LaGuardia Act but also systematically deprived the Plaintiff of due process and equal protection, as guaranteed under the 14th Amendment. The Defendants' use of perjured affidavits, fraudulent claims, and pretextual arguments weaponized the judicial system to harm the Plaintiff. The judicial actors' complicity in granting the ex parte injunction and subsequent conflicting orders exacerbated the Plaintiff's inability to comply, while deliberately denying a mandatory rehearing further underscored the procedural inequities.

124     The clerks' obstruction of critical filings and the judges' issuance of punitive, conflicting, and arbitrary orders on June 8th, 9th, 13th, and 14th served as key mechanisms in suppressing the Plaintiff's rights. The imposition of coercive penalties, including $2,500 daily fines, and the facilitation of civil contempt hearings designed to intimidate and threaten incarceration demonstrated the judicial actors' alignment with the Defendants' retaliatory objectives. These actions not only violated the Plaintiff's labor rights under the Norris-LaGuardia Act but also constituted a direct denial of due process by creating insurmountable procedural barriers to relief.

125     The court's refusal to address these barriers, combined with the judicial deference given to the Defendants' fraudulent filings, further perpetuated discriminatory practices against the Plaintiff as a Pro Se litigant. This disparate treatment, rooted in systemic bias and procedural manipulation, denied the Plaintiff equal protection under the law. By embedding these actions into the retaliatory injunction lawsuit, the Defendants ensured that the Plaintiff's constitutionally protected rights were repeatedly violated, compounding the harm already inflicted by their pretextual termination and retaliatory litigation.

## RELIEF

| RELIEF COUNT RETALIATORY COERCION UNDER THE NORRIS-LAGUARDIA ACT | | |
|---|---|---|
| 29 U.S.C. § 103 | Injunctive Relief | Prohibits further injunctions enforcing unlawful labor demands. |
| 29 U.S.C. § 104 | Declaratory Relief | Declares prior injunctions unlawful and void due to violations of labor dispute protections. |
| 29 U.S.C. § 110 | Compensatory Damages | Recovery of financial harm, including wages, legal fees, and costs arising from retaliatory injunctions and civil contempt orders. |
| 29 U.S.C. § 113 | Punitive Damages | Damages for malicious use of judicial processes to enforce labor demands in bad faith. |
| 42 U.S.C. § 1988(b) | Attorney's Fees and Costs | Full recovery of reasonable legal fees and expenses incurred in challenging unlawful injunctions and defending against retaliatory lawsuits. |

## PRAYER FOR RELIEF

94     WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

1.     Grant the full relief sought herein, as required by equity and fundamental principles of justice.

2.     Issue an opinion and order following oral argument and testimony, fully addressing the legal and factual issues presented in this case.

3.     Adjudicate all remaining claims that cannot be resolved by interlocutory judgment through a jury trial, ensuring full and fair resolution of all outstanding matters.

RESPECTFULLY SUBMITTED

February 9, 2025                                                      1334 Maple Avenue
                                                                     Essex, Maryland 21221
          /s/ Ryan Dillon-Capps                                      ryan@mxt3.com
          **Ryan Dillon-Capps**                                      703-303-1113