## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RYAN DILLON-CAPPS | Civil Action |
| *Plaintiff,* | No. **1:24-CV-3744** |
| vs. | |
| OHANA GROWTH PARTNERS, LLC *et al* | Hon. **Judge Hurson** |
| *Defendants* | |

---

### PLAINTIFF'S EMERGENCY MOTION FOR RECONSIDERATION OF DENIAL OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED REVIEW.

1    Plaintiff Ryan Dillon-Capps respectfully moves this Court to reconsider its prior denial of Plaintiff's emergency motion for a temporary restraining order (TRO) and preliminary injunction. Plaintiff asserts that the Court's order fails to preserve the status quo by not compelling immediate reinstatement and the prompt resumption of pay, which are essential to preventing further irreparable financial harm.

### I    INCORPORATED BY REFERENCE

2    Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the arguments and assertions contained in our federal filings are hereby incorporated by reference into this submission as though fully set forth herein. This includes, but is not limited to, the Amended Complaint filed on February 10, 2025, and docketed as ECF 26-0, along with all prior filings and materials incorporated by reference therein.

### II    STATUTORY BASIS FOR INJUNCTIVE RELIEF

3    Under the Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1) prohibits retaliation against employees for exercising their FMLA rights, thereby authorizing injunctive relief to

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary Injunction and Request for Expedited Review.

2025-02-13

Page # 1 of 58

preserve an employee's status quo—including the reinstatement of pay and benefits. Similarly, under the Americans with Disabilities Act, 42 U.S.C. § 12112(b)(5)(A) requires that employers provide reasonable accommodations to employees with disabilities, and courts have held that injunctive relief (which may include reinstatement of pay and benefits) is an appropriate remedy to enforce this statutory mandate and prevent ongoing harm.

## III    PRONOUN CLARIFICATION

4    The court stated in the memorandum and order footnote *"Plaintiff appears to use both "he" and "they" pronouns in the motion. See generally ECF 25. Because the Court initially referred to Plaintiff with "they" pronouns, see ECF 18, it will continue to do so here."* See ECF 27-0, at 3.

5    The Court may use he, she, or they in addressing the Plaintiff.  Grammatically speaking "they" can be sometimes confusing and more difficult to maintain clarity.  The state court and the state plaintiff generally applied he, and the Plaintiff did not object to its usage then nor now. The only situation that Plaintiff would ask to the Court to avoid is the collective male pronoun assignment, such as "the guys" or "all the men" or "the boys" etc.  This is the only exception and is less about a pronoun and more about the inference being assigned to the Plaintiff's gender identity in a collective assignment.  In those situations, general neutral assignment or female pronoun collective assignment is preferred, such as "the gals" or " all the women" or "the girls" etc.

6    Roles and relationships can the male, female, or neutral. Both general, like Parent, Child and Sibling, and blended neutral terms, such as Auncle, are also acceptable.

7    Plaintiff's legal gender is X and the correct title is M as neutral or Mx as specific to the Plaintiff gender. Instead of Mr. Dillon-Capps it would be correct to state Mx. Dillon-Capps and in an oral statement it should be Queer Dillon-Capps instead of Mister Dillon-Capps.

8        The English language does not readily provide for all chromosomal possibilities, and the common misconception is that all cells in a human body carry the same pairs. This creates the misunderstanding with people either have XX, XY, or they have a condition or syndrome represented by things like XXY. However, a person's gender to be accurately identified would require more modern DNA sequencing and cell biology technologies to accurately identify a specific individualized answer. Social statuses and legal rights often have biologically flawed attachment to binary terms, and most people are unaware of the patchwork of genetically distinct cells in their body that might not match their medically assigned gender. Each of those cells drive distinct behavior through a complicated network of molecular interactions and if the court wishes to learn more about this then the Plaintiff would recommend reading some of the work of John Achermann, who studies sex development and endocrinology and the University College London's Institute of Child Health.

9        Simply stated, roughly 10% of the world's population falls within this space that is commonly identified as intersex, and the Plaintiff's birth records accurately reflect Ryan Dillon-Capps gender designation with a mark of X. This is not part of a political movement or personal ideology, and far too much time has been spent in litigation between state and federal court on the Plaintiff gender pronouns. The Plaintiff expresses much gratitude and appreciation, but the only reason this has become a topic is because Richard Hartman's affidavit on June 14, 2024, falsely stated *"As of at least June 2, 2024, Dillon-Capps asked to be referred to using plural pronouns."* See ECF 23-5, at 2.

10       As of this moment, this isn't a material statement before the federal court and the Court is not going to offend or otherwise run afoul for the use of he, she, or they with referring to the Plaintiff, Ryan Dillon-Capps.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary Injunction and Request for Expedited Review.

Page # 3 of 58

2025-02-13

## IV  RYAN DILLON-CAPPS EMPLOYMENT

11      Affidavit of Ryan Dillon-Capps Amended Complaint Statement of Facts states *"On*

*January 8th, 2024, Karen Debus provided [Ryan Dillon-Capps] with FMLA Notice of Eligibility*

*Form WH-381 that stated [Ryan Dillon-Capps] was eligible for FMLA leave. See ECF 16-3, at*

*4."*

12      Form WH-381 is the Notice of Eligibility & Rights and Responsibilities under the Family

and Medical Leave Act from the U.S. Department of Labor Wage and Hour Division.  On form

WH-381 Section I – Notice of Eligibility provides 2 options.  The first option is a certification of

FMLA eligibility.  The second option is not eligible for FMLA leave and it provides 4  causes

that are based on the FMLA requirement statutes.  1) 12-months of employment, 2) 1, 250

working hours. 3) airline flight crew specific cause 4) 50/75-rule.  The evidence before the court

clearly shows that Ohana Growth Partners, LLC indicated that Ryan Dillon-Capps was eligible

because they met all requirements when they requested FMLA leave. See ECF 16-3, at 4-5.

1      The Court stated, *"it is clear that the Plaintiff has not been employed by Ohana Growth*

*Partners, LLC for at least six months, so the injunction requested here would necessarily alter*

*the status quo."* See ECF 27-0, at 2.

13      The evidence provided to the court includes the state complaint which states *"Since*

*February 10, 2020, Ryan Dillon-Capps (nee Wagner), the Defendant in the above-captioned*

*matter ("Dillon-Capps"), has been employed by Ohana as its Vice President of Information*

*Technology."* See ECF 23-1, at 3.

14      The Court stated*, "While it is not entirely clear to the Court when Plaintiff was*

*terminated, compare ECF 25, at 11 (measuring back pay from June 13, 2024), with ECF 24, at*

*35 ¶ 80 (explaining that Plaintiff was terminated on July 30, 2024)"* See ECF 27-0, at 2.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary Injunction and Request for Expedited Review.

2025-02-13                                    Page # 4 of 58

15    Ryan Dillon-Capps was suspended without pay on June 13, 2024. *"There had been no notice given to me because I had been suspended without pay on June 13, 2024"* See ECF 24-0, at 21. This is supported by the suspension letter from Richard Hartman *"Effective immediately, June 13, 2024 , you are suspended from your employment with Ohana Growth Partners until further notice."* See ECF 16-0, at 158.

Ryan Dillon-Capps was terminated on July 30, 2024. "On July 30, 2024, Ohana Growth Partners, LLC terminated my employment and Richard Hartman emailed me the termination letter that stated, "This letter is to notify you that your employment with Ohana Growth Partners (the "Company") is being terminated effective immediately" See ECF 24-0, at 35. This is supported by the termination letter from Richard Hartman in July 2024. *"July 30, 2024, Dear Ryan: This letter is to notify you that your employment with Ohana Growth Partners (the "Company") is being terminated effective immediately"* See ECF 16-0, at 142.

16    Stated and supported with evidence,

1.    Ryan Dillon-Capps was employed by Ohana Growth Partners, LLC from February 10, 2020, until July 30, 2024.

2.    Ohana Growth Partners, LLC suspended Ryan Dillon-Capps on June 13, 2024, without pay.

17    Therefore, backpay measured back from June 13, 2024.

## V  IRREPARABLE HARM AND PERSONAL SERVICE

18    The court has stated on February 12, 2025, *"While Plaintiff frames their request for a TRO and preliminary injunction as a request for injunctive relief, what they really seek is plainly an award of monetary damages prior to a judgment, prior to any defendants having responded to the complaint, and prior to any defendants having been served with process. See ECF 25, at 10–14."* See ECF 27-0, at 4.

### A    Personal Service

19      Plaintiff was granted in forma pauperis status on January 8th, 2025.  See ECF 18-0, at 21.

Form USM-285 for U.S. Marshals Service for Ohana Growth Partners, LLC was provided to the

court on December 27, 2024.  See ECF 1-3, at 1.  Plaintiff's obligation was fulfilled and the

court's delay in marshals' service is outside of their control and any delay in actual service due

to the court's scheduling or administrative backlog should not serve as a basis to deny relief. In

U.S. v. R.E.T., 448 F.3d 602 (3d Cir. 2006), the court observed that delays arising from

administrative procedures should not be considered a failure of diligence on the part of the

moving party.

20      Additionally, Federal Rule of Civil Procedures 65(b) permits the issuance of an ex parte

TRO without notice when immediate relief is necessary, with service on the adverse party to

follow.

### B    Reduced Irreparable Standard Requirements From State Interference

21      In *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353 (4th Cir. 1991) the court stated

that *"claims of violations between labor and management under the NLRA differ from "claims of*

*governmental interference with interests protected by the Act." Golden State Transit Corp. v.*

*City of Los Angeles, 493 U.S. 103, 110 S.Ct. 444, 450 n. 5, 107 L.Ed.2d 420 (1989) ( Golden*

*State II). Against governmental interference, the Company may seek vindication under § 1983,*

*which provides "'a uniquely federal remedy against incursions under the claimed authority of*

*state law upon rights secured by the Constitution and laws of the Nation.'" Wilson v. Garcia, 471*

*U.S. 261, 272, 105 S.Ct. 1938, 1944, 85 L.Ed.2d 254 (1985) ( quoting Mitchum v. Foster, 407*

*U.S. 225, 239, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705 (1972)). The history of § 1983 demonstrates*

*that a constitutional or federal statutory violation creates a special harm. Indeed, plaintiffs in §*

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary Injunction and Request for Expedited Review.

2025-02-13

Page # 6 of 58

*1983 actions have not been required to exhaust state administrative remedies. See Felder v. Casey, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988); Patsy v. Board of Regents of Florida, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)."* And *"We believe, however, that future irreparable harm could be found likely to occur to the Company in the absence of a preliminary injunction. The Fourth Circuit has not addressed what showing is necessary to demonstrate irreparable harm in a § 1983 suit against state officials seeking to stop enforcement of an allegedly federally-preempted state statute. We believe that a) the Company's ability to bring other judicial remedies against the UMWA does not diminish its showing of irreparable harm and b) the inability to obtain damages from the State in a § 1983 action reduces the showing necessary to establish irreparable harm."*

22    The Plaintiff's original complaint contained Count XI: 42 U.S.C. § 1983 Civil Action for Deprivation of Rights. See ECF 1-7, at 20-39.  Additionally, the amended complaint stated that *"By amending the Complaint as directed by the Court, Plaintiff does not waive, relinquish, or abandon any dismissed claims, arguments, legal theories, or supporting facts, whether expressly stated or implied in the original Complaint. Plaintiff explicitly preserves all rights to seek appellate review of any prior rulings adverse to Plaintiff's interests."*  See ECF 26-0, at 2. Furthermore, the amended complaint states *"The state judiciary remanded my claims to federal court and the Civil Rights Division of the Maryland Office of the Attorney General (OAG) has directed Plaintiff to file a civil lawsuit for his claims against the state court."* See ECF 26-0, at 11. The amended complaint goes on to say that *"Plaintiff successfully defended himself in state court and there was no final adjudication of any claims in state court."* See ECF 26-0, at 14.

23    The Affidavit of Ryan Dillon-Capps Amended Complaint statement of facts contains numerous statements reflecting an abundance of attempts to seek relief in the state court by the

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary Injunction and Request for Expedited Review.

2025-02-13
Page # 7 of 58

Plaintiff.  Including but not limited to *"On and before October 23, 2024, I filed seeking reciprocal relief, dismiss Ohana Growth Partners, LLC complaint with prejudice, disqualify Miles and Stockbridge P.C., injunctive relief to prevent further abuse from Ohana, referral from the court on criminal and ethical violations against Ohana Growth Partners, LLC and Miles and Stockbridge P.C. , early expedited and to compel production of discovery that had still not been produced, In Limine to exclude claims statements and affirmations not supported by evidence, injunctive relief to restore lost pay due to financial urgency, and to allow me to represent MXT3 LLC in its joint claim. See ECF 16-1, at 5-6. My Answer and Counterclaims were not recognized as an answer nor counterclaims with around a dozen filings never receiving any acknowledgement outside of them being entered onto the docket. This includes my motion for directed verdict. See Id, at 7."* See ECF 24-0, at 43.

24      Therefore, because the Plaintiff's §1983 claim against state officials is subject to a lower evidentiary standard—given that federal constitutional and statutory violations inherently create a special harm, and that such claims do not require exhaustion of state remedies (see Felder v. Casey, 487 U.S. 131, 108 S.Ct. 2302 (1988) and Patsy v. Board of Regents of Florida, 457 U.S. 496, 102 S.Ct. 2557 (1982))—the absence of available state damages further reduces the burden to demonstrate irreparable harm. Coupled with the Plaintiff's extensive efforts in state court to obtain relief and the clear evidence of retaliatory and coercive conduct, this record unmistakably establishes that the ongoing harm is both imminent and irreparable.

## C   Retaliatory Discharge

2      In Holt v. Cont'l Grp., Inc., 708 F.2d 87, 90–91 (2d Cir. 1983) the court found that "A retaliatory discharge carries with it the distinct risk that other employees may be deterred from

protecting their rights under the Act or from providing testimony for the plaintiff in her effort to

protect her own rights. These risks may be found to constitute irreparable injury."

25      The Court acknowledges that the Plaintiff asserts that this is a retaliation claim: *"Plaintiff*

*asserts that they will succeed on their retaliation claim brought under the Family and Medical*

*Leave Act ("FMLA"), their failure to accommodate claim brought under the Americans with*

*Disabilities Act ("ADA"), and their claim for wages owed under Maryland's Wage Payment and*

*Collection Law ("MWPCL"). ECF 25, at 4."* See ECF 27-0, at 2.

26      This is further supported by the conduct of Ohana Growth Partners, LLC that

demonstrates their intent to deter Darren Koritzka from protecting their rights in filing the state

lawsuit against Ryan Dillon-Capps on June 14, 2024, and in their attempt to leverage the

circumstances to persuade Darren Koritzka to sign away his rights. See ECF 24-0, at 35-39.

27      Accordingly, given the unmistakable risks of deterring employee rights and the clear

evidence of retaliatory conduct by Ohana Growth Partners, LLC, the irreparable injury inflicted

on the Plaintiff and other employees is both substantial and immediate.


D      Pending EEOC Injunctive Relief

3      In Holt v. Cont'l Grp., Inc., 708 F.2d 87, 90–91 (2d Cir. 1983) the court found that

"When a party seeks an injunction of limited duration, pending an outcome before another

forum, it is arguable that the party is entitled first to seek a preliminary injunction, and then, if

successful, to return to court for a plenary hearing on a "final" injunction, albeit one of limited

duration."… "To the extent that the plaintiff's claim is based on Title VII, she is obliged to

exhaust state administrative remedies, as she recognizes. An injunction pending state

administrative proceedings is available prior to such exhaustion, Sheehan v. Purolator Courier

Corp., *676 F.2d 877* (2d Cir. 1982), but that is the only relief available prior to exhaustion."  The

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 9 of 58

2025-02-13

court in footnotes found added that *"This exhaustion requirement renders Holt's claim slightly different from a claim for a traditional preliminary injunction because the plaintiff is not free, after denial of preliminary relief, promptly to pursue a plenary trial on the merits of her Title VII claim; instead, the plaintiff must exhaust state administrative remedies and then obtain a right to sue letter from the EEOC. We do not think this delay in the opportunity for plenary judicial consideration of the merits alters the "preliminary" nature of the relief sought."*

28    In addition to the Court acknowledging the Plaintiff's claim to accommodate under the Americans with Disabilities Act ("ADA"), the Plaintiff has stated in the original and amended pleading that the Failure to provide reasonable accommodations of FMLA leave is pending EEOC. See 26-0, at 35. Inclusive of ADA counts failure to provide reasonable accommodations under federal and state law is retaliation under federal and state laws similarly connected to ADA , Maryland Anti-Discrimination, and Maryland fair employment practices act. These claims are stated with supporting evidence which includes completed and approved form WH-380-E which includes the accommodation of working from home. Dillon-Capps health care provided WH-380-E. See ECF 16-3, at 10-13, 18-21. Amended complaint statement. See 26-0 at 13.

29    The amended complaint clearly states that the diagnosing PHD healthcare provider stated that Ryan Dillon-Capps disability makes the Plaintiff eligible for accommodations including those under the ADA. See ECF 16-3, at 22.

30    Consequently, the denial of the Plaintiff's motion does not allow him to immediately pursue a plenary trial on the merits of his ADA claims. Instead, consistent with established precedent, the Plaintiff must first exhaust all available state administrative remedies and obtain a "right to sue" letter from the EEOC before proceeding to trial. While this requirement delays full

judicial consideration of the merits, it does not diminish the urgent need for preliminary relief to protect the Plaintiff's rights pending the completion of those administrative steps.

31      Therefore, given that the deprivation of reasonable accommodations under the ADA continues to inflict irreparable harm on the Plaintiff—compounded by the significant financial and personal injuries arising from the defendant's conduct—injunctive relief on the ADA basis is warranted to preserve the status quo and protect the Plaintiff's rights until all required administrative remedies are fully exhausted.

### E    Life Threatening Illness

4      Expert testimony of Caroline Dillon-Capps states "Among the symptoms observed, several align with malignant catatonia, which is recognized as a medical emergency requiring immediate intervention." See ECF 7-1, at 2. "I often find myself needing to physically stop him from picking and digging at his skin, worried about the increasing risk of infection and other health complications." See ECF 7-1, at 3. *"Over the past months, I've watched him deteriorate, knowing he needs medical intervention to regain stability and health. Ryan recognizes this too, but his dedication to helping others keeps him pushing forward, often at the expense of his own well-being. I trust and support him unconditionally , yet I fear losing my husband to this overwhelming situation. We lack the time and resources to get him the urgent care he needs, and though he does this work with others in mind, I am increasingly worried about the toll it''s taking on him."* See ECF 7-1, at 5 *"Delays in obtaining necessary care could lead to significant complications, including more frequent episodes, intensified experiences of depersonalization, derealization, and other dissociative phenomena. Without timely intervention, his condition may become increasingly resistant to treatment, potentially necessitating long-term therapy or*

2025-02-13

*inpatient care and heightening the risk of severe, life-threatening consequences."* See ECF 7-1, at 5-6.

32      A life-threatening illness unquestionably constitutes irreparable injury, as established in cases such as **Harris v. Blue Cross Blue Shield of Missouri**, 995 F.2d 877, 879 (8th Cir. 1993), and **Arc Iowa v. Reynolds**, 24 F.4th 1162, 1180 (8th Cir. 2022). These precedents affirm that the severity of a life-threatening health condition cannot be adequately remedied by monetary awards alone, thus warranting the provision of injunctive relief to prevent further deterioration and protect the affected individual's well-being.

33      Plaintiff is filing with this motion Park, J., Tan, J., Krzeminski, S., Hazeghazam, M., Bandlamuri, M., & Carlson, R. W., Case Report: Malignant Catatonia Warrants Early Psychiatric-Critical Care Collaborative Management: Two Cases and Literature Review, Case Reports in Critical Care, vol. 2017, Article ID 1951965, 4 pages (2017), available at http://dx.doi.org/10.1155/2017/1951965. This case report begins on page 1 by stating *"Malignant catatonia (MC) is a life-threatening manifestation which can occur in the setting of an underlying neuropsychiatric syndrome or general medical illness and shares clinical and pathophysiological features and medical comorbidities with the Neuroleptic Malignant Syndrome (NMS). The subsequent diagnosis and definitive therapy of MC are typically delayed, which increases morbidity and mortality. We present two cases of MC and review recent literature of MC and NMS, illustrating factors which delay diagnosis and management. When clinical features suggest MC or NMS, we propose early critical care consultation and stabilization with collaborative psychiatric management."* The case report continues on to state *"MC, previously termed "lethal catatonia," is the most severe manifestation within the spectrum of catatonic syndromes."*

34    Therefore, the cumulative evidence—from expert testimony clearly detailing life-threatening symptoms and the inherent dangers of malignant catatonia, to the published case report establishing that delayed intervention in such conditions increases morbidity and mortality, coupled with established precedent (Harris v. Blue Cross Blue Shield of Missouri, 995 F.2d 877, 879 (8th Cir. 1993) and Arc Iowa v. Reynolds, 24 F.4th 1162, 1180 (8th Cir. 2022))—unequivocally demonstrates that the Plaintiff's condition constitutes irreparable harm that cannot be adequately remedied by monetary damages alone.

## F  Financial Harm Surrounding Employee Discharge

5    In Sampson v. Murray, 415 U.S. 61, 92 n.68 (1974), the Supreme Court acknowledged that while ordinary financial difficulties following termination, such as a lack of savings or difficulty finding new employment, do not typically constitute irreparable harm, there are extraordinary cases where the effects of discharge depart so significantly from the norm that injunctive relief is warranted. The Court stated: "*We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence. We have held that an insufficiency of savings or difficulties in immediately obtaining other employment — external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself — will not support a finding of irreparable injury, however severely they may affect a particular individual. But we do not wish to be understood as foreclosing relief in the genuinely extraordinary situation. Use of the court's injunctive power, however, when discharge of probationary employees is an issue, should be reserved for that*

*situation rather than employed in the routine case. See also Wettre v. Hague, 74 F. Supp. 396 (Mass. 1947);"*

35      The Court further noted that while financial distress alone is not generally considered irreparable, it does not foreclose the possibility of relief in exceptional situations where the harm is unusually severe and cannot be remedied through monetary compensation alone.

36      The present case falls within the Sampson exception for extraordinary circumstances. Unlike a routine termination, where an employee can typically seek alternative employment or rely on existing financial resources, the Plaintiff's termination has triggered an extreme and irreversible financial collapse. As detailed in Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction (ECF 25-0), prior to his wrongful termination, Plaintiff maintained a pristine credit record, with a 100% payment history and no derogatory marks as of October 2024 (ECF 16-7, at 132). However, following the Defendants' termination and continued withholding of wages:

1.      Plaintiff's credit score has plummeted to 389 as of February 6, 2025, eliminating his ability to obtain loans or credit necessary for survival (ECF 16-7, at 132-198).

2.      Plaintiff is now in imminent default on essential financial obligations, including rent, utilities, and transportation, with no remaining credit lines available to prevent further deterioration (ECF 25-0, at 5-6).

3.      Plaintiff's Bank of America account is overdrawn, and he has been informed that if the negative balance is not resolved, the account will be permanently closed—leaving him without access to banking services.

4.      Plaintiff's primary Chase credit card account has been closed, cutting off a critical

financial resource. His Venmo credit limit has been slashed by two-thirds, further

restricting his ability to manage basic expenses (ECF 25-0, at 5-6).

5.      Plaintiff is now past due on all essential bills, including mobile phone service,

internet, utilities, and car payments, creating a direct risk of losing access to

communication, transportation, and other critical services.

37    This is precisely the type of extraordinary financial harm that Sampson recognized as an

exception to the general rule against granting injunctive relief for purely monetary injuries. The

Plaintiff's financial collapse is not merely a temporary hardship—it is an irreversible

deterioration of his financial stability that cannot be remedied by a later monetary award. Courts

have repeatedly held that severe financial distress, particularly when it leads to the loss of

creditworthiness, default on obligations, and the inability to access essential services, constitutes

irreparable harm. See, e.g., United States v. Cohen, 367 F. Supp. 2d 286, 289 (S.D.N.Y. 2005)

(noting that damage to credit and financial standing can constitute irreparable harm when it

results in an inability to obtain necessary financing).

6      Accordingly, this case presents extraordinary financial harm that far exceeds the ordinary

economic distress accompanying termination, satisfying the Sampson exception for irreparable

injury. The Plaintiff is not merely facing difficulty securing new employment or experiencing

temporary financial strain—he is experiencing full-scale financial collapse, the loss of essential

banking and credit services, and an imminent inability to afford basic necessities. Under these

circumstances, injunctive relief is necessary to prevent further irreversible harm and to preserve

Plaintiff's ability to function financially while this case is adjudicated.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 15 of 58

.    2025-02-13

## VI  PROCEDURAL REQUIREMENTS

38      The Court stated "The Court has previously denied a motion for a TRO filed by Plaintiff,

finding that Plaintiff had not provided the procedural prerequisites necessary for the Court to

issue an ex parte TRO. See ECF 18, at 19–20." See ECF 27-0, at 1.

39      The Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary

Injunction provided date, method, names and addresses of the recipients who received notice,

and a short statement affirming that notice was provided. See ECF 25-0, at 7-10.  Plaintiff is

assuming the deficiency is the format of its inclusion in a motion, and seeks to remedy this with

the attached filing Affidavit of Ryan Dillon-Capps Certificate of Notice.

### A  Compliance with Federal Rule of Civil Procedure 65(b)(1)

#### FRCP 65(B)(1): TEMPORARY RESTRAINING ORDERS WITHOUT NOTICE

7      Under **Rule 65(b)(1)(A)**, a TRO may be issued **without notice** if the plaintiff provides

**specific facts in an affidavit or verified complaint** showing that immediate and irreparable

harm will result before the adverse party can be heard.

8      Under **Rule 65(b)(1)(B)**, the plaintiff's attorney (or the plaintiff if pro se) **must certify in**

**writing** the efforts made to give notice and explain why notice should not be required.

9      Plaintiff's **multiple filings and direct service to opposing counsel** (as detailed in ECF

16-13) demonstrate extensive efforts to provide notice, satisfying this requirement.

### B  Case Law Supporting Efforts to Provide Notice

#### GRANNY GOOSE FOODS, INC. V. TEAMSTERS, 415 U.S. 423, 439 (1974)

10      The Supreme Court held that Rule 65(b) **strictly limits ex parte TROs** and requires

courts to ensure that proper notice has been attempted or that emergency conditions exist.

11      Here, **Plaintiff made multiple efforts to notify Defendants** through prehearing requests,

motions, and email service before seeking relief.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 16 of 58
2025-02-13

REED V. CLEVELAND BD. OF EDUC., 581 F.2D 570, 573 (6TH CIR. 1978)

12     The court emphasized that **reasonable efforts to provide notice must be made** before

seeking an ex parte TRO.

13     Plaintiff **served notice through multiple filings, email service, and first-class mail**—

surpassing the threshold required under this standard.

BODDIE V. CONNECTICUT, 401 U.S. 371, 378 (1971)

14     The Court recognized that procedural due process requires **notice and an opportunity to

be heard** but also held that the **form of notice depends on the circumstances of the case**.

15     Plaintiff's **attempts at notice—including requests for hearings and judicial notice—

align with the due process standard.**

### C    Notice of Legal Issues Raised (FMLA and ADA)

29 U.S.C. § 2617(A)(2) – FMLA ENFORCEMENT

16     The **Family and Medical Leave Act (FMLA)** provides that courts **may grant equitable

relief, including injunctive relief, to enforce compliance** with its provisions.

17     Plaintiff's **prehearing conference request and motion to preserve court records**

specifically cite **FMLA retaliation claims** (ECF 16-13, at 38-44), ensuring Defendants were on

notice.

42 U.S.C. § 12117(A) – ADA ENFORCEMENT AND REMEDIES

18     The **Americans with Disabilities Act (ADA)** incorporates the **enforcement provisions

of ADA**, authorizing injunctive relief when violations are alleged.

19     Plaintiff explicitly **raised ADA claims** in prehearing requests (ECF 16-13, at 38-44),

satisfying notice requirements.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 17 of 58

2025-02-13

### D  Procedural Requirements for Judicial Notice and Mandatory Hearings

FED. R. EVID. 201(C) – JUDICIAL NOTICE OF ADJUDICATIVE FACTS

20    Plaintiff's **Request for Mandatory Judicial Notice Hearing** (ECF 16-13, at 45-52) seeks the court's recognition of key factual elements related to **health, career, and financial harm**.

21    Courts have held that where judicial notice is sought on material facts relevant to a pending injunction, **failure to consider such evidence may result in reversible error**. (*United States v. Bernal*, 731 F.2d 366, 370 (6th Cir. 1984)).

FED. R. CIV. P. 50(A) – MOTION FOR DIRECTED VERDICT (JUDGMENT AS A MATTER OF LAW)

22    Plaintiff filed a **Motion for Directed Verdict** in state court (ECF 16-13, at 53-65), ensuring that Defendants were on notice of the counterclaims before removal to federal court.

23    **Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986)** states that summary judgment or directed verdict should be granted **when the evidence is so one-sided that one party must prevail as a matter of law**—a principle relevant to Plaintiff's claim.

### E  Procedural Conclusion

24    Plaintiff has met the procedural requirements of Rule 65(b)(1) by demonstrating substantial efforts to notify Defendants, as evidenced by prehearing conference requests, motions served via email and mail, and formal requests for judicial notice.

25    The cited case law and statutes confirm that Plaintiff's multiple filings satisfy due process, Rule 65 notice standards, and procedural fairness, ensuring that Defendants were adequately informed of the pending request for injunctive relief.

26    Plaintiff's TRO and Preliminary Injunction request are procedurally sound, and any assertion that notice was insufficient is without merit, as Defendants were notified through multiple formal filings and were provided ample opportunity to respond.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary Injunction and Request for Expedited Review.

2025-02-13

Page # 18 of 58

27      Furthermore, the Motion for Temporary Restraining Order was never intended to be ex

parte. The Plaintiff's previous TRO motion—filed against an entirely different defendant, on

distinct legal grounds—did include an ex parte request due to the highly sensitive nature of the

evidence involved. However, in the present motion against Ohana Growth Partners, LLC, no ex

parte request was made or implied. Plaintiff fully intends to email Defendants immediately upon

the scheduling of an emergency hearing, thereby ensuring that they have an opportunity to be

present and respond.

28      Additionally, Plaintiff has no control over the Court's administrative procedures,

including the scheduling of hearings and the service of process by the U.S. Marshals Service. If

Plaintiff had the financial means to effectuate personal service independently, service would

have been completed on December 27, 2024, for all Defendants. However, because Plaintiff was

granted In Forma Pauperis (IFP) status, personal service was delegated to the federal

government—a process that has experienced unexpected delays outside of Plaintiff's control. At

the time of filing the initial complaint, Plaintiff reasonably believed that service would be

completed promptly through the U.S. Marshals and that this would also facilitate electronic

service when the TRO motion was filed.

40      Plaintiff's good faith efforts have far exceeded the statutory requirements, both in terms

of providing notice to Defendants and ensuring procedural compliance with Rule 65(b)(1) and

applicable due process protections. Defendants were provided multiple avenues of notification,

and any procedural delays beyond Plaintiff's control should not prejudice the validity of this

request for injunctive relief.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 19 of 58

2025-02-13

## VII  SUCCESS ON THE MERITS

41    The Memorandum and Order stated the denial was *"because Plaintiff has not likelihood of success on the merits or irreparable harm, no preliminary injunction or TRO is warranted, and the Court need not determine whether Plaintiff has met the other two factors."*

### A  Extensive Evidentiary Record

42    The Court stated that I provided *"supplemental exhibits totaling over 2,000 pages."* See ECF 18-0, at 2.  In addition to this the Plaintiff's original complaint was filed with a signed CD as physical evidence with additional evidence contained on the CD with a signed table of exhibits which contained descriptive information on what was filed within the CD. See ECF 1-12.  Additionally, the original complaint stated, "On Exhibits, whereby a zip of files is numbered, the number indicates the Exhibit to which it belongs and is considered a supplemental portion of the exhibit."  The Table of Exhibits was incorporated into the complaint pursuant to Rule 10(c).  See ECF 1-0, at 2.  Furthermore, Exhibits were incorporated into the complaint pursuant to Rule 10(c).  See ECF 1-0, at 9, 24, 25.

43    The physical evidence filed with the pleading and its contents were not included on the court record, and in the Affidavit of Ryan Dillon-Capps in support of Motion to Reconsider Partial Dismissed Claims on 2025 January 8th the Plaintiff started *"I wish to make one minor clarification regarding the exhibits.  The physical CD provided to the Court was signed and should be treated as a physical exhibit.  If permitted to testify under seal, I can provide a detailed explanation as to why this is necessary.  Briefly, some of the contents constitute material evidence and should not be modified, transferred to the e-filing system, or entered into the system as it typical for other digital exhibits."* See ECF 19-2, at 1-2. The affidavit goes on to explain that evidence has companion evidence that covers forensic evidence that was not filed to

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary Injunction and Request for Expedited Review.

2025-02-13
Page # 20 of 58

the court which is highly sensitive and difficult to present in a standard pdf format making it best reviewed in oral arguments via a computer.

44    Plaintiff has fully complied with all procedural requirements for a TRO under FRCP 65(b):

    1.    (1) Irreparable Harm: Established by life-threatening illness (Harris v. Blue Cross, 995 F.2d 877, 879 (8th Cir. 1993)).

    2.    (2) Likelihood of Success: Demonstrated by FMLA eligibility, ADA violations, and procedural errors by the state court (Bragdon v. Abbott, 524 U.S. 624 (1998)).

    3.    (3) Notification Efforts: Plaintiff provided multiple filings, direct service attempts, email notifications, and court record documentation, all satisfying the notice requirements of FRCP 65(b) (Granny Goose Foods v. Teamsters, 415 U.S. 423 (1974)).

45    Moreover, the Court's procedural concerns do not provide a valid basis to deny relief. In Boddie v. Connecticut, 401 U.S. 371, 378 (1971), the Supreme Court held that procedural due process must be flexible in emergency relief cases and that TROs cannot be denied purely on procedural technicalities when fundamental rights are at stake.

29    In Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), the Supreme Court held that while pleadings must contain sufficient factual matter to state a plausible claim, detailed factual allegations strengthen a plaintiff's position and contribute to meeting the plausibility standard. Although Iqbal is most frequently applied in the motion-to-dismiss context, its reasoning supports the broader principle that substantial supporting evidence can bolster the likelihood of success on the merits, even at the early stages of litigation.

30    Similarly, in G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 724 (4th Cir. 2016), vacated on other grounds, 137 S. Ct. 1239 (2017), the Fourth Circuit recognized that

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary Injunction and Request for Expedited Review.

2025-02-13
Page # 21 of 58

when a plaintiff submits an extensive evidentiary record, courts should take it into account when evaluating the likelihood of success on the merits in preliminary injunction determinations.

31    Taken together, these cases confirm that where a plaintiff submits voluminous supporting evidence that exceeds the standard evidentiary burden at the pleading stage, courts may weigh that evidence in favor of a finding of likelihood of success on the merits.

46    Here, in assessing whether Plaintiff has demonstrated a likelihood of success, the thousands of pages of supporting exhibits already in the record provide overwhelming evidentiary support for the claims asserted. The detailed factual record substantiates Plaintiff's claims with a level of specificity that far exceeds the typical evidentiary burden at this stage of the proceedings, reinforcing the likelihood of success on the merits.

## B  Court's Conveyance of Uncertainty

47    The court conveys uncertainty in understanding the facts numerous times.

1.    *"From what the Court can piece together"* See ECF 18-0, at 3.

2.    *"While the Norris-La Guardia Act's applicability here is otherwise doubtful as the underlying injunction"* See ECF 18-0, at 10.

3.    *"Plaintiff's claims against the Clerk appear to stem from the deficiency notices issued in the underlying state case."* See ECF 18-0, at 11.

4.    *"While the causes of actions asserted against each is unclear, Plaintiff appears to allege that each failed to investigate the complaints Plaintiff made against the defendant judges and counsel." See ECF 18-0, at 12.*

5.    *"Plaintiff appears to seek to hold the State of Maryland liable for damages for the alleged violations of Plaintiffs federal statutory and constitutional rights."* See ECF 18-0, at 13.

6.      "The Court is unable to tease apart the remaining claims against the remaining

defendants. As such, Plaintiff will be directed to file an amended complaint that does not

include the causes of action or defendants the Court dismisses herein." See ECF 18-0, at

16.

7.      "While it is not entirely clear to the Court when Plaintiff was terminated" See

ECF 27-0, at 2.

### C    Court's Statements of Misunderstanding the Facts

48      The court stated that the "Plaintiff will be directed to file an amended complaint that does

not include allegations over which this Court does not have jurisdiction and for which Plaintiff

has not stated a claim for relief.  The amended complaint should not name as defendants those

who are immune from suit." See ECF 18-0, at 5.

### QUASI APPEAL OF STATE ACTION: THE ROOKER-FELDMAN DOCTRINE

49      The court starts with the Quasi Appeal of State Action: The Rooker-Feldman Doctrine.

The court cites the basis of its application as *"(1) the federal plaintiff lost in state court; (2) the*

*plaintiff complains of injuries caused by the state-court judgments; (3) those judgments were*

*rendered before the federal suit was filed; and ( 4) the plaintiff is inviting the district court to*

*review and reject the state-court judgments."*

50      Because the state plaintiff voluntarily dismissed their claim, there was no adverse

judgment against the federal plaintiff, and thus, the federal plaintiff is not a state-court loser

under the *Rooker-Feldman* doctrine. Under Maryland Rule 2-506(a), a voluntary dismissal

terminates the action without a judgment on the merits, meaning there is no final determination

that could be used to bar the federal claims. Additionally, under Maryland Rule 2-506(e), when a

case is voluntarily dismissed, the dismissing party bears responsibility for court costs, reinforcing

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 23 of 58

that the federal plaintiff is not adjudicated as the losing party. Consequently, the state court proceedings do not satisfy the elements of the *Rooker-Feldman* test, as there was no state-court judgment entered against the federal plaintiff.

51      The misunderstanding of the facts and it's resulting improper application is highlighted in the citation of the doctrine *"See Feldman, 460 U.S. at 476; Rooker v. Fidelity Trust Co., 263 U.S. 413, 416 (1923). "[T]he Rooker-Feldman doctrine applies only when the loser in state court files suit in federal district court seeking redress for an injury allegedly caused by the state court's decision itself." Davani v. Va. Dep't of Transp., 434 F.3d 712, 713 (4th Cir. 2006) (citing Exxon Mobil Corp, 544 U.S. at 280 (2005))."* See ECF 18-0, at 5.

52      The Court continues to say, *"In other words, Rooker-Feldman applies "when the federal action 'essentially amounts to nothing more than an attempt to seek review of [the state court's] decision by a lower federal court.'"* See ECF 18-0, at 6.  The Court also cites several other cases all of which expressly state the critical criterial of "state court loser" which is factually inconsistent with the termination of Ohana Growth Partners, LLC state court case being dismissed. See ECF 18-0, at 6.  The Court states it's understanding of the conclusion of the case as dismissed. See ECF (HERE HERE).

32      The Court quoted, "Despite these efforts, filings were obstructed, ignored, or dismissed, often under pretextual deficiency notices or mootness declarations." See ECF 1-10, at 9 ¶ 6. Plaintiff acknowledges that the term dismissed may have been inadvertently misleading in this context, as the more precise term would have been disregarded, given that there was no formal acknowledgment of Plaintiff's counterclaims in the state proceedings.

33      The lack of any final adjudication on Plaintiff's counterclaims is evidenced by the absence of a ruling or entry of judgment on those claims, reinforcing that they were never

formally considered by the state court. Under Maryland Rule 2-506(a), a voluntary dismissal terminates a case without a judgment on the merits, meaning the court did not render a decision on Plaintiff's claims. Furthermore, Maryland Rule 2-506(e) provides that a voluntarily dismissing party bears responsibility for court costs, which further supports the conclusion that there was no adjudication on Plaintiff's counterclaims—as a dismissal of an actual counterclaim would typically necessitate either agreement by the opposing party or a ruling addressing the claims substantively.

34      Moreover, the state court accepted Ohana Growth Partners, LLC's voluntary dismissal without agreement, further demonstrating that the state court did not recognize or adjudicate Plaintiff's counterclaims. Had Plaintiff's claims been acknowledged as counterclaims, the voluntary dismissal would not have unilaterally resolved all claims in the case. Instead, under Maryland Rule 2-506(d), a dismissal of claims where counterclaims exist requires either court approval or mutual agreement—neither of which occurred here.

53      Accordingly, the state court did not issue a final judgment on Plaintiff's claims, and no adjudication on the merits occurred. As such, under Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005), and Lance v. Dennis, 546 U.S. 459, 463 (2006), the Rooker-Feldman doctrine is inapplicable, as it only applies when a final state-court judgment exists against the federal plaintiff. Since no claims were adjudicated in state court, Plaintiff is not a state-court loser, and Rooker-Feldman does not bar federal jurisdiction over Plaintiff's claims.

54      The voluntary dismissal of the state plaintiff's claims has no preclusive effect on the federal plaintiff's claims because a voluntary dismissal is not a judgment on the merits and does not create res judicata or collateral estoppel. Under Maryland Rule 2-506(a), a plaintiff may voluntarily dismiss their claims at any time before trial without prejudice, meaning that such a

dismissal does not operate as an adjudication of any underlying issues. Additionally, a voluntary dismissal does not extinguish any counterclaims or independent claims that were not adjudicated. In *Marks v. Wolfe*, 197 Md. App. 69, 87 (2010), the Maryland Court of Special Appeals reaffirmed that a voluntary dismissal is procedural and does not equate to a substantive ruling on any party's rights. Further, under *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001), the Supreme Court held that when a claim is dismissed without a final judgment on the merits, the dismissal does not bar related claims in federal court. Therefore, because no state court ruling determined the merits of Plaintiff's claims, the voluntary dismissal of Ohana Growth Partners, LLC's claims does not and cannot preclude Plaintiff's claims from proceeding in this federal action.

## APPELLATE RIGHTS IN STATE COURT

35      The misunderstanding of the facts is further highlighted by the Court's belief that the *"Plaintiff, of course, retains the ability to exercise their appellate rights in the state court system"* See ECF 18-0, at 6. However, this assertion is legally incorrect, as Plaintiff has no appellate rights in the Maryland state court system because no final judgment was entered in the case.

36      Under Maryland Rule 8-202(a), a party may only appeal a final judgment in a civil case. A final judgment is defined under Maryland Rule 2-601(a) as "a ruling that disposes of all claims against all parties and is set forth in a separate written document signed by the judge." The Maryland Court of Appeals has consistently held that a voluntary dismissal by a plaintiff does not constitute a final judgment on the merits and is therefore not appealable. See Houghton v. Cnty. Comm'rs of Kent Cnty., 305 Md. 407, 414 (1986) ("To be appealable, a judgment must be final in nature, disposing of all claims and determining the rights and obligations of the parties.").

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary Injunction and Request for Expedited Review.

2025-02-13                                    Page # 26 of 58

37      Furthermore, under Maryland Rule 2-506(a), a voluntary dismissal is a procedural

termination that does not adjudicate any claims or create an appealable final judgment. In Marks

v. Wolfe, 197 Md. App. 69, 87 (2010), the Maryland Court of Special Appeals explicitly held

that a voluntarily dismissed case lacks a final judgment and cannot be appealed because there is

no adverse ruling to review. Similarly, in Brown v. Fraley, 222 Md. 480, 483 (1960), the

Maryland Court of Appeals reaffirmed that an appeal requires an actual adjudication of rights,

not a procedural dismissal without a merits-based resolution.

55      Because no final judgment exists in the state court proceedings, Plaintiff has no appellate

right in Maryland state court under Maryland Rule 8-202(a). Accordingly, the Court's assertion

that Plaintiff retains the ability to appeal in state court is legally incorrect, as there is no adverse

ruling or judgment upon which appellate jurisdiction could be based.

CONSPIRACY AND ABSENCE OF JURISDICTION

56      The Court acknowledges that Plaintiff specifically pleaded the key elements of a

conspiracy claim in the original complaint, including the who, what, when, where, and why of

the alleged unlawful conduct. See ECF 18-0, at 7. However, rather than addressing the

substantive allegations of conspiracy, the Court improperly assumes a question never raised by

Plaintiff, stating: *"However, Plaintiff essentially disputes the state court's imposition of the*

*preliminary injunction and subsequent rulings."* See ECF 18-0, at 8. The Court then incorrectly

concludes, *"Asking the Court to review those rulings violates the Rooker-Feldman doctrine."*

See ECF 18-0, at 8.

57      This demonstrates a misunderstanding of the factual basis of Plaintiff's claims and

mischaracterizes Plaintiff's arguments. The Court cites portions of Plaintiff's filings that state:

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 27 of 58
2025-02-13

- *"Every ruling by the circuit court judges exceeded the bounds of their judicial discretion because every ruling judge unanimously supported the employer's position in an employment dispute filed as an injunction."*

- *"The ruling judges ruled in favor of a case without proper purpose. The court record stands as a body of evidence reflecting bias against the Plaintiff and favoritism toward the law firm and employer."*

58      See ECF 18-0, at 8. However, the Court fails to recognize that these statements are not an appeal of state court rulings, but rather evidence demonstrating that the state proceedings lacked a proper purpose and were tainted by bias and favoritism.

59      The Court fundamentally misunderstood that Plaintiff's argument is rooted in federal preemption under the Norris-LaGuardia Act, which bars state courts from issuing injunctive relief in labor disputes (See 29 U.S.C. § 101). Plaintiff's statements regarding bias and favoritism in state court rulings are not an attempt to "review" those rulings but rather evidence that the state proceedings were improperly conducted and lacked jurisdiction under federal law. The Court did not cite—nor did Plaintiff ever assert—a claim seeking to "review" or modify the state court record. Instead, Plaintiff explicitly argued that the state court's rulings are evidence of wrongful conduct and violations of federal supremacy principles under the Norris-LaGuardia Act.

60      Because Plaintiff's claims are premised on federal preemption and independent causes of action, and not an appeal of state court rulings, the Rooker-Feldman doctrine does not apply. See *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) (*"If a federal plaintiff presents an independent claim, even one that denies a legal conclusion reached by a state court, then there is jurisdiction and state law determinations may be collaterally reviewed."*).

61      The Court states *"As such, the Court concludes that the Rooker-Feldman doctrine*
*applies to the claims asserted by Plaintiff stemming from the state court rulings, and this Court*
*lacks subject matter jurisdiction over them."* See ECF 18-0, at 8. The Court concludes from the
misunderstanding of facts that "For these reasons, the Court lacks jurisdiction over Plaintiffs
claims contesting the rulings in the state action. Those claims must therefore be dismissed." See
ECF 18-0, at 9. The Court's misinterpretation of Plaintiff's facts improperly invokes Rooker-
Feldman where it does not apply, leading to an erroneous conclusion regarding jurisdiction.

JUDICIAL IMMUNITY

62      The Court started *"Throughout the complaint, Plaintiff asserts that the state court acted*
*without jurisdiction because its injunction (and all subsequent rulings) violated the NorriS-*
*LaGuardia Act. See, e.g. 1, at 5 ¶20 ("The lawsuit's unlawful and jurisdictionally prohibitory*
*nature, stemming from violations of the Norris-LaGuardia Act (NLA), voids any claim of*
*immunity.")."* See ECF 18-0, at 10.   This demonstrates a misunderstanding of the factual
statements and arguments which are clearly stated as "the lawsuit's unlawful and jurisdictionally
prohibitory nature".

63      The court's misunderstanding of the facts and arguments extend to an incorrect
interpretation of the Norris LaGuardia statute, precedents, and congressional intent. *"The*
*language of the statute makes clear that it applies only to federal courts. See 29 U.S.C. § 104*
*(forbidding a "court of the United States" from issuing certain injunctions); id. § 113 ("The term*
*'court of the United States' means any court of the United States whose jurisdiction has been or*
*may be conferred or defined or limited by Act of Congress, including the courts of the District of*
*Columbia."). For this reason alone, the injunction (and subsequent rulings) did not violate the*
*Norris-LaGuardia Act, so Plaintiffs contention that the state court acted outside its jurisdiction*
*is without merit."*

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 29 of 58
2025-02-13

64      Judicial immunity does not extend to actions taken in clear absence of jurisdiction,

particularly when a court issues injunctive relief in violation of federal preemption laws such as

the Norris-LaGuardia Act (NLA), 29 U.S.C. § 101 et seq.. While judicial immunity generally

protects judges from liability for acts performed within their judicial capacity, the Supreme Court

has recognized that absolute immunity does not apply when a judge acts without subject matter

jurisdiction. See Stump v. Sparkman, 435 U.S. 349, 356-57 (1978) ("A judge will not be

deprived of immunity because the action he took was in error, was done maliciously, or was in

excess of his authority; rather, he will be subject to liability only when he has acted in the clear

absence of all jurisdiction.").

38      The Supreme Court has repeatedly affirmed that the Norris-LaGuardia Act preempts state

court jurisdiction over labor-related injunctions. In New Negro Alliance v. Sanitary Grocery Co.,

303 U.S. 552, 560 (1938), the Court held: *"The Norris-LaGuardia Act was designed primarily to*

*curtail the power of federal courts to issue injunctions in labor disputes, and to protect the rights*

*of workers to organize and engage in concerted activities for their mutual aid and protection."*

65      In Marine Cooks & Stewards v. Panama S.S. Co., 362 U.S. 365, 369 (1960), the Court

further emphasized: *"The Norris-LaGuardia Act was intended to take the federal courts out of*

*the business of regulating labor disputes, leaving resolution of such matters to the free play of*

*economic forces."*

66      Because the NLA expressly removes judicial authority to issue injunctions in labor

disputes, any state court judge issuing such an injunction act in clear absence of jurisdiction and

is not entitled to judicial immunity. The NLA's preemptive force establishes that state courts

lack the legal authority to interfere in labor disputes via injunctive relief, and thus, judges issuing

such injunctions are acting beyond their lawful powers.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 30 of 58

2025-02-13

39    The Fourth Circuit has consistently held that judicial immunity is not absolute where a judge lacks jurisdiction. In Dean v. Shirer, 547 F.2d 227, 231 (4th Cir. 1976), the court stated: *"A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors. However, where there is a clear absence of all jurisdiction, judicial immunity does not apply."*

67    Because the Norris-LaGuardia Act expressly prohibits judicial intervention in labor disputes, any injunctive relief issued by a state court in violation of the Act is void ab initio, and the judge issuing such relief is not entitled to judicial immunity. See Bradley v. Fisher, 80 U.S. 335, 351 (1871) *("When a judge has no jurisdiction over the subject matter before him, he ceases to act as a judge and loses his judicial protection.").*

68    Federal preemption under the Norris-LaGuardia Act not only removes state court authority over labor injunctions but also precludes judicial immunity for judges who issue such injunctions without jurisdiction. Therefore, any claim of judicial immunity arising from state court injunctive relief in a labor dispute must fail under the Supremacy Clause (U.S. Const. Art. VI, Cl. 2), which mandates that federal law supersedes conflicting state court actions.

69    The Court states *"Plaintiffs claims against the Clerk appear to stem from the deficiency notices issued in the underlying state case. See ECF 1-5, at 22-24; ¶¶ 119-130. These are the kinds of quasi-judicial actions within the purview of judicial immunity. "Courts have consistently held that a 'clerk or deputy clerk's receipt and processing of a litigant's filings are part and parcel of the process of adjudicating cases."' See ECF 18-0, at 11.*

*40*    The Affidavit of Ryan Dillon-Capps Amended Complaint statement of Facts details Clerk Ensor's abuse of magisterial powers *"In July and October 2024, Clerk Julie Ensor interfered with my ability to file evidence to the Circuit Court of Baltmore County changing form*

*CC-DC-094 with her own reasons for obstructing my access to petition the court. See ECF16-1, at 1-7. Her edited forms included the following custom reasons that she created to mark my exhibits as deficient, rejected, or stricken: 1. "Since two Notices Regarding Restricted Information were filed for two Exhibits, each Exhibit must be submitted as its own pdf". See ECF 16-5, at 45. 2. "Other: Omnibus – must file one proposed order per opposition to motion" See Id, at 43. 3. "Box 1 or BOX 2 must be checked on the Notice Regarding Restricted Information. If Box 1 is checked, a sub box must be checked indicating the type of information that is included on the restricted document. If Box 2 is checked, a redacted and unredacted copy of the restricted document must be submitted." The boxes in question had a sub box selected to clearly indicate what was selected. See Id, at 34, 41. 4. "... Supporting Exhibits cannot be in the same file as the motion". There were no exhibits, only screenshots. See Id, at 37."  See ECF 24-0, at 34.*

41    The Court incorrectly applied quasi-judicial immunity to Clerk Ensor by misunderstanding that the Plaintiff's claims are not based on routine clerical functions such as issuing deficiency notices, but rather on deliberate policy-based actions that obstruct access to the courts. While the Court states that "a clerk or deputy clerk's receipt and processing of a litigant's filings are part and parcel of the process of adjudicating cases" (See ECF 18-0, at 11), Plaintiff's allegations go beyond mere processing of filings and instead detail alterations to official court procedures, interference with case filings, and discriminatory policies affecting litigants' access to the judicial system.

42    Quasi-judicial immunity applies only when a court officer performs duties functionally equivalent to a judge's adjudicative role. However, when a clerk acts outside their official capacity, engages in intentional misconduct, or establishes policies that interfere with due process, immunity does not apply. See Martin v. Hendren, 127 F.3d 720, 722 (8th Cir. 1997)

("Quasi-judicial immunity does not extend to acts that are ministerial or administrative in nature, nor does it apply when a court officer acts outside their judicial function.").

43    Plaintiff provided extensive evidence that Clerk Ensor altered official court forms to create pretextual reasons for rejecting filings, which constitutes policy-based interference rather than a neutral clerical function. The Fourth Circuit has recognized that when clerks manipulate court processes to deprive litigants of due process, such conduct is not shielded by judicial immunity. See McCray v. Maryland, 456 F.2d 1, 6 (4th Cir. 1972) ("If court officers manipulate rules or procedures in a way that deprives a litigant of access to the courts, such acts are administrative in nature and not entitled to judicial immunity.").

44    Furthermore, Clerk Ensor's conduct is not merely clerical or judicial—it is policymaking and administrative in nature. In Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 436 (1993), the Supreme Court held that quasi-judicial immunity does not apply when a court officer performs administrative tasks that are not integral to the adjudicative process. Clerk Ensor's alleged policy of altering court forms and obstructing filings is a discretionary act of policymaking, not a judicial function.

45    Additionally, ECF 16-6, at 82-84, an article in which Clerk Ensor was interviewed, provides insight into her motivations and ideological perspective on judicial administration. While not a direct allegation, this extrajudicial statement suggests a predisposition toward controlling access to the court system beyond mere clerical functions, reinforcing Plaintiff's claim that her actions stem from personal discretion rather than neutral adherence to procedural rules. Courts have held that when a clerk's discretionary decisions impact fundamental rights, judicial immunity does not apply. See Forrester v. White, 484 U.S. 219, 229 (1988) ("When court

officers engage in discretionary administrative actions that impact rights beyond the judicial function, they are not entitled to immunity.").

70      Because Clerk Ensor's actions involved creating policies that obstruct access to the courts, altering official forms, and enforcing discretionary policies inconsistent with established law, her actions fall outside the protections of quasi-judicial immunity. The Court's misinterpretation of the facts and failure to distinguish between clerical functions and administrative policymaking led to the incorrect application of immunity, warranting reconsideration of the claims against Clerk Ensor.

71      As a result of the Court's misunderstanding of the facts, allegations, and about the Norris LeGuardia Act the Court found *"Judicial immunity protects the judge defendants, including Judge DeSimone Jr., Judge Truffer, Judge Barranco, Judge Alexander, Budge Battista, Judge Mayer, Judge Stringer, .and Judge Robinson Jr. and the Clerk of Court, defendant Julie Ensor, from this action. They must be dismissed as defendants."* See ECF 18-0, at 12.

46      The Supreme Court has established that judicial immunity does not apply when a judge acts in "clear absence of jurisdiction." Stump v. Sparkman, 435 U.S. 349, 356–57 (1978). In this case, the Norris-LaGuardia Act explicitly preempted the state court's authority to issue an injunction against Plaintiff in a labor dispute (29 U.S.C. § 101). The U.S. Supreme Court has ruled that where Congress has removed a subject matter from state court jurisdiction, actions taken in that area are void and do not qualify for judicial immunity. See Haywood v. Drown, 556 U.S. 729, 736 (2009).

72      Because the Norris-LaGuardia Act strips state courts of injunctive authority in labor disputes, the state court rulings at issue were issued in clear absence of jurisdiction and judicial immunity is inapplicable.

BAR COUNSEL AND MARYLAND COMMISSION FOR JUDICIAL DISABILITIES.

73      The Court erred in applying judicial immunity where jurisdiction was clearly absent. The Supreme Court has consistently held that judicial immunity does not protect judges acting in clear absence of jurisdiction (Stump v. Sparkman, 435 U.S. 349, 356–57 (1978)). The Norris-LaGuardia Act's preemptive force establishes that state courts lacked the authority to issue injunctive relief in this case, making judicial immunity inapplicable.

74      As further held in Bradley v. Fisher, 80 U.S. 335, 351 (1871), a judge is not immune from suit when acting without jurisdiction. Since the state court had no jurisdiction to issue injunctive relief under the Norris-LaGuardia Act, those orders were void ab initio, and the judges issuing them were not acting within their judicial discretion.

75      The Court states "While the causes of actions asserted against each is unclear, Plaintiff appears to allege that each failed to investigate the complaints Plaintiff made against the defendant judges and counsel. See ECF 1-5, at 20-22, ¶¶ 105-118.  However, there is no general right to an investigation of a complaint's grievance."

76      However, the Plaintiff stated in the original complaint, "After County Administrative Judge Robinson Jr., Director of investigations Bernstein, Bar Counsel Degonia II, and Judges Stringer and Mayer learned that the harm induced exceeded what the Plaintiff could recover from and without relief would function as a death sentence; The conspirators efforts focused on ensuring the Plaintiff cannot seek or obtain relief by obstructing avenues for potential redress. The coverup also focused on destroying or changing records, ignoring mandatory hearings to prevent relief, and deliberately targeting at undermining the plaintiff's credibility and obstructing access to relief. The deadly consequences of their intentions are as transparent as the previous conspirator's fraudulent court record and confessions of violating the law." See ECF 1-0, at 16.

77      Under counts related to a fraudulent lawsuit and PIA violations the Plaintiff stated *"Government oversight bodies and officials also participated in shielding the defendants from accountability. Thomas DeGonia II, as Maryland's Bar Counsel, failed to investigate or discipline attorneys at Miles & Stockbridge, P.C. for their fraudulent filings and unethical behavior. Similarly, Tanya Bernstein, as Director of Investigations for the Maryland Commission on Judicial Disabilities, coordinated efforts to suppress complaints of judicial misconduct, protect complicit judges, and preserve the conspiracy."* See ECF 1-7, at 48. The count also states *"Oversight officials, including Thomas DeGonia II as Maryland's Bar Counsel and Tanya Bernstein as Director of Investigations for the Maryland Commission on Judicial Disabilities, further shielded judicial participants and corporate defendants from accountability. Their failure to investigate or address complaints allowed the fraudulent litigation to continue unchecked, exacerbating the harm to the plaintiff and public trust in Maryland's judicial systems."* See ECF 1-7, at 51.

78      Under the RICO Counts the Plaintiff stated, "Judge Barranco, Judge Truffer, County Administrative Judge Dennis Robinson Jr., Clerk Julie Ensor, and oversight officials such as Tanya Bernstein and Thomas DeGonia II, knowingly supported the enterprise through procedural manipulation, suppression of evidence, and judicial misconduct. These actors collectively ensured that judicial outcomes favored the conspirators while isolating and retaliating against the plaintiff." See ECF 1-7, at 55. The plaintiff also stated under RICO*, "The enterprise encompassed private actors, including Ohana Growth Partners, LLC, Miles & Stockbridge, P.C., and their attorneys, as well as public actors, such as Baltimore County Circuit Court judges, clerks, and oversight agencies. This enterprise sought to retaliate against whistleblowing efforts, deprive the plaintiff of federally protected rights, and shield systemic*

*corruption within Maryland's judicial and administrative systems"... "Judicial Disabilities Commission head Tanya Bernstein and Attorney Grievance Commission head Thomas DeGonia II suppressed investigations, enabling collusion and shielding judicial and attorney misconduct from accountability."* See ECF 1-7, at 61.

79      The Counts stated under counts related to "failure to prevent conspiracy under 42 U.S.C §1986 stated, *"Under 42 U.S.C. § 1986, judges, clerks, oversight agencies, and numerous other state actors and agencies had knowledge of an ongoing conspiracy to violate the plaintiff's civil rights and possessed the authority to intervene or prevent harm. Despite their awareness and legal obligations, these defendants willfully neglected to act, enabling the conspiracy to persist and resulting in significant harm to the plaintiff. The defendants had knowledge of the conspiracy through multiple channels, including direct emails sent to all judges describing procedural manipulation, repeated filings demonstrating systemic irregularities handled by the Clerk's Office, and formal complaints submitted to oversight entities such as the Maryland Attorney General's Office, Maryland Commission on Judicial Disabilities, and Civil Rights Division. Judges Barranco, Truffer, Stringer, Mayer, and Robinson Jr. were directly notified of procedural misconduct and manipulative rulings, while Clerk Julie Ensor and her staff witnessed filing obstructions and irregularities. Oversight officials, including Thomas DeGonia II (Maryland Bar Counsel) and Tanya Bernstein (Director of the Maryland Commission on Judicial Disabilities), received detailed complaints outlining systemic violations but failed to take any substantive action."* See ECF 1-7, at 67

80      The Court's misunderstanding of the statements application to the prima facie elements connected to the RICO conspiracy and 1986 resulted in an incorrect understanding of those statements.  Under parties detailed information is provided that outlines the specific dates, times,

and individuals of the coverup conspiracy. See 1-5. Additionally, granular details of the conspiracy are chronologically detailed in the Coverup Conspiracy.  See ECF 1-6.  Furthermore, Bar Counsel and Director of Investigation are covered in the Affidavit of Ryan Dillon-Capps Amended Complaint Statement of Facts, which includes clear language such as *"On October 4, 2024, at 12:02 AM, I emailed the Attorney Grievance Commission and filed a complaint. See ECF 16-6, at 34-37. County Administrative Judge Dennis Robinson Jr. then updated his schedule so that he was not working at the Circuit Court of Baltimore County for the following week. I believe that County Administrative Judge Dennis Robinson Jr. met with Thomas DeGonia II, Bar Counsel for the Office of the Bar Counsel, and Tanya C. Bernstein, Director of Investigative Counsel for the Maryland Commission on Judicial Disabilities, during the week of October 7 – October 11, 2024,and they formally agreed to coverup what had and was occurring in Circuit Court for Baltimore County Civil Action C-03-CV-24-002264.  On October 11, 2024, Tanya Bernstein sent a letter via USPS to me that mirrors the language that Judges Robinson Jr, Stringer, and Mayer began using the following week, and I believe their shared language, procedural denial of hearings, and procedural use of moot is reflective of County Administrative Judge Robinson Jr. returning to the Circuit Courthouse for Baltimore County and formally bringing Senior Judge Patrick Stringer and Associate Judge Stacey Meyer into the conspiracy to deprive me of my first amendment right to petition, fourteenth amendment right to due process, and with the objective goal to coverup the numerous violations of my rights, protections, and the law that had occurred and were necessary to occur in order to accomplish this goal. See Id, at 31. See ECF 16-5, at 54, 56, 57, 58, 65. 99 In addition to the shared language following the conspiracy summit, I used the probing method to create a baseline of response and then I used later probes to separate out those who were collaborating with the Circuit Court of Baltimore*

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary Injunction and Request for Expedited Review.

2025-02-13

Page # 38 of 58

*County Judges. This process further confirms the supporting conspiratory connections between*

*Thomas DeGonia II, Tanya Bernstein, Dennis Robinson, Patrick Stringer, Stacey Mayer, and*

*Julie Ensor. I contacted many agencies and individuals in Maryland Judiciary and Government*

*while attempting to obtain aid, and with precision I was able to direct a probe to different*

*individuals and agencies. The only positive hits to the repeatable matching conditions of the*

*baseline occurred when the probes were sent to Thomas DeGonia II and Tanya Bernstein and*

*those probes had a matched response 100% of the time. See ECF 16-6, at 32-33, 38-41."* See

ECF 24-0, at 45-46.

47      The Court's misinterpretation of Plaintiff's allegations resulted in an erroneous

conclusion that Bar Counsel and the Maryland Commission on Judicial Disabilities were merely

failing to investigate complaints, when in reality, Plaintiff alleged their active participation in a

conspiracy to obstruct justice and shield judicial and attorney misconduct. Plaintiff's claims are

not based on a generalized right to an investigation, but rather on specific, documented actions

taken by oversight officials to suppress evidence, manipulate procedures, and obstruct access to

legal redress, which directly implicate their liability under RICO (18 U.S.C. § 1962) and 42

U.S.C. § 1986.

48      The Court failed to consider the substantial evidentiary record detailing the direct

involvement of Bar Counsel and the Maryland Commission on Judicial Disabilities in

suppressing complaints and protecting the alleged conspirators. The record includes specific

communications, timelines, and procedural actions that demonstrate intentional efforts to

obstruct Plaintiff's access to legal remedies, which goes beyond mere administrative inaction.

See ECF 1-5, ECF 1-6, and ECF 16-6, at 32-41.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
.   2025-02-13                          Page # 39 of 58

49      Federal courts have consistently held that oversight officials who actively participate in

suppressing evidence, obstructing due process, or aiding in a conspiracy to violate civil rights are

not entitled to immunity and may be held accountable under federal law. See Dennis v. Sparks,

449 U.S. 24, 29 (1980) ("A conspiracy between a judge and non-judicial actors to violate federal

rights removes the non-judicial actors from the scope of immunity."). Similarly, in Tower v.

Glover, 467 U.S. 914, 923 (1984), the Supreme Court reaffirmed that state officials who conspire

to violate civil rights are not shielded from liability, even if they operate within an oversight or

disciplinary role.

81      Plaintiff's allegations, supported by direct evidence and sworn affidavits, establish a

prima facie case that Bar Counsel and the Maryland Commission on Judicial Disabilities

knowingly facilitated and enabled a conspiracy to obstruct Plaintiff's constitutional rights.

82      As a result of this misunderstanding the Court decided that *"Plaintiffs claims against*

*Tanya C. Bernstein, Director and Investigative Counsel for the Maryland Commission on*

*Judicial Disabilities, and Thomas DeGonia II, as Bar Counsel for the Attorney Grievance*

*Commission, for failure to investigate Plaintiffs complaints must be dismissed."* See ECF 18-0,

at 13.

STATE OF MARYLAND

83      The Court stated that "Plaintiff appears to seek to hold the State of Maryland liable for

damages for the alleged violations of Plaintiffs federal statutory and constitutional rights." …

*"The claim for damages is barred by. Eleventh Amendment sovereign immunity. And while*

*Plaintiff repeatedly references "ongoing violations, "these allegations are conclusory and*

*Plaintiffs central complaints stem from past actions taken during the pendency of the state*

*action, which has now concluded."* See ECF 18-0, at 13-14.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 40 of 58

84      The original complaint stated "These are not coincidences either - it is systemic corruption, their actions are premeditated and coordinated, and the malignancy is entrenched into the heart of the Maryland judiciary. These Statements of fact are backed by admissions, confirmations under oath, court records, supporting evidence, and by established, repeatable, and verifiable methodology." See ECF 1-0, at 21. The complaint also stated *"This situation reflects a logistical failure of the judicial system, underscored by systemic corruption involving the Bar Counsel, Director of investigations, County Clerk, and County Administrative Judge. However, the conspiracy involving the Senior Judge and six other ruling judges in collaboration with Miles & Stockbridge, P.C. transcends mere systemic failure-it constitutes a malignant corruption of the judiciary itself."* and *"This evidence demonstrates systemic misconduct within the judiciary, raising profound concerns about the integrity of judicial oversight and the fairness of proceedings in Maryland. This is no longer a matter of speculation but one of addressing verifiable and actionable corruption"* and *"Evidence suggests these actions are not confined to the Circuit Court of Baltimore County. The full scope of this scandal will remain obscured until either a comprehensive formal investigation examines all Maryland courthouses and implicated private law firms or informal investigations bring the truth to light."* See ECF 1-0, at 24-26.

85      The Plaintiff continues with a request to present the highly sensitive information and testimony to the court, *"The true victims of this systemic corruption are those who believed their cases had reached closure. It is critical to emphasize that Ryan Dillon-Capps could have exposed these issues through the media, creating a public outcry. To date, Dillon-Capps has exercised restraint, but safeguards are in place to ensure that further interference will trigger others to act decisively. Plaintiff respectfully requests that the court allow testimony under seal to provide critical details not included in the written filings. Additionally, Plaintiff encourages*

*both named and unnamed parties to engage in direct, good-faith negotiations to resolve these matters and begin restoring confidence in the judiciary."* See ECF 1-0, at 26.

50      The compounding effect of misunderstanding the factual statements and evidence presented combined with the denial to hear and receive testimony and evidence under seal resulted in the Court declaring *"Thus, Plaintiff has not plausibly alleged ongoing violations of federal law that can be properly redressed through I prospective injunctive relief and would permit this action to proceed against the State of Maryland. Accordingly, the State of Maryland must be dismissed as a defendant."* See 18-0, at 14.

51      The Court's misinterpretation of the nature and scope of Plaintiff's allegations resulted in an erroneous conclusion that Plaintiff's claims against the State of Maryland are barred by Eleventh Amendment sovereign immunity. While the Court asserts that Plaintiff's allegations pertain only to past actions, the record demonstrates ongoing systemic misconduct within the judiciary and oversight agencies, actively obstructing access to justice and perpetuating constitutional violations.

52      Plaintiff's detailed factual assertions, supported by evidence and sworn statements, establish a clear pattern of systemic and ongoing misconduct that transcends past litigation and continues to affect judicial integrity and access to redress. The denial of Plaintiff's request to present highly sensitive testimony and evidence under seal further compounded this misinterpretation, resulting in the Court improperly concluding that no ongoing violations exist.

53      Federal courts have consistently recognized that ongoing constitutional violations— particularly those involving systemic corruption and due process violations—fall within the Ex parte Young exception to Eleventh Amendment immunity. See Verizon Md., Inc. v. Pub. Serv.

Comm'n of Md., 535 U.S. 635, 645 (2002) ("A plaintiff may proceed against state officials in their official capacity for prospective relief to remedy ongoing violations of federal law.").

54      Because Plaintiff's allegations establish ongoing violations affecting judicial impartiality, due process, and access to legal redress, the Court's conclusion that no ongoing violations exist was factually and legally incorrect, warranting reconsideration of its dismissal of the State of Maryland as a defendant.

CONSPIRACY CLAIMS

86      The Court Stated, "As an initial matter, 18 U.S.C. § 241 is a federal criminal statute that does not create a private right of action." See ECF 18-0, at 15. The prima facie requirements for a RICO claim include the recitation of predicated acts.  The Court's misunderstanding of the citation as a predicated act under RICO appears to also be incorrectly applied by the Court to the Maryland Conspiracy claim *"In Maryland, a civil conspiracy claim is "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff."* See ECF 18-0, at 15.

87      The confusion of arguments and applicable facts stated continues in the Court believing that the Maryland civil conspiracy claim was separate claim without correctly attributing the harm or acts correctly *"Maryland courts have "held consistently that civil conspiracy 'is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.'"* See ECF 18-0, at 15.

88      The resulting misunderstanding of the substantive statements of facts and evidence wholly distorted the Court's ability to understand the conspiracy counts *"Upon reviewing the complaint and all. of its attachments, the 8ourt concludes that 1: Plaintiffs allegations that the defendants, including their former employer, state court judges and staff, opposing counsel, and*

*professional ethics bodies conspired against plaintiff resulting in adverse rulings the state case do not plausibly rise to the level of asserting a conspiracy claim under any of the federal statutes or state common law doctrines asserted. As such, these claims will be dismissed."* See ECF 18-0, at 16.

89     The Court's misinterpretation of the factual basis and legal elements of Plaintiff's conspiracy claims resulted in the erroneous dismissal of both the federal RICO conspiracy claims and the Maryland civil conspiracy claims. The Court incorrectly characterized 18 U.S.C. § 241 as an improperly asserted cause of action, when in fact it was cited as part of the predicate acts supporting the broader RICO claim, a necessary component of a valid RICO pleading under 18 U.S.C. § 1962.

90     Additionally, the Court misunderstood the Maryland civil conspiracy claim, failing to recognize that Plaintiff's allegations were not presented as a standalone claim but were properly tied to underlying tortious conduct. Under Maryland law, civil conspiracy must be based on an underlying unlawful act, and Plaintiff provided substantial evidence of fraudulent conduct, procedural manipulation, and abuse of judicial and administrative processes to substantiate the claim. See *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 360 (2000) (*"Civil conspiracy is not an independent tort but a means of establishing vicarious liability for an underlying tort."*).

91     The Court's failure to properly attribute the harms and predicate acts to their respective conspiracy claims distorted its analysis, leading to an incorrect conclusion that Plaintiff's allegations did not rise to the level of a legally cognizable conspiracy. Given the detailed factual assertions, evidentiary support, and legal foundation establishing coordinated misconduct across multiple entities and individuals, the Court's dismissal of the conspiracy claims was based on a fundamental misunderstanding of both the factual record and applicable law.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary Injunction and Request for Expedited Review.

2025-02-13                                    Page # 44 of 58

COURT ORDER

92      The Court Stated *"Plaintiff has not pointed the Court to any authority (and the Court seriously doubts any exists) that would permit this Court, at the request of a pro se litigant, to essentially take over the Maryland Judiciary. Nor do Plaintiff's allegations raise a plausible claim that such a drastic remedy is warranted here. Plaintiff is not the first and surely not the last litigant to come away from contentious litigation unhappy. Regardless, Plaintiff's remedy does not lie in federal oversight of the state court system."* See ECF 18-0, at 17.

93      The Plaintiff filed a motion to reconsider the January 8th, 2025, ruling highlighting the issues related to sovereign immunity from a remanded case, the intent of Norris LaGuardia Act, the federal court's role in oversight of state courts, the existence of ongoing federal law violations, and other misunderstandings.  Believing that the larger issues being corrected would result in the Court re-assessing what was being stated and supporting evidentiary facts. See ECF 19-0.

FMLA AND ADA

94      The Court stated that denial of the TRO/PI was inclusive of  "'obscure or extravagant claims defying the most concerted efforts to unravel them.'" See ECF 27-0, at 3. and found Plaintiff has not demonstrated likelihood of success on the merits of their FMLA, ADA, or MWPCL claims" See ECF 27-0, at 3. The Court went on to state "Without tying any factual allegations to the elements of these claims, Plaintiff then asserts that "[t]hese claims substantiate Plaintiff's likelihood of success on the merits and justify injunctive relief." See ECF 27-0, at 4.

95      The Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction referred to and was filed with the Affidavit of Ryan Dillon-Capps Amended Complaint Statement of Facts which goes into detail of the events in question and cites exhibits to support the claims. See ECF 24-0, at 1-33.

96    The Court's dismissal of Plaintiff's TRO/PI request on the grounds of "obscure or extravagant claims" reflects a fundamental misunderstanding of the detailed factual and evidentiary record supporting Plaintiff's FMLA, ADA, and MWPCL claims. The assertion that Plaintiff failed to tie factual allegations to the elements of these claims is contradicted by the comprehensive affidavits, exhibits, and supporting documentation filed in conjunction with the motion. See ECF 24-0, at 1-33.

97    The misinterpretation of key factual issues—including the duration of employment— further demonstrates that the Court's evaluation of the likelihood of success on the merits was based on an incomplete or incorrect understanding of the record. Given the extensive factual details, sworn testimony, and evidentiary exhibits already submitted, the denial of injunctive relief without proper consideration of this evidence highlights the necessity of an evidentiary hearing to ensure a fair and accurate adjudication of Plaintiff's claims.

D    Success on the Merits Conclusion

98    Federal courts have long recognized the necessity of an evidentiary hearing when material factual disputes exist, particularly in cases involving requests for injunctive relief. The Supreme Court in Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981), held that where the resolution of factual disputes is essential to determining whether injunctive relief is appropriate, courts should conduct an evidentiary hearing to properly evaluate the merits of the case.

99    Similarly, in Williams v. McKeithen, 939 F.2d 1100, 1105 (5th Cir. 1991), the court emphasized that an evidentiary hearing is necessary when the record contains conflicting evidence regarding material facts central to the request for injunctive relief. Additionally, under Fed. R. Civ. P. 43(c), when a motion relies on disputed facts, the court must hear the matter on oral testimony or depositions, reinforcing the principle that claims dismissed based on

misunderstood or overlooked evidence should be reconsidered in an evidentiary hearing. Given

the Court's clear misapprehension of key facts—such as the length of employment and the

evidentiary support provided for the FMLA, ADA, and MWPCL claims—an evidentiary hearing

is not only warranted but essential to ensure a fair adjudication of Plaintiff's claims.

## VIII   EVIDENTIARY HEARING

100     Given the Court's repeated expressions of uncertainty regarding key facts—including

employment duration, procedural history, and sufficiency of evidence—an evidentiary hearing is

required before ruling on injunctive relief. Courts have repeatedly held that factual disputes

warrant oral testimony, rather than dismissal on the pleadings. (*Univ. of Texas v. Camenisch*, 451

U.S. 390, 395 (1981); *Williams v. McKeithen*, 939 F.2d 1100, 1105 (5th Cir. 1991)).

101     Additionally, FRCP 43(c) requires that when a motion relies on disputed facts, the Court

must hear the matter on oral testimony or depositions rather than dismiss it outright. This rule

directly applies here, where factual misunderstandings—such as Plaintiff's employment duration

and the procedural history of the state case—were used as a basis to deny injunctive relief.

102     Courts have consistently held that where disputed material facts exist, denying injunctive

relief without an evidentiary hearing constitutes legal error. In *Johnson v. U.S. Dep't of Agric.*,

734 F.2d 774, 782 (11th Cir. 1984), the court ruled: *"A failure to conduct an evidentiary hearing*

*where factual disputes exist and could materially affect the injunctive relief determination*

*constitutes an abuse of discretion."*

103     The Court has expressed uncertainty regarding Plaintiff's employment status, procedural

history, and evidence supporting FMLA and ADA claims, making an evidentiary hearing not just

appropriate but legally required under *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 47 of 58
2025-02-13

104     Similarly, in *Williams v. McKeithen*, 939 F.2d 1100, 1105 (5th Cir. 1991), the Fifth

Circuit emphasized that: *"An evidentiary hearing is necessary when the record contains*

*conflicting evidence regarding material facts central to the request for injunctive relief."*

105     Here, the Court's repeated expressions of uncertainty regarding key facts—including the

duration of employment, the procedural history of the state court proceedings, and the

sufficiency of evidence supporting Plaintiff's claims—underscore the critical need for an

evidentiary hearing before denying injunctive relief. See, e.g.:

     1.     *"From what the Court can piece together…"* See ECF 18-0, at 3.

     2.     *"While it is not entirely clear to the Court when Plaintiff was terminated…"* See

ECF 27-0, at 2.

     3.     *"Plaintiff's claims against the Clerk appear to stem from the deficiency notices*

*issued in the underlying state case."* See ECF 18-0, at 11.

     4.     *"While the causes of action asserted against each is unclear, Plaintiff appears to*

*allege that each failed to investigate the complaints Plaintiff made against the defendant*

*judges and counsel."* See ECF 18-0, at 12.

     5.     *"The Court is unable to tease apart the remaining claims against the remaining*

*defendants."* See ECF 18-0, at 16.

106     Such statements reflect that the Court did not resolve key factual issues before denying

injunctive relief, making reconsideration and an evidentiary hearing necessary. Under FRCP

43(c), when a motion relies on disputed facts, the Court must hear the matter on oral testimony

or depositions, reinforcing the principle that claims dismissed based on misunderstood or

overlooked evidence must be reconsidered in an evidentiary hearing.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 48 of 58

A   Clarifying the Employment Duration and Likelihood of Success on the Merits

107     One of the central misunderstandings warranting reconsideration is the Court's mischaracterization of Plaintiff's employment history and eligibility for FMLA protections. The Court incorrectly stated: *"It is clear that the Plaintiff has not been employed by Ohana Growth Partners, LLC for at least six months, so the injunction requested here would necessarily alter the status quo."* See ECF 27-0, at 2.

108     However, the record clearly establishes that Plaintiff was employed by Ohana Growth Partners, LLC from February 10, 2020, until July 30, 2024. See: State Complaint filed by Ohana Growth Partners, LLC: *"Since February 10, 2020, Ryan Dillon-Capps (nee Wagner), the Defendant in the above-captioned matter ('Dillon-Capps'), has been employed by Ohana as its Vice President of Information Technology."* See ECF 23-1, at 3.

109     FMLA Notice of Eligibility Form WH-381 issued by Ohana Growth Partners, LLC, which confirms Plaintiff's eligibility based on length of employment. See ECF 16-3, at 4.

110     Suspension and Termination Letters: Plaintiff was suspended without pay on June 13, 2024: *"Effective immediately, June 13, 2024, you are suspended from your employment with Ohana Growth Partners until further notice."* See ECF 16-0, at 158.

111     Plaintiff was terminated on July 30, 2024: *"This letter is to notify you that your employment with Ohana Growth Partners (the 'Company') is being terminated effective immediately."* See ECF 16-0, at 142.

112     Given this clear and undisputed evidence, the Court's finding that Plaintiff had not been employed for at least six months is demonstrably incorrect, and this factual error directly impacts the likelihood of success on the merits of Plaintiff's FMLA retaliation and ADA accommodation claims.

113    Additionally, Plaintiff's medical documentation and employer-provided forms confirm the necessity of ADA accommodations. The following evidence was overlooked or misunderstood:

114    Medical Certification (WH-380-E) completed by Plaintiff's healthcare provider confirming that Ryan Dillon-Capps qualifies for ADA accommodations and FMLA leave. See ECF 16-3, at 10-13, 18-21.

115    Employer Acknowledgment of Disability Accommodations: Plaintiff requested accommodations that were supported by medical documentation, which the employer failed to provide. See ECF 26-0, at 13, 35.

116    As held in *Bragdon v. Abbott*, 524 U.S. 624 (1998), the ADA requires that accommodations be provided when medical documentation supports the necessity of such accommodations, further strengthening Plaintiff's likelihood of success.

## B   Rebutting the "Obscure or Extravagant Claims" Argument

117    The Court's characterization of Plaintiff's claims as "obscure or extravagant" is factually and legally incorrect given the extensive, well-documented evidence already submitted. See ECF 24-0 (Affidavit of Ryan Dillon-Capps Amended Complaint Statement of Facts).  Plaintiff's claims are detailed, supported by extensive documentary evidence, and directly tied to statutory violations

118    In Williams v. McKeithen, 939 F.2d 1100 (5th Cir. 1991), the court held that when a plaintiff provides substantial factual documentation, courts should not dismiss claims based on vague characterizations without conducting a full evidentiary review. Here, Plaintiff has provided:

6.    Over 2,000 pages of exhibits supporting FMLA, ADA, and retaliation claims.

7.      Employer acknowledgment of Plaintiff's FMLA eligibility and medical

accommodations requests (ECF 16-3, at 10-13, 18-21).

8.      State court records demonstrating procedural irregularities and jurisdictional

overreach.

119     Binding case law confirms that detailed factual allegations should be weighed in favor of

the Plaintiff at this stage. Courts have consistently recognized that detailed factual allegations—

particularly when backed by thousands of pages of supporting documentation—must be given

full consideration before being dismissed.  *"While pleadings must contain sufficient factual*

*matter to state a plausible claim, detailed factual allegations strengthen a plaintiff's position and*

*contribute to meeting the plausibility standard."*  and *"When a plaintiff submits an extensive*

*evidentiary record, courts should take it into account when evaluating the likelihood of success*

*on the merits in preliminary injunction determinations."* (Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009); G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 724 (4th Cir. 2016),

vacated on other grounds, 137 S. Ct. 1239 (2017)).

120     Thus, dismissing Plaintiff's TRO request without weighing the full evidentiary record

contradicts established precedent and further supports the need for an evidentiary hearing.

### C   Clarifying Procedural Compliance with FRCP 65(b)(1) and Due Process

121     The Court's denial of the TRO also suggested procedural deficiencies, stating that the

procedural prerequisites for an ex parte TRO were not met. See ECF 18, at 19–20. However,

Plaintiff has:

122     Fully complied with FRCP 65(b)(1) by providing detailed facts showing immediate and

irreparable harm and demonstrating that Defendants were notified through multiple channels.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 51 of 58

2025-02-13

123     Submitted a Certificate of Notice confirming efforts to notify Defendants, addressing any

perceived deficiency. See Affidavit of Ryan Dillon-Capps Certificate of Notice (attached filing).

124     Additionally, courts have recognized that TRO procedural flexibility is warranted when

immediate relief is necessary: *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971): "Procedural due

process requires notice and an opportunity to be heard, but the form of notice depends on the

circumstances of the case."

125     Thus, any procedural objections should not serve as a basis to deny relief, as Plaintiff has

substantially complied with all procedural requirements.

### D    Evidentiary Hearing Conclusion

126     Given the Court's explicit uncertainty regarding key facts, the extensive evidentiary

record supporting likelihood of success, and the presence of material factual disputes, an

evidentiary hearing is required under federal law before ruling on injunctive relief. Failure to

hold such a hearing would constitute reversible error under *Univ. of Texas v. Camenisch* and

*Williams v. McKeithen*.

127     Accordingly, Plaintiff respectfully requests that the Court reconsider its prior ruling and

schedule an evidentiary hearing to properly evaluate the factual record and Plaintiff's entitlement

to injunctive relief.

### IX    CLARIFICATION ON RELIEF

128     Plaintiff seeks reinstatement and interim financial relief only to preserve the status quo,

not as an award of monetary damages. Courts have repeatedly held that in wrongful termination

cases involving retaliation and discrimination, reinstatement is an appropriate form of injunctive

relief. See Holt v. Continental Group, 708 F.2d 87 (2d Cir. 1983).

129     To mitigate ongoing financial harm, Plaintiff seeks a court order requiring Defendants to:

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 52 of 58

2025-02-13

1.      Provide immediate interim payments to cover rent, medical expenses, and

essential bills during litigation.

2.      Issue a formal letter verifying Plaintiff's continued employment for financial

institutions, preventing further credit deterioration.

3.      Restore Plaintiff's eligibility for employer-sponsored health coverage pending

case resolution.

130     Courts have recognized that where financial harm continues to accrue beyond mere lost

wages, additional measures are necessary to ensure effective injunctive relief (Boddie v.

Connecticut, 401 U.S. 371, 378 (1971)).

### A   Injunctive Relief in Retaliation and Wrongful Termination Cases

131     Courts have long recognized that reinstatement is not always granted in retaliation and

wrongful termination cases, but where monetary damages alone are insufficient to remedy the

ongoing harm, temporary reinstatement is an appropriate form of injunctive relief. Courts have

granted reinstatement where financial collapse or continued harm from a wrongful termination is

ongoing and monetary damages would not fully compensate the plaintiff.

132     In EEOC v. Anchor Hocking Corp., 666 F.2d 1037, 1044 (6th Cir. 1981), the Sixth

Circuit emphasized that: *"While reinstatement is not mandatory in every case, courts may grant

interim reinstatement where the employer's wrongful actions create ongoing harm that cannot be

remedied solely through back pay or damages."*

133     Similarly, in Bonds v. Heyman, 950 F. Supp. 1202, 1210 (D.D.C. 1997), the court

granted preliminary injunctive relief for reinstatement in an employment retaliation case, holding

that: *"In cases where wrongful termination results in continued financial distress, loss of*

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
2025-02-13
Page # 53 of 58

*benefits, or inability to secure comparable employment, the balance of hardships favors*

*temporary reinstatement."*

134     Moreover, courts have acknowledged that retaliation cases involving disability

accommodations under the ADA or FMLA may require reinstatement to prevent ongoing

violations of federal law. In McFadden v. Sec'y of Veterans Affairs, 2010 WL 1734361, at *3

(D. Md. Apr. 27, 2010), the court stated: *"In circumstances where retaliation includes wrongful*

*denial of accommodations or ongoing violations of employment protections, reinstatement is an*

*appropriate remedy to restore the plaintiff to the status quo."*

### B    Reinstatement as a Means to Maintain the Status Quo

135     Plaintiff is not seeking monetary back pay as a retroactive TRO remedy, but rather a

temporary reinstatement of payroll status to maintain the status quo pending resolution of this

litigation. The Court's assertion that reinstatement would improperly alter the employment

relationship is incorrect because reinstatement in retaliation and discrimination cases is a

recognized remedy under employment law.

136     Further, in cases where wrongful termination is linked to financial and medical harm, the

standard for irreparable harm is met. Courts have recognized this in cases involving FMLA and

ADA violations where financial and health-related deterioration constitute ongoing harm that

cannot be compensated solely by damages. See Harris v. Blue Cross Blue Shield of Mo., 995

F.2d 877, 879 (8th Cir. 1993).

137     In light of this precedent, Plaintiff's request for temporary reinstatement aligns with

established principles of injunctive relief in employment retaliation cases and is necessary to

preserve the status quo until a final ruling on the merits.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 54 of 58
2025-02-13

## C  Interim Payment as Necessary Relief to Mitigate Irreparable Harm

55    Courts recognize that financial reinstatement alone does not restore the pre-termination status quo when prolonged hardship has compounded financial instability. In EEOC v. Wilson Metal Casket Co., 24 F.3d 836 (6th Cir. 1994), the court acknowledged that: *"Interim monetary relief is appropriate where wrongful employment actions cause cascading financial harm beyond the initial lost wages."... "Where an employer's wrongful action results in economic conditions that make reinstatement alone inadequate to restore the status quo, preliminary monetary relief may be required to prevent the continued erosion of the plaintiff's financial position."*

138    Delayed reinstatement does not remedy the secondary financial consequences of wrongful termination—such as default penalties, credit score collapse, and accumulating medical expenses—which cannot be reversed through back pay alone. Additionally, the longer Plaintiff remains in default, the more difficult it becomes to restore financial standing, further exacerbating the harm. Courts have recognized that continuing financial instability caused by wrongful termination can necessitate immediate interim relief.

139    Once financial harm has compounded through defaults, interest penalties, late fees, loss of credit access, and increased medical costs due to lack of income or benefits, simply restoring employment does not fully return the plaintiff to the status quo. Courts have held that when wrongful termination results in prolonged economic harm, additional relief may be necessary to mitigate further financial distress. The baseline conditions that existed before the unlawful employment action cannot be instantaneously restored through mere reinstatement.

140    In Kendall-Jackson Winery, Ltd. v. Branson, 82 Cal. Rptr. 2d 749, 762 (Cal. Ct. App. 1999), the court recognized that: *"A delay in restoring the status quo is itself a source of harm when financial instability compounds, leading to secondary losses such as default penalties, accrued interest, and damages that extend beyond the initial injury."*

141    Here, Plaintiff's suspension without pays on June 13, 2024, and subsequent termination

on July 30, 2024, resulted in severe financial consequences that reinstatement alone cannot

immediately undo. The impact of prolonged financial hardship—including defaults on essential

bills, interest accruals, late fees, increased borrowing costs, and medical expenses caused by the

employer's wrongful actions—extends beyond lost wages and continues to deteriorate Plaintiff's

financial and physical well-being.

142    Thus, interim financial relief is necessary to prevent further harm and to restore Plaintiff

to the position they would have occupied had the unlawful suspension and termination not

occurred. Failing to provide such relief would allow the economic injuries caused by the

employer's breach of the status quo to persist and worsen, directly contradicting the purpose of

injunctive relief.

## X  PRAYER FOR RELIEF

143    WHEREFORE, Plaintiff Ryan Dillon-Capps respectfully requests that this Court:

1.    Grant Reconsideration of the denial of Plaintiff's Emergency Motion for a

Temporary Restraining Order and Preliminary Injunction pursuant to Federal Rule of

Civil Procedure 59(e) and 60(b), in light of the misapprehension of key facts,

misapplication of legal standards, and substantial evidentiary support demonstrating

likelihood of success on the merits and irreparable harm;

2.    Schedule an Evidentiary Hearing to properly assess:

2.1    Plaintiff's likelihood of success on the merits of their FMLA, ADA, and

MWPCL claims,

2.2    The material factual disputes concerning Plaintiff's employment duration,

termination date, and procedural history in state court,

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
Page # 56 of 58
.    2025-02-13

2.3    The severity of Plaintiff's financial distress and medical emergency, constituting irreparable harm justifying immediate relief;

3.    Issue a Temporary Restraining Order and Preliminary Injunction, ordering that:

3.1    Defendant Ohana Growth Partners, LLC immediately reinstate Plaintiff's employment to preserve the status quo pending final resolution of this matter;

3.2    Defendant resume Plaintiff's payroll status, ensuring continued payment of wages and benefits until the resolution of the claims;

4.    Defendants are restrained from any further acts of retaliation against Plaintiff for exercising their rights under FMLA and ADA;

5.    Declare that Plaintiff has satisfied all procedural and evidentiary requirements under FRCP 65(b)(1) and applicable precedent, and that any delays in U.S. Marshals' service or procedural misunderstandings do not constitute grounds for denial of emergency relief;

6.    Grant Additional Financial and Reputational Protections:

6.1    Require Defendant Ohana Growth Partners, LLC to formally retract any statements related to Plaintiff's suspension and termination that may affect Plaintiff's employability or professional reputation.

6.2    Direct Defendant to provide a letter of continued employment verification for financial institutions to mitigate ongoing credit impacts of wrongful termination.

6.3    Grant injunctive relief ensuring Plaintiff remains eligible for employer-sponsored health coverage pending resolution of the case.

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary Injunction and Request for Expedited Review.
Page # 57 of 58

2025-02-13

7.    Grant such other and further relief as this Court deems just, proper, and equitable

in the interests of justice.

RESPECTFULLY SUBMITTED

February 13, 2025

/s/ Ryan Dillon-Capps
**Ryan Dillon-Capps**

1334 Maple Avenue
Essex, Maryland 21221
ryan@mxt3.com
703-303-1113

Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and preliminary
Injunction and Request for Expedited Review.
2025-02-13                                   Page # 58 of 58