# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RYAN DILLON-CAPPS | Civil Action |
| **Plaintiff,** | No. **1:24-CV-3744** |
| vs. | |
| OHANA GROWTH PARTNERS, LLC *et al* | Hon. **Judge Hurson** |
| **Defendants** | |

## AMENDED EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1    COMES NOW, Plaintiff Ryan Dillon-Capps, Propria Persona, and moves this Honorable Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for an Emergency Temporary Restraining Order ("TRO") and Preliminary Injunction against Defendants Ohana Growth Partners, LLC, et al.

2    Plaintiff is facing an immediate financial and medical emergency, directly caused by Defendants' unlawful actions, including wrongful termination, unpaid wages, and retaliatory legal tactics. Plaintiff has no remaining funds to cover basic living expenses and is at imminent risk of losing access to essential utilities, transportation, and food.

3    Given the urgent and irreparable harm Plaintiff faces, he respectfully requests an expedited ruling on this motion to prevent further damage to his financial, medical, and personal well-being.

4    Plaintiff acknowledges that the motion of the same intention was denied and understands that the Court may not accept this filing.  However, the Court has indicated that one of the defects was a lack of specific information and supporting evidence cited directly in the motion, and while it was not directly asked of the Plaintiff it was received as a directive to adjust the

manner to which the Plaintiff is filing his motions. It is in good faith and hope that the Court accepts this filing in concert with the request to reconsider because if the flaw that led to the misunderstanding was procedural then I hope that issue has been resolved. I accept that the filing could have been better presented, and it was not a mistake made with malintent.

5       In the future, I will provide citations in the motions, and if there are any bench rules or other procedural rules that are neglected then the Court only need to inform me of what is required. I acknowledge that I do not know the procedures, but I am very familiar with certain areas of the law. My case is not exaggerated, it is what it is because that is what happened. I have no control over what happened, and I can only state what happened and try to explain it the best I can. I do have control over myself to follow the rules and procedures that I am aware of, and I am appreciative of the opportunity to be heard because the supporting evidence is overwhelming.

6       Without oral arguments and questions being answered there is a substantial risk to there being a miscarriage of justice, but if my statements are accepted as true long enough for an evidentiary hearing on even this one motion then I believe that the Court will view the entire case differently than what is reflected in the memorandums and orders. Moreover, I believe that the Court will be filled with righteous indignation after the truth is understood and the individuals involves are seen clearly for who they are, what they did, and what they are going to continue to do to others.

7       I did everything I could to avoid being the Plaintiff in any lawsuit, I did everything right and exhausted all of my options, I gave the opposing parties every opportunity to resolve any and all issues, but they made their choices, and those choices were unlawful and have compelled me to be here.

## I  PROCEDURAL CLARITY & JURISDICTIONAL BASIS

8      This Court has jurisdiction under 28 U.S.C. § 1331 because this case arises under federal

law, including the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2615, and the

Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. Additionally, this Court has

supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367, including

claims under the Maryland Wage Payment and Collection Law (MWPCL), Md. Code, Lab. &

Empl. § 3-507.2(b).

9      Venue is proper in this Court under **28 U.S.C. § 1391(b)** because the events giving rise to

this claim occurred in **Maryland**, and Defendants conduct business in this District.

## II  THE PARTIES

10      Defendant Ohana Growth Partners, LLC is a Maryland limited liability company with its

principal place of business located at 212 West Padonia Road, Timonium, Baltimore County,

Maryland 21093. See ECF 23-1, at 2.

11      Plaintiff Ryan Dillon-Capps is a citizen of the State of Maryland who resides at 1334

Maple Avenue, Essex, Baltimore County, Maryland. See ECF 23-1, at 2.

## III  INCORPORATED BY REFERENCE

12      Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the arguments and

assertions contained in our federal filings are hereby incorporated by reference into this

submission as though fully set forth herein. This includes, but is not limited to, the Amended

Complaint filed on February 10, 2025, and docketed as ECF 26-0, along with all prior filings and

materials incorporated by reference therein. Notably, the Affidavit of Ryan Dillon-Capps

Amended Complaint Statement of Facts, docketed as 24-0.

13      Furthermore, it also includes the Plaintiff's Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and Preliminary Injunction and Request for Expedited Review, docketed as 28-0.

## IV  BACKGROUND

14      Ohana Growth Partners, LLC is a franchisee of Planet Fitness with Area Development Agreement (ADAs) rights in Washington, California, Tennessee, Florida, and Maryland. Formerly it also possessed the ADAs rights for District of Columbia.  They currently own and operate 83 franchised Planet Fitness health clubs with over 550,000 members in those jurisdictions.  On June 14, 2024, Ohana Growth Partners, LLC owned and operated 78 Planet Fitness locations with over 500,000 members. See ECF 23-1, at 2.

15      Ohana Growth Partners, LLC complaint filed on June 14, 2024, to the Circuit Court of Baltmore County, stated *"Ohana has 1,472 employees, 712 of whom live in Maryland."* See ECF 23-1, at 2.

16      Additionally, the state complaint stated *"Since February 10, 2020, Ryan Dillon-Capps (nee Wagner), the Defendant in the above-captioned matter ("Dillon-Capps"), has been employed by Ohana as its Vice President of Information Technology. On January 9, 2020, Ohana and Dillon-Capps executed an Employment and Non-Disclosure Agreement (the "Dillon-Capps Employment Agreement")."* See ECF 23-1, at 3.

17      On January 4, 2024, Ryan Dillon-Capps requested Family and Medical Leave (FMLA) via email at 12:24 PM.  The email was sent to Ohana's Vice President of Human Resources (See ECF 23-3, at 2), Ohana's CFO Glenn Norris (See ECF 23-3, at 2), Ohana's President Justin Drummond (See ECF 23-2), and Ohana's attorney Holly Butler from Miles and Stockbridge P.C. (See ECF 16-0, at 1 or ECF 16-3, at 1). The email says *"I am writing to inform you that I will be taking leave under the Family and Medical Leave Act (FMLA) for mental health reasons.  This*

2025-02-14

*letter is a follow-up to my email on 21 December 2023, in which I informed Glenn Norris, Justin Drummond, and Rich Hartman that I needed to take some time off. I asked for time off to recover, I asked for help, and I asked for some reprieve because the hostile work environment, excessive hours, and the investigation were negatively affecting me physically, emotionally, and mentally. This has not happened, and I have been experiencing daily panic attacks that sometimes last hours, severe anxiety, and every part of my life has been negatively affected."* See ECF 16-0, at 10

18    Ohana's HR Generalist Karen Debus provided the employer completed U.S. Department of Labor Wage and Hour Division Notice of Eligibility and Rights and Responsibilities under the Family and Medical Leave Act form WH-381 dated January 8, 2024. See ECF 16-3, at 4-8. The notice stated that Ryan Dillon-Capps was eligible for FMLA leave for Dillon-Capps own serious health condition, and states Ohana Growth Partners, LLC learned about the need for leave under the FMLA on January 4, 2024.  See ECF 16-3, at 4.

19    Form WH-381 also stated that Ohana Growth Partners, LLC was requesting the leave be supported by a certification from the Plaintiff's health care provider.  See ECF 16-3, at 5. Additionally, the form stated  *"[Ryan Dillon-Capps is] considered a key employee and defined under the FMLA.  [Ryan Dillon-Capps] leave cannot be denied for this reason."* See ECF 16-3, at 6.

20    Ohana Growth Partners, LLC provided the employer completed portion of U.S. Department of Labor Wage and Hour Division Certification of Health Care Provider for Employee's Serious Health Condition under the Family and Medical Leave Act form WH-380-E, and Plaintiff's health care provider completed the health care provider portion on January 22, 2024, and then recertified on March 12, 2024. See ECF 16-3, at 13, 21.

21      A letter from the Plaintiff's diagnosing health care professional Maguy Destin-Jeanty, MD, dated November 13, 2013, states "*physical symptoms … are episodic and recurring; they impair his major life activities when they are active.  [Ryan Dillon-Capps] has, in the last few weeks, experienced an increase in active symptoms, resulting in Ryan requiring additional treatment sessions and emergency medical care… Given the nature of his mental impairments, [Ryan Dillon-Capps] needs reasonable accommodations under the ADA or the Rehabilitation Act of 1990 and its subsequent 2008 amendment.*" See ECF 16-3, at 22.

22      In December 2013, Ryan Dillon-Capps acquired a service dog which completed specialized training in April of 2014. See ECF 16-3, at 3.  From April 2014 until October 2019, the Plaintiff's relied on his service dog, Bumi, 24/7.  In October 2019, Ryan Dillon-Capps began transitioning away from requiring Bumi full time, and by the time Ryan Dillon-Capps moved to Maryland to started work for Ohana Growth Partners, LLC in February 2020 he was able to function throughout the workday without his service dog.

23      By the time COVID restrictions were being lifted more broadly in 2021, Ryan Dillon-Capps was able to travel for work without his service dog.  When Bumi passed away in December 2022, Ryan Dillon-Capps was no longer in need of a service dog, medication, or regular treatment sessions.

24      Ryan Dillon-Capps success at work had resulted in Ohana Growth Partners, LLC IT Department successfully achieving all desired supported metrics for the first time in the company's history.  The Plaintiff and Glenn Norris had been actively negotiating the terms of his promotion to the C-suite.  Other C-level executives had already been notified of the pending promotion and other employees knew that Ryan Dillon-Capps and the IT Department were about to be taking on more responsibility for the company.

25    All that changed after October 16, 2024, when Ryan Dillon-Capps discovered accounting irregularities and reported it to Glenn Norris, and days before Christmas 2023 Ryan Dillon-Capps requested time off with a request for a 3rd party investigator to investigate two separate fraudulent discoveries.  Holly Butler of Miles & Stockbridge P.C. was identified by Justin Drummond and herself as being that 3rd party investigator. *"Good morning, Mr. Wagner. My name is Holly Butler; I am an attorney with the law firm of Miles & Stockbridge. I have been engaged by [Ohana] Growth Partners to conduct an independent investigation relating to your recent allegations regarding potential violations of the law."* See ECF 16-0, at 1.

26    Plaintiff's health care provider stated on the FMLA form that the permanent and chronic condition started on May 15, 2013.  See ECF 16-3, at 11. The health care provider described the medical facts related to the condition as *"[Ryan Dillon-Capps] experiences frequent intense panic attacks, severe anxiety, and agoraphobia.  These episodes are particularly triggered by specific workplace stressors, including direct contract with certain individuals at work.  The condition varies in frequency and intensity, leading to intermittent incapacitation that prevents [Ryan Dillon-Capps] from working or performing regular daily activities during episodes. [Ryan Dillon-Capps] undergoes ongoing psychotherapy and medication management as part of the treatment plan.  Due to the unpredictable nature of these episodes, [Ryan Dillon-Capps] ability to work is intermittently impacted necessitating periods of FMLA leave for recovery."* See ECF 16-3, at 20.

27    Plaintiff's health care provider goes on to state *"Despite these treatments, [Ryan Dillon-Capps] experiences episodes of incapacitation that are unpredictable and significantly impair his work ability.  These episodes are particularly exacerbated by the hostile interactions and environment in his workplace…. Working from home is essential to mitigate the impact of the*

*hostile workplace triggers and manage his panic attacks and agoraphobia"* See ECF 16-3, at 20. Additionally, the health care provider stated that as part of essential job functions that *"working from home becomes a necessary reasonable accommodation."* See ECF 16-3, at 21.

28      Richard Hartman requested additional information from the health care provider, and the health care provider responded via a letter dated January 31, 2024.  The letter stated *"the intermittent FMLA leave is specifically for flare-ups as described. Ryan does not require a consistently reduced work schedule each week.  His work capacity is directly affected by these episodic flare-ups, during which he is unable to work."* See ECF 16-3, at 17.

29      Richard Hartman and Glenn Norris continued to create a hostile work environment and escalating the harassment, retaliation, and interference through out 2024.  At the end of May 2024, the pretext for the state civil action began with coercive threats from Richard Hartman, Glenn Norris, and Victor Brick to create the illusion of Ryan Dillon-Capps refusing to comply with Ohana Growth Partners, LLC.

30      Richard Hartman and Glenn Norris levied their position to enlist others into contributing to their retaliatory efforts, some of them had no idea what they were doing.  Their retaliatory harassment against me were also directed against other members of the IT Department including Darren Koritzka and members of the Help Desk, and during the weeks leading up to June 13, 2024, had become an endless barrage that required endless vigilance from Ryan Dillon-Capps to redirect their efforts back toward himself and shield the other employees as much as possible.

31      At this time, Justin Drummond was not fully aware that Richard Hartman and Glenn Norris actions were intentionally obtuse and obstructive to create the pretext, and on June 7, 2024, Ryan Dillon-Capps reached out to Justin Drummond via text message to facilitate Justin Drummond previous request to receive Global Administrator access.

32    Away from Glenn Norris and Richard Hartman in a private text message the President of

Ohana Growth Partners, Justin Drummond, agreed to receive Global Administrator access the

following week on June 10-11th.  See ECF 16-0, at 42-44.  This is often referenced in the filings

as the written accord of June 7, 2024.

33    However, Justin Drummond did not satisfy the accord and receive Global Administrative

access, and instead mislead the Plaintiff into believing that he would satisfy the accord and

receive access one week later.  Justin Drummond, then becomes an active participant in the

pretext and played a critical role on June 13, 2024, then filed an affidavit on June 14, 2024, lying

about the Plaintiff and misrepresenting other material facts to the state court.

    1.    Justin Drummond stated that Ryan Dillon-Capps was refusing to grant him

access: *"Dillon-Capps refused to instate [Global Administrator] rights to the Ohana MS

365 Account to Ohana's President."* See ECF 23-6, at 1.

    2.    Justin Drummond stated he directed Richard Hartman to send the 9 AM demand

to work letter, 2 hours after receiving notice of the Plaintiff's intent to use FMLA leave

that day. See ECF 23-6, at 2. The 7:12 AM email notifying Glenn Norris, Richard

Hartman, and Justin Drummond is ECF 16-0, at 14 and it explicitly states *"this is*

*FMLA"* when referencing the previous paragraph *"I am going to be out for a few hours*

*today and not sure when I will be back on. It depends on how well things go today."*  The

Richard Hartman, 9 AM email clearly stated that Glenn Norris directed Richard

Hartman's actions not Justin Drummond: *"Glenn has signed an agreement on behalf of*

*OGP with Hartman Executive Advisors (HEA) and demands that you add Phil Leadore*

*from HEA as a Global Administrator by 3 pm today."* See ECF 23-5, at 14.

3.       Justin Drummond stated, *"nor has Dillon-Capps complied with the directive to add Phil Leodore from HEA as a Global Administrator on Ohana's Microsoft 365 account."* See ECF 23-6, at 3.  However, Justin Drummond was in direct communication with the Plaintiff for hours on June 13, 2024.  The Plaintiff informed the company president that he had emailed Phil Leadore: *"I will forward you the email… two emails sent"* (See ECF 48, at 16-0), was waiting on a response: *"they won't response"* (See ECF 16-0, at 48), and was eager to provide Mr. Leadore access: *"I wish they would…I want them to be backup right now"* (See ECF 16-0, at 48).  Justin Drummond told the Plaintiff on June 13 *"we will update you shortly"* and *"as stated before we are working with professionals and will be in touch"* (See ECF 16-0, at 56) and the Plaintiff was told by Justin Drummond to *"please stop with all these texts"* (See ECF 16-0, at 60).  That was the last message received from Justin Drummond at 5:18 PM until 4 hours later when the Plaintiff was suspended in complete contradiction to the entire day and the multi-hour conversation with Justin Drummond.

4.       Justin Drummond stated *"Ohana believes that, in the absence of a Court Order directing Dillon-Capps to immediately provide the Global Administrator rights to Phil Leadore there is a significant risk that Dillon-Capps will take action to disrupt Ohana's software systems and business operations and to destroy or corrupt Ohana's data."* See ECF 23-6, at 4.  Ryan Dillon-Capps was the one had discovered that while he was away for his wedding the safeguards that he setup to protect Ohana's data, including financial data, had been disabled.  In response, Ryan Dillon-Capps re-enabled those safeguards and then enabled additional safeguards to prevent tampering.  Those safeguards expired at the beginning of November 2024, and the state court granted Ohana's voluntary dismissal of

their own lawsuit on November 2, 2024, and it was docketed on November 6th. See ECF 16-5, at 55. The Plaintiff had stated in his filings that the safeguards would expire at this time many times during the state court proceedings.

5.      Justin Drummond stated, *"So long as Dillon-Capps continues to hold exclusive Global Admin rights to the Ohana MS 365 Account, and by extension Ohana's employee email accounts and data, those accounts and data are vulnerable to disruption by Dillon-Capps."* See ECF 23-6. Justin Drummond was the one who prevented satisfaction, and he intentionally acted to prevent himself from having access only days before. Never once on June 13, 2024, did Justin Drummond ask for access, and every effort was made by the Plaintiff to provide access to Phil Leadore. Moreover, Ohana's Help Desk had sufficient access to obtain access to multiple accounts with the Global Administrator role, and therefore at no point did Ohana lack the ability to self-remedy the pretext and they did exactly that – requiring no assistance from Ryan Dillon-Capps. *"Ohana has succeeded in regaining Global Admin rights in its Microsoft 365 tenant and has disabled access via your account"* See ECF 24-0, at 32.

34    For more information about Ohana's documented self-remedy, more perjured statements, and other violations of the law from Ohana Growth Partners and Miles & Stockbridge P.C. see the Affidavit of Ryan Dillon-Capps Amended Complaint statement of Facts (ECF 24-0).

35    Ohana Growth Partners, LLC interfered with Ryan Dillon-Capps FMLA leave on June 13, 2024, and in the June 13, 2024, 9 AM letter where they demanded Ryan Dillon-Capps work instead of take FMLA leave Richard Hartman declares *"Your communication yesterday about your need for FMLA time off, to which you are entitled"* See ECF 23-5, at 14. Richard Hartman inadvertently admits to intentionally violating Ryan Dillon-Capps FMLA leave on June 13 in his

June 14, 2024, affidavit "retaliation against Dillon-Capps for requesting family and medical leave." See ECF 23-5, at 4. Furthermore, Lead Counsel for the civil action, Robert Brennen, tells Judge Barranco on June 26th under oath *"The facts, which are established in the record that's already before the Court, and I don't think there's any dispute of it is, this concept that the -- a demand was made to, uh, the defendant on June 13th, an hour after he'd asked for -- for FMLA leave, uh, and we're forcing him to work".* See ECF 23-11, at 48.

36      On June 18, 2024, Ryan Dillon-Capps informed Robert Brennen *"I am doing the best I*

37      *can, and technically since I said I would tell them when I was back, my FMLA leave is*

*still active. If they believe something else to be true, please inform [Ohana] that as a result of the escalated hostility, I will be on FMLA leave until further notice."* See ECF 16-0, at 123.

38      Ryan Dillon-Capps unpaid suspension began on June 13, 2024. See ECF 16-0, at 120. Ohana Growth Partners, LLC terminated Ryan Dillon-Capps employment while he was still on FMLA leave with unused FMLA leave still available on July 30, 2024. See ECF 16-0, at 142.

39      Ryan Dillon-Capps successfully defended themselves in the state court with no final judgements made for or against any of his claims. Moreover, Judge Barranco remanded the Plaintiff to federal court "if you have a federal claim, assuming they're violating the law, I'm making no such finding, fine, you can pursue that claim either administratively or -- or by law. You can go down to federal court." See ECF 23-11, at 56.

40      On December 27, 2024, Ryan Dillon-Capps filed the remanded case from state court to the U.S. District Court for the District of Maryland. See ECF 1-0.

## V   CERTIFICATE OF NOTICES

41      Pursuant to Federal Rule of Civil Procedure 65(b)(1), Plaintiff states that Ryan Dillon-Capps has attempted to notify Defendants of this lawsuit, intent to seek injunctive relief, and intent to seek judgement. Please note that ECF 16-13 has a clerical error where the by pages are

incorrectly sorted.  Page 29-65 then 1-28.  The citations below are the current court record citation in the incorrect sorting order.

1.      Request for Prehearing Conference to Discuss Injunctive Relief was filed to the Circuit Court of Baltimore County on November 1, 2024, at 8:43 PM in envelope 18662858.  A copy of the request was emailed to their counsel rbrennen@milesstockbridge.com and served on via first-class, postage paid to Robert S. Brennen Miles & Stockbridge P.C. 100 Light Street Baltimore Maryland 21202. The request says *"**Purpose of Conference:** A prehearing conference would provide the opportunity to discuss all issues related to injunctive relief that has already been filed, as well as additional injunctive relief that may be sought. This would allow the Court and the parties to clarify the scope of relief in question , ensuring both fairness and procedural efficiency. **Judicial Efficiency and Reduced Future Litigation:** This request is made in the interest of judicial economy and efficiency. Despite efforts to engage in good-faith negotiations on matters concerning both current and potential litigation, attempts to resolve these issues outside of court have been ignored or not responded to in good faith by opposing counsel. By holding a prehearing conference, the Court can streamline the process and reduce the need for future litigation steps on these matters, as key issues will already have been addressed. **Opportunity for Resolution:** The prehearing conference may also facilitate constructive dialogue between the parties, potentially leading to an agreement on aspects of injunctive relief. Such a discussion could narrow the issues in dispute and address any concerns in advance, thus minimizing further litigation."* Among other legal violations, FMLA and ADA are specifically cited. See ECF 16-13, at 38-44.

2.      Motion to Preserve Court Records was filed to the Circuit Court of Baltimore County on November 7, 2024, at 11:42 AM in envelope 18716089. A copy of the motion was emailed to their counsel rbrennen@milesstockbridge.com and served on via first-class, postage paid to Robert S. Brennen Miles & Stockbridge P.C. 100 Light Street Baltimore Maryland 21202.  The motion says *"[I intent] to pursue related claims in the United States District Court for the District of Maryland."*  See ECF 16-13, at 34-37.

3.      Request for Mandatory Judicial Notice Hearing on Material Facts was filed to the Circuit Court of Baltimore County on November 1, 2024, at 9:18 AN in envelope 18649236. A copy of the motion was emailed to their counsel rbrennen@milesstockbridge.com and served on via first-class, postage paid to Robert S. Brennen Miles & Stockbridge P.C. 100 Light Street Baltimore Maryland 21202.  In addition to providing notice of my request seeking Judicial Notice of Facts of the case and controversy, I was also seeking to have the facts adjudicated in connection with my "health and mental wellbeing", "career harm", and "financial harm" See ECF 16-13, at 45-52.

4.      Motion for Directed Verdict was filed to the Circuit Court  of Baltimore County on November 1, 2024, at 9:18 AM in envelope 18649236. A copy of the motion was emailed to their counsel rbrennen@milesstockbridge.com and served on via first-class, postage paid to Robert S. Brennen Miles & Stockbridge P.C. 100 Light Street Baltimore Maryland 21202. This motion gave notice that I was seeking judgement as a matter of law on my counterclaims which are now before this Honorable Court. See ECF 16-13, at 53-65, 1-13.

2025-02-14

## VI  LEGAL STANDARD FOR EMERGENCY INJUNCTIVE RELIEF

42    To obtain a Temporary Restraining Order (TRO) and Preliminary Injunction, Plaintiff

must demonstrate:

1.    A likelihood of success on the merits

2.    Irreparable harm in the absence of relief

3.    The balance of hardships favors Plaintiff

4.    The injunction serves the public interest (Winter v. Nat. Res. Def. Council, Inc.,

555 U.S. 7, 20 (2008)).

## VII  ARGUMENT

### A  Plaintiff is Likely to Succeed on the Merits

43    Plaintiff has provided the court over 2000 pages of overwhelming evidence, and it is

including of overwhelming evidence Ryan Dillon-Capps was:

1.    Intentionally and maliciously retaliated against for exercising FMLA rights – in

violation of 29 U.S.C. § 2615(a)(1). Courts have held that termination after requesting

FMLA leave is strong evidence of retaliation. See Vannoy v. Fed. Reserve Bank of

Richmond, 827 F.3d 296, 304 (4th Cir. 2016) (finding FMLA retaliation where adverse

action followed an FMLA request).

2.    Wrongfully denied reasonable accommodations under the ADA – in violation of

42 U.S.C. § 12112(b)(5)(A). See EEOC v. GMRI, Inc., 221 F. Supp. 3d 1314 (M.D. Fla.

2016) (holding that failure to accommodate a known disability is actionable).

3.    Owed wages under Maryland law – Courts have held that Maryland's Wage

Payment and Collection Law allows treble damages where an employer willfully

withholds wages. See Adams v. Citicorp Credit Servs., Inc., 93 F. App'x 515, 517 (4th

Cir. 2004).

44    These claims substantiate Plaintiff's likelihood of success on the merits and justify injunctive relief.

B    <u>Plaintiff Will Suffer Irreparable Harm Without Relief</u>

45    Plaintiff's financial crisis has now reached a **critical and unsustainable level**, making immediate injunctive relief necessary:

1.    **Credit Rating Collapse:** Plaintiff's financial stability has deteriorated catastrophically due to Defendants' actions. As of June 7, 2024, Plaintiff's credit score was 746 (Equifax) and 741 (TransUnion) as of May 24, 2024 (ECF 16-7, at 133).

2.    As of early October 2024, Plaintiff's credit report showed no derogatory remarks, only one hard inquiry, and a 100% payment history (ECF 16-7, at 132). However, after Defendants wrongfully terminated Plaintiff and withheld his wages, his credit rating collapsed to 389 as of February 6, 2025, preventing him from obtaining loans or credit to sustain himself.



3.    Extensive documentation of Plaintiff's financial harm, including credit score declines, default notices, and overdue account statements, is already on the record at ECF

16-7, at 132-198. Additionally, a newly attached exhibit provides a current credit score screenshot, reflecting Plaintiff's worsening financial condition.

4.     **Bank Account in Jeopardy:** Plaintiff's Bank of America account is overdrawn, and the bank has informed him that if it is not brought to a positive balance, the account will be closed—leaving Plaintiff without access to banking services.

**5.     Credit Card Accounts Closed or Restricted:**

5.1     Primary Chase credit card account has been closed, eliminating a key financial resource.

5.2     Venmo credit card has reduced Plaintiff's available credit by two-thirds (⅔), further limiting his ability to cover essential expenses.

6.     No other available credit or line of credit remains accessible.

7.     **Past Due on All Essential Bills:** Plaintiff cannot pay for his mobile phone, utilities, email services, or car payment, and risks losing access to communication, transportation, and critical online services.  The lender for the car has recently notified the Plaintiff that they will seek to reposes the vehicle as soon as next week, and the Dillon-Capps household is barely meeting food needs with that not lasting much longer. Utilities are months overdue and will likely be turned off when the cold weather restrictions end.  Mobile phones, of which are inclusive of the Plaintiff's elderly mother and disabled brother's service, are overdue and could be disconnected any day.

46     With no financial resources, no access to credit, and imminent loss of banking services, Plaintiff faces irreversible financial collapse, loss of essential utilities, and an inability to afford food and necessities. The urgency of this crisis necessitates immediate intervention from this Court.

47    These **facts meet the federal standard for irreparable harm because:**

1.    **Financial ruin qualifies as irreparable harm when it leads to an inability to sustain**

       **basic needs.** Courts have found that **loss of essential financial resources justifies**

       **emergency injunctive relief**. See *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975)

       (holding that financial devastation can constitute irreparable harm).

2.    **Loss of healthcare coverage is an independent ground for irreparable harm.** See

       *Harris v. Blue Cross Blue Shield of Mo.*, 995 F.2d 877, 879 (8th Cir. 1993) (finding that

       loss of health insurance coverage constitutes irreparable harm warranting injunctive

       relief).

3.    **Delaying relief would make later compensation ineffective.** Courts recognize that

       **waiting for a final judgment is not an option when a plaintiff faces immediate**

       **financial ruin.** See *Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 90-91 (2d Cir. 1983) (finding

       irreparable harm when delay would cause significant personal financial hardship).

48    **Plaintiff's case meets all of these criteria.** Without immediate court intervention,

Plaintiff will suffer **irreversible financial and medical harm that money alone cannot**

**remedy later.**

## C    The Balance of Hardships Favors Plaintiff

1.    Defendants face no hardship in complying with an order to restore wages and

       benefits owed.

2.    Plaintiff, however, faces total financial collapse and medical deterioration.

49    Courts have held that when the hardship on the plaintiff outweighs any inconvenience to

the defendant, injunctive relief is appropriate. See Blackwelder Furniture Co. of Statesville v.

Seilig Mfg. Co., 550 F.2d 189, 196 (4th Cir. 1977) (holding that balance of hardships is the 'most important factor' in granting preliminary injunctive relief).

## D   The Injunction Serves the Public Interest

1.      Granting relief will uphold labor and employment laws and prevent retaliation against employees for asserting their rights.

2.      Denying relief rewards illegal corporate misconduct and allows intentional financial destruction of an individual through abusive legal tactics.

3.      **Immediate relief is necessary** because delaying relief for the notice process would cause **irreparable harm**, including further credit damage, eviction risk, and medical consequences.

4.      **Plaintiff requests that the Court waive the notice requirement** or set an expedited hearing at the earliest possible date.

## VIII   CONCLUSION & REQUESTED RELIEF

50      Plaintiff has met all legal criteria for emergency injunctive relief and faces **imminent, irreparable harm** if relief is not granted to restore the status quo and prevent further harm. Plaintiff is seeking restoration to the status quo before they unlawfully denied use of his leave and pay, and then forced him to litigate the defense of a fraudulent case for several months.  The Defendants knew Ryan Dillon-Capps was at risk of worsening his health because Ryan Dillon-Capps told Glenn Norris and Justin Drummond days before of his declining health from the hostile and retaliatory abuse they were intentionally inflicting.

51      The Defendants knew Ryan Dillon-Capps was facing default after the first few months of litigation because he said it many times in the state filings, and they intentionally kept the lawsuit going to worsen his financial situation.  Ohana Growth Partners, LLC, through Miles &

Stockbridge, notified the state court they had full access to everything in July.  Financial default

was raised in September as a future concern and evidence of default was provided at the start of

October, and Ryan Dillon-Capps has yet to be reimbursed for even costs.  They withheld and

then forged dates on insurance paperwork to prevent the Plaintiff from having an opportunity to

continue coverage.

52      In short, Ohana Growth Partners, LLC did everything they could to ensure that Ryan

Dillon-Capps would be exactly where he is today.  Dealing with a medical emergency to which

the Plaintiff has no way to seek treatment, in financial ruin, and his career reputation damaged to

prevent employment opportunities.

53      Simply reinstating employment will not even halt the ongoing harm let alone restore the

status quo.  Additional arguments and legal basis supporting this relief can be found in Plaintiff's

Emergency Motion for Reconsideration of Denial of Temporary Restraining Order and

Preliminary Injunction and Request for Expedited Review, docketed as ECF 28-0.

54      Accordingly, Plaintiff respectfully requests this Court to issue a Temporary Restraining

Order and Preliminary Injunction, ordering Defendants to:

   1.      Immediately reinstate Plaintiff to active payroll at the post-2024 raise salary level,

   including full salary payments beginning from the date of this Court's order and

   continuing until this matter is resolved, as required under the terms outlined in Plaintiff's

   2022 and 2023 employment agreements (ECF 16-2, at 183-184).

      1.1    2022 to 2023 Compensation Increases:

         (A)    Base Salary: Increased from $124,120.00 (2022) → $136,532.00

         (2023) (+10.00%).

(B)    Monthly Bonus: Increased from $1,000.00 (2022) → $1,100.00

(2023) (+10.00%).

(C)    Annual Bonus: Increased from $6,000.00 (2022) → $12,000.00

(2023) (+100.00%).

(D)    Phone/Internet Reimbursement: Maintained at $150.00/month.

1.2    Applying the same percentage increase from 2023 to estimate 2024

compensation:

(A)    Base Salary: Increased from $136,532.00 (2023) → $150,185.20

(2024) (+10.00%).

(B)    Monthly Bonus: Increased from $1,100.00 (2023) → $1,210.00

(2024) (+10.00%).

(C)    Annual Bonus: Increased from $12,000.00 (2023) → $24,000.00

(2024) (+100.00%).

(D)    Phone/Internet Reimbursement: Maintained at $150.00/month.

1.3    Biweekly Pay (24 Pay Periods per Year): $6,257.72 per pay period

1.4    Monthly Pay (12 Months per Year): $12,515.43 per month

2.    Provide back pay from the date of termination through the present, including

wages, bonuses, and reimbursements, to be paid in full within **[3] business days** of this

Court's order, including:

2.1    Base Salary Back Pay (June 13, 2024 – February 6, 2025, 8 Months:

$100,123.44

2.2    Bonuses & Reimbursements Back Pay:

2.3    Monthly Bonus: $9,680.00

2.4     Annual Bonus (Pro-Rated for 8 Months, up to $24,000.00/year):

$16,000.00

2.5     Phone/Internet Reimbursement: 1,200.00

2.6     Total Back Pay (Before Interest & Penalties): 127,003.44

2.7     Interest on Unpaid Wages (6% Annual for 8 Months): $5,080.14

3.     Statutory Damages:

3.1     FMLA Liquidated Damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii)

(2× Wages Owed): $254,006.88

3.2     Maryland Treble Damages pursuant to Maryland Wage Payment and

Collection Law (MWPCL), Md. Code, Lab. & Empl. § 3-507.2(b)  (3× Wages

Owed, If Granted by Court): $381,010.32

4.     Restore all of Plaintiff's insurance policies:

4.1     Including health, dental, vision, and life insurance, with full coverage as

previously provided by Ohana Growth Partners (ECF 16-2, at 183-184).

5.     Reinstate all employment benefits, including:

5.1     Retirement plan contributions (401(k) and related benefits.

5.2     Stock options or financial incentives Plaintiff would have received had he

remained employed.

5.3     Other employment-related benefits outlined in the associate handbook

(ECF 16-2, at 183-184).

6.     Cease all coercive legal and financial actions, including any further interference

with Plaintiff's wages, credit, or financial stability, until this matter is fully litigated.

55      Additionally, Plaintiff respectfully requests that the Court set an expedited hearing on this

motion due to the severe and immediate financial harm Plaintiff is suffering.

IX   PRAYER FOR RELIEF

56      WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

1.      Issue a Temporary Restraining Order and Preliminary Injunction, ordering

Defendants to:

1.1      Immediately reinstate Plaintiff to active payroll at the post-2024 raise

salary level, including full salary payments beginning from the date of this

Court's order and continuing until this matter is resolved, as required under the

terms outlined in Plaintiff's 2022 and 2023 employment agreements (ECF 16-2, at

183-184).

1.2      Provide back pay from June 13, 2024, through the present, including:

(A)      Base salary: $150,185.20 annual salary, pro-rated for the period of

nonpayment.

(B)      Monthly bonus: $1,210.00 per month, pro-rated accordingly.

(C)      Annual bonus: $24,000.00 per year, pro-rated accordingly.

(D)      Phone/Internet reimbursement: $150.00 per month.

1.3      Restore all of Plaintiff's insurance policies, including health, dental,

vision, and life insurance, with full coverage as previously provided by Ohana

Growth Partners (ECF 16-2, at 183-184).

1.4      Reinstate all employment benefits, including:

(A)      Retirement plan contributions (401(k) and related benefits

(B)      All financial incentives Plaintiff would have received had he

remained employed.

(C)    Other employment-related benefits outlined in the associate

handbook.

1.5    Cease all coercive legal and financial actions, including any further

interference with Plaintiff's wages, credit, or financial stability, until this matter is

fully litigated.

2.    Award back pay, interest, and statutory damages as follows:

2.1    Back pay for unpaid wages, bonuses, and reimbursements: $127,003.44

2.2    Interest on unpaid wages (6% annual, applied monthly for 8 months):

$5,080.14

3.    Statutory Damages (Court to Award the Higher Applicable Remedy):

3.1    FMLA Liquidated Damages (Double Wages Owed) pursuant to 29 U.S.C.

§ 2617(a)(1)(A)(iii): $254,006.88, unless Defendants demonstrate a good-faith

justification for their FMLA violations.

3.2    Alternatively, if Maryland law provides a stronger remedy, Treble

Damages (3× Wages Owed) under Md. Code, Lab. & Empl. § 3-507.2(b):

$381,010.32.

Plaintiff requests that the Court award the statutory remedy that provides the

greatest relief, as permitted under applicable federal or state law.

4.    Set an expedited hearing on this motion due to the severe and immediate financial

harm Plaintiff is suffering.

5.    **Issue an anti-retaliation order** barring Defendants from taking **any adverse**

**action** against Plaintiff for pursuing this lawsuit.

6.     **Order Defendants to preserve all evidence** relevant to this case, including

emails, payroll records, personnel files, and internal communications.

7.     Grant such other relief as this Court deems just and proper.

<u>RESPECTFULLY SUBMITTED</u>

**February 14, 2025**

/s/ Ryan Dillon-Capps

**Ryan Dillon-Capps**

1334 Maple Avenue
Essex, Maryland 21221
ryan@mxt3.com
703-303-1113